**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| BANK OF NEW YORK MELLON CORP. | ) | 12 MD 2335 (LAK) |
| FOREX TRANSACTIONS LITIGATION | ) | |
| | ) | ECF Case |
| This Document Relates to: | ) | |
| | ) | |
| *In re Bank of New York Mellon Corp. False Claims* | ) | 12 Civ. 03064 (LAK) |
| *Act Foreign Exchange Litigation* | ) | |
| | ) | |

**OPPOSITION OF THE BANK OF NEW YORK MELLON**
**TO LOS ANGELES DEPARTMENT OF WATER & POWER RETIREMENT PLAN'S**
**AND FX ANALYTICS' MOTIONS FOR LEAVE**
**TO FILE A FOURTH AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 2

    A.    BNYM's Custodial and Foreign Exchange Services ................................ 2

    B.    BNYM's Standing Instruction Service ...................................................... 4

    C.    The Funds' Payments to BNYM ............................................................... 5

    D.    Procedural History ................................................................................... 7

    E.    The Proposed Fourth Amended Complaints ........................................... 10

ARGUMENT ...................................................................................................... 12

    I.    Plaintiffs' Proposed Allegations About BNYM's Monthly Invoices
        Reflect Bad Faith ..................................................................................... 12

    II.    Plaintiffs' Remaining Proposed Allegations and Claims Are Futile ................... 20

    A.    Plaintiffs' Proposed Allegations that BNYM's Accounting Reports
        Were CFCA "Claims" Are Futile ........................................................... 20

    B.    Plaintiffs' Proposed Claim that BNYM Violated CFCA Subsection
        (a)(4) Is Futile (Count III) ...................................................................... 23

    C.    Plaintiffs' Proposed Claim that BNYM Violated Subsection (a)(7)
        of CFCA Is Futile (Count IV) ................................................................. 25

CONCLUSION ................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Contract Servs. v. Allied Mold & Die, Inc.*, 94 Cal. App. 4th 854 (2001) ...................24

*Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162 (2d Cir. 2012)..............................20

*Daewoo Eng'g & Constr. Co. v. United States*, 73 Fed. Cl. 547 (2006), *aff'd*, 557 F.3d 1332 (Fed. Cir. 2009)........................................................................................................14

*Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978) .................................................................19

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83 (2d Cir. 2002) ..........20

*Evangelatos v. Superior Court*, 753 P.2d 585 (Cal. 1988) ............................................................24

*Felton v. Walston & Co.*, 508 F.2d 577 (2d Cir. 1974) ................................................................18

*Industrial Assets, Inc. v. Capital Equip. Sales Co.*, No. 96-1737, 1997 WL 359061 (6th Cir. Jun. 26, 1997) ........................................................................................................18

*Lee v. Regal Cruises, Ltd.*, 916 F. Supp. 300 (S.D.N.Y. 1996), *aff'd*, 116 F.3d 465 (2d Cir. 1997)................................................................................................1, 13, 14, 17

*Mooney v. Vitolo*, 435 F.2d 838 (2d Cir. 1970) ........................................................................18

*Pallottino v. City of Rio Rancho*, 31 F.3d 1023 (10th Cir. 1994) .................................................18

*Parmalat Sec. Litig., In re*, 501 F. Supp. 2d 560 (S.D.N.Y. 2007), *aff'd sub nom. Pappas v. Bank of Am. Corp.*, 309 F. App'x 536 (2d Cir. 2009).........................................12, 13, 18

*Poindexter v. EMI Record Group, Inc.*, No. 11 Civ. 559 LTS JLC, 2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012) ...............................................................................................4

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230 (2d Cir. 1995) ......................................13

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)..........................................................................3

*Royal Ins. Co. of Am. v. Southwest Marine*, 194 F.3d 1009 (9th Cir. 1999) ...............................18

*San Francisco Unified Sch. Dist. ex rel. Contreras v. Laidlaw Transit, Inc.*, 182 Cal. App. 4th 438 (2010)...............................................................................................................24

*State ex rel. Bowen v. Bank of Am. Corp.*, 126 Cal. App. 4th 225 (2005)....................................25

*State ex rel. McCann v. Bank of Am.*, 191 Cal. App. 4th 897 (2011) ............................................25

*Sulton v. Wright*, 65 F. Supp. 2d 292 (S.D.N.Y. 2003) ....................................................................4

*United States v. Neifert-White Co.*, 390 U.S. 228, 88 S. Ct. 959 (1968) ....................................22

*United States v. Rivera*, 55 F.3d 703 (1st Cir. 1995) ....................................................................14

*United States ex rel. Aakhus v. Dyncorp., Inc.*, 136 F.3d 676 (10th Cir. 1998) ........................23

*United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28
    (D.D.C. 2003) ............................................................................................................................23

*United States ex rel. S. Prawer & Co. v. Verrill & Dana*, 946 F. Supp. 87 (D. Me. 1996)..........26

*United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196 (D.C. Cir. 1995)..........22

*Vine v. Beneficial Fin. Co.*, 374 F.2d 627 (2d Cir. 1967) .......................................................17, 19

*Wimm v. Jack Eckerd Corp.*, 3 F.3d 137 (5th Cir. 1993)..................................................16, 17, 18

**Statutes and Rules**

Fed. R. Civ. P. 9(b) ......................................................................................................................2, 26

Fed. R. Civ. P. 15(a)(2) ..............................................................................................................12, 18

Cal. Const. art. 4, § 8(c)(1) ............................................................................................................23

2009 Cal. Legis. Serv. ch. 277 ......................................................................................................23

California False Claims Act, Cal. Gov't Code § 12650 *et seq.* .......................................................1

    Cal. Gov't Code § 12650(1)....................................................................................................20

    Cal. Gov't Code § 12651(a) (2009) ........................................................................................15

    Cal. Gov't Code § 12651(a)(1) .......................................................................................1, 11, 20

    Cal. Gov't Code § 12651(a)(2) ...........................................................................................1, 20

    Cal. Gov't Code § 12651(a)(4) ...........................................................................................2, 23

    Cal. Gov't Code § 12651(a)(7) ...........................................................................................2, 25

    Cal. Gov't Code § 12652(b)(1)..................................................................................................7

Va. Code § 8.01-216.6(A)..............................................................................................................8

**Other Authorities**

1 John T. Boese, *Civil False Claims and Qui Tam Actions* § 3.05[B]
    (4th ed. Supp. 2011)...............................................................................................15, 16

## INTRODUCTION

Plaintiffs Los Angeles Department of Water & Power Retirement Plan ("LADWP") and FX Analytics (the "Relator") seek leave to file Fourth Amended Complaints[1] against the Bank of New York Mellon (collectively, with its affiliates, "BNYM"), alleging violations of the California False Claims Act, Cal. Gov't Code § 12650 *et seq.* ("CFCA").  Leave should be denied because Plaintiffs' new allegations are made in bad faith and the rest are futile.

Plaintiffs seek to allege that BNYM sent invoices to certain California public pension funds ("Funds") for custodial services, and that those invoices were false "claims" that violated CFCA.  According to Plaintiffs themselves, they have known about those invoices for years.  Yet none of their previous pleadings even *mentioned* BNYM's custody invoices, much less claimed that those invoices violated CFCA.  Instead, they advanced a different (and potentially far more lucrative) theory of liability, alleging that BNYM made thousands of allegedly false "claims" to the Funds through individual line items in monthly accounting reports, rather than dozens of such "claims" in monthly invoices.  Only after Judge Alsup rejected their accounting-report theory did Plaintiffs retrench their position and allege that BNYM's custody invoices were false "claims" that violated CFCA.  This sequence "reflects an evolutionary development in plaintiffs' case that falls under the heading of bad faith," *Lee v. Regal Cruises, Ltd.*, 916 F. Supp. 300, 304 (S.D.N.Y. 1996) (Kaplan, J.), *aff'd*, 116 F.3d 465 (2d Cir. 1997), and this Court should deny leave to amend here as it did in *Lee*.

Plaintiffs' remaining proposed allegations are clearly futile.  Plaintiffs attempt to reassert claims that BNYM's accounting statements were false "claims" under Cal. Gov't Code § 12651(a)(1) and (a)(2), and that BNYM's standing instruction service concealed an

---

[1] Referring to Proposed Fourth Amended Complaint on Behalf of Los Angeles Department of Water & Power Retirement Plan ("PFAC") and Relator's Fourth Amended Complaint on Behalf of Santa Barbara County Employees' Retirement System and the Tulare County Employees' Retirement Association ("RPFAC").

"obligation" under § 12651(a)(7).  Judge Alsup squarely rejected both theories.  Plaintiffs seek merely to reassert the same allegations he already found insufficient.  Plaintiffs also seek leave to allege that BNYM's standing instruction transactions caused it to deliver less property to the Funds than it owed, thereby violating Cal. Gov't Code § 12651(a)(4).  But the pre-2010 version of CFCA that governs the conduct alleged here imposes liability only if a defendant received a "certificate or receipt" for the delivery of the property in question.  Plaintiffs do not even attempt to allege the existence of such a certificate or receipt.  Accordingly, Plaintiffs' proposed allegations under § 12651(a)(4), if allowed, would not state a claim.  The motions for leave to amend should be denied.

Plaintiffs' new allegations concerning the custody invoices also fail to state a claim and do not contain sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b).  BNYM is confident in the strength of its arguments on these issues, but believes they are better addressed in a motion subject to a full briefing cycle (including a full-length opposition for Plaintiffs and a reply for BNYM) rather than in this Opposition.  It therefore respectfully reserves them to be raised if this Court grants leave to amend.

## BACKGROUND

### A.     BNYM's Custodial and Foreign Exchange Services

BNYM is a leading manager and servicer of global financial assets.  Among the services BNYM provides are custody services for large institutional investors, such as pension funds.  As a custodian, BNYM undertakes a specific set of core duties, explicitly set forth in a custody contract.  With respect to the three Funds at issue here, BNYM's core duties included holding assets in safekeeping, settling transactions as instructed by the Funds or their investment

managers, and providing reports and information.  *See* Ex. 1 §§ 6(a), 8, (LADWP); Ex. 2 §§ 6(a),

8 (Tulare), Ex. 3 §§ 6(a), 8 (Santa Barbara).[2]

BNYM's *settlement* of a transaction is an administrative function that involves ensuring

the accurate transfer of money and assets according to instructions received.  *See*, *e.g.*, Ex. 4 at

35-36.[3]  Settlement is required for foreign exchange, securities, and derivatives transactions, as

well as other types of asset purchases and sales.  *See* Exs. 1 - 3 § 6(a), (c).  It does not involve

negotiating a transaction or determining whether a transaction is in a client's interest.  Indeed,

the custody contracts prohibited BNYM from exercising investment discretion over the Funds'

assets.  *See id.* § 4(b).  They also expressly limited BNYM's duties to those "specifically

undertaken" in each contract.  *Id.* § 13.

Separate from those core custody services, BNYM also offered the Funds a range of

options for *executing* FX transactions.  *See* Ex. 4 at 40-41.  Execution, as opposed to settlement,

involves buying or selling assets.  For example, a Fund's investment manager can elect to

execute foreign currency trades by negotiating the terms of each transaction directly with

BNYM's foreign exchange desk.  *See* PFAC ¶ 82.  When it negotiates transactions, BNYM

undisputedly acts as principal and represents its own interests.  *See id.*  BNYM also offers

customers the option to execute trades on a non-negotiated basis through its standing instruction

service.  *See id.* ¶ 83.

---

[2] BNYM has attached the contracts (along with other documents) to the accompanying declaration of Gregory G. Rapawy.  Because the proposed complaints expressly reference the contracts (at PFAC ¶ 185 and RPFAC ¶ 125), this Court can consider them here.  *See Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (noting that court can consider "documents incorporated in [a complaint] by reference" on a motion to dismiss).

[3] Exhibit 4 is BNYM's Response to LADWP's Request for Proposal ("Response"), which the PFAC incorporates by reference at ¶¶ 123-124.

**B.**     **BNYM's Standing Instruction Service**

Standing instruction service allows a customer or manager to direct BNYM to repatriate (that is, convert to U.S. dollars) selected foreign cash balances on a daily basis, or to convert cash balances to settle purchases and sales of foreign securities.  BNYM offers this service without any per-transaction charge and expects to generate revenue through the exchange rates that it applies to the transactions themselves.  Each morning, BNYM publishes the guaranteed rates at which it will convert currencies involved in standing instruction transactions, establishing for each foreign currency a low "buy" price and a high "sell" one.  *See* Third Am. Compl. ¶ 12 ("TAC").[4]  Plaintiffs do not allege that BNYM failed to comply with these guarantees.  Customers and managers have the opportunity to review those rates and can decline to utilize BNYM's standing instruction service for any transaction.  The decision whether or not to execute transactions through BNYM's standing instruction service is typically made by a customer's investment manager.  *See* Exs. 1 - 3 § 3.

BNYM assigns actual (as opposed to guaranteed) buy and sell prices for standing instruction trades each afternoon.  With few exceptions, BNYM assigns an actual "buy" price that is at or near the low end of reported trades in the interbank market, and a "sell" price that is at or near the high end of reported trades in the interbank market.  *See* Ex. 5 ¶ 1(e).  It then executes standing instruction trades at the assigned prices and reports those prices to its customers and their investment managers.  *See id*.  BNYM earns revenue (a "margin" or "spread") on standing instruction trades, which is the difference between BNYM's own cost of

---

[4] The PFAC and RPFAC omit any reference to BNYM's published, guaranteed prices.  However, the TAC is still part of the record of this case, and this Court "may still credit admissions in [the TAC] and attached exhibits."  *Poindexter v. EMI Record Group, Inc.*, No. 11 Civ. 559 LTS JLC, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012); *see Sulton v. Wright*, 65 F. Supp. 2d 292, 295 (S.D.N.Y. 2003) ("Admissions in earlier complaints remain binding when a plaintiff files subsequent pleadings").

currency and its standing instruction prices.  That difference generally increases when the market

is volatile and the low- and high-end reported trades are far apart.  *See* PFAC ¶¶ 84-85, 93.

The PFAC and RPFAC repeatedly allege that the rates BNYM assigned to standing

instruction transactions were "false" or "fictitious."  *See*, *e.g.*, PFAC ¶¶ 2, 5, 8, 14, 25.  These

allegations of falsity (which are not at issue in the present motion) are legal conclusions, not

factual allegations.  Specifically, Plaintiffs contend that BNYM was prohibited from earning *any*

revenue from standing instruction trades (because, they say, any such revenue would be a

"hidden charg[e] or fee") and was required to buy from and sell to its custody customers at the

same prices that BNYM itself "paid or received for the currency" when trading on its own

account.  *E.g.*, *id.* ¶ 10.  From this they draw the conclusion that any price to the Funds on any

transaction where BNYM earned any margin or spread was a "false" price.  *See id.*  They do not

(and could not) allege that the prices BNYM reported to the Funds differed from the prices

actually assigned through its standing instruction program.  If Plaintiffs are granted leave to

amend, BNYM will demonstrate that Plaintiffs' conclusory allegations of falsity lack any basis

in concrete, particularized factual allegations.  *See supra* p. 2.

## C.    The Funds' Payments to BNYM

BNYM charged the Funds an annual custody fee for its core services.[5]  The contracts

explicitly set forth the services covered by that fee.  The fee schedule with LADWP, for

example, provided that BNYM's annual fee covered only certain enumerated "[s]ervices,"

including  "Domestic Custody," "Global Custody," "Trade Settlements," and "Monthly and

Annual Reports."  Ex. 1.E at 1.  Neither foreign-exchange execution generally nor standing

---

[5] *See* Ex. 1.E at 1 (LADWP); *see* Ex. 6.B (Tulare), Ex. 7 at 1 (Santa Barbara).

instruction specifically appeared on this list of "[i]nclude[d]" services.  *Id.*  The contract

provided that LADWP would "be billed monthly" for a portion of the annual fee.  *Id.* at 4.[6]

 BNYM did not charge any fee for its standing instruction services – although, as we have

noted, it did earn revenue from standing instruction trades.  In contrast, BNYM did impose a per-

transaction charge on foreign-exchange transactions executed with third parties, *see*, *e.g.*, Ex. 4

at 42, and BNYM's periodic invoices reflected those charges.  *See* PFAC ¶ 134; RPFAC ¶ 140.

For example, a Fund that wished to convert 100 U.S. dollars to Euros could choose to buy those

Euros from a third-party trader.  The Fund then would pay 100 U.S. dollars to the trader, receive

an agreed-upon number of dollars in exchange, and would pay BNYM an additional transaction

charge.  *See*, *e.g.*, Ex. 1.E at 2 (charging $50 "per FX trade not executed through Mellon").  If,

however, the Fund chose BNYM as its trading counterparty (either by negotiating or by using

standing instructions), it simply paid BNYM the 100 dollars.

 Because BNYM charged no fee for foreign-exchange transactions that it executed with

the Funds, BNYM did not send the Funds invoices for those transactions.  It did, however,

document the Funds' transactions – including their foreign-exchange transactions – in periodic

accounting statements.  *See* Exs. 1 - 3 § 8(h) (providing that BNYM would "[r]ender periodic

statements" with respect to assets under custody).  The statements contained "monthly

summaries of transactions," PFAC ¶ 186; RPFAC ¶ 192, which listed, among other information,

the rates at which the Funds had executed transactions over the previous month.

---

[6] The fee schedules for Tulare and Santa Barbara are similar.  *See* Ex. 6.B at 1 (Tulare) (providing flat fee for list of services, no reference to foreign-exchange execution), *id.* at 4 (providing that a "payment of approximately 1/12th of estimated annual fees will be paid monthly via direct debit"); Ex. 7 at 1 (Santa Barbara) (providing flat fee for "Global Custody and Accounting" including 75 FX "transactions not executed at BNY Mellon" without referencing FX executed with BNYM); *id.* at 5 (providing that a "payment of approximately 1/12th of estimated annual fees will be paid monthly via an electronic debit").

D.    **Procedural History**

1.        From October 20 to October 23, 2009, the Relator, a Delaware general

partnership whose principal owner[7] allegedly "possesses extensive knowledge and experience

regarding the Bank's office, businesses and personnel," RPFAC ¶ 27, filed substantially similar

complaints under seal against BNYM in at least five states.[8]  In each case, the Relator alleged

that BNYM's execution of standing instruction transactions violated the state's False Claims

Act.  Here, the Relator asserted such allegations on behalf of ten California public pension funds.

*See* Dkt. No. 82 at 9 & n.6.  The Relator filed its initial complaint on October 22, 2009 in

California Superior Court.  *See* Ex. 9.  Over the next six months, it amended that complaint

twice.[9]

Each version of the Relator's complaint was served on the allegedly affected political

subdivisions, and triggered a statutory duty on the part of those subdivisions to "diligently

investigate" the allegations.  Cal. Gov't Code § 12652(b)(1).  On October 14, 2011 – nearly two

years after the Relator filed its first sealed complaint – LADWP intervened and joined the action.

Three other funds intervened; the remaining six declined.  *See* Dkt. No. 82 at 9 & n.6.[10]  On

October 31, 2011, Plaintiffs – which at this point included LADWP, the other three intervening

---

[7] On April 30, 2012, the Relator's principal owner was identified in a public filing by the Relator as former BNYM employee Grant Wilson.  *See* Ex. 8 at 10 (Response to Interrogatory No. 3).  Wilson's alleged personal knowledge comes from his employment with BNYM during the period "from September of 1997 through March of 2011."  *Id.* at 8 (Response to Interrogatory No. 1).

[8] *See* Ex. 9 (Cover sheet for the Relator's original Complaint in this case, dated Oct. 22, 2009); *see also Virginia ex rel. FX Analytics v. The Bank of New York Mellon*, CL2009-15377 ("*Virginia v. BNYM*") (Va. Cir. Ct. filed under seal Oct. 23, 2009, unsealed Jan. 24, 2011); *Florida ex rel. FX Analytics v. The Bank of New York Mellon*, 2009-CA-4140 ("*Florida v. BNYM*") (Fla. Cir. Ct. filed under seal Oct. 21, 2009, unsealed Feb. 7, 2011); *Massachusetts ex rel. FX Analytics v. The Bank of New York Mellon Corp.*, No. 09-4490-G ("*Massachusetts v. BNYM*") (filed under seal Oct. 21, 2009, unsealed Sep. 30, 2010); *New York ex rel. FX Analytics v. The Bank of New York Mellon*, No. 09-114735 ("*New York v. BNYM*") (N.Y. Sup. Ct. filed under seal Oct. 20, 2009, unsealed Oct. 4, 2011).

[9] *See* Ex. 10 (Cover sheet for the Relator's First Amended Complaint in this case, dated Nov. 2, 2009); Ex. 11 (Relator's Second Am. Compl., filed Apr. 5, 2010).

[10] The three other pension funds that intervened were:  the Los Angeles County Employees' Retirement Association ("LACERA"), San Diego County Employees Retirement Association ("San Diego"), and Stanislaus County Employees' Retirement Association ("Stanislaus").

Funds, and the Relator (on behalf of the six Funds that did not intervene) – unsealed the Second Amended Complaint and served it on BNYM.  BNYM then removed the case to the United States District Court for the Northern District of California.

2.     Meanwhile, the Relator pursued its parallel actions in other states, including its lawsuit in Virginia state court.  On September 30, 2011, the Commonwealth of Virginia and the Relator[11] filed an amended complaint that resembled the Relator's Second Amended Complaint in this case.[12]  On October 7, 2011, BNYM filed a demurrer, arguing (among other things) that Virginia had identified no "claim" under Virginia's Fraud Against Taxpayers Act ("VFATA").  BNYM emphasized that VFATA, like CFCA, defines the term "claim" as a "request or demand" for "money or property," and that Virginia had alleged no such request or demand.[13]  The Virginia state court granted BNYM's demurrer in part.  Virginia then filed a Second Amended Complaint alleging that BNYM had made "claims" to the Virginia funds through periodic accounting statements that showed the prices for standing instruction transactions.[14]  The Virginia court ultimately (on reconsideration) sustained BNYM's demurrer, reasoning that the accounting statements were not claims because they "d[id] not request or demand money or property."[15]

Plaintiffs in this action (including LADWP, as well as the Relator) were aware of the ongoing briefing in Virginia.  On December 27, 2011, Plaintiffs in this action amended their complaint to match Virginia's theory that BNYM had presented "claims" to the Virginia funds

---

[11] Although Virginia, represented by its Attorney General, had "primary responsibility" for the litigation, the Relator "continue[d] as a party to the action," Va. Code § 8.01-216.6(A), and participated in briefing and argument.

[12] *See* Ex. 12 (Am. Compl.-in-Intervention, *VA v. BNYM* (filed Sept. 30, 2011)).

[13] *See* Ex. 13 (BNYM Mem. in Supp. of Demurrer at 4-7, *VA v. BNYM* (Oct. 13, 2011)).

[14] *See* Ex. 14 (Second Am. Compl.-in-Intervention ¶¶ 137-138, 142, *VA v. BNYM* (filed Dec. 2, 2011)).

[15] Ex. 15 (Order at 9, *VA v. BNYM* (entered May 1, 2012)).

through periodic accounting statements.  *See* Dkt. No. 18.  In their TAC, Plaintiffs asserted that

BNYM had created "End of Month Client Custody Reports" and "present[ed] [them] . . . to the

Plaintiffs for approval."  TAC ¶ 46; *see id.* ¶¶ 64, 84.  The TAC did not mention any invoice or

bill.  Rather, Plaintiffs' theory was – as in Virginia – that BNYM's accounting statements were

"claims."  *Id.* ¶ 66.  BNYM moved to dismiss the TAC, asserting essentially the same arguments

as in the Virginia case, along with some additional ones.

On February 8, 2012, while BNYM's motion to dismiss was pending, the Relator filed an

amended complaint in Massachusetts that alleged that BNYM's "monthly bills for payment of all

custodial fees" sent to a Massachusetts pension fund constituted false "claims" under that state's

analogue to CFCA.[16]  Plaintiffs in the present case, by contrast, did *not* attempt to amend the

TAC to assert that BNYM's bills for its custodial fees constituted false claims.  Instead, on

February 9 – one day after the Massachusetts amendment – they filed an opposition to BNYM's

motion to dismiss in which they relied solely on BNYM's accounting statements as "claims"

within the meaning of CFCA, or in the alternative contended that the statute did not require any

specific allegations of "claims."  *See* Dkt. No. 40.

**3.**    After oral argument and extensive briefing, Judge Alsup dismissed Plaintiffs'

CFCA claims in their entirety.  *See* Dkt. No. 68 ("Order").  He first noted that CFCA defines a

"claim" in pertinent part as a "'request or demand . . . for money, property, or services.'"  *Id.* at

6.  Observing that "[n]o demand for payment or approval was allegedly contained in the monthly

reports," he rejected Plaintiffs' assertion that the "fraudulent pricing scheme" allegedly reflected

in those reports "*amounted to* demands for payments."  *Id.* at 7.  Judge Alsup distinguished the

---

[16] Ex. 16 (First Am. Compl. ¶ 124, *Massachusetts v. BNYM* (filed Feb. 8, 2012)).  Although the Relator initially filed a sealed complaint in Massachusetts on October 21, 2009, it never served that complaint on BNYM.  In fact, it failed to serve BNYM with any complaint until March 29, 2012.  On May 16, 2012, the Relator voluntarily dismissed the Massachusetts action.  *See* Ex. 17.

accounting statements from "invoices . . . actually presented for payment," and held that, "under

even a broad reading of the CFCA," those statements were "not 'claims.'" *Id.* at 8-9.

Judge Alsup also dismissed Plaintiffs' allegations under subsection (a)(7) of CFCA,

which imposes liability for avoiding an "obligation to pay or transmit money or property" to the

government.  He held that the term "obligation" in CFCA requires a "certain and liquidated"

duty arising from a "specific contract remedy, a judgment or an acknowledgment of

indebtedness." *Id.* at 9.  Because Plaintiffs had identified no "provision of the contracts"

imposing such a liquidated duty on BNYM, they had not stated an (a)(7) claim.  *Id.* at 10.[17]

Judge Alsup stated that Plaintiffs could "seek leave to amend the complaint" and required

that they do so within twenty-one days. *Id.* at 20.  After the Judicial Panel on Multidistrict

Litigation transferred the case, this Court vacated Judge Alsup's deadline.  *See* Dkt. No. 75.  On

June 22, 2012, LADWP and the Relator sought leave to file a Fourth Amended Complaint.

**E.     The Proposed Fourth Amended Complaints**

LADWP's Proposed Fourth Amended Complaint and the Relator's Proposed Fourth

Amended Complaint are virtually identical.  Both attempt to remedy the TAC's most

fundamental defect by asserting a wholly new theory of CFCA liability – namely, that BNYM's

"monthly invoices" for custody services were false "claims." *E.g.*, PFAC ¶¶ 2-6, 38-39, 134-

135, 171-182; RPFAC ¶¶ 2-4, 6, 37, 140-141, 177-188.  Plaintiffs now seek to allege that

BNYM, since at least 2004,[18] has sent the Funds "monthly invoices" that contained "explicit

requests for payment" reflecting "all fees and charges – without exception."  PFAC ¶ 134;

---

[17] Judge Alsup also granted BNYM's motion as to the intervening Funds' unjust enrichment cause of action, *see* Order at 15-16; denied BNYM's motion as to the Funds' causes of action for breach of contract, breach of fiduciary duty, common-law fraud, and violation of California's Unfair Competition Law, *id.* at 11-14; and dismissed LACERA, San Diego, and Stanislaus for lack of venue, *id.* at 16-19.

[18] Plaintiffs allege that BNYM entered the governing fee arrangements with LADWP and Santa Barbara in 2004, *see* PFAC ¶ 128; RPFAC ¶ 124, and with Tulare in 2003, *see* RPFAC ¶ 124.

RPFAC ¶ 140.  Plaintiffs would further assert that the Funds "relied" every month on BNYM's descriptions of its standing instruction transactions in deciding to pay those invoices.  *See* PFAC ¶ 6; RPFAC ¶ 6.  In addition, Plaintiffs seek leave to assert a new cause of action – under subsection (a)(4) of CFCA – that appeared in none of its previous complaints.  *See* PFAC ¶¶ 193-201; RPFAC ¶¶ 199-207.

Plaintiffs acknowledge that their proposed complaints contain "significant additional factual allegations" and an "additional Claim under the CFCA" not found in any of their previous pleadings.  Mem. in Supp. of PFAC at 3; Mem. in Supp. of RPFAC at 2.  Plaintiffs do not say when they discovered these facts.  They do not explain how BNYM's "monthly invoices" escaped their notice during the 26 months between the Relator's filing of its initial Complaint and the filing of the TAC.[19]  They do not (and cannot) contend that when they filed the TAC they did not know that CFCA defined a "claim" as a "request or demand . . . for money or property," Cal. Gov't Code § 12651(a)(1), or that they did not know that BNYM would defend this case by pointing to their failure to identify any specific relevant claim – both of which were clear no later than October 7, 2011, when BNYM filed its first demurrer in Virginia.  Plaintiffs likewise offer no reason for their previous failure to assert a cause of action under CFCA subsection (a)(4).  Rather, they argue only that these "significant" and wholly new allegations suffice to "cure [the] defects identified by Judge Alsup."  Mem. in Supp. of PFAC at 3; Mem. in Supp. of RPFAC at 2.

The proposed complaints would also allege, like the TAC, that BNYM's accounting statements were false "claims."  *See* PFAC ¶¶ 183-186; RPFAC ¶¶ 189-192.  Plaintiffs' allegations concerning these points are essentially identical to the ones Judge Alsup rejected.

---

[19] Twenty-six months elapsed between the filing of the Relator's initial Complaint (Oct. 22, 2009) and the filing of Plaintiffs' Third Amended Complaint (Dec. 27, 2011).

They claim that the Funds possessed a contractual "right to object" to the accounting statements, and that the Funds' failure to exercise those rights amounted to the approval of "claims."  PFAC ¶ 185; RPFAC ¶ 191; *cf.* Dkt. No. 40 at 13.  The proposed complaints would also allege, as before, that the accounting statements "induced" them "to continue" using BNYM's standing instruction service.  PFAC ¶ 186; RPFAC ¶ 192; *cf.* TAC ¶¶ 66, 167, 170.

Finally, the proposed complaints seek to again allege a violation of CFCA subsection (a)(7).  *See* PFAC ¶¶ 202-206; RPFAC ¶¶ 208-212.  Plaintiffs seek leave to assert that BNYM's standing instruction transactions, by allegedly sending the Funds less currency than they were owed under the contracts, breached an "obligation to remit moneys due" to the Funds.  PFAC ¶ 204; RPFAC ¶ 210.  As before, Plaintiffs insist that the differences between the rates that BNYM assigned to standing instruction transactions and the more favorable rates that it allegedly should have assigned reflect "sums certain."  *Compare* PFAC ¶ 205 *and* RPFAC ¶ 211 *with* Dkt. No. 40 at 24.  Plaintiffs do not allege that any of the contracts created a remedy for disgorgement, or that any judgment required BNYM to pay the Funds a specific sum of money.

## ARGUMENT

I.    **Plaintiffs' Proposed Allegations About BNYM's Monthly Invoices Reflect Bad Faith**

Federal Rule of Civil Procedure 15(a)(2) allows a plaintiff to amend its complaint more than 21 days after service of a responsive pleading only with "the opposing party's written consent or the court's leave."  Although the Rule contemplates that "leave to amend should be freely granted" in many cases, "that principle has its limits."  *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 592 (S.D.N.Y. 2007) (Kaplan, J.), *aff'd sub nom. Pappas v. Bank of Am. Corp.*, 309 F. App'x 536 (2d Cir. 2009).  "Bad faith, undue delay, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice and other factors may warrant denial of

leave." *Id.* (citing *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234-35 (2d Cir. 1995)). Plaintiffs' proposed allegations about BNYM's custody invoices evince bad faith and should be rejected.[20]

    **A.**    In *Lee v. Regal Cruises Ltd.*, this Court denied a motion for leave to amend that was "made in bad faith." 916 F. Supp. at 303. *Lee* involved a husband and wife who alleged that a cruise ship's owners negligently operated and maintained an onboard staircase, causing the wife to slip and fall. *See id.* at 301-02. The plaintiffs' initial theory was that the defendants had negligently allowed ice cubes onto the stairway. *See id.* at 302. After the defendants sought summary judgment on that theory, the plaintiffs moved to amend their complaint and assert new "alleged causative factors in the accident," including the "allegedly rough sea conditions" and the "allegedly worn condition of the carpeting." *Id.* at 303.

    This Court denied leave to amend. It observed that "the very nature of the[] [newly alleged] circumstances" demonstrated that the victim "must have known" of them "from the moment she fell." *Id.* The plaintiffs' sudden shift to focus on a new theory of causation, despite their previous knowledge of the underlying facts, "reflect[ed] an evolutionary development in plaintiffs' case that falls under the heading of bad faith." *Id.* at 304. Only after the defendants' legal arguments had "demonstrated that plaintiffs were in serious danger of losing the case" did they "first suggest" that the new factors "played a role" in the accident. *Id.* "These considerations alone" warranted denying the plaintiffs leave to amend. *Id.* The Court did not require any additional showing of "dilatory purpose" or "prejudice to the defendants." *Id.* at 303.

---

[20] This Court should also deny Plaintiffs leave to amend to assert a new cause of action under CFCA subsection (a)(4). Plaintiffs offer no explanation for their previous failure to mention that subsection. That omission is particularly inexcusable because the Relator in Virginia initially asserted a cause of action under a substantially identical provision of VFATA. *See* Ex. 12 ¶ 194(c). That alone justifies denying leave to amend. In any event, the proposed allegations under (a)(4) should also be rejected because they fail to state a claim. *See infra* pp. 23-24.

So too here.  As in *Lee*, the "very nature" of Plaintiffs' new theory demonstrates that they "must have known" of the underlying facts for years.  *Id.*  LADWP, for instance, now asserts that it has received custody invoices from BNYM on a "monthly" basis since 2004, *e.g.*, PFAC ¶ 3; that those invoices "were false and/or fraudulent on their face," *id.*; and that it "relied" on BNYM's description of its standing instruction services in deciding to "pay [those] monthly invoices," *id.* ¶ 6.  Yet the invoices do not appear in the TAC that LADWP filed on December 27, 2011.  Even when LADWP had reviewed BNYM's motion to dismiss, which argued at length that the TAC was deficient for lack of any allegedly false "request or demand" for payment, *see* Dkt. No. 45 at 10-15, LADWP did not amend to allege that the invoices were false.  Instead, it opposed BNYM's motion, gambling that the TAC's accounting-statements theory might survive BNYM's motion.[21]  Only after Judge Alsup dismissed that theory, thus placing LADWP's case "in serious danger," *Lee*, 916 F. Supp. at 304, did it first allege that BNYM's custody invoices were fraudulent.  As in *Lee*, the "evolutionary development" of LADWP's theory manifests "bad faith."  *Id*.

The same arguments apply with even greater force to the Relator.  The Relator filed its original Complaint in October 2009 and amended complaints in November 2009 and April 2010, in addition to joining the TAC in December 2011.  It says that its allegations of fraud are based on the "personal knowledge" of its principal owner.  RPFAC ¶ 27.  In light of that allegation, the Relator had no good-faith reason for omitting from four complaints in a row the details of an

---

[21] In their Opposition, moreover, Plaintiffs cited a case that identified a "false invoice" as a "paradigmatic example of a false claim under the FCA."  *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995) (decision cited at Plfs.' Joint Opp., Dkt. No. 40 at 12-13).  Nor is *Rivera* an outlier:  it reflects a general understanding among courts that invoices are prototypical "claims" under the FCA.  *See, e.g.*, *Daewoo Eng'g & Constr. Co. v. United States*, 73 Fed. Cl. 547, 585 (2006) ("Typical examples of false claims . . . are those represented by invoices or similar 'claims for payment.'"), *aff'd*, 557 F.3d 1332 (Fed. Cir. 2009).  Accordingly, Plaintiffs' failure to come forward earlier in the case with allegations about invoices that they now assert "were false and/or fraudulent on their face," PFAC ¶ 3, shows that they either held these allegations deliberately in reserve, or do not really think that the invoices were false.

alleged fraud he purportedly discovered in 2009.  Further, this Court may take judicial notice of the Relator's statement in the Virginia case that its owner's alleged personal knowledge was acquired no later than March 2011, when he left his job with BNYM.  *See supra* note 7.  That admission rules out any argument by the Relator that its owner acquired his purported knowledge of the allegedly fraudulent invoices after the filing of the TAC.[22]  And, if more were needed, the Relator's amended Massachusetts complaint specifically alleged that BNYM's "monthly bills for payment of all custodial fees" constituted false claims under that state's analogue to CFCA.  Ex. 16 ¶ 124.  Thus, at the absolute latest, the Relator had everything it needed to pursue its current theory in this case on February 8, 2012, the day *before* it opposed BNYM's motion to dismiss in this case and chose to proceed to oral argument.  *See supra* p. 9.  The Relator cannot offer any good-faith explanation why it waited to do so until after Judge Alsup ruled.

    **B.**    The inference that Plaintiffs acted in bad faith is strengthened because they had clear financial incentives to reserve the monthly custodial invoices as a fall-back theory.  At the relevant time, CFCA imposed on a violator a ten-thousand-dollar civil penalty for "each false claim," Cal. Gov't Code § 12651(a) (2009).[23]  The size of Plaintiffs' potential recovery therefore depended in significant part on the *number* of false claims they could allege.  *See generally* 1 John T. Boese, *Civil False Claims and Qui Tam Actions* § 3.05[B] (4th ed. Supp. 2011) ("Boese") (discussing precedent involving the counting of claims in federal FCA actions).  If they could allege that every allegedly fraudulent transaction constituted a "claim" against the Funds that BNYM "presented for approval" through its accounting statements, the number of

---

[22] Further, the Relator also knew from the Virginia litigation – well before the filing of the TAC here – that BNYM intended to argue that the Relator's complaints were deficient for failure to identify a particular request or demand or payment.  In its October 19, 2011 reply in support of its Virginia demurrer, BNYM specifically called the state court's attention to the absence of any "bill," "invoice," or comparable document from the complaint in that case. *See* Ex. 18 at 2 & n.3.

[23] The California Legislature amended CFCA in 2009 to impose a penalty on "each violation" instead of "each false claim."  The pre-amendment version of CFCA governs the conduct alleged here.  *See infra* pp. 22-23.

potential claims would be in the thousands or even the tens of thousands – raising the specter of an exorbitant billion-dollar recovery.[24]  Though Plaintiffs had little chance of ever actually *obtaining* such a judgment[25] a figure of that magnitude was valuable for the *in terrorem* settlement pressure it would create.  By contrast, if the only "claims" were monthly custodial-fee invoices, Plaintiffs could only allege a dozen claims per Fund per year, leading to a far smaller total penalty.

Plaintiffs also had tactical reasons for holding any allegations based on the custodial invoices in reserve until they had tested their accounting-statement theory in court.  To include allegations about the custodial invoices would starkly demonstrate the differences between accounting statements and actual "claims," highlighting the inconsistency between Plaintiffs' preferred theory and the plain language of the statute.  Further, by leaving the invoices out, Plaintiffs were able to present Judge Alsup with an all-or-nothing choice regarding CFCA liability:  either accept the accounting statements as "claims," or dismiss the CFCA counts entirely despite the asserted principle that CFCA should be broadly construed.[26]  And, of course, keeping additional factual allegations in reserve allowed them to seek an additional chance to brief and argue the case – as they do now.  *See Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 141 (5th

---

[24] For an explicit example of this hyperinflated penalty strategy, consider the Virginia complaint.  That complaint sought "civil penalties of at least $811,624,000, based on a civil penalty of $11,000 for each of the 73,784 presented standing-instruction FX trades."  Ex. 14 at 36.  Virginia's alleged actual damages were $35,000,000 – approximately *one-twenty-third* of the penalties, and *one-twenty-sixth* of the total recovery sought after treble damages were taken into account.  *See id.*  Plaintiffs in this case did not calculate their damages explicitly in the TAC, but the Relator was well aware of the Virginia complaint, and it is safe to assume that LADWP's experienced counsel did not neglect to estimate the potential recovery before taking on the case.

[25] In addition to the strong defenses BNYM would have to liability, any per-transaction penalty that CFCA might make available on the facts of this case would also likely be so punitive as to violate the Excessive Fines Clause of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  *See generally* Boese § 3.06[B].

[26] *See, e.g.*, Dkt. No. 40 at 2 (accusing BNYM of arguing that its "scam was so well-designed that the Court should absolve [BNYM] of any responsibility for it"); *see also id.* at 9, 16 (arguing that CFCA is a remedial statute that should be liberally construed).

Cir. 1993) (noting that a party's "awareness of facts and failure to include them in the complaint" supports an "inference that the [party] was engaging in tactical maneuvers to force the court to consider various theories seriatim").

This Court can and should conclude that Plaintiffs had everything they needed to make their present allegations in late 2011, but instead "wait[ed] to see how [they] would fare on the prior motion to dismiss" with respect to their more lucrative accounting-statements theory. *Vine v. Beneficial Fin. Co.*, 374 F.2d 627, 637 (2d Cir. 1967) (affirming denial of leave to amend); *see Lee*, 916 F. Supp. at 304 (citing *Vine* and endorsing "denial of leave to amend where facts [are] known to plaintiff from outset" but plaintiff "await[s] outcome of motion to dismiss before seeking leave"). As the Fifth Circuit has observed, a plaintiff that engages in such "tactical maneuvers," by which it "first presents a theory difficult to establish but favorable and, only after that fails, a less favorable theory," does not merit leave to amend. *Wimm*, 3 F.3d at 141 (internal quotations omitted).

Even if Plaintiffs' previous failure to mention BNYM's custody invoices was not a *deliberate* tactical ploy, however, this Court should still deny leave to amend. *Lee* made clear that an evolving litigation strategy can "fall[] under the heading of bad faith" even when a plaintiff lacks a "dilatory purpose." 916 F. Supp. at 303-04. That is because "bad faith" encompasses not just an initial decision to reserve factual allegations, but also any subsequent attempt to salvage a case based on newly alleged facts that had not previously been considered plausible. *See id.* at 304 (inferring that newly alleged causal factors had previously not been raised because they "were not regarded as causative, did not really exist, or some combination of both"). Here, Plaintiffs' failure to reference the invoices in any of their four previous complaints suggests, if not deliberate withholding of those facts, at least, that Plaintiffs do not genuinely

17

believe that those invoices were fraudulent or had any relation to standing instruction transactions.  *See Wimm*, 3 F.3d at 141 (noting that a failure to advance a theory "at the outset" of a case "strongly suggests either a lack of diligence . . . or a lack of sincerity") (internal quotations omitted); *see also Royal Ins. Co. of Am. v. Southwest Marine*, 194 F.3d 1009, 1016-17 (9th Cir. 1999) ("Late amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action.") (internal quotations and brackets omitted).[27]  That alone justifies denying leave to amend.

C.     Nor does "justice . . . require[]" allowing Plaintiffs to file a Fourth Amended Complaint.  Fed. R. Civ. P. 15(a)(2).  The relevant public pension funds are "sophisticated business entities," Order at 18; Plaintiffs are represented by sophisticated counsel; and Plaintiffs have "had several opportunities to draft a satisfactory complaint against" BNYM.  *Felton v. Walston & Co.*, 508 F.2d 577, 582 (2d Cir. 1974).  Since the Relator first accused BNYM of defrauding pension funds, Plaintiffs have had 32 months to investigate and have produced four previous complaints.  They also have received assistance from a putative whistleblower who assertedly "possesses extensive knowledge and experience" regarding BNYM's foreign-exchange practices.  PFAC ¶ 28; *cf. Mooney v. Vitolo*, 435 F.2d 838, 839 (2d Cir. 1970) (per curiam) (affirming denial of leave to amend where plaintiffs "had extensive access to the records and files" relevant to the action).

Further, Plaintiffs "had the benefit of extensive pleadings by other parties as well as rulings . . . on other motions in other cases."  *Parmalat*, 501 F. Supp. 2d at 593.  By the time they

---

[27] *See also Industrial Assets, Inc. v. Capital Equip. Sales Co.*, No. 96-1737, 1997 WL 359061, at *4 (6th Cir. Jun. 26, 1997) (affirming denial of leave to amend where plaintiff "knew at the time of its original filing" the facts to support a claim but "neglected to include that claim in its complaint"); *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1027 (10th Cir. 1994) (affirming denial of leave to amend where plaintiff "proposed a theory that [he] did not choose to advance until after his primary theory had been dismissed").

filed the TAC, Plaintiffs had seen complaints in six parallel cases against BNYM that involved extensive pre-suit discovery.[28]  In fact, the TAC contained many allegations and document quotations that Plaintiffs extracted directly from complaints filed in other actions.[29]  Plaintiffs also had access (before the TAC) to BNYM's motions to dismiss in three other *qui tam* cases, which had thoroughly briefed the "claim" requirement of false claims statutes[30] – and two of which, in Virginia and Florida, BNYM had served on the Relator.

In light of Plaintiffs' extraordinary litigation advantages, they should not be allowed "a third go-around" to assert new allegations that they should have raised months earlier.  *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (affirming denial of leave to amend and holding that plaintiff "ha[d] no right to a second amendment" of complaint).  It is well within a district court's discretion to deny leave because "[t]he new information alleged in the complaint was within [Plaintiffs'] knowledge before argument of the motion to dismiss [a previously] amended complaint," *Vine*, 374 F.2d at 636, and this Court should do so here.

---

[28] In addition to complaints filed in the four other state *qui tam* actions, *see supra* note 8, Plaintiffs had access to complaints filed by the Massachusetts Securities Division and by the United States Attorney.  *See* Am. Compl., *United States v. BNYM*, No. 11-Civ-6969 (S.D.N.Y. filed Oct. 4, 2011); Ex. 19 (Admin. Compl., *In re BNYM*, No. 2011-0044 (Mass. Sec. Div. filed Oct. 26, 2011) ("MSD Compl.")).

[29] *Compare* TAC ¶ 5 (alleging email stating that BNYM was "enjoying greater success than competitors in 'maintaining spreads in the FX space' because, unlike competitors, [BNYM was] not providing [its] clients 'time stamping' and 'fixed spreads' across currencies"), *with* MSD Compl. ¶ 92 (alleging email that "stated that 'BNY Mellon has been more successful in maintaining spreads in the SI [standing instruction] space compared to these peers [that are] offering time stamping and fixed spreads across all currencies'"); *compare* TAC ¶ 87 (alleging email stating that the "'pricing advantages,' of BNY Mellon's FX pricing scheme would 'disappear' if the Bank's custodial clients achieved 'full transparency'"), *with* MSD Compl. ¶ 62 (quoting email stating that "'pricing advantages disappear when a client trades via an e-commerce platform and full transparency is achieved'"); *compare* TAC ¶ 88 (alleging email "noting that 'standing instruction FX is the most profitable form of business'"), *with* MSD Compl. ¶ 62 (alleging email stating that standing instruction provides "'the most profitable form of business'"); compare TAC ¶ 98 (alleging email stating "'I do NOT like it. Once pricing spreads are disclosed it will be a race to how quickly clients can work it down to zero.'"), *with* Ex. 20 (Compl. and Superseded Compl. ¶ 41, *New York v. BNYM* (filed Oct. 4, 2011)) (alleging email stating "I do NOT like it.  Once pricing spreads are disclosed it will be a race to how quickly clients can work it down to zero.").

[30] *See* Mem. in Supp. of BNYM Mot. to Dismiss, *New York v. BNYM* (filed Dec. 13, 2011); Mot. to Dismiss, *Florida v. BNYM* (filed Nov. 14, 2011); Ex. 13 (BNYM Consolidated Mem. in Supp. of Demurrer, *VA v. BNYM*).

## II.      Plaintiffs' Remaining Proposed Allegations and Claims Are Futile

If this Court finds that Plaintiffs' late-breaking assertion of their "invoices" theory

reflects bad faith, it should deny them leave to file the proposed complaints in their entireties.

The remainder of Plaintiffs' proposed allegations are meritless, and amendment would be futile.

A court should deny leave to amend for futility "if a proposed claim could not withstand a

motion to dismiss."  *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88

(2d Cir. 2002).  "The adequacy of a proposed amended complaint to state a claim is to be judged

by the same standards as though governing the adequacy of a filed pleading."  *Anderson News,*

*LLC v. American Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).  Leaving aside Plaintiffs' bad-

faith allegations about BNYM's invoices, the proposed complaints allege that:  (1) BNYM's

accounting reports were "claims" under CFCA; (2) BNYM's custody contracts gave rise to an

"obligation" under subsection (a)(7) of CFCA; and (3) BNYM violated subsection (a)(4) of

CFCA.  None of these allegations, if filed, would state a claim.

## A.      Plaintiffs' Proposed Allegations that BNYM's Accounting Reports Were CFCA "Claims" Are Futile

To satisfy Cal. Gov't Code § 12651(a)(1) and (a)(2), Plaintiffs must properly allege the

existence of a "claim."  CFCA defines a "claim" in relevant part as a "request or demand . . . for

money, property, or services."  *Id.* § 12650(1).  As Judge Alsup observed, subsections (a)(1) and

(a)(2) are not "intended to cover any and all attempts to cheat" a political subdivision, but rather

"focus[] on" the presence of such a "claim."  Order at 6 (internal quotations omitted).  Judge

Alsup dismissed Plaintiffs' previous allegations under those subsections for failing to allege any

request or demand for money.  *Id.* at 6-9, 10-11.

Plaintiffs' primary response is to allege a new species of purported "claim" – BNYM's

monthly custody invoices.  *See*, *e.g.*, PFAC ¶¶ 171-182, 190; RPFAC ¶¶ 177-188, 196.  As

BNYM has already shown, this Court should deny Plaintiffs leave to assert those allegations now.  If this Court does so, the only remaining "claims" that Plaintiffs assert are BNYM's "monthly reports and statements," which listed (among many other transactions) standing instruction transactions that BNYM had executed with the Funds over a previous month.  PFAC ¶ 136; *see id.* ¶¶ 183-186; RPFAC ¶¶ 189-192.  According to Plaintiffs (at PFAC ¶ 185, RPFAC ¶ 191), those accounting reports amounted to "claims" because the Funds had the right to "object" to them, thereby escaping any "liab[ility] for the trades outlined therein."[31]

Judge Alsup squarely rejected this very argument.  In opposing BNYM's motion to dismiss their previous complaint, Plaintiffs maintained that BNYM's "monthly reports . . . and the periodic accounting were presented for approval."  Dkt. No. 40 at 8 (citing TAC ¶¶ 62, 64-65).  According to Plaintiffs, those reports "were meaningful claims" because the Funds "had the contractual right to challenge [them] if they appeared to be incorrect."  *Id.* at 13.  But Judge Alsup held that "even if implicitly 'approved' by the government funds," the accounting reports were not "claims."  Order at 7.  Because "[n]o demand for payment or approval was allegedly contained in the monthly reports," Plaintiffs' assertion that the reports "*amounted to* demands for payments" did not state a cause of action under CFCA.  *Id.*

Plaintiffs thus ask this Court for leave to amend to reassert the same allegations that Judge Alsup already rejected.[32]  Their reasoning is as deficient now as it was then.  The

---

[31] The custody contracts do not support Plaintiffs' assertion.  Those contracts provide that, if the Funds fail to provide BNYM "written notice of any exception or objection" to an account statement within a certain time period, the "statement shall be deemed to have been approved, and in such case, [BNYM] shall not be liable for any matters in such statements."  Exs. 1 - 3 § 12.  These provisions protect *BNYM* from liability concerning any accounting statement to which the Funds do not timely object.  They do not confer on the Funds the extraordinary ability to nullify retroactively any transaction depicted in those accounting statements.

[32] *Compare* PFAC ¶¶ 185 (asserting that the accounting statements were claims because LADWP had the "right to object"), *id.* ¶ 186 (calling the statements "implicit requests for payment" because they "induced Plaintiff to continue" using BNYM's standing instruction service), *and* RPFAC ¶¶ 191-192 (same). *with* Order at 6 (rejecting argument that "contractual right to challenge the statements" made them "claims"); *id.* (rejecting theory that

accounting statements merely described past transactions and valued assets.  *See* PFAC ¶ 186

(accounting statements contained "monthly summaries of transactions"); RPFAC ¶ 192 (same).

As the Virginia court held in sustaining BNYM's demurrer to virtually identical allegations

under Virginia's analogue to CFCA:  "accounting statements submitted by BNYM . . . do not

request or demand money or property.  Instead they are records or statements – which even if

fraudulent – are of past transactions."  *See* Ex. 15 at 9.[33]

Plaintiffs attempt to remedy this defect by adding a single conclusory assertion that

accounting statements are "akin to modern invoices" providing a "certain number of days to

object after review of the statement or record."  PFAC ¶ 185; RPFAC ¶ 191.  Merely calling a

historical account statement an "invoice" does not make it so.  *See* Ex. 13 at 9 (holding that

"accounting statements" are not "invoices . . . for reimbursement").  Nor does Plaintiffs'

unsupported contention that such a statement is "like many others existing in the modern

economy" convert it into a demand for money.  Mem. in Supp. of PFAC at 20; Mem. in Supp. of

RPFAC at 19.  Accounting statements are "not 'claims' under even a broad reading of the

CFCA."  Order at 9.  Plaintiffs' continuing insistence to the contrary is futile.[34]

---

"continued use of the standing instruction service was allegedly contingent on . . . approval of the prices contained in the monthly reports").

[33] *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196 (D.C. Cir. 1995), is not to the contrary. That case involved allegedly false "progress reports" certifying that a contractor's software complied with certain contractual specifications.  *Id.* at 198.  The contract required the defendant to certify its software, and it made clear that certification was a condition precedent to the "payment of invoices."  *Id.* (brackets and internal quotations omitted).  Thus, the court held that the reports were "false statements in support of false claims."  *Id.* at 199.  It did not hold that such progress reports were *themselves* "claims."

[34] Plaintiffs cite *United States v. Neifert-White Co.*, 390 U.S. 228, 88 S. Ct. 959 (1968), for the proposition that the FCA "reaches . . . all fraudulent attempts to cause the Government to pay out sums of money."  *Id.* at 233, 88 S. Ct. at 962 (quoted by Mem. in Supp. of PFAC at 21, Mem. in Supp. of RPFAC at 20).  Plaintiffs quoted the same portion of *Neifert-White* before Judge Alsup, *see* Dkt. No. 40 at 13, and this Court should not permit them to recycle the same argument that he rejected.  In any event, *Neifert-White* does not support Plaintiffs' position.  That case involved the "narrow and precise" question whether the FCA punishes fraudulent "applications for loans" presented to the Government.  *Id.* at 230, 88 S. Ct. at 960.  The Court noted that a fraudulent loan application, like an invoice, has the "purpose and effect of inducing the Government immediately to part with money," and so can be a "claim" under the FCA.  *Id.* at 232, 88 S. Ct. at 961.  An accounting statement is nothing like a loan application; it does not request that the Government "immediately . . . part with money."

**B.** **Plaintiffs' Proposed Claim that BNYM Violated CFCA Subsection (a)(4) Is Futile (Count III)**

To satisfy the applicable, pre-2010 version of Cal. Gov't Code § 12651(a)(4), Plaintiffs must show that BNYM had "possession, custody, or control of public property or money" used by the government and "knowingly deliver[ed] or cause[d] to be delivered less property than the amount *for which [it] receive[d] a certificate or receipt*." (emphasis added). Plaintiffs can state a claim under this provision only by alleging the existence of "certificate[s] or receipts . . . created by the government" that "have some connection or relationship to [BNYM's] return of property." *United States ex rel. Aakhus v. Dyncorp., Inc.*, 136 F.3d 676, 681 (10th Cir. 1998); *see United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 36 (D.D.C. 2003) (dismissing claim under FCA subsection (a)(4) for failure to allege that the defendant delivered "property to the United States and receiv[ed] a receipt in return").

Plaintiffs do not even attempt to allege that BNYM received a "certificate" or "receipt" upon transferring money to the relevant funds.[35] Rather, they assert that BNYM violated the *present* version of CFCA subsection (a)(4), which omits the "certificate or receipt" requirement imposed by the previous statute. *See* PFAC ¶¶ 193-201; RPFAC ¶¶ 199-207. That version of the statute, however, does not apply to Plaintiffs' claims.

The Legislature amended CFCA on October 11, 2009, *see* 2009 Cal. Legis. Serv. ch. 277, and the amendments took effect on January 1, 2010, *see* Cal. Const. art. 4, § 8(c)(1). California "adhere[s] to the time-honored principle" that "a statute will not be applied retroactively unless it is very clear . . . that the Legislature . . . must have intended a retroactive application."

---

[35] Plaintiffs allege (at PFAC ¶ 199; RPFAC ¶ 205) that "[w]hen paying for the monthly invoices referenced in this Complaint, [the Funds] submitted documents back to the Bank confirming the amount of payment." The proposed complaints offer no concrete facts or details about these purported "documents." In any event, a document confirming a pension fund's payment of monthly invoices is not a "certificate or receipt" for *BNYM's* delivery of money or property. *See Aakhus*, 136 F.3d at 681 (holding that receipt must have some "connection or relationship" to the defendant's "return of property").

*Evangelatos v. Superior Court*, 753 P.2d 585, 598 (Cal. 1988).  CFCA manifests no such intent.

*See San Francisco Unified Sch. Dist. ex rel. Contreras v. Laidlaw Transit*, 182 Cal. App. 4th

438, 447 n.7 (2010) (holding the 2010 CFCA amendments "not material" to claims that "were

submitted long before the effective date of the amendment").  Accordingly, the post-amendment

version of the statute governs only conduct occurring on or after January 1, 2010.

The proposed complaints, which seek to amend allegations that the Relator originally

filed on October 22, 2009, allege no such conduct.  The only allegations that mention events

occurring in 2010 are an internal BNYM email; an estimate of BNYM's profits for that year, and

a BNYM business plan statement that is not alleged to have been received by any of the relevant

pension funds.  *See* PFAC ¶¶ 16-17, 84, 121; RPFAC ¶¶ 16-17, 85.

Further, although LADWP does not provide a concrete date on which it ceased using

BNYM's standing instruction service, it alleges that it did so "[a]fter the Bank's practices came

to light."  PFAC ¶ 190; *see also id.* ¶ 173.  LADWP was aware of the Relator's allegations no

later than January 14, 2010, when it filed its first motion in the California state court proceeding

that became this case.[36]  In any event, any continued use after October 2009 of BNYM's

standing instruction service by LADWP – or by any other Fund that knew of the Relator's

allegations – could not support a CFCA claim.  *See American Contract Servs. v. Allied Mold &*

*Die, Inc.*, 94 Cal. App. 4th 854, 864 (2001) (holding that there is no CFCA cause of action

"where the government is fully aware of the facts surrounding the claim and approves it").  The

pre-amendment version of CFCA thus governs Plaintiffs' claims, and Plaintiffs' proposed

allegations are futile.

---

[36] *See* Docket, *FX Analytics v. Bank of New York Mellon Corp.*, No. RG09480749 (Cal. Super. Ct., Alameda Cty.) (showing filings by Funds in January 2010).  On January 14, 2010, the Los Angeles City Attorney's office, which currently represents LADWP in this action, made a filing in that docket (attached as Exhibit 21) on behalf of the "City of Los Angeles Water and Power Employees' Retirement System."  BNYM presumes this is the same as, or a misnomer for, LADWP.

**C.    Plaintiffs' Proposed Claim that BNYM Violated Subsection (a)(7) of CFCA Is Futile (Count IV)**

To satisfy Cal. Gov't Code § 12651(a)(7), Plaintiffs must allege that BNYM

"[k]nowingly ma[de], use[d], or cause[d] to be made or used a false record or statement . . . [to]

conceal[,]. . . avoid[], or decrease[] an obligation to pay or transmit money or property to the"

government.  Judge Alsup observed that the phrase "obligation to pay . . . money or property"

refers narrowly to obligations that are "certain and liquidated."  Order at 9.  Relying on

California law, Judge Alsup held that a plaintiff properly alleges such an obligation only by

identifying a "'specific contract remedy, a judgment or an acknowledgment of indebtedness'"

that compels the payment of a liquidated debt.  *Id.* at 9 (quoting *State ex rel. McCann v. Bank of

Am.*, 191 Cal. App. 4th 897, 910 (2011)).  Were it otherwise, there would be "no way to define

the scope of reverse false claim cases," which would be as "broad as any lawyer's creative

impulses in defining a possible claim in the first place."  *McCann*, 191 Cal. App. 4th at 914

(internal quotations and brackets omitted).  Judge Alsup therefore dismissed Plaintiffs'

subsection (a)(7) claim because they cited no contract provision "characteriz[ing] the FX spreads

as 'monies owed' in sum certain."  Order at 10.[37]

The proposed complaints do not cure this defect.  They re-assert (at PFAC ¶ 204; RPFAC

¶ 210) that BNYM had a duty under its custody contracts to "remit moneys due and owing to"

the pension funds.  But a contractual duty is an "obligation" under CFCA only if it expressly

"provide[s] for the specific remedy of disgorgement," or if it forms the basis of a specific legal

"judgment" requiring the payment of money.  *State ex rel. Bowen v. Bank of Am. Corp.*, 126 Cal.

App. 4th 225, 242 (2005).  Plaintiffs allege neither.  Instead, they merely tack on the phrase

---

[37] The court in the Virginia action also dismissed Virginia's initial claim under subsection (A)(7) of VFATA.  *See* Ex. 22 (Order Granting in Part and Overruling in Part BNYM's Demurrer to Virginia's First Amended Complaint-in-Intervention (entered Nov. 18, 2011)).

"sums certain" to a recycled version of their previous allegations.[38]   That conclusory recharacterization cannot change an unadjudicated contract breach – no matter how "certain" in the eyes of the aggrieved party – into an "obligation" under CFCA.  *See United States ex rel. S. Prawer & Co. v. Verrill & Dana*, 946 F. Supp. 87, 94 (D. Me. 1996) (noting that a mere "breach [of] contract . . . absent a specific remedy provided in the contract" creates no "obligation to pay or transmit money to the other contracting party until he obtains a judgment.").

\* \* \*

If this Court allows Plaintiffs to bring their new allegations concerning the monthly invoices, BNYM intends to show on motion to dismiss that those allegations fail to state a claim under CFCA and lack the particularity that Fed. R. Civ. P. 9(b) requires.  BNYM will also show that Plaintiffs should not be permitted to add The Bank of New York Mellon Corporation as a new defendant in this action.[39]   Because these issues are better addressed in a motion subject to a full briefing cycle (including a full-length opposition for Plaintiffs and a reply for BNYM) rather than in this Opposition, BNYM respectfully reserves them and will not raise them here.

## CONCLUSION

Plaintiffs' Motions for Leave to File a Fourth Amended Complaint should be denied.

---

[38] *See* PFAC ¶ 205, RPFAC ¶ 211; *cf.* TAC ¶¶ 68, 173-174.

[39] *Compare* PFAC ¶ 29 *and* RFPAC ¶ 28, *with* Dkt. No. 26 at 2 (stipulation dismissing claims against The Bank of New York Mellon Corporation).

Dated:  July 30, 2012                    Respectfully submitted,

                                         THE BANK OF NEW YORK MELLON


                                         */s/ Reid M. Figel*
                                         _____
                                         Reid M. Figel (RF-8663)
                                         Rebecca A. Beynon (*pro hac vice*)
                                         David L. Schwarz (*pro hac vice*)
                                         Derek T. Ho (DH-0104)
                                         Gregory G. Rapawy (*pro hac vice*)
                                         Joshua D. Branson (*pro hac vice*)
                                         KELLOGG, HUBER, HANSEN, TODD,
                                           EVANS & FIGEL, P.L.L.C.
                                         1615 M Street, NW, Suite 400
                                         Washington, DC 20036
                                         Telephone:  (202) 326-7900
                                         Facsimile:  (202) 326-7999
                                         rfigel@khhte.com
                                         rbeynon@khhte.com
                                         dschwarz@khhte.com
                                         dho@khhte.com
                                         grapawy@khhte.com
                                         jbranson@khhte.com

                                         *Counsel for the The Bank of New York Mellon*