**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) |
|  | ) |
|  | ) |
| BANK OF NEW YORK MELLON CORP. | )   12 MD 2335 (LAK) |
| FOREX TRANSACTIONS LITIGATION | ) |
|  | )   ECF Case |
| This Document Relates to: *Ohio Police & Fire* | ) |
| *Pension Fund, et al. v. The Bank of New York Mellon* | )   12-cv-03470 (LAK) |
| *Corp., et al.* | ) |
|  | ) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED AND CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS ..............................................................................................4

    A.    OP&F's Contract ...........................................................................5

    B.    SERS' Contract ............................................................................8

    C.    The Scope and Impact of Defendants' Deceptive FX Practices. .................9

ARGUMENT .................................................................................................................11

    I.    Plaintiffs State A Claim For Breach Of Contract. ................................................11

    II.    Plaintiffs Have Properly Pled A Claim For Fraud In The Inducement.................15

        A.    Plaintiffs Have Sufficiently Pled Material Misrepresentations and Omissions.................................................................................................16

        B.    Plaintiffs Pled Justifiable Reliance on Defendants' Misrepresentations and Omissions. ........................................................20

        C.    Plaintiffs Have Properly Pled Defendants' Knowledge of the Fraud. .......................................................................................................22

    III.    Plaintiffs' Claim For Unjust Enrichment Should Proceed....................................24

    IV.    Plaintiffs State A Claim For Conversion. ...........................................................25

    V.    SERS Has Stated A Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing. ......................................................................................26

    VI.    Plaintiffs Have Standing Under The Ohio Deceptive Trade Practices Act. ..........28

    VII.    Plaintiffs' Claims Are Timely...............................................................................30

    VIII.    Plaintiffs State Claims Against BNYMC. ...........................................................35

CONCLUSION..............................................................................................................35

CERTIFICATE OF SERVICE ......................................................................................37

1056022.4

# TABLE OF AUTHORITIES

**Page**

## CASES

*380544 Canada, Inc. v. Aspen Tech., Inc.*,
633 F. Supp. 2d 15 (S.D.N.Y. 2009)......................................................................... 24

*ABM Farms, Inc. v. Woods*,
692 N.E.2d 574 (Ohio 1998) ................................................................................... 22

*Amida Capital Management, II, LLC v.*
*Cerberus Capital Management, L.P.*,
669 F. Supp. 2d 430 (S.D.N.Y. 2009)...................................................................... 22

*Anwar v. Fairfield Greenwich Ltd.*,
831 F. Supp. 2d 787 (S.D.N.Y. 2011).............................................................. 12, 13

*Astor v. International Bus. Machs., Corp.*,
7 F.3d 533 (6th Cir. 1993) ...................................................................................... 13

*Aultman Hosp. Ass'n v. Community Mut. Ins. Co.*,
544 N.E.2d 920 (Ohio 1989) ................................................................................... 14

*Bank One v. Financial Ventures, LLC*,
No. C2-01-0049, 2002 WL 484394
(S.D. Ohio Mar. 26, 2002) ............................................................................... 25, 26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................. 12

*Billy Casper Golf, LLC v. Kennsington Golf Club, LLC*,
No. 4:11-cv-527, 2012 U.S. Dist. LEXIS 26644 (N.D. Ohio Feb. 29, 2012).................. 16, 22

*Blankenship v. CFMOTO Powersports, Inc.*,
944 N.E.2d 769 (Ohio Ct. Com. Pl. 2011).............................................................. 29

*Blon v. Bank One, Akron, N.A.*,
519 N.E.2d 363 (Ohio 1998) ............................................................................ 19, 20

*Bower v. Int'l Business Machines, Inc.*,
495 F. Supp. 2d 837 (S.D. Ohio 2007) ................................................................... 29

*Brooklyn Navy Yard Cogeneration Partners v. Superior Court*,
60 Cal. App. 4th 248 (1997) ................................................................................... 35

*Bucyrus-Erie Co. v. Gen. Products Corp.*,
643 F.2d 413 (6th Cir. 1981) .................................................................................. 35

*Burns v. Rice*,
813 N.E.2d 25 (Ohio Ct. App. 2004) ...................................................................... 22

1056022.4

# TABLE OF AUTHORITIES
## (continued)

Page

*Compania Sud-Americana de Vapores S.A. v.*
  *IBJ Schroder Bank & Trust Co.,*
  785 F. Supp. 411 (S.D.N.Y. 1992).................................................................................... 21

*Culbreath v. Golding Enterps., L.L.C.,*
  872 N.E.2d 284 (Ohio 2007) ............................................................................................ 29

*Doner v. Snapp,*
  98 Ohio App. 3d 597, 649 N.E.2d 42 (2d Dist. 1994).......................................................... 11

*DSW, Inc. v. Zina Eva, Inc.,*
  Case No. 2:11-cv-0036, 2011 U.S. Dist. LEXIS 37944 (S.D. Ohio Apr. 6,
  2011) .................................................................................................................................... 24

*Ed Schory & Sons, Inc. v. Soc. Natl. Bank,*
  662 N.E.2d 1074 (Ohio 1996) ................................................................................ 16, 26, 27

*Elysian Fed. Sav. Bank v. First Interregional Equity Corp.,*
  713 F. Supp. 737 (D.N.J. 1989) ................................................................................... 33, 34

*Eva v. Midwest Nat'l Mortg. Banc, Inc.,*
  143 F. Supp. 2d 862 (N.D. Ohio 2001)............................................................................... 26

*Frank v. Dana Corp.,*
  646 F.3d 954 (6th Cir. 2011) ............................................................................................. 23

*Freedom Foods, Inc. v. Rose Valley Land Group, Ltd.,*
  2006 U.S. Dist. LEXIS 49591 (S.D. Ohio July 20, 2006).................................................... 21

*Galmish v. Cicchini,*
  734 N.E. 2d 782 (Ohio 2000) ........................................................................... 14, 15, 16, 17

*Grandon v. Merrill Lynch & Co.,*
  No. 95 Civ. 10742 (SWK), 2001 U.S. Dist. LEXIS 10169
  (S.D.N.Y. July 20, 2001) ............................................................................................ 33, 34

*Groob v. KeyBank,*
  843 N.E.2d 1170 (Ohio 2006) ........................................................................................... 22

*Gurfein v. Ameritrade, Inc.,*
  312 F. App'x 410 (2d Cir. 1989) ....................................................................................... 13

*In re Livent, Inc. Noteholders Sec. Litig.,*
  151 F. Supp. 2d 371 (S.D.N.Y. 2001).................................................................................. 13

*In re Mexico Money Transfer Litig.,*
  164 F. Supp. 2d 1002 (N.D. Ill. 2000), *aff'd*, 267 F.3d 743 (7th Cir. 2001) ...................... 14

- iii -

## TABLE OF AUTHORITIES
### (continued)

Page

*In re XM Satellite Radio Holdings Sec. Litig.*,
  479 F. Supp. 2d 165 (D.D.C. 2007) ................................................................ 18

*Int'l Union of Operating Eng'rs, Stationary Eng'rs Local 39 Pension Trust*
  *Fund v.*
  *Bank of N.Y. Mellon Corp.*,
  No. C 11-03620 WHA, 2012 U.S. Dist. LEXIS 18281 (N.D. Cal. Feb. 14,
  2012) .......................................................................................................... passim

*J.C. Penney Corp. v. Carousel Ctr. Co.*,
  635 F. Supp. 2d 126 (N.D.N.Y. 2008) .............................................................. 33

*Jacobson-Kirsch v. Kaforey*,
  2012 Ohio 3553, No. 26102, 2012 Ohio App. LEXIS 3138
  (Ohio Ct. App. Aug. 8, 2012) ............................................................................ 34

*Kham v. Nates Shoes No. 2 v. First Bank of Whiting*,
  908 F.2d 1351 (7th Cir. 1990) ........................................................................... 27

*King v. Hertz Corp.*,
  No.: 1:09 CV 2674, 2011 U.S. Dist. LEXIS 35610 (N.D. Ohio Mar. 31, 2011).................... 11

*Langfan v. Carlton Gardens Co.*,
  916 N.E.2d 1079 (Ohio Ct. App. 2009) ............................................................. 14

*Layne v. Progressive Preferred Ins. Co.*,
  820 N.E.2d 867 (Ohio 2004) ............................................................................. 14

*Matrixx Initiatives, Inc. v. Siracusano*,
  131 S. Ct. 1309 (2011) ....................................................................................... 23

*Miami Valley Mobile Health Servs. v. ExamOne Worldwide, Inc.*,
  No. 3:11-cv-158, 2012 U.S. Dist. LEXIS 16556 (S.D. Ohio Feb. 6, 2012) ............ 24, 34

*MMK Grp., LLC v. SheShells Co., LLC*,
  591 F. Supp. 2d 944 (N.D. Ohio, 2008)............................................................. 11

*Nelson v. Stahl*,
  173 F. Supp. 2d 153 (S.D.N.Y. 2001).................................................................. 30

*Norgard v. Brush Wellman, Inc.*,
  766 N.E.2d 977 (Ohio 2002) ................................................................... 31, 32, 33

*O'Brien v. Ravenswood Apartments, Ltd.*,
  862 N.E.2d 549 (Ohio App. 1st Dist. 2006) ...................................................... 26

*Palm Beach Co. v. Dunn & Bradstreet*,
  665 N.E.2d 718 (Ohio Ct. App. 1995)................................................................ 34

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Pavlovich v. Nat'l City Bank*,
    435 F.3d 560 (6th Cir. 2006) ............................................................... 11

*Philadelphia Fin. Mgmt. of San Francisco v. DJSP Enters., Inc.*,
    10-cv-61261, 2011 WL 4591541 (S.D. Fla. Sept. 30, 2011)................... 18

*Robins v. Global Fitness Holdings, LLC*,
    838 F. Supp. 2d 631 (N.D. Ohio 2012)................................................... 29

*Sanchez v. Giromex, Inc.*,
    No. D042459, 2004 WL 2750332 (Cal. Ct. App. Dec. 2, 2004) ........... 14

*Schupak Group, Inc. v. Travelers Cas. & Sur. Co. of Am.*,
    716 F. Supp. 2d 262 (S.D.N.Y. 2010)..................................................... 13

*Scotts Co. LLC v. Farnam Cos.*,
    659 F. Supp. 2d 913 (S.D. Ohio 2009) ................................................... 26

*SEC v. Gabelli*,
    653 F.3d 49 (2d Cir. 2011)...................................................................... 30

*Tannenbaum v. Zeller*,
    552 F.2d 402 (2d Cir. 1977).................................................................... 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................ 23

*Ullmann v. May*,
    72 N.E.2d 63 (Ohio 1947) ...................................................................... 24

*Wm. Passalacqua Builders v. Resnick Developers*,
    933 F.2d 131 (2d Cir. 1991).................................................................... 35

*Wsol v. Fiduciary Mgmt. Assocs., Inc.*,
    266 F.3d 654 (7th Cir. 2001) .................................................................. 14

*YTY Indus. SDN. BHD. v. Dow Chem. Co.*,
    05-cv-8881, 2009 WL 3633871 (C.D. Cal. Oct. 28, 2009) ................... 18

*Zelina v. Hillyer*,
    846 N.E.2d 68 (Ohio Ct. App. 2005)...................................................... 14

**STATUTES**

29 U.S.C. § 1108(b)(18)(C) .......................................................................... 28

Cal. Bus. & Prof. Code § 17500 ..................................................................... 2

Cal. Bus. & Prof. Code §§ 17200, *et seq.* ...................................................... 2

ERISA § 408(b)(18).......................................................................................... 6

**TABLE OF AUTHORITIES**
(continued)

Page

O.R.C. § 1345.02, *et seq.* ................................................................. 29

O.R.C. § 2305.06 ................................................................................ 30

O.R.C. § 4154.01 *et seq.* ................................................................... 28

O.R.C. § 4165.02(B) ........................................................................... 29

O.R.C. §§ 4165.02(A)(7), (11) ........................................................... 28

**RULES**

Fed. R. Civ. P. 9(b) ............................................................................ 22

## INTRODUCTION

More than one year ago, the first whistleblower lawsuits filed by employees of The Bank of New York Mellon ("BNYM") related to Defendants'[1] foreign currency exchange ("FX") trading practices were unsealed.  These actions were followed by several proposed class actions (*Operating Engineers*[2] and *SEPTA*[3]) brought by public and private pension fund and ERISA customers asserting contractual and other common law theories of liability, along with statutory consumer protection claims.  These actions were in turn followed by enforcement actions brought by the Attorney General for the State of New York ("NYAG"), the Office of the Secretary of the Commonwealth of Massachusetts ("OSCM"), and the United States Department of Justice ("DOJ"), all seeking broad relief and/or penalties against Defendants for misrepresenting the terms and execution of their FX custody services to their customers for years.

On January 17, 2012, a partial consent decree was entered in the DOJ Action[4] in which Defendants finally admitted – after years of dissembling – that they assigned prices to "standing instructions" FX trades that were "at or near the high end of the range of prices reported in the interbank market for currency sales for the relevant pricing cycle, and at or near the low end of the range of prices reported in the interbank market for currency sales for the relevant pricing cycle," and that the "pricing of Standing Instruction Service transactions is generally less

---

[1] "Defendants" refers to The Bank of New York Mellon Corporation ("BNYMC"), BNYM, The Bank of New York ("BNY"), and Mellon Bank, N.A. ("Mellon").

[2] *International Union of Operating Engineers, Stationary Engineers Local 39 Pension Trust Fund v. The Bank of New York Mellon Corp.*, No. 11-cv-03620-WHA (N.D. Cal.), consolidated with this MDL proceeding as No. 12-cv-03067 (LAK).

[3] *Southeastern Pennsylvania Transportation Authority v. The Bank of New York Mellon Corporation, et al.*, No. 11-cv-01628-JHS (E.D. Pa.), consolidated with this MDL proceeding as No. 12-cv-3066 (LAK).

[4] *United States v. The Bank of N.Y. Mellon Corp.*, No. 11-cv-6969 (LAK) (S.D.N.Y.).

favorable to clients than directly negotiated trades." *See* Dkt. No. 17 (Jan. 17, 2012) in *United States v. The Bank of N.Y. Mellon Corp.*, No. 11 Civ. 6969 LAK (S.D.N.Y.).  These admissions flew in the face of Defendants' prior claims that their "standing instructions" FX trades for custodial clients met "best execution" standards or were "free of charge."  *Id.*  Indeed, the DOJ consent decree prohibits Defendants from making such claims going forwards, along with the claim that "all Standing Instruction Service clients receive the same pricing."  *Id.*  Additionally, Defendants have also finally agreed to fully disclose Defendants' pricing of "standing instructions" FX transactions and to provide custodial clients with a mechanism to compare the average pricing of "standing instructions" transactions with trades for non-restricted currency pairs at a particular point in time.  *Id.* at 3-4.  Defendants to date have not agreed to make any restitution to defrauded clients (apart from a recent settlement with Prudential Financial) or to disgorge the profits it or its subsidiaries and affiliates obtained through their unlawful scheme.

Less than a month later, in the first decision to address pension funds' private civil claims arising out of the same facts, Judge William Alsup of the Northern District of California denied in its entirety Defendants' motion to dismiss the *Operating Engineers* action, holding that Plaintiffs had sufficiently alleged that Defendants' alleged FX practices (i) were "unfair" under California's Unfair Competition Law ("UCL")[5]; (ii) constituted "false advertising" under California's False Advertising Law ("FAL")[6] (insofar as Defendants falsely promised FX services that were subject to "best execution," were "free of charge," or would be executed in a manner not less favorable than those done for "unrelated parties in a comparable arm's length FX Transaction"); (iii) breached Defendants' contracts with their custodial customers; (iv) breached the implied covenant of good faith and fair dealing; and (v) constituted "deceptive trade

---

[5] Cal. Bus. & Prof. Code § 17200, *et seq.*
[6] Cal. Bus. & Prof. Code § 17500.

1056022.4

practices" as contemplated by N.Y. General Business Law ("GBL") § 349.  *See Int'l Union of Operating Eng'rs, Stationary Eng'rs Local 39 Pension Trust Fund v. Bank of N.Y. Mellon Corp.*, No. C 11-03620 WHA, 2012 U.S. Dist. LEXIS 18281 (N.D. Cal. Feb. 14, 2012) ("*IUOE Local 39*").

Now come the Ohio Police & Fire Pension Fund ("OP&F") and School Employees Retirement System of Ohio ("SERS") (collectively, "Plaintiffs") who together seek relief, under similar legal theories, on behalf of themselves and a proposed Class of similarly situated FX customers for the exact same wrongs alleged in *Operating Engineers*.  In response, Defendants employ the same arguments they have used to date in these cases, which boil down to the following:  (i) Plaintiffs were no better than a retail FX customer who walks into a currency exchange booth off the street, notwithstanding the efforts Defendants went through to win and keep Plaintiffs' custodial business, including contracting with Plaintiffs and responding to Plaintiffs' Requests for Proposals and/or Information with deceptive claims about their services; and (ii) Plaintiffs should have paid more attention all along to the FX prices they were being charged under "standing instructions," notwithstanding both Defendants' assurances, *inter alia*, of "best execution," and the fact that Plaintiffs did not receive real-time pricing information for such trades, and only summary information at the end of each month.

These arguments are all that Defendants have, which is why they keep repeating them. They are belied, however, not only by the allegations concerning Plaintiffs' own specific circumstances, but also (literally) thousands of internal BNYM documents that have been produced or otherwise made public (and described in the Amended and Class Action Complaint ("AC")), wherein Defendants (i) discuss exactly what they meant by the term "best execution" when trying to win a client's custodial FX business; and (ii) openly describe the lack of

"transparency" with custodial clients that enabled Defendants to keep the gravy train operational. Defendants' response is to just act as if these documents and allegations do not exist.  Recent Supreme Court jurisprudence requires, on a motion to dismiss, that Plaintiffs allege facts that are "plausible" – it does not permit Defendants to deny reality.  Defendants' motion to dismiss should be denied.

**STATEMENT OF FACTS**

OP&F is a body corporate and politic created by the Ohio legislature to provide retirement, disability, and other benefits to active and retired police officers and firefighters as well as to their beneficiaries and survivors.  ¶ 1.[7]  OP&F serves more than 56,210 public employees across the State of Ohio, and managed approximately $11.62 billion in assets as of August 31, 2011.  *Id.*  SERS was established and operates to provide pension benefits and access to post-retirement health care coverage to active and retired non-teaching public school employees.  ¶ 2.  SERS serves more than 189,000 public employees across the State of Ohio, and managed approximately $10.48 billion in assets as of July 31, 2011.  *Id.*  Like other proposed Class members, Plaintiffs have increasingly looked to overseas companies and securities markets over the last decade in order to diversify their holdings and maximize investment returns.  ¶ 19. The necessity for pension funds, in particular, to invest in foreign securities in order to properly diversify and meet their funding requirements is well-known to and appreciated by custodial services providers such as Defendants.  *Id.*

Between May 1, 2004 and July 5, 2010 (with respect to OP&F) and February 1, 2007 to the present (with respect to SERS), Defendants provided custodial services to Plaintiffs, including executing FX transactions on Plaintiffs' behalf under "standing instructions" ("SIs").

---

[7] Citations to "¶ __" are to paragraphs of the AC.

¶¶ 22-23, 25, 30, 31-33, 34.  Under SIs, a custodial FX service provider acquires foreign or domestic currency to effectuate a client's purchase or sale of a foreign security, or the repatriation of a foreign dividend, on an as-needed basis without the direct involvement of either the custodial client's investment staff or outside investment managers.  ¶ 46.  Custodial clients pay substantial fees for custody FX services.  ¶¶ 48, 65, 77-78.

In "direct" or "negotiated" sales or purchases of foreign or domestic currency, by contrast, the custodial client or its outside investment manager directly negotiates, at arm's length, the sale or purchase of foreign currency with the custodial FX services provider.  ¶ 45. Direct FX transactions traditionally yield modest profits to a purchaser or seller of currency, perhaps up to two to three basis points ("bps") of "spread" per unit as compared with the interbank exchange rate applicable to the currency at the time.  *Id.*  Defendants' own experience amply confirms this.  ¶¶ 44, 71-72, 86-93, 103, 115.

### A.      OP&F's Contract

Section 13(a) of the Global Custody Agreement ("GCA") (*see* AC, Exh. A) concerning Defendants' services to OP&F deals directly with FX, and provides as follows:

> Instructions, including ***standing instructions***, may be issued with respect to such contracts but the ***BNY may establish rules or limitations concerning any foreign exchange facility made available***.  In all cases where BNY, its subsidiaries, affiliates or Subcustodians enter into a foreign exchange contract related to Accounts, the terms and conditions of the then current foreign exchange contract of BNY, its subsidiary, affiliate or Subcustodian and, ***to the extent not inconsistent,*** this Agreement shall apply to such transaction.  (¶ 25).[8]

BNY's 2003 written FX Policies & Procedures for ERISA Plans ("2003 FX Procedures"), which were operative at the time and thus incorporated in the GCA, ostensibly set forth the "rules and limitations" described above, including the method for

---

[8] Unless otherwise indicated, all emphases are added.

determining the rates at which FX transactions would be executed under SIs.  ¶ 14; *see also* Exh. 4 to the Decl. of Joshua D. Branson ISO Defs' Motion To Dismiss Plaintiffs' Amended and Class Action Complaint ("Defs. Decl.") [Dkt. No. 149-4].  These included the promise that "[t]he terms of FX Transactions with any Plan," including those executed pursuant to SIs, "**shall not be less favorable** to the Plan than terms offered by BNY to unrelated parties in a **comparable arm's length** FX Transaction."  Defs. Decl., Exh. 4; *see also* ¶¶ 68, 76.[9]  This promise was repeated in BNY's 2006, 2007, and 2008 FX Procedures.  Defs. Decl., Exh. 4.

The 2003, 2006, 2007 and 2008 FX Procedures further provided that, under SIs, "all income item conversions" (*e.g.*, dividend repatriations) involving foreign currency for ERISA fund clients would be "bundled" and "executed" each day at 11:00 a.m. New York time "at or within the range of buy/sell rates in effect at 11:00 a.m. New York time."  *Id.*  The 2003 FX Procedures (in effect at the time of the GCA) went on to say that this was done "to achieve **better rates for the benefit of clients.**"  *Id.*  No disclosure was made in these or any subsequent FX Procedures indicating that Defendants would instead be pricing SI FX trades in a manner uniformly **detrimental** to clients.

---

[9] These terms echo Section 408(b)(18) of ERISA (still in effect), which permits FX transactions to be performed for an ERISA-covered plan by a custodial bank if "[a]t the time the [FX] transaction is entered into, the terms of the transaction are not less favorable to the plan than the terms generally available in comparable arm's length foreign exchange transactions between unrelated parties." Although Defendants' **current** FX Procedures may no longer actually quote the ERISA requirements (*see* Defs. Decl., Exh. 1), those requirements remain in force.  Further, by submitting the FX Procedures to the Court for consideration on this motion, Defendants acknowledge (and have consistently maintained in these actions) that the terms contained in the FX Procedures were not limited to ERISA plan customers, but were rather applied across the board to all custody FX clients (with the exception of those preferred clients with whom Defendants quietly reached special arrangements in order to prevent "transparency" from spreading.  *See* ¶¶ 69-72, 116).

In 2006, the Treasurer of the State of Ohio sent out a Service Legal Assessment for Custody Services ("SLA") that (i) sought information from Defendants concerning their custody services (including FX) and (ii) provided that "[a]ny agreement for ancillary services" (such as services related to FX) would be "between the Beneficial Owner [*i.e.*, P&F or SERS] and Custodian [*i.e.*, Defendants]" directly. ¶¶ 26-28; AC, Exh. E.  In its response dated September 1, 2006 ("P&F RFI Response"), BNY further set out its "rules and limitations" as referenced in the SCA when providing "ancillary services," such as custody FX – none of which contradicted any of the terms set forth in either the SCA or the 2003, 2006, 2007 and 2008 FX Procedures.  ¶¶ 23, 26-28; AC, Exh. D.

In the P&F RFI Response, BNY described its FX services as capable of pricing during a 24-hour window in a manner designed to optimize the custodial client's experience, and that "maintaining such a rich and important client base requires superior service and competitive rates as an FX provider." ¶ 27; AC, Exh. D.  In response to the Treasurer's query concerning how and when it set its FX rates, BNY stated:  "We utilize the Daily Foreign Exchange Rates from WMReuters.  Each price is converted back to its base currency based on the FX rate each day.  Currently we use a 4:00 p.m. London close for FX rates." ¶ 28; AC, Exh. D.  And in response to the query whether there was any "financial advantage" to transacting in FX through Defendants, BNY stated:  "Since The Bank of New York is one of the largest global custodians, our clients gain the ongoing benefit of aggregation of transactions across our broad customer base; ***accordingly, we price foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk***." *Id.* "***Best execution***,"[10]

---

[10] "Best execution," as understood throughout the financial services industry and (as the AC describes at length) ***recognized by Defendants internally***, requires that a service provider seek to obtain for its customers the most favorable terms reasonably available under the circumstances.

BNY continued, "encompasses a variety of services designed to ***maximize the proceeds of each trade, while containing inherent risks and the total cost of processing***." *Id.*[11]

### B.    SERS' Contract

Meanwhile, the Sub-Custody Agreement between Huntington National Bank and Mellon, dated February 1, 2007 ("2007 SCA") governed Mellon's FX services for SERS.  ¶ 34; AC, Exh. B.  The 2007 SCA was preceded by, and specifically incorporated, Mellon's response to the Request for Information: International Custody Services for the School Employees Retirement System, dated September 1, 2006 ("SERS RFI Response").  ¶ 35; AC, Exh. F.  In the SERS RFI Response, Mellon promised accurate and timely pricing of FX trades, including that: (i) Mellon had a "***historical commitment to accurate and efficient settlement***[]" of FX trades; (ii) "***[t]ransactions for forward foreign exchanges and other currency derivatives are entered into the accounting system on a timely basis***"; (iii) "***Mellon works closely with the investment manager to ensure that all foreign exchanges and currency derivatives are processed and reported accurately***"; and (iv) "[a]s active market makers in the interbank, institutional and corporate FX markets, Mellon FX traders are acutely aware of current currency prices.  ***Prices we offer clients are intended to be competitive with the current market***."  ¶ 33; AC, Exh. F at § 2.16.

Nothing in Mellon's 2004 Foreign Exchange Procedures contradicted the foregoing statements from the SERS RFI Response and the 2007 SCA concerning FX.  *See* Defs. Decl.,

---

¶¶ 40, 96-105.  At a minimum, therefore, "best execution standards" required that Defendants execute trades in a manner designed to maximize the proceeds for Plaintiffs and the Class.  ¶ 40. Defendants' website contained similar false assertions regarding "best execution" and SI trades being executed "free of charge" until just recently (¶¶ 13, 39, 42, 48, 106, 108, 113, 115), when they were pulled as the result of litigation and the consent decree with the DOJ described above.

[11] Plaintiffs are not aware of, and Defendants have not provided, any subsequent contract with Defendants for the benefit of OP&F that superseded the GCA.

Exh. 5.  Indeed, not until after the unsealing (in late 2009) of a *qui tam* lawsuit against State

Street Bank & Trust ("State Street") alleging FX misconduct, in a new contract dated July 5,

2010 ("2010 SCA"), did Defendants grow concerned enough about their own potential liability

to add a term entitled "Subcustodian Provides Diverse Financial Services and May Generate

Profits as a Result," in which Defendants stated (for the first time) that they "may be in

possession of information tending to show that the Instructions received may not be in the best

interest" of SERS, and that "neither [BNYM] nor its Affiliates are under any duty to disclose any

such information."  ¶¶ 31, 37; AC, Exh. C at § 7.4.  The foregoing notwithstanding, the 2010

SCA still provided that BNYM "***shall treat all transactions with . . . [SERS] as arms-length

transactions***."  *Id.*

### C.    The Scope and Impact of Defendants' Deceptive FX Practices.

Contrary to all of the foregoing, Defendants did not use "best execution" when

conducting FX trades, nor were they "free of charge" or comparable to "arm's length"

transactions designed to "achieve better rates for the benefit of clients."  Instead, Defendants

charged their SI clients fictitious FX rates that were higher (for purchases) or lower (for sales)

than those Defendants owed or received for the currencies in question, and pocketed the

difference, resulting in profits that were orders of magnitude greater than those Defendants

earned on direct transactions.  ¶¶ 11-15, 20-21, 29, 38, 42-44, 47-66, 77-78, 104-05, 115.

Indeed, Plaintiffs' analysis of all of the FX trades in five major global currencies that Defendants

conducted on their behalf revealed that Defendants charged Plaintiffs FX rates that were 16-17

bps worse, on average, than Plaintiffs could have expected from typical arm's length

transactions.  ¶¶ 79-83.  This is over and above the millions of dollars in custodial fees that

Plaintiffs and similarly-situated customers paid to Defendants for custodial services such as SI FX trades that Defendants deceptively billed as cost and time-efficient.  ¶¶ 44, 48, 65, 77-78.

Defendants' profits from this scheme have been massive—in 2008, during a financial crisis which saw wild fluctuations in currency values, BNYMC reported a record $1.5 *billion* in FX and other trading activity revenue (an increase of 86% over the previous year).  ¶ 43.  For the years 2002 to 2008, BNYMC and the banks that merged to form it (BNY and Mellon) reported more than $5 billion in FX trading revenue.  *Id.*

Defendants' conduct is currently the subject of whistleblower lawsuits being pursued by the Commonwealth of Virginia, the States of Florida and New York, and various counties in California.  ¶ 13.  It is also the subject of an administrative proceeding by the OSCM, an investigation by the SEC, and the DOJ Action.  *Id.*

Plaintiffs devote substantial space in the AC (¶¶ 84-116) to describing Defendants' internal documents and/or statements that have been made public since the filing of the initial complaint, either in the DOJ Action or the whistleblower actions.  Defendants largely ignore these allegations, strangely asserting only (in a footnote) that they are irrelevant because Plaintiffs do not allege that they "saw, agreed to, or relied" on the internal documents while using Defendants' FX services.  (Br. at 20 n.30.)[12]  In summary, these allegations reveal that: (a) Defendants knew that they made higher profits out of their SI transactions than negotiated transactions, often by a tenfold or twentyfold margin; (b) Defendants also knew that more "transparency" with custodial clients about their SI pricing would cause such clients to migrate to negotiated FX transactions and drastically reduce Defendants' profits; (c) Defendants thus did not want full transparency, and were therefore (in the words of one executive) "late to the

---

[12] "Br." refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended and Class Action Complaint [Dkt. No. 148].

transparency space" relative to their competitors; (d) Defendants made numerous common misrepresentations in various documents and on the internet that misled custodial clients concerning their conduct with respect to SI trades; (e) in the words of one employee, BNYM trained its FX traders to commit fraud, which was pervasive and fully known to top management; and (f) Defendants sought to cover up their fraudulent practices beginning in late 2009 once the California Attorney General sued State Street for similar practices.  ¶¶ 84-116.  These allegations buttress Plaintiff's otherwise sufficient allegations stemming from their individual contracts, and are more than adequate to support each of Plaintiff's contract, tort and statutory claims.

## ARGUMENT

### I.      Plaintiffs State A Claim For Breach Of Contract.

Plaintiffs' contract claims are straightforward.  To state a prima facie claim for breach of contract, a plaintiff must plead facts showing: (1) the existence of a contract; (2) plaintiff's performance under the contract; (3) defendant's failure to perform under the contract; and (4) damages resulting from defendant's failed performance.  *King v. Hertz Corp.*, No.: 1:09 CV 2674, 2011 U.S. Dist. LEXIS 35610, at *26 (N.D. Ohio Mar. 31, 2011) (citing *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006); *MMK Grp., LLC v. SheShells Co., LLC*, 591 F. Supp. 2d 944, 963 (N.D. Ohio, 2008); *Doner v. Snapp*, 98 Ohio App. 3d 597, 649 N.E.2d 42 (2d Dist. 1994)).  Defendants contest just one of these elements, arguing that they did not fail to perform under the contract because they undertook no duty to price FX trades other than in the manner in which they only now openly admit they did – *i.e.*, consciously maximizing the proceeds of each trade for themselves, to the direct detriment of Plaintiffs.  Defendants are wrong.

As described above, the contracts each required (at a minimum) that Defendants *not*

1056022.4

manipulate or assign fictitious prices to FX trades so as to maximize the proceeds of each and every trade to Defendants at the direct expense of Plaintiffs.  This requirement stems from obligations that Defendants undertook to Plaintiffs that were specifically incorporated or referenced in the contracts, whether it be the promise to supply (i) terms on SI FX trades that were no worse than unrelated parties would receive in comparable arm's length transactions (*see* ¶¶ 14, 25, 37, 68, 76; Defs. Decl., Exh. 4); (ii) "better rates for the benefit of clients" (Defs. Decl., Exh. 4) or (iii) "best execution," "accurate and efficient settlement" of FX trades to be "processed and reported accurately" at levels "competitive with the current market," along with pricing "generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk."  ¶¶ 28, 33.  Defendants failed to do each of these things.  Instead, Defendants charged their SI clients fictitious FX rates that were higher (for purchases) or lower (for sales) than those Defendants owed or received for the currencies in question, and pocketed the difference, resulting in profits that were orders of magnitude greater than those Defendants earned on direct transactions.  ¶¶ 11-15, 20-21, 29, 38, 42-44, 47-66, 77-78, 104-05, 115.

The foregoing clearly sets out a claim for breach of contract under Ohio law.  Contract claims are subject to Rule 8's pleading standards, which require only that Plaintiffs' allegations "raise a right to relief above the speculative level." *Anwar v. Fairfield Greenwich Ltd.*, 831 F. Supp. 2d 787, 791 (S.D.N.Y. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).[13]

---

[13] In *Anwar*, cited by Defendants (Br. at 12), the court dismissed a breach of contract claim where it was compelled (in the absence of allegations to the contrary) to interpret that claim (which dealt with intermediary banks' alleged failure to properly calculate the Net Asset Value ("NAV") of a hedge fund) "in light of the customary usage [of the term NAV] within [the financial] industry." *Id.* at 794-95.  The court found that it was simply not plausible to expect an intermediary bank to determine the NAV of a hedge fund it did not manage; such NAVs were customarily calculated by the hedge fund itself and reported to the intermediary bank. *Id.* at 795.  These facts are far removed from the present case, since no one could plausibly argue that Defendants did not themselves assign the FX prices that Plaintiffs were charged or credited, or did not understand full well what "best execution" meant in

Accordingly, "the task of the court in ruling on a motion to dismiss is to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Id.* (internal quotations omitted).

Further, as Defendants' own authorities illustrate, to the extent any of the terms relied on by Plaintiffs to allege Defendants' breach could be considered "ambiguous," the job of contractual interpretation is "turned over to the fact-finder." *Astor v. International Bus. Machs., Corp.*, 7 F.3d 533, 539-40 (6th Cir. 1993) (internal citations omitted). In fact, of the fifteen cases Defendants cite in support of their argument that Plaintiffs' contract claims should be dismissed under Rule 12(b)(6), only five (including *Astor* and *Anwar*, which are distinguishable for the reasons stated immediately above) actually arise in the context of a motion to dismiss.[14] The remainder are all procedurally inapposite, concerning entries of summary judgment or trial

---

the context of the FX services they provided (notwithstanding Defendants' efforts to distract the Court with citations to inapposite authorities assertedly dealing with "industry usage" of the term "best execution"). ¶¶ 96-105.

[14] The three cases apart from *Astor* and *Anwar* are also readily distinguishable from the present case, or even helpful to Plaintiffs' argument. For instance, *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001), which concerned a motion to dismiss, stands for the proposition that Rule 8(e) "permits a plaintiff to make two or more 'statements of a claim' alternatively" or to "state as many separate claims as they have regardless of consistency," without granting plaintiffs "license to plead inconsistent *assertions of facts* within the allegations that serve as the factual predicates for an independent, unitary claim." *Id.* at 406-07 (emphasis in original). Moreover, "conflicting allegations" that may make one claim insufficient do not similarly affect other claims "to the extent the elements necessary to make out a case under those other theories are sufficiently pleaded." *Id.* at 407. Defendants can point to no inconsistencies in the AC sufficient to defeat Plaintiffs' claims under Rule 8. In *Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410, 412-13 (2d Cir. 1989), meanwhile, plaintiff's contract claim was dismissed where the contract was "unambiguous" on the question of whether defendant had breached any obligation, "concerning which there [was] no reasonable basis for a difference of opinion" (internal citation omitted). The contractual terms at the heart of Plaintiffs' claim simply cannot be considered to be unambiguously supportive of Defendants' arguments, as Judge Alsup so found when allowing Plaintiffs' contract claims to proceed in *Operating Engineers. IUOE Local 39*, 2012 U.S. Dist. LEXIS 18281, at *16-17. And *Schupak Group, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 716 F. Supp. 2d 262 (S.D.N.Y. 2010) concerned a plaintiff's failure to sufficiently plead its own adequate performance under the contract, a necessary element which Defendants do not contest here.

verdicts after the consideration of admitted evidence.[15]  Defendants' heavy reliance on *Mexico Money* is additionally misplaced for another fundamental reason – *Mexico Money* concerned a pure retail transaction in which there was no custodial contract or relationship between the parties.  (Br. at 13, 17.)

Defendants characterize several of the promises underlying Plaintiffs' contract claim as inadmissible "parol evidence" based on the integration clauses in the contracts.  Defendants' arguments miss the mark on two levels.  First, although the GCA and the 2007 SCA contain integration clauses in one form or another, they also either (i) specifically incorporate or reference the terms Plaintiffs cite or (ii) allow for the adoption of such terms through separate documentation or "rulemaking" not inconsistent with the contracts.  *See, e.g.*, ¶¶ 14, 25-28, 35. Further, as one of Defendants' own cases makes clear, the parol evidence rule excludes evidence of alleged contractual promises that cannot be reconciled with, or are directly contradicted by, a subsequent integrated writing – not promises which, as here, can be squared with the language in the contract without contradicting it.  *Galmish v. Cicchini*, 734 N.E.2d 782, 789-91 (Ohio 2000). Moreover, the parol evidence rule does not apply to extrinsic evidence used to demonstrate (as

---

[15] *See, e.g.*, *Langfan v. Carlton Gardens Co.,* 916 N.E.2d 1079 (Ohio Ct. App. 2009) (partially affirming judgment after trial and examining the evidentiary record); *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000), *aff'd*, 267 F.3d 743 (7th Cir. 2001) (granting final approval of nationwide class actions "after months of discovery and negotiations"); *Galmish v. Cicchini*, 734 N.E. 2d 782 (Ohio 2000) (concerning jury verdict after trial); *Aultman Hosp. Ass'n v. Community Mut. Ins. Co.*, 544 N.E.2d 920 (Ohio 1989) (reversing trial court judgment entered after consideration of evidence); *Layne v. Progressive Preferred Ins. Co.*, 820 N.E.2d 867 (Ohio 2004) (affirming reversal of summary judgment); *Zelina v. Hillyer*, 846 N.E.2d 68 (Ohio Ct. App. 2005) (affirming entry of summary judgment); *Wsol v. Fiduciary Mgmt. Assocs., Inc.*, 266 F.3d 654 (7th Cir. 2001) (affirming entry of judgment under Rule 52 after findings of fact and consideration of evidence); *Tannenbaum v. Zeller*, 552 F.2d 402 (2d Cir. 1977) (concerning judgment entered after bench trial); and *Sanchez v. Giromex, Inc.*, No. D042459, 2004 WL 2750332 (Cal. Ct. App. Dec. 2, 2004) (affirming entry of summary judgment after consideration of evidence).  *Sanchez*, moreover, is a pre-2007 unpublished California appellate decision that may not be cited in this context pursuant to Cal. R. Ct. 8.1115 (as Defendants well know, having tried the same in *Operating Engineers*).

alleged here) that a written contract was induced by fraud.  *Id.*

The remainder of Defendants' arguments improperly ask the Court to weigh (or selectively ignore) evidence, or make inferences against, rather than in favor of, the truth of the matters alleged.  Defendants' feigned befuddlement at Plaintiffs' allegations concerning the modest "2 to 3 basis points . . . of spread" that one may encounter in an arm's length FX trade is one example.  (Br. at 14).  Plaintiffs did not simply make those numbers up (nor were they made up in *Operating Engineers*).  They are supported by Defendants' own experience, as revealed in numerous documents produced in these cases to date and described in the AC.  ¶¶ 44, 71-72, 86-93, 103, 115.

As Judge Alsup held in *Operating Engineers* in considering identical facts and elements, "the construction of a disputed contract term such as 'comparable' is best left to a motion for summary judgment after discovery has been conducted.  The same is true of 'free of charge,' 'best execution standards,' and 'as principal,' the meanings of which are also disputed by the parties."  *IUOE Local 39*, 2012 U.S. Dist. LEXIS 18281, at *16-17.[16]  For all of these reasons, Plaintiffs' claim for breach of contract should proceed.

## II.   Plaintiffs Have Properly Pled A Claim For Fraud In The Inducement.

Plaintiffs have sufficiently pled that Defendants fraudulently induced them to enter into the agreements under which Defendants provided custodial FX services.  The AC specifically alleges that Defendants knowingly made several material misrepresentations and withheld material information concerning its custodial FX services, that Defendants intended that Plaintiffs rely on those misrepresentations and omissions, and that Plaintiffs justifiably relied on

---

[16] *See also* Tr. of May 8, 2012 Hearing in *Ark. Teacher Ret. Sys. v. State St. Corp.*, No. 1:11-cv-10230-MLW (D. Mass.) (attached as Exhibit 1 to Decl. of Brian K. Murphy ("Murphy Decl.")), at 89:2-89:19, 99:7-100:11 (allowing similar breach of contract claim to proceed against State Street).

them.  *See Billy Casper Golf, LLC v. Kennsington Golf Club, LLC*, No. 4:11-cv-527, 2012 U.S. Dist. LEXIS 26644, at *6 (N.D. Ohio Feb. 29, 2012) (listing elements of fraudulent inducement). Defendants' arguments that Plaintiffs have not pled affirmative misrepresentations or omissions amount to factual disputes not appropriate for resolution on a motion to dismiss.

      A.      **Plaintiffs Have Sufficiently Pled Material Misrepresentations and Omissions.**

Plaintiffs allege that in the P&F RFI Response, BNY misrepresented to OP&F the FX services that it provided.  *See* ¶¶ 26, 29.  In that Response, BNY falsely stated that it used a "4:00 p.m. close for FX rates," and that it "price[d] foreign exchange at levels generally reflecting the interbank market at the time the trade is executed by the foreign exchange desk."  ¶ 28.  BNY also promised "[b]est execution," which it represented "encompasses a variety of services designed to maximize the proceeds of each trade, while containing inherent risks and the total cost of processing."  *Id.*  These statements were knowingly false, as Defendants instead assigned fictitious rates to Plaintiffs' FX transactions, and claimed to have paid or received a different rate than what was required to settle the trades.  ¶¶ 52-78.

Defendants attempt to minimize these misrepresentations by arguing that the document containing these misrepresentations is not part of the contract with OP&F.  (*See* Br. at 23 (referring to pages 15-16).)  As Plaintiffs explain above, Defendants are mistaken, but whether or not the P&F RFI response is part of OP&F's contract is not relevant to the question of whether OP&F was fraudulently induced to enter into the contract.  Plaintiffs are not limited to the contract itself in pleading fraudulent inducement, and Defendants' attempt to preclude consideration of statements outside of the contract that allegedly induced Plaintiffs to sign the contract is contrary to Ohio law.  Under Ohio law, "the Parol Evidence Rule will not exclude evidence of fraud which induced the written contract."  *Galmish*, 734 N.E.2d at 790 (quoting *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 662 N.E.2d 1074, 1080 (Ohio 1996)).  As the *Galmish*

- 16 -

court held, "It was never intended that the parol evidence rule could be used as a shield to prevent the proof of fraud." *Id.* at 789.

Defendants argue that Plaintiffs have not alleged material misrepresentations or omissions leading up to the signing of OP&F's first contract with Defendants, from May 2004. ¶ 24. However, Defendants ignore one of the very documents it submitted to the Court for consideration on this motion – the 2003 FX Procedures, which set forth the rules and limitations for BNY's custodial FX services as described by the GCA, and stated (falsely) that "[t]he terms of FX Transactions with any Plan," including those executed pursuant to SIs, "***shall not be less favorable*** to the Plan than terms offered by BNY to unrelated parties in a ***comparable arm's length*** FX Transaction." Defs. Decl., Exh. 4; *see also* ¶¶ 14, 68, 76. Further, Plaintiffs allege that the misrepresentations in the P&F RFI response, from September 1, 2006, constituted the "standard description of the FX services [BNYM] offered to its clients." ¶ 29. Plaintiffs also alleged, and Defendants do not dispute, that the FX practices at issue were unchanged until recently, following scrutiny from the public and law enforcement. The misrepresentations within the P&F RFI response, which OP&F directly solicited, induced OP&F to continue the custodial relationship with BNY (and later BNYM). And Defendants' promise to provide "best execution" was also false, and at odds with Defendants' own internal definition of "best execution," reflected in documents pre-dating the P&F RFI response. *See* ¶¶ 96-105.

Plaintiffs also sufficiently allege that Defendants fraudulently misrepresented their FX practices to SERS, inducing them to enter into agreements with Mellon. In the SERS RFI Response, dated September 1, 2006 (which preceded and is incorporated by the sub-custody agreement between Huntington National Bank and Mellon, dated February 1, 2007, ¶ 31), Mellon promised accurate and timely pricing of FX trades. *See* ¶ 33. It also promised "accurate

and efficient settlement[]" of FX trades, that "all foreign exchanges and currency derivatives are processed and reported accurately," and that trades would be entered "on a timely basis."[17]  *Id.*

Defendants characterize their misrepresentations in the SERS RFI Response as having "nothing to do with pricing" (while conceding that the promise that its prices would be "competitive with the current market" does).  (Br. at 16.)  But promises that transactions would be entered "on a timely basis," or that "all foreign exchanges and currency derivatives are processed and reported accurately," ¶ 33, go to the heart of the wrongdoing alleged.  Defendants did not enter trades on a timely basis, but instead cherry-picked the worst rate of the day for Plaintiffs and Class members, "regardless of when the client's specific trade request was submitted," ¶¶ 59, 69, and they waited to use a price range observed in London time on FX trades entered in New York to achieve a larger spread.  ¶ 61.[18]  The broken promise to report FX trades accurately is also key to how Defendants were able to carry out and continue their wrongdoing:  Defendants' end-of-month Client Custody Reports included nothing "that would

---

[17] Mellon provided this document specifically in response to the SERS RFI, and the response was specifically incorporated into the overall agreement between Mellon and SERS.  ¶¶ 31, 35.  Thus, Defendants' contention that Plaintiffs' allegations of reliance are "boilerplate" (Br. at 23) is meritless.

[18] These representations are hardly mere "puffery," as Defendants suggest.  (Br. at 24 n. 38.) Defendants rely on three cases, none of which supports that assertion.  *Philadelphia Fin. Mgmt. of San Francisco v. DJSP Enters., Inc.*, 10-cv-61261, 2011 WL 4591541, at *14 (S.D. Fla. Sept. 30, 2011), was a securities fraud action in which the Court held that statements regarding the use of technology were non-actionable "puffery" both because there was no allegation that the defendants did not use that technology, and "more important," because those statements about technology and operations "were not material" and were not "specific" and "verifiable."  Here, misrepresentations about Defendants' "timely" execution of trades and "competitive" rates go to the heart of "specific" and "verifiable" misconduct – that Defendants waited to pick the worst rate of the day to apply to Plaintiffs' transactions.  Similarly, in *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 180 (D.D.C. 2007), another securities case, the Court found that general statements promising "efficient," "sound," "smart" expenditures were too subjective to be reasonably relied upon by investors.  Here, there is nothing subjective about the promises that Defendants made to execute trades in a timely fashion.  Finally, in *YTY Indus. SDN. BHD. v. Dow Chem. Co.*, 05-cv-8881, 2009 WL 3633871, at *19 (C.D. Cal. Oct. 28, 2009), the Court found, after a bench trial, that the plaintiff had not proved that the defendant seller set an artificially low price with the intent to induce a sale and then breach a sales agreement.

lead a custodial client to suspect that it had been unfairly charged exorbitant mark-ups (or mark-downs) on its [SI] FX trades that were orders of magnitude larger than under the terms offered to unrelated parties in comparable arm's length FX transactions."  ¶ 68.

Plaintiffs also sufficiently allege that SERS's most recent agreement – the 2010 SCA – was fraudulently induced.  Following the unsealing in late 2009 of the *qui tam* lawsuit against State Street over its FX practices, Defendants added new language characterizing their FX services.  ¶ 37.  Although Defendants argue, contrary to the standards governing a motion to dismiss, that they are entitled to an inference that the language in the 2010 SCA sufficiently informed Plaintiffs of the true nature of their conduct, even the new language was materially misleading.  For example, the 2010 SCA misrepresented that BNYM treated its transactions with SERS as "arms-length transactions."  ¶ 37.  Under Ohio law, in a true arm's length transaction, both parties are "presumed to have the opportunity to ascertain relevant facts."  *Blon v. Bank One, Akron, N.A.*, 519 N.E.2d 363, 367 (Ohio 1998).  By concealing from Plaintiffs their practice of assigning the worst possible rate to FX transactions, Defendants prevented Plaintiffs from knowing all the facts relevant to these transactions.  The negotiated transactions that Defendants entered into with other clients were a proxy for the market rate for FX transactions and represented genuine arm's length transactions; those transactions involved much smaller spreads for Defendants.  *See*  ¶¶ 38, 45.  By contrast, Plaintiffs could not determine whether they had received a true arm's length price for their SI FX trades and certainly could not detect Defendants' daily manipulation of the FX rates because the monthly reports Plaintiffs did receive did not include time-stamps.  ¶¶ 49-50.  Defendants' 2010 disclosures simply added another layer of deception to their conduct.

Defendants do not dispute that they withheld what they euphemistically call their "pricing

methodology" (Br. at 25), but instead argue that they had no duty to disclose these facts because they called them arm's length transactions. But Defendants did not treat SI FX transactions the way they belatedly labeled them, and Defendants are not entitled to any factual inference that their FX trades were true arm's length transactions. Further, even if these transactions could properly be called arm's length, Defendants would not be relieved of all duty to disclose. As the Ohio Supreme Court held, "Full disclosure may also be required of a party to a business transaction where such disclosure is necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts." *Blon*, 519 N.E.2d at 367. Having chosen to make a partial disclosure in 2010, Defendants were under a duty to speak truthfully, but did not.

### B.   Plaintiffs Pled Justifiable Reliance on Defendants' Misrepresentations and Omissions.

Contrary to Defendants' assertions, Plaintiffs' reliance on Defendants' misstatements and omissions was justified. Plaintiffs had no reason to believe that Defendants were manipulating the rates they assigned to Plaintiffs' FX trades, and were not provided with time-stamped records that indicated when an FX trade actually occurred and which would show Defendants' exorbitant markups. *See* ¶¶ 49-50; 68-69; 117. Despite these allegations of concealment, Defendants insist that because Plaintiffs could have performed the investigation they conducted before filing this complaint to test whether Defendants were acting in bad faith, "any reliance on BNYM's marketing statements was unreasonable as a matter of law." (Br. at 15, 25.) The implications of this argument are far-reaching – Defendants can say whatever they want about their FX practices to induce potential clients to sign up for and keep using their services, as long as those clients remain vigilant of fraud, constantly performing the type of analysis Plaintiffs conducted before

filing suit.[19]  This is not the law; a duty of good faith is implied in every contract (*see* Section V), and a contracting party is not required to assume that his counterpart will perform in bad faith.[20]

Plaintiffs have also alleged in detail that Defendants concealed the actual costs of the FX transactions they carried out, and concealed the manner in which Defendants established their rates.  *See ¶¶* 68-78.  Defendants, however, argue that Plaintiffs cannot allege justifiable reliance for any omission because BNYM disclosed that it took a spread on FX trades.  (Br. at 25-26.) This mischaracterizes Plaintiffs' claims, which are not based on the fact that Defendants took a spread, but on Defendants' misconduct in realizing their massive spreads, which belied Defendants' promises to provide, for example, prices "competitive with the current market." ¶ 33.  Defendants were well aware that their clients would object if they learned the true nature of the spreads Defendants "earned" on standing instruction FX trades, and took steps to keep them concealed.  As one BNYM executive stated, when presented with a proposal to make pricing transparent, "I do NOT like it.  Once pricing spreads are disclosed it will be a race to how quickly clients work it down to zero." ¶ 92.  Thus, the fact that Plaintiffs continued to use BNYM following the disclosure that BNYM "earned" a spread is irrelevant, because Defendants withheld the source and extent of those exorbitant spreads.  Plaintiffs were in the same position as Defendants' other clients about Defendants' spread – in the dark – and Defendants'

---

[19] *Compania Sud-Americana de Vapores S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 419-20 (S.D.N.Y. 1992), cited by Defendants, does not support the proposition that it was unreasonable as a matter of law for Plaintiffs to rely on Defendants' marketing materials.  In that case, the parties discussed each foreign exchange transaction, with the plaintiff learning the exact exchange rate applied at the time.  *Id.* at 415.  As a result, the Court found there was "no basis to dispute that [the plaintiff] had access to the critical information underlying the fraud claim…." *Id.* at 419.  Here, Plaintiffs learned of the rates applied through monthly reports, which supplied only the "fictitious" FX rate, and did not include time-stamps or anything else that would indicate the exorbitant mark-ups and markdowns that Defendants took.  ¶ 68.

[20] *See, e.g., Freedom Foods, Inc. v. Rose Valley Land Group, Ltd.*, 2006 U.S. Dist. LEXIS 49591 (S.D. Ohio July 20, 2006) (reliance justified where one "reasonably investigates the truth of representations made ***prior*** to reliance thereon") (citation omitted).

misleading disclosure of "some" spread does not defeat Plaintiffs' allegations of reliance based on Defendants' material omissions.

### C.   **Plaintiffs Have Properly Pled Defendants' Knowledge of the Fraud.**

Plaintiffs set forth detailed allegations of Defendants' knowledge of their FX scheme.  As part of their claim for fraud in the inducement, Plaintiffs must allege a "knowing, material misrepresentation." *ABM Farms, Inc. v. Woods*, 692 N.E.2d 574, 578 (Ohio 1998). Alternatively, Plaintiffs may allege that Defendants spoke with "such utter disregard and recklessness as to whether [the statement] is true or false that knowledge may be inferred." *Billy Casper Golf*, 2012 U.S. Dist. LEXIS 26644 at *6 (quoting *Groob v. KeyBank*, 843 N.E.2d 1170 (Ohio 2006)).  Moreover, pursuant to Fed. R. Civ. P. 9(b), while the circumstances of fraud must be alleged with particularity, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Plaintiffs' allegations meet these standards.[21]

Plaintiffs' complaint details Defendants' years-long conduct, ample financial motive, attempts to avoid disclosure, and disappointment when the game was up.  This more than establishes a "strong inference" of knowledge.  Plaintiffs' complaint alleges that Defendants were well aware that standing instructions FX transactions were wildly profitable, and that Defendants sought to keep clients from migrating to negotiated FX transactions.  *See* ¶¶ 84-88.

---

[21] Although Plaintiffs meet either standard, Defendants wrongly argue that Plaintiffs must establish a "strong inference of scienter" under any applicable law.  (Br. at 26.)  Unlike the federal securities laws, there is no such heightened requirement under Ohio law.  The first case Defendants cite to support the "strong inference" requirement, *Amida Capital Management, II, LLC v. Cerberus Capital Management, L.P.*, 669 F. Supp. 2d 430, 444 (S.D.N.Y. 2009), applies New York law.  The single Ohio case Defendants cite for such a requirement, *ABM Farms, Inc. v. Woods*, 692 N.E.2d 574, 578 (Ohio 1998), has no mention of a "strong inference" requirement in alleging fraud in the inducement. Defendants also assert that an Ohio case, *Burns v. Rice*, 813 N.E.2d 25, 41 (Ohio Ct. App. 2004), stating a *respondeat superior* theory of liability, somehow serves to displace Ohio law in favor of federal securities law as to Plaintiffs' state law claim.  (*See* Br. at 26 n.40.)  That case does not support that proposition.

Defendants' employees also understood the materially deceptive nature of their scheme, stating that greater "transparency" for their standing instructions clients would cause clients to migrate to negotiated FX transactions, where BNYM's profits would be 10-20 times less, and resisted any steps towards greater disclosure.  ¶¶ 87, 90-92.  One employee acknowledged that BNYM was "'late' to the transparency space" – and that this was a *good* thing for BNYM's business.  ¶ 93.  Defendants' reactions to the lawsuit against State Street for similar conduct reveal their knowledge of the deceptive nature of their scheme: one employee simply wrote, "oh no," while another, hearing of subsequent government investigations into BNYM, remarked, "It's over, it's all over."  ¶¶ 111-12.  Plaintiffs alleged that Defendants' conduct stretched over at least ten years.  ¶ 13.  These allegations more than suffice to establish Defendants' knowledge of fraudulent conduct.

Defendants' arguments about scienter, focused on isolated paragraphs of Plaintiffs' complaint, are contrary to the Supreme Court's approach to scienter recently set forth in *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011), a federal § 10(b) case.  As the Sixth Circuit recently held, the Supreme Court, in assessing scienter, "did not parse out the allegations for individual analysis."  *Frank v. Dana Corp.*, 646 F.3d 954, 962 (6th Cir. 2011) (citing *Matrixx*, 131 S. Ct. at 1324-25).  Instead, it viewed the allegations "holistically."  *Id.* at 961 (citing *Matrixx*, 131 S. Ct. at 1323-25)). The Sixth Circuit went on: "This is the only appropriate approach following *Tellabs's* mandate to review scienter pleadings based on the collective view of the facts, not the facts individually."  *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007)).  Plaintiffs' allegations of Defendants' knowledge of the scheme,

read in a manner consistent with this precedent, are more than sufficient.[22]

Defendants' other arguments concerning scienter fail.  First, their assertion that Plaintiffs, in their extensive allegations of Defendants' knowledge of the scheme, have not identified pre-merger Mellon employees, and have therefore failed to allege scienter, makes little sense.  One of the sources of the misrepresentations made to SERS was the 2007 SERS agreement with Mellon, which incorporated the SERS RFI Response.  Finally, Defendants' argument that the 2010 SCA, because it contained new disclosures, does not suggest fraud, fails for the reasons stated above.  Defendants' "disclosures" in that document were as misleading as the statements leading up to and in the previous agreements.

## III.   Plaintiffs' Claim For Unjust Enrichment Should Proceed.

Defendants do not argue that Plaintiffs have failed to plead the elements of an unjust enrichment claim.  Nor can Defendants dispute that Rule 8(d)(3) of the Federal Rules of Civil Procedure allows for pleading claims in the alternative, "specifically provid[ing] that a party may state as many claims as it has, regardless of consistency."  *See, e.g., Miami Valley Mobile Health Servs. v. ExamOne Worldwide, Inc.*, No. 3:11-cv-158, 2012 U.S. Dist. LEXIS 16556, at *31-33 (S.D. Ohio Feb. 6, 2012) (denying motion to dismiss quasi-contractual or tort claims pled in the alternative); *DSW, Inc. v. Zina Eva, Inc.*, Case No. 2:11-cv-0036, 2011 U.S. Dist. LEXIS 37944, at *12 (S.D. Ohio Apr. 6, 2011).  Defendants also concede that courts may allow unjust enrichment claims to continue alongside contract claims where fraud or bad faith is present.  (*See* Br. at 29 n.46 (citing *Ullmann v. May*, 72 N.E.2d 63, 66-67 (Ohio 1947)).  As Plaintiffs set out in

---

[22]  Defendants assert that the internal communications cited in the AC from after 2005 and which indicate fraud do not support an inference of knowledge of the fraud at the time the SERS agreement was reached, but the authority they cite for that proposition is not applicable.  The portion of *380544 Canada, Inc. v. Aspen Tech., Inc.*, 633 F. Supp. 2d 15, 32 (S.D.N.Y. 2009) cited by Defendants (Br. at 27) dealt with the defendant's knowledge of a specific side agreement, not an ongoing business practice, unchanged over the course of years, of the type alleged here.

Sections II and V herein, they have properly alleged both, and thus, their unjust enrichment claim should proceed.

**IV.**     **Plaintiffs State A Claim For Conversion.**

Defendants assert that, despite their surreptitious funneling of funds away from Plaintiffs' segregated custodial accounts through use of false representations and fictitious FX trading prices, applicable law "forbids" a tort claim for conversion under these circumstances.  They are wrong.  Indeed, in *Bank One v. Financial Ventures, LLC*, Judge Sargus of the United States District Court for the Southern District of Ohio held under circumstances nearly identical to those present in this case that a claim for conversion could be maintained.  *See Bank One v. Financial Ventures, LLC*, No. C2-01-0049, 2002 WL 484394 (S.D. Ohio Mar. 26, 2002).  The same result is required here.

In *Bank One*, a group of investors engaged in foreign securities trading had individual commercial checking accounts at Bank One that were opened pursuant to several written agreements and aggregated into a single account for business purposes.  *Id.* at *1.  Bank One became concerned about certain of the group's overseas activities, and refused to allow the individuals to withdraw monies from their checking accounts.  *Id.*  The individuals brought claims against Bank One for breach of contract, interference with prospective business relationships, negligent misrepresentation, and conversion.  *Id.* at *1-5.  The Court found that any duty which would exist even if no contract existed, such as those arising under a statute or the common law, would be sufficient to allow a separate claim for conversion to survive a motion to dismiss.  *Id.* at *3.  Here, Plaintiffs have alleged Defendants have violated duties arising independent of the contracts, including under statute (ODTPA) and common law (fraud

in the inducement).  Plaintiffs also seek relief, including punitive damages and attorneys' fees, broader than contractual damages.

Defendants also urge a strained and overly narrow interpretation of the funds or property which may be the subject of a conversion claim.  Plaintiffs properly pled ownership of "specific and identifiable funds," and Defendants' conversion of those funds.  ¶¶ 154-57.  Although Defendants state that the exorbitant and hidden markups and markdowns on FX trades were "funds earned by BNYM" (Br. at 30), those funds rightfully belonged to Plaintiffs, who should be permitted to pursue a claim for conversion.[23]

## V.     SERS Has Stated A Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing.

"The duty of good faith and fair dealing, implied in every contract, requires honesty and reasonableness in the enforcement of a contract."  *Scotts Co. LLC v. Farnam Cos.*, 659 F. Supp. 2d 913, 927 (S.D. Ohio 2009) (quoting *O'Brien v. Ravenswood Apartments, Ltd.*, 862 N.E.2d 549 (Ohio App. 1st Dist. 2006)).  As the Ohio Supreme Court has explained, "'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties."  *Ed Schory*, 662 N.E.2d at 1082-83.  As Judge Alsup held in denying Defendants' motion to dismiss this claim for the same conduct under California law, the covenant of good faith and fair dealing "is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the

---

[23] Contrary to Defendants' assertions, Ohio law does not limit conversion claims to "money in a bag" or non-fungible money.  *See, e.g., Bank One*, 2002 Wl 484394, at *1 (concerning bank deposits); *Eva v. Midwest Nat'l Mortg. Banc, Inc.*, 143 F. Supp. 2d 862, 896-897 (N.D. Ohio 2001) (concerning mortgage payments).

contract." *IUOE Local 39*, 2012 U.S. Dist. LEXIS 18281, at *17 (quotation and citation omitted). "The implied covenant can be violated by expressly permitted conduct done in bad faith." *Id.* at *18.[24]

Plaintiffs have properly alleged that Defendants violated the covenant of good faith and fair dealing implied in every contract. Plaintiffs explained that SERS's contracts "confer discretionary power to Defendants for executing FX trades pursuant to 'standing instructions' under specified circumstances. However, Defendants have exercised this discretion in bad faith, as they have selected fictitious FX rates to report and charge or credit to SERS and the Legacy Mellon Subclass for 'standing instruction' FX trades…." ¶ 161; *see also* ¶ 50. This abuse of contractual discretion is precisely the type of conduct encompassed by this claim.

Defendants wrongly argue that, because their written FX Procedures referred to a 300-basis point limit for FX transactions, Plaintiffs "expressly agreed" to Defendants' actions, and no breach of the implied duty of good faith is possible. (Br. at 31.)[25] This argument misreads Plaintiffs' allegations and the relevant documents. The current FX Procedures that Defendants attached to their motion (Defs. Decl., Exh. 1) state merely that standing instructions rates "will not deviate by more or less than three (3) percent from the relevant Interbank bid or ask rates," a

---

[24] As the complaint explains, this claim is asserted by SERS on behalf of itself and the Legacy Mellon Subclass against Defendants BNYM and Mellon. ¶ 160. Paragraph 161 specifically mentions Pennsylvania law, but Defendants do not challenge this claim as insufficient under Pennsylvania law.

[25] Defendants' authority for this proposition, *Ed Schory & Sons, Inc. v. Society Nat'l Bank*, 662 N.E.2d 1074, 1082 (Ohio 1996), is not applicable. The court, reviewing a grant of summary judgment, characterized the duty of good faith as the "implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting…." *Id.* at 1082 (quoting *Kham v. Nates Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351, 1357-58 (7th Cir. 1990)). Here, Plaintiffs have alleged that Defendants' actions were against their reasonable expectations. ¶ 161. The *Schory* court reviewed a full record on summary judgment. Here, Defendants have merely identified a disputed issue of fact.

requirement that also comes from ERISA,[26] without disavowing any of Defendants' other representations regarding "best execution," accurate and timely execution, or SI FX trades as being "free of charge."  ¶¶ 28, 33, 39.  Even if there were such a term allowing a maximum spread of 300 basis points, Plaintiffs in no way agreed that Defendants could manipulate and set fictitious rates on Plaintiffs' FX transactions.

Finally, it is telling that Defendants, at page 32 of their brief, point to the more favorable trading arrangements that Defendants reached with a favored few clients in a last attempt to prevent scrutiny of its FX practices, *see* ¶¶ 71-73, as evidence that Plaintiffs are simply seeking more favorable terms than originally negotiated.  If Defendants had not breached the duty of good faith implied in their contracts with Plaintiffs, there would have been no reason for Plaintiffs to seek the same arrangement that the high-value clients to whom Defendants offered a "benchmarking arrangement" to "protect" its standing instructions business did.  ¶ 72.  Defendants' attempts to placate its select few clients would not have been necessary, either.  Plaintiffs allege that Defendants abused the discretion afforded them under the contracts, and this claim should be allowed to proceed.

## VI.    Plaintiffs Have Standing Under The Ohio Deceptive Trade Practices Act.

Plaintiffs have alleged that Defendants violated the Ohio Deceptive Trade Practices Act, O.R.C. § 4154.01 *et seq.* ("ODTPA") because Defendants represented that their "custodial FX services had 'characteristics' or 'benefits' that they 'they do not have' and '[a]dvertised goods or services with intent not to sell them as advertised."  ¶ 166 (quoting O.R.C. §§ 4165.02(A)(7), (11)).  Defendants do not deny that Plaintiffs have pled a violation of the ODTPA, but instead assert that Plaintiffs, as consumers, do not have standing under the ODTPA.  Defendants are

---

[26] *See* 29 U.S.C. § 1108(b)(18)(C).

incorrect.[27]

First, the text of the ODTPA itself supports Plaintiffs' standing.  As the Court in the Southern District of Ohio held, since the ODTPA "by its plain language places no limitation on the type of individuals who are considered to be a 'person' and may pursue a claim," consumer plaintiffs have standing under the ODTPA.  *Bower v. Int'l Business Machines, Inc.*, 495 F. Supp. 2d 837, 842 (S.D. Ohio 2007).  Additionally, although, as Defendants argue, some courts have held that the federal Lanham Act limits standing to competitors, the ODTPA explicitly provides that "a complainant need not prove competition between the parties to the civil action."  O.R.C. § 4165.02(B).  Defendants blur this crucial distinction between the Lanham Act and the ODTPA.

Second, a central rationale offered in the cases Defendants cite for the proposition that Plaintiffs lack standing[28] – that consumer standing under the ODTPA renders superfluous language prohibiting the same conduct under Ohio's Consumer Sales Practice Act, O.R.C. § 1345.02, *et seq.* ("OCSPA") – is absent here.  Ohio courts have held that only natural persons have standing under the OCSPA.  *See Culbreath v. Golding Enterps., L.L.C.*, 872 N.E.2d 284, 363 (Ohio 2007).  Thus, without the ODTPA, and its broad definition of "person" entitled to relief, *see* O.R.C. § 4165.01(D), Plaintiffs, alone among other plaintiffs to have brought cases

---

[27] Defendants have sought to have it both ways in these related cases.  In tension with their argument that Plaintiffs are consumers here, Defendants previously argued that another pension fund's New York statutory consumer fraud claim should be dismissed because Defendants' FX services, as extended to "sophisticated" pension funds, were *not* "consumer-oriented" within the meaning of the New York statute.  *See Int'l Union of Operating Engineers v. Bank of New York Mellon Corp., et al.*, 1:11-cv-3620 (N.D. Cal.) (Dkt. No. 77, at 23).

[28] *See, e.g., Blankenship v. CFMOTO Powersports, Inc.*, 944 N.E.2d 769, 776-77 (Ohio Ct. Com. Pl. 2011); and *Robins v. Global Fitness Holdings, LLC*, 838 F. Supp. 2d 631 (N.D. Ohio 2012) (cited at p. 33 and n.51 of Br.).

against Defendants and others for similar conduct, would be without a path to relief under their own state's consumer fraud statutes.[29]

## VII.   Plaintiffs' Claims Are Timely.

Defendants do not challenge the timeliness of Plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing—nor could they, as those claims are subject to a 15-year statute of limitations.  *See* O.R.C. § 2305.06.  And Defendants take issue with the timeliness of Plaintiffs' other claims only "[t]o the extent" they purportedly "are barred by their respective statutes of limitation."  (Br. 33.)  Notwithstanding the murkiness of their argument, Defendants face a steep—indeed, insuperable—hurdle in attempting to have Plaintiffs' claims thrown out on statute of limitations grounds.  The Second Circuit has explained "[t]he lapse of a limitations period is an affirmative defense that a defendant must plead and prove," and dismissal "is appropriate only if a complaint *clearly shows* the claim is out of time."  *SEC v. Gabelli*, 653 F.3d 49, 60 (2d Cir. 2011) (citations and internal quotation marks omitted).  Moreover, as a general matter, "the question of whether Plaintiffs should have discovered . . . fraud earlier than they did, and thus whether the action is timely, is a question for the trier of fact."  *Nelson v. Stahl*, 173 F. Supp. 2d 153, 166 (S.D.N.Y. 2001).

The Complaint comes nowhere near affording a "clear showing" of untimeliness with respect to any of Plaintiffs' claims.  To the contrary, Plaintiffs' allegations—buttressed by facts revealed in connection with BNYM whistleblower actions, including information provided by

---

[29] Notably, two other courts, assessing the same conduct by Defendants or similar conduct by another financial institution, have denied motions to dismiss claims based on consumer fraud statutes from three other states.  *See IUOE Local 39*, 2012 U.S. Dist. LEXIS 18281, at *11-15 (allowing claims under California's Unfair Competition, Cal. Bus. & Prof. Code § 17200, California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, and New York's General Business Law § 349 to proceed); *Ark. Teacher Ret. Sys. v. State St. Corp.*, 1:11-cv-10230-MLW (D. Mass.) (Dkt. No. 33, entered May 8, 2012) (denying motion to dismiss claim brought under Massachusetts Consumer Protection Act, M.G.L. Ch. 93A); *see also* Murphy Decl., Exh.1 at 86:5-10, 97:3-99:6.

Defendants' own employees—illustrate that Plaintiffs did not discover, and could not reasonably

have discovered, the basis for their claims until sometime after January 21, 2011, when the first

whistleblower complaint was unsealed.  Plaintiffs allege that Defendants perpetrated a fraudulent

scheme that entailed—and depended on—measures to actively conceal their wrongdoing.[30]

The "discovery rule," which applies to Plaintiffs' claims (with the possible exception of

their claim for unjust enrichment), provides that "a cause of action does not arise until the

plaintiff discovers, or by the exercise of reasonable diligence should have discovered, that he or

she was injured by the wrongful conduct of the defendant."  *Norgard v. Brush Wellman, Inc.*,

766 N.E.2d 977, 979 (Ohio 2002).[31]  Determining whether the discovery rule applies thus entails

a "two-pronged test"—that is, "discovery not just that [Plaintiffs] ha[ve] been injured but also

that the injury was caused by [Defendants'] conduct."  *Id.* (citation and internal quotation marks

omitted).

Plaintiffs aptly invoke the discovery rule by alleging that the respective statutes of

limitations for their claims were tolled by the numerous "acts of fraud, concealment, and

intentional misrepresentations" Defendants perpetrated in carrying out their scheme.  ¶ 117; *see*

*also* ¶¶ 52-78, 84-116.  Plaintiffs further allege that they relied on Defendants'

misrepresentations and could not have discovered the basis for their claims before the first

---

[30] *See, e.g.*, ¶¶ 52-78, 84-116.

[31] Defendants' statement that "Ohio does not apply the discovery rule to unjust enrichment claims" (Br. 34 n.54) is misleading, or at least imprecise.  In fact, Ohio appellate courts are divided on the issue.  *See Desai v. Franklin*, 895 N.E.2d 875, 882-84 (Ohio Ct. App. 2008) (detailing split of authority and observing that "the Ohio Supreme Court has yet to decide the issue"); *Brown v. Vaniman*, No. 17503, 1999 Ohio App. LEXIS 3821, at *12-13 (Ohio Ct. App. Aug. 20, 1999) (holding that "although it would appear that the statute of limitations has run on [plaintiff]'s claim [for unjust enrichment], the existence of doctrines tolling the statute of limitations under various circumstances preclude[d]" dismissal).  This Court need not resolve that debate, however, because, as detailed below, Plaintiffs' claim is timely regardless of whether the discovery rule applies.

whistleblower complaint against one or more of the Defendants was unsealed on January 21, 2011.  ¶ 117.

Plaintiffs did not *actually discover* Defendants' misconduct until they performed a detailed empirical analysis of their FX trading data, an exercise Plaintiffs reasonably did not consider until the unsealing of the first whistleblower action.  ¶ 117; *see also* ¶¶ 79-83. Accordingly, the relevant inquiry for the Court is whether Plaintiffs should have discovered that they were injured within the applicable limitations periods (set forth on page 33 of Defs. Br.).

The Complaint establishes that Plaintiffs could not, in exercising reasonable diligence, have discovered even that they had been injured, never mind that Defendants were intentionally cheating them.  *See Norgard*, 766 N.E.2d at 979 ( "[D]iscovery of an injury alone is insufficient to start the statute of limitations running if at that time there is no indication of wrongful conduct of the defendant.").  In that regard, Plaintiffs sufficiently allege:

(i) Defendants' misconduct in reporting fictitious rates to Plaintiffs was inherently self-concealing.  For example, Plaintiffs allege that "[n]othing in the FX rates that Defendants actually reported to Plaintiffs and the Class—which Defendants almost exclusively placed within (though at the extremes of) the trading range of the day— indicated that those rates were false and included hidden and unauthorized mark-ups or mark-downs."  ¶ 15; *see also* ¶¶ 52-78. Defendants' scheme required that Defendants actively conceal their malfeasance, which they did.  *See, e.g.*, ¶ 58 (describing daily "Reconciliation" calls between New York and Pittsburgh FX trading desks made, according to whistleblowers, "on a private, direct line, and may have been shielded from Defendants' customary policy of recording transactional conversations").  Indeed, BNYM employees internally acknowledged that transparency would *undermine* Defendants' efforts to reap profits from unsuspecting clients.  ¶¶ 84-116.

(ii) Plaintiffs were only able to discover Defendants' misconduct after (a) whistleblower complaints began to be unsealed and (b) Plaintiffs performed an in-depth analysis of FX trades Defendants had executed on their behalf.  ¶¶ 13, 15, 79-83, 117.

Defendants' assertion that "Plaintiffs or their investment managers could have, at any time after they started trading with BNYM, compared the prices they received to the midpoint of the day and therefore concluded that BNYM was earning a spread well in excess of 2 to 3 basis points" (Br. 34), misses the point, because until January 2011, Plaintiffs had no reason to suspect Defendants' misconduct.  As the Ohio Supreme Court has observed, "[I]f a plaintiff is unaware that his or her rights have been infringed, how can it be said that he or she slept on those rights?" *Norgard*, 766 N.E.2d at 981.  Plaintiffs were not required, upon receiving monthly reports from Defendants (falsely) stating the prices at which they executed FX trades on Plaintiffs' behalf, to undertake the extensive analysis of FX transactions that Plaintiffs ultimately performed.[32]

Evaluating substantially identical allegations in *Operating Engineers*, Judge Alsup rejected Defendants' argument that plaintiff's claims under California and New York law (which apply a "discovery rule" standard similar to that of Ohio law) were time-barred.  *IOUE Local* 39, 2011 U.S. Dist. LEXIS 18281, at *20-22.  The court explained that "[n]othing in the FX rates reported to plaintiff indicated that the rates were false and included hidden and unauthorized markups or markdowns," thus plaintiff "would have had little reason to believe, prior to the unsealing of the whistleblower complaints in 2011, that it had been deceptively charged fictitious FX rates." *Id.*  Judge Alsup's analysis bears equal force here.[33]

---

[32] *See J.C. Penney Corp. v. Carousel Ctr. Co.*, 635 F. Supp. 2d 126, 133 (N.D.N.Y. 2008) (holding plaintiff's claims timely where plaintiff alleged that "Defendants withheld information or provided it with misleading information about their calculations").  *See also Elysian Fed. Sav. Bank v. First Interregional Equity Corp.*, 713 F. Supp. 737, 738, 746 (D.N.J. 1989) (finding plaintiff's claims timely for pleading purposes where plaintiff alleged defendants defrauded it through "excessive mark-ups" in the sale of collateralized mortgage obligations and principal-only trust certificates, and alleged it did not discover defendants' misconduct until retaining a consulting firm that reviewed plaintiff's securities portfolio).

[33] Courts have rejected statute of limitations arguments similar to those pressed by Defendants here in analogous cases.  For example, in *Grandon v. Merrill Lynch & Co.*, No. 95 Civ. 10742 (SWK), 2001 U.S. Dist. LEXIS 10169 (S.D.N.Y. July 20, 2001), a case involving excessive markups on

Moreover, Plaintiff's unjust enrichment claim is timely even if the discovery rule does not apply (*see supra* note 31), because the statute of limitations did not commence until the last of the alleged markups or markdowns occurred.[34]  Because Plaintiffs allege that Defendants' misconduct spanned from January 12, 1999 "to the present" (¶ 119), the limitations period for their unjust enrichment claim only recently commenced (if it has run at all).

Finally, even if the Court finds that the discovery rule does not apply, Plaintiffs sufficiently allege that Defendants fraudulently concealed their misconduct, which—independent of the discovery rule—defeats Defendants' statute of limitations argument under the doctrine of equitable tolling.  *See* ¶¶ 52-78, 84-117.[35]  Addressing substantially similar claims against State Street, Chief Judge Mark L. Wolf of the District of Massachusetts ruled that plaintiffs' claims were timely due to State Street's fraudulent concealment:

> It is alleged that the defendant fraudulently concealed compensation it was taking for 1998 to 2009.  The plaintiff alleges it had no notice of its injury until 2009 when a suit was filed in California making a comparable claim and the defendant revised

---

municipal bond sales, Judge Kram found that the plaintiffs' claims were timely because, for pleading purposes, plaintiffs showed "their duty to inquire into the allegedly fraudulently excessive markups did not arise" until less than one year before filing suit "because, *inter alia*, the municipal bond market is opaque, and the excessive fees were hidden." *Id.* at *31.  Here, too, the FX market involves, as Defendants acknowledge, sophisticated transactions (*see* Br. 5-6 (discussing types of SI FX transactions), non-transparent  FX trading practices (*see, e.g.*, ¶¶ 52-78, 84-116), and hidden markups and markdowns.  *See also Elysian Fed. Sav. Bank*, 713 F. Supp. at 746-47 (rejecting defendants' argument that plaintiff should have discovered "excessive markups" earlier, explaining, "Quite apart from the illogical nature of defendants' argument they should somehow be rewarded for successfully concealing their allegedly fraudulent conduct, at this time there is no evidence in this case that plaintiff had the benefit of 'storm warnings' and simply ignored them.").

[34] *See Miami Valley Mobile Health Servs., Inc.*, 2012 U.S. Dist. LEXIS 16556, at *13; *Palm Beach Co. v. Dunn & Bradstreet*, 665 N.E.2d 718, 723 (Ohio Ct. App. 1995) (affirming lower court holding that limitations period for unjust enrichment claim began to run "when the last of the alleged overcharges, or false billings or accountings, occurred").

[35] *See Jacobson-Kirsch v. Kaforey*, 2012 Ohio 3553, No. 26102, 2012 Ohio App. LEXIS 3138, at *8 (Ohio Ct. App. Aug. 8, 2012) (applying tolling where plaintiffs alleged "that the defendant took affirmative steps to conceal the plaintiff's] cause of action and the plaintiff could not have discovered the cause of action within the applicable limitations period despite exercising due diligence").

> its Investment Manager's Guide to disclose the compensation it
> was taking for FX transactions.  This case was filed in 2011,
> therefore the Massachusetts claims . . . at this motion to dismiss
> point . . . cannot be found to be time barred.

Murphy Decl., Ex. 1 at 101:6-15.  That reasoning should apply equally here.

## VIII.   **Plaintiffs State Claims Against BNYMC.**

Plaintiff has properly named BNYMC as a Defendant.  BNYMC is the parent of BNYM, and is responsible for holding over $25 trillion in assets under custody.  ¶ 4.  Further, in its 2010 Form 10-K, BNYMC stated its principal assets and sources of income derived from two of its subsidiaries, including BNYM—the principal entity responsible for providing the custodial FX services to Plaintiffs and other Class members.  ¶¶ 4-5.  Substantial overlap exists between BNYMC and its principal subsidiary BNYM—every current BNYMC executive officer also serves as an officer of BNYM.  ¶ 5.  Since this case arises from BNYM's unfair, fraudulent, and unlawful FX practices affecting its custodial clients, BNYMC is a proper Defendant due to the custodial banking and FX services it provided to Plaintiffs and other Class members through its subsidiary BNYM.  BNYMC was also the named party to the recent consent decree in the DOJ Action.  ¶ 115.[36]  These exact allegations were held to be sufficient to properly name BNYMC as a Defendant in *Operating Engineers.  IUOE Local 39*, 2012 U.S. Dist. LEXIS 18281, at *22-23.

## <u>CONCLUSION</u>

For each of the foregoing reasons, Defendants' motion to dismiss should be denied.

---

[36] Defendants offer no meaningful support for their argument that by asserting claims against BNYMC, Plaintiffs seek to pierce the corporate veil or otherwise disregard the corporate form. Even so, as Defendants' principal authority illustrates, the questions of corporate veil-piercing or alter ego liability (to the extent they even apply here) are typically reserved for the fact-finder. *See Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos.*, 617 N.E.2d 1075, 1087 (Ohio 1993) (reversing judgment entered after trial holding a director personally liable for corporation's alleged bad acts, where judgment was not supported by "competent, credible evidence"); *see also Bucyrus-Erie Co. v. Gen. Products Corp.*, 643 F.2d 413 (6th Cir. 1981) (addressing jury verdict and jury instructions on veil piercing and alter ego liability); *Wm. Passalacqua Builders v. Resnick Developers*, 933 F.2d 131 (2d Cir. 1991) (same).

Respectfully submitted,

Date:  September 12, 2012

MIKE DEWINE
OHIO ATTORNEY GENERAL


By:  */s/ Brian K. Murphy*
MURRAY MURPHY MOUL + BASIL LLP
Brian K. Murphy (admitted *pro hac vice*)
Joseph F. Murray
Geoffrey J. Moul
1533 Lake Shore Drive
Columbus, Ohio 43204
Telephone:  (614) 488-0400
Facsimile:  (614) 488-0401
Email: murphy@mmmb.com

*Special Counsel for Plaintiffs*


LIEFF CABRASER HEIMANN &
   BERNSTEIN, LLP
Elizabeth J. Cabraser (admitted *pro hac vice*)
Steven E. Fineman (SF-8481)
Daniel P. Chiplock (DC-1137)
Daniel E. Seltz (DS-0837)
Michael J. Miarmi (MM-1193)
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592
Email: ecabraser@lchb.com
         sfineman@lchb.com
         dchiplock@lchb.com
         dseltz@lchb.com
         mmiarmi@lchb.com

*Special Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel does hereby certify that he has this day caused to be served a

true and correct copy of the above and foregoing on counsel of record via CM/ECF filing.

This the 12th day of September, 2012.


*/s/ Brian K. Murphy*
Brian K. Murphy