UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

BANK OF NEW YORK MELLON CORP.
FOREX TRANSACTIONS LITIGATION

MASTER DOCKET
12 MD 2335 (LAK)

This document relates to:

*Southeastern Pennsylvania Transp. Auth. v. The Bank of
New York Mellon Corp., et al.*, 12 Civ. 3066 (LAK).
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

Joseph H. Meltzer
Darren J. Check
Matthew Mustokoff
Peter H. LeVan, Jr.
Naumon A. Amjed
Sean M. Handler
Ryan T. Degnan
KESSLER TOPAZ MELTZER & CHECK, LLP


Bradley E. Beckworth
Brad E. Seidel
Susan Whatley
Jeffrey J. Angelovich
Lisa Baldwin
NIX PATTERSON & ROACH, LLP


*Attorneys for Plaintiff*

Richard L. Scheff
Peter Breslauer
MONTGOMERY, MCCRACKEN,
WALKER & RHOADS, LLP


Reid M. Figel
Derek T. Ho
Joseph S. Hall
Andrew E. Goldsmith
Geoffrey S. Brounell
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, PLLC


*Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

The Bank of New York Mellon ("BNY Mellon") acted for the Southeastern Pennsylvania Transportation Authority ("SEPTA") under a Master Trust Agreement (the "MTA"), principally as a custodian for securities of pension and other funds managed for SEPTA by other investment managers. From time to time, BNY Mellon and a predecessor provided foreign exchange ("FX") services, exchanging dollars for foreign currencies or *vice versa* in connection with purchases and sales of securities or other instruments for the trust. This is one of many actions in which SEPTA and others who dealt with BNY Mellon in more or less similar circumstances claim that BNY Mellon overcharged them for these FX services, allegedly in breach of the pertinent contracts and/or of alleged fiduciary duties, and by misrepresenting or failing fully to disclose the manner in which it charged for these activities.

Important to this and presumably other such cases is a contention that BNY Mellon was obligated contractually to provide currencies at "best execution" prices but failed to do so. The matter is now before the Court on defendants' motion to dismiss the second amended complaint (the "SAC"), principally on the ground that BNY Mellon had no such "best execution" obligation and that the pleading does not allege any legally sufficient claim.

It is undisputed that the parties executed the MTA and that at least some of SEPTA's investment managers at various times signed varying versions of a second document. But neither the complaint nor the other materials before the Court unequivocally establishes all of the terms of the contract or contracts that governed all of the relevant transactions. In part, but only in part, that is attributable to the practice, common in this new electronic age, of putting putative terms and conditions of business transactions on Internet web pages that may change from time to time and that may or may not have been assented to. So this matter quite plainly is not susceptible of

disposition on a motion to dismiss the complaint. The contract claim—which is the heart and soul of the case—would not be appropriate for such disposition even on assumptions resolving many of the uncertainties surrounding the contract in favor of the defendants. Nonetheless, it has proven appropriate, notwithstanding the uncertainties with respect to the contract, to dispose of some of SEPTA's other claims.

*Facts*

*Parties*

SEPTA "is a regional public transportation authority serving" various Pennsylvania counties.[1] It brings this action "on behalf of a[n alleged] Class of all public and private pension funds and any other trusts or funds for which BNY Mellon served as the custodial bank and executed FX transactions on an 'indirect' basis (or based on 'standing instructions') during the Class Period"—which runs from "at least 2000 . . . through May 2, 2011."[2]

The Bank of New York Mellon Corporation ("BNY Mellon Corp.") is a Delaware corporation with its headquarters and principal place of business in New York.[3] Defendant Mellon Bank N.A. ("Mellon") is an "historical subsidiary" of BNY Mellon Corp. that "originally provided the custodial and FX services at issue in this action to SEPTA and the Class" until "approximately

---

[1]
    Second Amended Complaint ("SAC") [DI 32] ¶ 12.

[2]
    *Id.* ¶¶ 67, 4. The alleged Class excludes litigants bringing *qui tam* actions unsealed before or during the pendency of the action.

[3]
    *Id.* ¶ 13.

3

2007," when "BNY Mellon assumed Mellon's custodial and FX operations."[4]   Defendant BNY

Mellon is a New York–chartered bank formerly named "The Bank of New York" that runs BNY

Mellon Corp.'s "institutional businesses, including Asset Servicing, Issuer Services, Treasury

Services, Broker–Dealer and Advisor Services[,] and the bank-advised business of Asset

Management."[5]   BNY Mellon is BNY Mellon Corp.'s largest bank subsidiary and has substantial

overlap in leadership and structure.[6]   According to SEPTA, "[u]pon assuming operations from

Mellon, BNY Mellon began providing custodial and FX Services through its FX Desk to SEPTA

and the Class."[7]   For the sake of convenience, this opinion refers to both BNY Mellon and Mellon

Bank, N.A., collectively as "BNY Mellon" except as otherwise indicated.


*Procedural Posture*

       SEPTA brought this action in the Eastern District of Pennsylvania on March 7, 2011,

and filed the SAC on June 1, 2011.   It alleges four causes of action based on the defendants'

provision of FX services: breach of fiduciary duty and unjust enrichment and, in the alternative,

breach of contract and breach of the implied covenant of good faith and fair dealing.[8]

---

[4]
     *Id.* ¶ 14.

[5]
     *Id.* ¶ 15.

[6]
     *Id.* ¶¶ 13, 15.

[7]
     *Id.* ¶ 15.

[8]
     *Id.* ¶¶ 79–106.

4

*The Master Trust Agreement*

The principal relationship among the parties is set forth in the MTA, effective January 1, 1990, and amended in 1999.[9]  The MTA established a trust consisting of money and property contributed by SEPTA, with Mellon—later replaced by BNY Mellon—as the Master Trustee.[10]  Under the MTA, SEPTA may issue "investment policies, objectives and guidelines" for the trust and appoint "Investment Managers or other fiduciaries" to exercise "discretion and control" over delineated portions of the trust's assets.[11]  Upon the appointment of each fiduciary, it must notify the Master Trustee to separate into a different account the assets assigned to that fiduciary's discretion and control.[12]  Once a portion of the trust is placed under the control of such an investment manager, BNY Mellon is "released and relieved of all investment duties responsibilities and liabilities normally or statutorily incident to a trustee . . . , and thereafter shall act in the capacity of custodian of such assets."[13]  BNY Mellon nevertheless retained other powers as custodian to exercise as it "may deem necessary or desirable for the protection of the Master Trust Fund."[14]  The MTA provides that the Master Trustee holds the assets in the fund "for the exclusive benefit" of the

---

[9]     DI 32-1; DI 32-2.  (All "DI" references in this opinion are to the docket in 12 Civ. 3066).

[10]    *See* MTA §§ 2.1, 2.5.

[11]    MTA §§ 5.1(a), 5.1(b)(i), 5.2(a).

[12]    *Id.* § 5.2(a).

[13]    *Id.*

[14]    *Id.* § 7.2(g).

5

beneficiaries of the trust fund, which includes participants of SEPTA plans.[15]   A duty of care is imposed expressly upon the Master Trustee.[16]

In addition to whatever custodial or investment responsibilities BNY Mellon may have with regard to particular assets under the MTA, the agreement explicitly permits BNY Mellon to "provide such ancillary services as SEPTA and the Master Trustee may agree upon from time to time."[17]   Compensation for such additional services shall be "agreed upon by the parties in an arm's-length manner."[18]

*FX Transactions*

When SEPTA's investment managers bought foreign assets, they typically required conversion of U.S. dollars to obtain the required foreign currencies.[19]   Likewise, when funds were returned to the United States, foreign currencies were converted back into U.S. dollars.[20]   The SAC alleges that "BNY Mellon's provision of custodian services to SEPTA and the Class included execution of its clients' FX trades."[21]

---

[15] *Id.* § 2.6.

[16] MTA Amend. ¶ 7 (amending § 6.1).

[17] MTA § 9.1.

[18] *Id.*

[19] SAC ¶ 45.

[20] *Id.*

[21] *Id.* ¶ 21.

BNY Mellon executed FX transactions for the Master Trust in two different ways: "direct" trading and "indirect" trading.[22]  In direct FX transactions, "clients or third-party investment managers communicate trade requests to a BNY Mellon representative, who quotes a rate that the client or third-party investment manager can accept or reject."[23]   If accepted, the BNY Mellon representative executed the trade at the agreed-upon price.[24]  By contrast, indirect FX transactions were executed according to previously agreed-upon standards called "standing instructions," with BNY Mellon overseeing the transaction "from start to completion."[25]  The plaintiff's allegations in this action concern only indirect FX transactions.[26]

The precise mechanism and procedures applicable to indirect trading under standing instructions are matters of some controversy.  But several documents are pertinent to the inquiry: the FX Procedure Form, the FX Policies and Procedures, the Daily Schedule Web Page, and the Standing Instructions Web Page.

A.      *FX Procedure Form*

The only one of these documents actually signed by SEPTA or one of its investment managers is the FX Procedure Form.

---

[22]       *Id.* ¶ 24.

[23]       *Id.* ¶ 25.

[24]       *Id.*

[25]       *Id.* ¶ 26.

[26]       *Id.* ¶ 27.

According to the SAC, "in the recent past" BNY Mellon began requiring custodial clients or their investment managers to sign a one-page "Foreign Exchange Procedure Form" relating to indirect trading.[27]   It alleges that in the version of the form applicable when the SAC was filed, the manager checked a box indicating that it had elected to have BNY Mellon arrange execution of FX transactions through standing instructions for specified accounts.[28]   It acknowledged also receipt of Mellon's FX procedures.[29]   The form indicated that the transactions would be processed in accordance with Mellon's procedures and provided also a hyperlink to the Daily Schedule Webpage, discussed further below.[30]

Defendants have submitted with their motion to dismiss what appear to be five such forms executed by SEPTA or its investment managers in 2000, 2003, 2004, 2007, and 2011, respectively.[31]   In each, SEPTA or one of its investment managers checked one or more boxes electing to have BNY Mellon arrange execution of FX transactions.   The language of the various forms, however, differed in material ways.

In a form signed in March 2000, SEPTA's investment manager, Brandywine Asset Management, elected to have Mellon Bank, N.A., for an account listed on the form arrange execution of FX both in the context of (1) the purchase and sale of securities and (2) income

---

[27]      *Id.* ¶ 31.

[28]      *Id.* ¶ 32.

[29]      *Id.*

[30]      *Id.*

[31]      DI 40-5, 40-6, 40-7.

received from securities or interest received on cash balances.[32]  This form does not appear to reference any applicable procedures that might explain how these executions were supposed to occur.[33]

In a form signed in August 2003, another of SEPTA's investment managers, Evergreen Investments, also elected for Mellon to arrange FX executions with respect to securities purchases/sales and income conversions for another account.[34]  That form, however, specifically referred to a separate document outlining the procedures to be followed: "Manager acknowledges receipt of Mellon Foreign Exchange (FX) Procedures and agrees to act in accordance with Procedures as indicated below."[35]  The form later stated that "FX with Mellon will be executed pursuant to the Mellon Foreign Exchange Procedures."[36]  It refers also to a web page, discussed below, stating: "'Daily Schedule,' referenced in Mellon Foreign Exchange Procedures, will be

---

[32]
   DI 40-5 at 3.  With respect to the purchase and sale of securities election, the form indicates that the manager needed to provide FX instructions on each trade.  *Id.*  This appears to mean that while income received in foreign currency automatically would be converted to U.S. dollars under the program, Mellon Bank, N.A., expected the manager to indicate the desired conversions that would be made in connection with any purchases or sales of securities on a trade-by-trade basis.

[33]
   *Id.*  There is a note on the document stating "See Guide to Trading Around the World for additional FX information."  *Id.*  No document of that name is in the record.

[34]
   DI 40-6 at 2.  As in the March 2000 form, the form indicates that the manager still would need to request, on a trade-by-trade basis, if and when it wanted FX conversions in connection with a securities purchase or sale.

[35]
   *Id.*

[36]
   *Id.*

posted at https://fx.mellon.com/rates."[37]

Two later forms, signed by Brandywine and SEPTA in August 2004 and September 2007, respectively, elected for Mellon to arrange execution of FX related to income conversions.[38] While the language of these forms varied somewhat from the August 2003 form, both similarly provided that execution would occur pursuant to the procedures provided in "Mellon Foreign Exchange Procedures" and both referred to the same web page containing the "Daily Schedule."[39] The August 2004 form signed by Brandywine indicated that the election would apply to all of Brandywine's Mellon custody accounts,[40] while the September 2007 form signed by SEPTA pertained to a specifically listed account, named "AIG PEP V."[41]

Finally, a form signed by SEPTA in February 2011 contained yet different language. As in the September 2007 form, SEPTA elected for BNY Mellon Asset Servicing to execute FX transactions in the AIG PEP V account with respect to income conversions.[42]  The references in this

---

[37]
   *Id.*

[38]
   DI 40-5 at 2; DI 40-7 at 2.  These forms no longer contain any separate election regarding the purchase and sale of securities.  Rather, the forms state that "FX requirements other than Income Items may be processed through Mellon GSS under the Procedures, but only if the Manager/Fiduciary specifically instructs Mellon GSS to do so on a transaction-by-transaction basis."  *Id.*

[39]
   *Id.*

[40]
   DI 40-5 at 2.

[41]
   DI 40-7 at 2.

[42]
   DI 40-7 at 4.  It is not apparent from the record why this form was necessary in light of the September 2007 form.  Note that attached to the February 2011 form in the record is a letter of the same date from assistant treasurer at SEPTA to BNY Mellon Asset Servicing, stating "Please use this letter as your standing instruction to convert all EUR funds to US dollars."

10

form to the applicable procedures were somewhat different, however.  The form stated that the execution would occur "per procedure posted at: https://gm.bankofny.com/FX/ErisaRates.aspx." [43] It stated also: "Please review The Bank of New York Mellon's FX trading program guidelines on the attached link" and then at the bottom of the page repeated the link to "https://gm.bankofny.com/FX/ErisaRates.aspx."[44]

### B.    FX Policies and Procedures

The second pertinent document, according to the SAC, is the FX Policies and Procedures.

The version current w hen the SAC was filed allegedly provided the following:  First, it stated that BNY Mellon would "publish a 'Daily Schedule' of program FX [buy and sell] rates, available prior to 9:00 a.m. [E]astern time at https://gm.bankofny.com/FX/ErisaRates.aspx."[45]  Then, unless the manager instructed BNY Mellon otherwise by telephone prior to 11 a.m. Eastern time,[46] "all FX transaction requests received by the BNYM Foreign Exchange group on a given day [would] be executed that day with BNYM on a principal basis at rates that [would] not deviate by more or less than three (3) percent from the relevant Interbank bid or ask rates and [would] not be less

---

[43]    *Id.* at 3.

[44]    *Id.*

[45]    *Id.*

    SAC ¶ 34.  The SAC refers to the webpage reached from following this hyperlink as the "FX Website."

[46]

    The SAC suggests that the manager's other options include executing a "direct" trade with BNY Mellon on a negotiated basis or trading with a third-party.  *Id.* ¶¶ 20, 25.

favorable to the account than the corresponding rates indicated on the Daily Schedule for that day."[47] The SAC alleges that the FX Policies and Procedures was available on the BNY Mellon website at the time of filing at  https://gm.bankofny.com/includes/ErisaPol.pdf.[48]

BNY Mellon has submitted with its motion to dismiss three documents that seem to be versions of the FX Policies and Procedures document referenced by the SAC.  The first appears identical to the version alleged by the SAC.[49]  It is entitled "FX Program for Trade Requests through BNY Mellon Custody,"[50] and defendants assert that it has been available on BNY Mellon's website since July 1, 2008.[51]

The other two documents both are entitled "Mellon Foreign Exchange Procedures." One is dated July 27, 2004.  The other is undated but BNY Mellon says that it "believes [it] to be the Mellon Foreign Exchange Procedures in effect from at least 2000 until the July 27, 2004 procedures came into effect."[52]  These two documents generally are similar to the first insofar as is pertinent to this motion, except in one respect: they omit the limitation that the prices must be within

---

[47]

*Id.*

[48]

*Id.* ¶ 32.

[49]

DI 40-8.

This document is consistent with the quotations alleged by the SAC as being contained in the FX Policies and Procedures.  Moreover, the Court notes that following the hyperlink alleged in the SAC as corresponding to the FX Policies and Procedures leads, as of January 23, 2013, to a document identical to that attached by defendants.

[50]

*Id.*

[51]

DI 40-3 ¶ 6.

[52]

*Id.* ¶ 8; *see* DI 40-9; DI 40-10.

12

three percent of the relevant interbank rates.  Thus, these two documents provide that the requested conversions "will be executed that day by Mellon on a principal basis at a rate not less favorable than indicated on the Daily Schedule for that day."[53]

> C.    *The Daily Schedule Web Page*

As noted above, both the February 2011 version of the FX Procedure Form and the most recent version of the FX Policies and Procedures refer to a web page, https://gm.bankofny.com/FX/ErisaRates.aspx, which this opinion will refer to as the "Daily Schedule Web Page."[54]  SEPTA attached a snapshot of this web page, apparently as of May 20, 2011, to its opposition to this motion.[55]

As alleged in the SAC and is apparent in the snapshot, the Daily Schedule Web Page posted a list of guaranteed prices for a large number of currencies, including for each currency the prices at which BNY Mellon would buy or sell the currency relative to the U.S. dollar.[56]

The SAC alleges that the Daily Schedule Web Page contained also at least two hyperlinks, one to the FX Policies and Procedures and one to another web page called the "Standing

---

[53]

   DI 40-9 at 2; DI 40-10 at 2.

[54]

   The Court does not use the SAC's terminology for this page—the SAC called it the "FX Website"—in order to avoid the ambiguity that may result from the general understanding of a "website" as comprising several different web pages.

[55]

   DI 41-7 at 2; *see* 41-2 ¶ 3.

[56]

   SAC ¶ 32; DI 41-7 at 2.

Instructions Web Page."[57]  In particular, the snapshot shows that, above the daily schedule, there was a link to the FX Policies and Procedures stating "Click here to view The Bank of New York Mellon's Policies and Procedures for FX processed through BNY Mellon Custody."[58]  The snapshot then shows, along its left side, what appear to be a number of links to different web pages, including a link entitled "Standing Instruction" directing to the Standing Instructions Web Page, described next.

### D.    *The Standing Instructions Web Page*

Besides being linked to by the Daily Schedule Web Page, the Standing Instructions Web Page allegedly was accessible directly at the time the SAC was filed at https://gm.bankofny.com/FX/TradeExecution/StandingInstruction.aspx.[59] Defendants attach to their motion a copy of this page as of July 8, 2011.[60]

The Standing Instructions Web Page stated that "Standing Instructions captures all types of custody-related foreign exchange funding needs and automates the currency execution and settlement . . . . provid[ing] a complete FX solution allowing clients to concentrate on their core businesses."[61]  It listed a number of benefits of the Standing Instruction process:

---

[57]

  SAC ¶¶ 32–33.

[58]

  DI 41-7 at 2.

[59]

  Accessing the same hyperlink as of January 23, 2013 led to a new web page that does not resemble the SAC's allegations.

[60]

  DI 40-3 ¶ 10; DI 40-12.

[61]

  DI 40-12 at 2.

14

"Clients benefit from:

- Automatic capture of FX trade requirements from underlying custody activity.
- Pre-trade administration associated with regulated markets.
- Aggregation and netting of trades based on guidelines tailored to client needs.
- *FX execution according to best execution standards.*
- Settlement of cash to accounts.
- Automated sweeps of residual local currency balances into base currency.
- Automatic reporting of trade details to investment accounting systems.
- Report on FX execution in a timely and flexible fashion."[62]

The page stated also the following:

"We consider best execution, as it relates to the Standing Instruction process, as providing a consistent, accurate, and efficient means of facilitating pre-trade, trade and post-trade activities.  These activities include identification of trade requirements, pre-trade administration associated with regulated markets, arranging settlement, reconciling discrepancies, posting cash to accounts and reporting all relevant transaction details to investment accounting systems."[63]

The SAC alleges that the Standing Instructions Web Page "sets forth additional obligations to which BNY Mellon is subject . . . when executing FX transactions"[64] and in particular, the SAC alleges that the "best execution" standard set forth in the Standing Instructions Web Page

_____

[62]

*Id.* (emphasis added).

The SAC does not allege when the Standing Instructions Web Page was created or when the term "best execution" first appeared on it.  Counsel for the defendants represented at oral argument that the term appeared on BNY Mellon's website around 2007.  *See* Tr. 41:19–21.

[63]

DI 40-12 at 2.

[64]

SAC ¶ 35.

required BNY Mellon "to extend every effort [to] obtain the best price for its clients."[65]

*Alleged Manipulation of FX Trades*

The SAC alleges that, upon receiving instructions to execute an FX trade under standing instructions, BNY Mellon would convert funds from United States dollars into a foreign currency in order to complete the requested transaction.[66]  At the end of the trading day, "rather than charging clients the prevailing FX rate at the time the FX trade was executed," BNY Mellon "charged its clients for the FX transaction as if the trade occurred at either the high or low of the day (depending on the nature of the transaction, buy or sell), in order to charge the least favorable rate that occurred that trading day."[67]  To corroborate this alleged practice, the SAC contains a graph that purportedly plots a "random sample" of SEPTA's indirect FX trades with BNY Mellon.[68]  The graph tends to show that BNY Mellon price its trades with SEPTA towards the end of the interbank range least favorable to SEPTA.[69]

According to the SAC, on May 2, 2011, after the unsealing of *qui tam* complaints

---

[65]

*Id.* ¶ 28.

Besides alleging that BNY Mellon assured clients that indirect FX trades were subject to "best execution" standards during the Class Period, the SAC alleges also that BNY Mellon described the trades as "free of charge."  *Id.*  The SAC does not state how or where this "free of charge" representation was made.

[66]

*Id.* ¶ 40.

[67]

*Id.* (brackets and internal quotation marks omitted).

[68]

*Id.* ¶ 46.

[69]

*Id.* ¶¶ 46–47.

filed against BNY Mellon in Florida and Virginia, BNY Mellon emailed clients a document entitled "Overview of BNY Mellon's Foreign Exchange Services."[70]  BNY Mellon there stated that its standing instruction service is "ancillary to and independent of the basic custodial relationship," that it acts as a "principal" in such transactions rather than entering the market "on behalf of or for the benefit of clients," and that it "tend[s] to purchase currencies for its clients towards the low end of the interbank range and sell towards the high end."[71]  It further stated that "the fiduciary obligation and decision-making for these FX transactions—including decisions to participate in the 'standing instruction' program—rests with our clients and their investment managers, and we act only at their direction."[72]  BNY Mellon acknowledged that "[o]f course, there are other parts of BNY Mellon's custody business where we do assume fiduciary responsibility, and we take those fiduciary obligations extremely seriously."[73]  The SAC alleges that the information in this document was not provided to SEPTA or the class during the Class Period.[74]

---

[70]

    *Id.* ¶ 49; DI 40-3 ¶ 11; DI 40-13.

[71]

    SAC ¶¶ 50–51.

    At the same time, BNY Mellon said that the prices clients received were "significantly more favorable than the retail prices small trades would otherwise receive — which can be 200 basis points (or more) above the interbank rate on any given day."  DI 40-13 at 4.  The document noted also a number of benefits of the standing instructions program for clients, including eliminating the administrative complications associated with "smaller, time-consuming, and labor- and system-intensive transactions."  *Id.*

[72]

    SAC ¶ 50.

[73]

    *Id.*

[74]

    *Id.* ¶ 52.

*Discussion*

## I.     *Motion to Dismiss Standard*

To survive a Rule 12(b)(6) motion, a plaintiff must plead facts sufficient "to state a claim to relief that is plausible on its face."[75]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[76]  In resolving a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor.[77]  It may "rely upon documents attached to the complaint as exhibits[] and documents incorporated by reference in the complaint."[78]  "Moreover, when a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss."[79]

---

[75]

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[76]

*Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).

[77]

*Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir.2006).

[78]

*Halebian*, 644 F.3d at 131 n.7.

Courts properly may consider also "matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) (alterations omitted).

[79]

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (internal quotation marks and alterations omitted).

In particular, the Court concludes that the following documents, the authenticity of which is not disputed, either are incorporated by reference in or integral to the complaint and therefore are properly considered on this motion to dismiss: the five FX Procedure Forms

## II.   Claims

### A.   Breach of Express Contract

Count III of the SAC alleges that BNY Mellon breached the express terms of its contract[80] with SEPTA by failing to provide best execution pricing, as it alleges that term should be understood.[81]

Under Pennsylvania law,[82] "a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'"[83]

BNY Mellon does not challenge either the existence of a contract or damages.  It

---

signed by SEPTA or its investment managers, DI 40-5; DI 40-6; DI 40-7, the most recent version of the FX Policies and Procedures, DI 40-8, the snapshot of the Daily Schedule Web Page, DI 41-7, the snapshot of the Standing Instructions Web Page, DI 40-12, and BNY Mellon's May 2, 2011 disclosures, DI 40-13.

For the sake of clarity, the Court does not convert this motion into one for summary judgment.  *See* Fed. R. Civ. P. 12(d).  It has considered the documents referred to above only for the facts of their contents and not for the truth of any matters asserted.  Although the Court may refer to the older versions of the FX Policies and Procedures attached by defendants, DI 40-9; DI 40-10, it does not rely on them to reach its decision.

[80]

The claim is brought in the alternative to Counts I and II for breach of fiduciary duty and unjust enrichment.  SAC ¶¶ 93–99.

[81]

For convenience, the remainder of the opinion will refer to "best execution pricing" as the pricing mechanism that SEPTA alleges it should have received—i.e., the best price possible in the circumstances.

[82]

Both parties agree that Pennsylvania law applies to this dispute.  *See, e.g.*, DI 40-1 at 3; DI 41 at 30 n.27.

[83]

*Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (alteration in original) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct.1999)).

contends only that it did not breach the contract because the contract did not obligate it to provide "best execution." That term, it argues, appeared only on the Standing Instructions Web Page, which it submits was not a part of the contract. Alternatively, it argues that even if the Standing Instructions Web Page was part of the contract, BNY Mellon complied with any such obligation as a matter of law.

       *1.    Whether the Standing Instructions Web Page Imposed Contractual Obligations*

The challenge in assessing this claim is that the parties did not reduce their relationship to a single writing. "To determine whether or not a writing is the parties' entire contract, the writing must be looked at and if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the parties' engagement, it is conclusively presumed that the writing represents the whole engagement of the parties."[84] We have no single such writing here.

SEPTA executed two documents with BNY Mellon: the MTA and the FX Procedure Form.[85] The MTA says substantially nothing about BNY Mellon's indirect FX trading program, and the FX Procedure Form is a one-page document that plainly is not "complete within itself," even when taken together with the MTA. Rather, the form refers to other documents, apparently drafted and in any case maintained solely by BNY Mellon.

---

[84]

    *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 497–98 (2004) (internal quotation marks and alterations omitted).

[85]

    The MTA was signed by both parties. DI 32-1 at 27. Versions of the FX Procedure Form were signed either by SEPTA or its investment managers acting on SEPTA's behalf. DI 40-5, DI 40-6, DI 40-7.

20

The parties agree that FX Procedure Form incorporated the FX Policies and Procedures in setting forth BNY Mellon's obligations. As discussed, the version of this document in effect when the SAC was filed required BNY Mellon to publish a daily schedule of FX prices each morning and then, absent contrary directions from SEPTA or its investment manager, to execute any required FX transaction at a price no less favorable than the daily schedule price (the daily schedule rule, or "DSR") and within three percent of the relevant interbank rate (the "3% Rule").

The FX Policies and Procedures leaves a noticeable gap in BNY Mellon's obligations. On the one hand, it does not impose any express pricing mechanism on BNY Mellon, providing only that the price satisfy the outer bounds established by the DSR and 3% Rule. On the other hand, it does not state expressly that BNY Mellon was free to charge whatever it wished as long as those two requirements were satisfied. Nor does it contain an integration clause making clear that the document represents the sum total of BNY Mellon's obligations.

BNY Mellon contends that this gap demonstrates that it had no obligation to apply any particular methodology so long as it complied with the DSR and 3% Rule. SEPTA contends that the gap should be filled by reference to the Standing Instructions Web Page, which allegedly shows that BNY Mellon was required to apply a best execution pricing methodology that gave SEPTA the best price possible in the circumstances in addition to meeting the DSR and 3% Rule.

SEPTA makes two separate arguments as to why the Standing Instructions Web Page should be considered. First, it argues that the FX Policies and Procedures defines the sum total of BNY Mellon's contractual obligations, that it is ambiguous, and that the ambiguity must be resolved by resort to the extrinsic evidence of the Standing Instruction Web Page. Second, it contends that the Standing Instructions Web Page is a part of the parties' contract and therefore directly imposes

obligations on BNY Mellon.

a.    *Whether the FX Policies and Procedures Is Ambiguous*

"Pennsylvania law on contract interpretation and ambiguity is somewhat complicated; while the broad principles are clear, it is not a seamless web."[86]  The Third Circuit has explained the Pennsylvania ambiguity inquiry as follows:

> "Ambiguity in a contract can be either patent or latent. While a patent ambiguity appears on the face of the instrument, a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous. A party may use extrinsic evidence to support its claim of latent ambiguity, but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract.  Lest the ambiguity inquiry degenerate into an impermissible analysis of the parties' subjective intent, such an inquiry appropriately is confined to the parties linguistic reference.  The parties' expectations, standing alone, are irrelevant without any *contractual hook* on which to pin them."[87]

Thus, a contract is not "rendered ambiguous by the mere fact that the parties do not agree on the proper construction,"[88] and extrinsic evidence must "support a reasonable alternative semantic reference for specific terms contained in the contract"—the so-called "contractual hook."[89]

SEPTA's claim that the FX Policies and Procedures itself is ambiguous fails for want of such a contractual hook.  Neither the DSR nor the 3% Rule could be clearer.  SEPTA has

---

[86]

    *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 92 (3d Cir. 2001).

[87]

    *Id.* at 93 (citations, alterations, and internal quotation marks omitted; emphasis in original).

[88]

    *Id.* (internal quotation marks omitted).

[89]

    *Id.* at 94 & n.3 (internal quotation marks omitted).

identified nothing in either that remotely could be construed to impose or allude to a best execution pricing obligation, even assuming that the extrinsic evidence from the Standing Instruction Page were considered.[90]   While there is a gap in the FX Policies and Procedures regarding how BNY Mellon should price FX transactions aside from these two requirements, a *gap* is distinct from a contractual *ambiguity*.   To the extent that SEPTA points to confusion among customers, who had assumed that standing instruction trades were subject to best execution pricing,[91] that is precisely the resort to expectations unmoored from contractual text that does not render a contract ambiguous under Pennsylvania law.

> b.      *Whether the Standing Instructions Web Page Is Part of the Contract*

The fact that the FX Policies and Procedures document is not ambiguous does not end the matter.   The SAC alleges that the Standing Instructions Web Page itself is a part of the parties' contractual relationship.   Assessing this claim requires interpreting the incorporation language in the FX Procedure Form, as this is the one document executed by the parties that can explain what comprised the contract.   Here, SEPTA stands on better ground because, while the FX Policies and Procedures is clear and unambiguous, relevant versions of the FX Procedure Form are less so.

The SAC alleges that the version of the form applicable when the SAC was filed

---

[90]

> SEPTA attempts to locate ambiguity in the 3% Rule's reference to the "relevant" interbank rate.  DI 41 at 34.  Even if the Court were to agree that there may be some doubt about the precise meaning of "relevant" in this context, SEPTA has not shown how any plausible rendering of that term would get it where it needs to go—i.e., to an obligation for BNY Mellon to provide best execution pricing.

[91]

> DI 41 at 35.

23

provides a hyperlink to the Daily Schedule Web Page, which itself links to the Standing Instructions Web Page.[92]   The SAC does not provide the actual language of the form and, as discussed above, the language in the forms executed by SEPTA and its investment managers varied over time in material ways.

Several versions of the FX Procedure Form support BNY Mellon's reading of the contract.  In particular, the August 2003, August 2004, and September 2007 versions all required SEPTA or its investment managers to acknowledge receipt of "Mellon's Foreign Exchange Procedures" and provided that "all FX transactions processed through Mellon . . . will be executed pursuant to these Procedures."[93]   Their reference to the capitalized "Mellon's Foreign Exchange Procedures" appears to refer to the document with nearly the exact same title, "Mellon Foreign Exchange Procedures," submitted by defendants.[94]   That document  contains the DSR and other terms not applicable here, but does not include either the 3% Rule, or most importantly, any reference to best execution.[95]   Although these forms link to the Daily Schedule Web Page, the reference is for a very narrow purpose—only to indicate where the daily schedule is found.[96]   Thus,

---

[92]

SAC ¶ 32.

[93]

DI 40-5 at 2; DI 40-7 at 2.

[94]

DI 40-9; *see* DI 40-3 ¶ 7.

[95]

DI 40-9.

[96]

DI 40-5 at 2; DI 40-7 at 2.

It appears that the Daily Schedule Web Page at that time was available at a slightly different web address than alleged in the SAC.  The record does not indicate whether that web page resembles the one described in the SAC and attached by SEPTA to its opposition.

24

even assuming that the Daily Schedule Web Page at that time indeed did refer to a Standing Instructions Web Page which in turn referred to best execution, the Court would be inclined to conclude that the form, and thus the contract, did not incorporate any such language.  Rather, the form appears to incorporate only the contents of the document entitled "Mellon Foreign Exchange Procedures" and states that the daily schedule referenced in that document is available at the listed hyperlink.[97]

The problem for BNY Mellon is the February 2011 form.  This version does not reference any single named document as the aforementioned forms did.  Rather, it indicates that the FX trades will be executed "per the procedures available at https://gm.bankofny.com/FX/ErisaRates.aspx."[98]  In addition, the form directs the manager to review "The Bank of New York Mellon's FX trading program guidelines," available at the same link.[99] BNY Mellon might have simplified the inquiry if that link went to the location of the FX Policies and Procedures document, https://gm.bankofny.com/includes/ErisaPol.pdf.  But it did not.  Instead, it went to https://gm.bankofny.com/FX/ErisaRates.aspx—that is, the Daily Schedule Web Page.

Thus, a manager considering whether to elect to receive standing instruction services who followed that link then would have been presented not with a set of procedures or guidelines, but instead with, *inter alia*, the latest daily schedule of prices, a link to the FX Policies and

---

[97]

Similar to the August 2004 and September 2007 forms, a form signed in August 2003 stated that "Manager acknowledges receipt of Mellon Foreign Exchange (FX) Procedures and agrees to act in accordance with Procedures as indicated below."  DI 40-6 at 2. The reference to the Daily Schedule Web Page is identical in this form to the August 2004 and September 2007 forms.

[98]

DI 40-7 at 4.

[99]

*Id.*

Procedures, *and* a link to the Standing Instructions Web Page.  To be sure, the link to the FX Policies and Procedures stated: "Click here to view The Bank of New York Mellon's Policies and Procedures for FX processed through BNY Mellon Custody," strongly suggesting that this document provided at least some of the governing "procedures available at https://gm.bankofny.com/FX/ErisaRates.aspx" that were referenced in the form.  But what to make of the form's reference to "trading program *guidelines*" available on the Daily Schedule Web Page? That term does not appear anywhere on the Daily Schedule Web Page or the FX Policies and Procedures.

The Court cannot now conclude as a matter of law that only the link to the FX Policies and Procedures, and not the link to the Standing Instructions Web Page, was to be followed in defining BNY Mellon's contractual obligations under the February 2011 form.  The Standing Instructions Web Page set forth a number of features of the trading program, most of which are not addressed otherwise in the FX Policies and Procedures.[100]  SEPTA plausibly has alleged that BNY Mellon's statements that the program provided these benefits were part of the bargain when SEPTA elected to sign the February 2011 form.[101]

---

[100]

BNY Mellon dismissively characterizes the Standing Instructions Web Page as a "promotional page" that could not create contractual obligations.  DI 40-1 at 23.  That is hardly clear as a matter of law at this stage.

[101]

DI 40-7 at 4.

This conclusion finds further support in the existence of a gap in the FX Policies and Procedures.  If the FX Policies and Procedures had contained an integration clause or made clear that BNY Mellon was free to price the transactions however it wished, subject to the DSR and the 3% Rule, it would not be plausible that the FX Procedure Form was intended to incorporate any other documents that set forth BNY Mellon's pricing obligations, regardless of the language used.  Thus, while the gap in the FX Policies and Procedures does not give rise to a contractual ambiguity in that same document, it does support SEPTA's position regarding ambiguity in the FX Procedure Form.

While the February 2011 form appears to provide the strongest basis for SEPTA's position,[102] it demonstrates more generally that what documents were part of the contract can be determined only after a careful inquiry as to what forms SEPTA signed, what documents those forms incorporated, and what obligations those documents imposed.[103]   Moreover, the Court is mindful that, at least in some circumstances, Pennsylvania law will read different documents together as part of the same contract even when they do not by their terms refer to each other.[104]

---

[102]

The March 2000 form further confuses the inquiry, as it appears not to reference any applicable guidelines or procedures governing the execution of FX trades.  DI 40-5 at 3.

[103]

BNY Mellon makes much out of the fact that the SAC does not allege that "best execution" appeared on the website when SEPTA signed the forms or that SEPTA relied on this representation.  *But see* SAC ¶ 82 ("SEPTA and the Class reasonably and foreseeably relied upon" defendants' "best execution" representation.).  It is true that the SAC does not allege when "best execution" appeared on the website; it alleges only that BNY Mellon represented during the Class Period that it would provide best execution.  *Id.* ¶ 28.  At oral argument, counsel for the defendants represented that the term first appeared around 2007, well before at least the signing of the February 2011 form.  *See* Oral Arg. Tr., Oct. 6, 2011, DI 50 [hereinafter "Oral Arg. Tr."] at 41:19–21.

In any event, BNY Mellon misapprehends the significance of the timing.  The FX Procedure Forms do not specify that the guidelines for the program are those in place when the form was signed.  Rather, the February 2011 form specifically pointed to the *current* website for the program's guidelines.  In fact, the most recent FX Policies and Procedures makes clear that the document was subject to change and that clients' continued operation under the program would constitute implied consent to any such changes.  DI 40-8 at 3.

Nor has BNY Mellon explained why reliance would be relevant.  SEPTA has not argued that the Standing Instructions Web Page should be incorporated under a promissory estoppel theory. If SEPTA shows that the FX Procedure Form incorporates the current Standing Instructions Web Page as a matter of contract interpretation, then obligations imposed by that web page would be binding regardless of any reliance.

The Court concludes that, having stated a plausible claim that BNY Mellon's "best execution" representation was a part of the contract for at least part of the Class Period, SEPTA is entitled to discovery in an effort to flesh out its claim.

[104]

*See Giant Food Stores, LLC v. THF Silver Spring Dev., L.P.*, 959 A.2d 438, 445 (Pa. Super. Ct. 2008) ("[W]here several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although

27

Finally, even where the incorporation language of a contract appears clear and unambiguous, a party sometimes may show that the language nevertheless suffers from latent ambiguity recognized by Pennsylvania law.[105]  The Court thus will assume for the remainder of this opinion that the Standing Instructions Web Page was incorporated into the contract.[106]

### 2.    Whether BNY Mellon Provided "Best Execution"

SEPTA next contends that BNY Mellon breached its obligation to provide "FX execution according to best execution standards"[107] insofar as BNY Mellon did not provide SEPTA with the best possible price under the circumstances.

Defendants concede that "best execution" is a term commonly used in the securities business with a meaning that essentially matches the definition that SEPTA advances.[108]  For example, Financial Industry Regulatory Authority (FINRA) Rule 5310, entitled "Best Execution and Interpositioning," requires member broker-dealers to "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the

---

the instruments may have been executed at different times and do not in terms refer to each other").  The Court expresses no view here as to whether this principle would apply to documents not executed by the parties.

[105]

*Bohler-Uddeholm Am., Inc.*, 247 F.3d at 93.

[106]

None of this should be read as a conclusion that SEPTA will survive summary judgment even for claims based on the February 2011 form.  The Court concludes only that SEPTA has a plausible claim warranting denial of the motion to dismiss on this ground.

[107]

SAC ¶ 37 (emphasis omitted).

[108]

DI 40-1 at 24.

customer is as favorable as possible under prevailing market conditions."[109]   The rule provides a

number of factors that comprise "reasonable diligence" including the character of the market for the

security, the size and type of transaction, number of markets checked, accessibility of the quotation,

and the terms and conditions of the order.[110]   Notably, the rule makes clear that, at least in this

context, a best execution requirement may exist even if a broker-dealer acts as a principal and not

as an agent in the transaction.[111]   Courts regularly have recognized this duty of securities broker-

dealers.[112]

        BNY Mellon contends that this definition is inapplicable to its obligations here as a

matter of law.  While BNY Mellon's contentions ultimately may prove meritorious, none warrants

---

[109]

    FINRA Rule 5310.

[110]

    *Id.*

[111]

    *Id. See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 170 n.12 (3d Cir. 2001) ("Defendants' duty to provide best execution remained consistent whether they were acting as agents of the trade or principals.").

[112]

    *E.g., NetCoalition v. SEC*, 615 F.3d 525, 530 n.6 (D.C. Cir. 2010) (describing "duty of best execution" as requiring broker-dealer "to exercise reasonable diligence to obtain favorable order execution terms for its customers"); *Kurz v. Fidelity Management & Research Co.*, 556 F.3d 639, 640 (7th Cir. 2009) (describing "duty of best execution" as "getting the optimal combination of price, speed, and liquidity for a securities trade"); *Geman v. SEC*, 334 F.3d 1183, 1186 (10th Cir. 2003) (holding that "duty of best execution requires that a broker-dealer seek to obtain for its customer orders the most favorable terms reasonably available under the circumstances"); *Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*, 336 F.3d 1373, 1381 n.* (Fed. Cir. 2003) (noting that "best execution rule required broker to fill a client's order at the best available price"); *see also e.g.*, Francis J. Facciolo, *A Broker's Duty of Best Execution in the Nineteenth and Early Twentieth Centuries*, 26 PACE L. REV. 155 (2005); Arthur Levitt, *Best Execution, Price Transparency, and Linkages: Protecting the Investor Interest*, 78 WASH. U. L. Q. 513 (2000); Jonathan R. Macey & Maureen O'Hara, *The Law and Economics of Best Execution*, 6 J. Fin. Intermediation 188 (1997); David A. Lipton, *Best Execution: The National Market System's Missing Ingredient*, 57 NOTRE DAME LAW. 449 (1982); Kenneth D. Garbade & William L. Silber, *Best Execution in Securities Markets: An Application of Signaling and Agency Theory*, 37 J. FIN. 493 (1982).

dismissal at this stage.

First, BNY Mellon argues that the SAC fails to allege that this established concept in securities trading has any meaning in the context of FX trading. This draws too fine a distinction. BNY Mellon concedes that the concept has meaning in the financial industry in situations in which a bank buys or sells a financial product as a principal, the bank and counterparty have not negotiated a specific price, and the bank is to execute the order as well as possible under prevailing market conditions. This situation is sufficiently analogous to render plausible SEPTA's claim that the securities trading definition should control here.

Second, BNY Mellon points out that, even in the securities business, an obligation of best execution still entitles the broker-dealer "to mark up the price to cover its costs and earn a profit."[113] The point merits little discussion. BNY Mellon may be correct that any best execution obligation would not have required it to provide FX to SEPTA at precisely the rates it could obtain in the interbank market. But that hardly settles as a matter of law that its alleged conduct satisfied the best execution standard, a heavily fact-bound question.

Third, BNY Mellon contends that the best execution obligation is irreconcilable with the pricing terms in the FX Policies and Procedures, which it reads as expressly permitting pricing provided only that it does not conflict with the DSR and 3% Rule. The Court disagrees. Both the DSR and 3% Rule are phrased only as limitations. As noted earlier, there is nothing in the FX Policies and Procedures that says that BNY Mellon was free to price FX however it wished aside from these requirements. To be sure, if BNY Mellon prevails on its contention that it had no obligation to provide best execution pricing as SEPTA contends, then the natural consequence may

---

[113] DI 40-1 at 25.

be that BNY Mellon was permitted to price the FX however it chose aside from those two requirements.  But that hardly creates an irreconcilable conflict when the question is whether there is a best execution pricing obligation in the first instance.

The real thrust of BNY Mellon's argument appears to be that a best execution pricing obligation would render the DSR and 3% Rule superfluous.  This plainly would not be the case with the DSR which, unlike best execution pricing, provides a prospective guarantee that the price would be no worse than that listed in the daily schedule on a given morning, no matter how unfavorably the market might move over the course of a day.  Nor would it be the case with the 3% Rule.  As defendants themselves point out, the best execution obligation, as understood in securities trading, allows the broker to take into account a number of factors in setting the price, including a markup to the broker for costs and profit.  While the three percent band around the relevant interbank rate may have been a wide one, it cannot be concluded as a matter of law that a best execution pricing methodology would have rendered that requirement superfluous.

More to the point, defendants themselves concede the true purpose of the 3% Rule in its FX trading program procedures: to allow participation by custodial clients that were qualified ERISA plans.[114]  Under Sections 406 and 408 of ERISA,[115] a fiduciary with respect to an ERISA plan or party in interest may not engage in transactions regarding plan assets in its own interest.  Foreign exchange transactions are exempt, however, if they meet a number of requirements, including most importantly for present purposes:

"[T]he exchange rate used by such bank or broker-dealer (or affiliate) for a

---

[114]    DI 40-1 at 17 n.6.

[115]    29 U.S.C. §§ 1106, 1108.

> particular foreign exchange transaction does not deviate by more than 3 percent from
> the interbank bid and asked rates for transactions of comparable size and maturity
> at the time of the transaction as displayed on an independent service that reports rates
> of exchange in the foreign currency market for such currency."[116]

The FX Policies and Procedures corroborates the point: "This Program is designed to provide

ERISA plan accounts the ability to engage in FX transactions with [BNY Mellon] in compliance

with one or more prohibited transaction exemptions."[117]

Thus, while defendants at times seek to paint the 3% Rule as the focus of the pricing

bargain that it struck with its clients, the procedures themselves permit the inference that the 3%

Rule was designed simply to make the program obviously ERISA-compliant.   While ERISA

compliance perhaps was not meaningful for SEPTA, which is not itself alleged to have been an

ERISA plan, it does demonstrate that there is nothing irreconcilable between the existence of a best

execution pricing obligation and the 3% Rule.

Finally, BNY Mellon contends that, whatever best execution may be understood to

mean as a matter of industry usage, the Standing Instructions Web Page provided a definition of

"best execution" that is entirely unrelated to pricing.[118]   Specifically, the document stated,

> "We consider best execution, as it relates to the Standing Instruction process,
> as providing a consistent, accurate, and efficient means of facilitating pre-trade,
> trade, and post-trade activities.   These activities include identification of trade

---

[116]

29 U.S.C. § 1108(b)(18)(C).

[117]

DI 40-8 at 2.

[118]

At oral argument, counsel for plaintiff represented that this definition was added to the
Standing Instruction Web Page only in late 2009, after allegations similar to those in this
case were made against State Street, and that previously the term "best execution" was used
without any corresponding definition.   Oral Arg. Tr. 77:14–22.   This allegation does not
appear in the SAC or any attached papers and will not be considered by the Court here.

requirements, pre-trade administration associated with regulated markets, arranging settlement, reconciling discrepancies, posting cash to accounts and reporting all relevant transaction details to investment accounting systems."

Although this statement does suggest that BNY Mellon viewed its best execution standard as involving many aspects of trade facilitation other than pricing, the language does not expressly forswear the industry understanding of the term. One at least plausibly might read this sentence as *adding* to BNY Mellon's obligations, rather than implicitly redefining an oft-used industry pricing term without saying so expressly. In addition, the use of the term "efficient" could be read to support an understanding of the term that includes best execution pricing. Simply put, while defendants' argument about the proper construction of this contract term may prove sufficient to warrant summary judgment or a verdict at trial, the Court cannot now conclude that SEPTA's reading of the contract is implausible as a matter of law.[119]

B.     *Count IV: Implied Covenant of Good Faith and Fair Dealing*

SEPTA claims also that BNY Mellon breached the contract in issue here by violating the implied covenant of good faith and fair dealing.[120]

Pennsylvania courts have adopted Section 205 of the *Restatement (Second) of*

---

[119]

The Court's conclusion is consistent with that of Judge Alsup in *Int'l Union of Oper. Eng'rs v. BNY Mellon Corp.*, 2012 WL 476526, *6 (N.D. Cal. Feb. 14, 2012)—a case now consolidated in the MDL before this Court—which held that the construction of a disputed term such as "best execution standards" was best left to a motion for summary judgment after discovery has been conducted.

[120]

SAC ¶¶ 100–06.

*Contracts*,[121] which provides that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."[122]  "The obligation to act in good faith in the performance of contractual duties varies somewhat with the context,"[123] but violations may include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."[124]  The duty "emphasizes faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party."[125]  Further, under the closely related doctrine of necessary implication:

> "In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract."[126]

 "Courts employ the doctrine of necessary implication as a means of avoiding injustice by inferring contract provisions that reflect the parties' silent intent."[127]

---

[121]

    *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992).

[122]

    RESTATEMENT (SECOND) OF CONTRACTS § 205.

[123]

    *Somers*, 613 A.2d at 1213.

[124]

    *Id.*

[125]

    RESTATEMENT (SECOND) OF CONTRACTS § 205; *accord CMR D.N. Corp. v. City of Phila.*, 803 F. Supp. 2d 328, 337 (E.D. Pa. 2011).

[126]

    *Stamerro v. Stamerro*, 889 A.2d 1251, 1259 (Pa. Super. Ct. 2005).

[127]

    *Id.*

34

These doctrines apply "only in limited circumstances."[128]  "Implied duties cannot trump the express provisions in the contract."[129]  Accordingly, "implied covenants and any express terms of a contract are necessarily mutually exclusive—one can invoke 'implied' terms only when there are no express terms in the contract relating to the particular issue."[130]  At the same time, the obligation of good faith and fair dealing "is tied specifically to and is not separate from the express duties a contract imposes on the parties," and "cannot imply a term not explicitly contemplated by the contract."[131]  Rather, "[b]oth the implied covenant of good faith and the doctrine of necessary implication are principles for courts to harmonize the reasonable expectations of the parties with the intent of the contractors and the terms in their contract."[132]

SEPTA contends that "BNY Mellon exploited its superior knowledge of the FX rates to extract significant profits for itself from SEPTA and the Class," and that "exploitation of [the contractual] ambiguity is exactly the type of manipulative behavior the covenant of good faith and fair dealing seeks to eliminate."[133]   The Court disagrees.

The purpose of the implied covenant is to prevent a party from making an agreement and then acting in such a way as to prevent the other party from receiving its fruits.  But this merely

---

[128]

*John B. Conomos, Inc. v. Sun Co., Inc. (R & M)*, 831 A.2d 696, 706 (Pa. Super. Ct. 2003).

[129]

*Id.*

[130]

*USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 438 (3d Cir. 1993).

[131]

*Conomos*, 831 A.2d at 706–07.

[132]

*Id.* at 707.

[133]

DI 41 at 37.

begs the question: for what did SEPTA bargain?  Either best execution pricing was an express term of the contract or it was not.  If it was, then SEPTA will be able to pursue its claim of an express breach and has pointed to no sense in which BNY Mellon prevented SEPTA from receiving the benefit of best execution pricing aside from simply failing to provide best execution.  If, conversely, best execution was not an express term of the agreement, then SEPTA had no claim to it as a fruit of the contract.[134]  Nor has SEPTA pointed to any other express benefit for which it bargained that would have justified an expectation of implicit best execution pricing.   The implied covenant protects the benefit of the bargain made.  It does not create new benefits out of whole cloth.  If anything, SEPTA's theory on this claim sounds more in breach of fiduciary duty, to which the Court next turns.[135]

### C.    Breach of Fiduciary Duty

SEPTA brings also a state law claim for breach of fiduciary duty against BNY Mellon.[136]

---

[134]    To be sure, as discussed below, BNY Mellon allegedly made misrepresentations suggesting that it would provide best execution pricing.  But short of SEPTA relying on any such misrepresentations as bases of a contractual obligation through a theory of promissory estoppel—and it makes no such claim—the Court concludes that the implied covenant of good faith and fair dealing creates no benefit that the contract does not already provide.

[135]    In *Operating Engineers*, Judge Alsup permitted a claim for breach of the implied covenant of good faith and fair dealing to proceed under California law against BNY Mellon in similar circumstances.  Judge Alsup concluded that "[t]he implied covenant can be violated by expressly permitted conduct done in bad faith."  2012 WL 476526 at *6.  This is true but incomplete, at least under Pennsylvania law.  The covenant here is violated only when that expressly permitted conduct done in bad faith frustrates a party's right to receive a bargained-for benefit in the contract.  The SAC makes no such allegation here.

[136]    *See* SAC ¶¶ 79–86.

   *1. Fiduciary Duties Under the MTA*

   Under Pennsylvania law, the existence of a "confidential relationship" is an essential element of a claim for breach of fiduciary duty.[137]  One method of establishing such a relationship is to "demonstrate a legal relation ordinarily known as confidential at law . . . [which] generally exists between trustee and cestui que trust, guardian and ward, attorney and client, and principal and agent."[138]

   The MTA unquestionably established a fiduciary relationship between BNY Mellon and SEPTA.  Indeed, BNY Mellon expressly "acknowledge[d] that it assume[d] the fiduciary duties established by this Agreement."[139]  The agreement provided that the Master Trust Fund "shall be held by the Master Trustee in trust" and shall be held only for the exclusive benefit of plan participants.[140]

   To be sure, upon the appointment of investment managers with respect to portions of the Master Trust Fund, the MTA relieved BNY Mellon of "all *investment* duties, responsibilities and liabilities normally or statutorily incident to a trustee" as to such assets and provided that BNY Mellon thereafter would "act in the capacity of custodian of such assets."[141]  And it appears investment managers in fact were appointed for all of SEPTA's assets, as the SAC does not allege

---

[137]

   *Basile v. H & R Block, Inc.*, 52 A.3d 1202, 1210 (2012).

[138]

   *Id.* (emphasis and internal quotation marks omitted).

[139]

   MTA § 12.1.

[140]

   MTA §§ 2.5, 2.6.

[141]

   MTA § 5.2 (emphasis added).

that BNY Mellon retained any such investment duties here.[142]  Even so, however, nothing in the MTA suggests any intent to relieve BNY Mellon of its fiduciary obligations relating to the safekeeping and protection of the assets entrusted to its care.[143]  Indeed, while BNY Mellon now seeks to paint its role as custodian as a mere holder of assets, the MTA plainly entrusted BNY Mellon with a number of discretionary powers even as custodian.[144]  Irrespective of whether investment managers were appointed,[145] the MTA provided BNY Mellon with the power "to generally take all action, whether or not expressly authorized, which the Master Trustee may deem necessary or desirable for the protection of the Master Trust Fund."[146]  Moreover, however it chose

---

[142]

      Indeed, SEPTA conceded that investment managers were appointed for all of its assets at oral argument.  Oral Arg. Tr. 55:2–8.

[143]

      BNY Mellon makes much of the MTA's use of a named term "Fiduciary" to denote appointed investment managers, contending that this demonstrates that fiduciary obligations attached to BNY Mellon only so long as it retained investment duties.  *Id.*  The Court is not persuaded that the MTA's accurate shorthand referring to investment managers as "Fiduciaries" was meant to divest BNY Mellon of the fiduciary obligations otherwise imposed by the MTA and Pennsylvania law.

[144]

      *See* DI 40-1 at 29, 30 n.17.  This renders inapposite BNY Mellon's citations to cases that show that mere holders of assets are not fiduciaries under the statutory definition provided by ERISA.  *See, e.g., Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12 (1st Cir. 1998); *Burtch v. Ganz (In re Mushroom Transport Co., Inc.)*, 382 F.3d 325, 346–47 (3d Cir. 2004).

[145]

      MTA § 7.1 contains "general powers" that the Master Trustee has only when investment managers have not been appointed.  But MTA § 7.2 then provides "specific powers" to the Master Trustee, with no indication that these powers disappear upon the appointment of investment managers.

[146]

      MTA § 7.2 (emphasis added).  The MTA specifically enumerated a number of such powers, including *inter alia* the ability to delegate power to other agents where needed "to facilitate the operations of the Master Trust Fund," the power to "form corporations and to create trusts, . . . to enter into agreements creating partnerships or joint ventures for any purpose or purposes determined by the Master Trustee to be in the best interests of the Master Trust Fund," and the power "to make, execute and deliver, as trustee, any and all deeds, leases, mortgages, conveyances, waivers, releases or other instruments in writing necessary or

Case 1:12-md-02335-LAK   Document 188   Filed 01/23/13   Page 39 of 62

38

to exercise these powers, BNY Mellon was obligated to act with reasonable care.[147]

The SAC thus adequately alleges that BNY Mellon had a fiduciary relationship with SEPTA in its capacity as custodian.[148]  Identifying such a fiduciary relationship is consistent with Pennsylvania law recognizing that custodians of assets in other contexts have fiduciary obligations.[149]

### 2.    Ancillary Services

The Court next considers how the FX trading relationship fit within the MTA and the

---

desirable for the accomplishment of any of the foregoing powers."  *Id.*

Separately, the MTA granted also "any and all discretionary powers not explicitly or implicitly conferred by this Agreement which it may deem necessary or proper for the protection of the property held hereunder."  *Id.* § 8.1.

[147]

*See* MTA Amend. ¶ 7 (amending § 6.1) ("In performing its duties under this agreement, th Master Trustee shall exercise the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims."); *cf. In re Lux's Estate*, 480 Pa. 256, 263, 389 A. 2d 1053, 1057 (1978) (defining "duty of care" in trust context as "[t]he measure of diligence and care . . . that which a man of ordinary prudence would practice in care of his own estate").

At oral argument BNY Mellon conceded that the duty of care in this provision applied to its custodial responsibilities. *See* Oral Arg. Tr. 14:2–5 (counsel for BNY Mellon stating that § 6.1 "provides more generally that the master trustee will exercise care, skill, prudence, and diligence acting in its capacity which is to say its capacity as custodian").

[148]

In reaching this conclusion, the Court emphasizes that it makes no such statement generally about BNY Mellon's custodial clients.  Its decision here is rooted in the obligations created by the MTA between SEPTA and BNY Mellon and applicable Pennsylvania law.

[149]

*See Witherow v. Weaver*, 337 Pa. 488, 12 A.2d 92 (1940) (recognizing that "custodian of [tax] collections" entrusted to "insure their safekeeping" had "fiduciary obligations with respect to the fund"); *In re Wilson's Estate*, 59 Pa. Super. 358 (Pa. Super. Ct. 1915) (recognizing that executor of estate who was "merely a custodian of the assets" nevertheless had a "fiduciary position[]").

relationship between the parties.

       The MTA expressly permits BNY Mellon to provide, "in addition to the services rendered" under the MTA, "such ancillary services as SEPTA and the Master Trustee may agree upon from time to time" with "[t]he compensation received by the Master Trustee for such services [to be] agreed upon by the parties in an arm's-length manner."[150]  BNY Mellon contends that the standing instructions service was precisely such an ancillary service.  While not addressing this provision of the MTA directly, SEPTA appears to argue, to the contrary, that FX trading was part and parcel of BNY Mellon's fiduciary custodial obligations and that BNY Mellon thus had a freestanding fiduciary obligation under the MTA to provide SEPTA with the best prices it could obtain, independent of any "best execution" representations.[151]

       The MTA says next to nothing about FX trading at all and certainly nothing about BNY Mellon's standing instructions service.  SEPTA nevertheless argues that standing instructions FX trading still was part of BNY Mellon's custodial duties.  It points principally to the following provision in the amended MTA:

> "The Master Trustee is hereby granted any and all discretionary powers not explicitly or implicitly conferred by this Agreement which it may deem necessary or proper for the protection of the property held hereunder.  This shall include the ability to take any and all actions necessary to *settle* transactions in futures and/or options contracts, short-selling programs, foreign exchange or foreign exchange contracts, swaps, and other derivative instruments."[152]

---

[150]

      MTA § 9.1.

[151]

      *See* Oral Arg. Tr. 74:12–14 ("[T]hey're supposed to be providing us as our fiduciary with the best rate that they could obtain at that time.").

[152]

      MTA Amend. ¶ 30 (amending § 8.1) (emphasis added).

40

Even in the absence of other evidence, it would be quite a leap from (1) language empowering the trustee—under an MTA that at least contemplated that the trustee would perform investment functions, although that ultimately was not the role that BNY Mellon played—to settle transactions (2) to a conclusion that the trustee, acting merely as a custodian of assets, owed SEPTA a fiduciary duty to provide best execution pricing where SEPTA or its investment managers made the investment decisions and opted to engage in FX through the standing instructions service.  But there is more here.

The FX Policies and Procedures—which SEPTA does not dispute set forth binding parameters of the program—stated that BNY Mellon would execute the standing instruction trades "on a principal basis."[153]  The traditional understanding in securities law is that a party acts as a "principal" when trading for its own account as distinguished from acting as an agent for a customer.[154]  To be sure, on this motion to dismiss, SEPTA would be entitled to any plausible inferences in its favor regarding what the term "principal basis" might mean.  But neither the SAC nor SEPTA's opposition brief put forward any plausible understanding of the term that could be consistent with the conclusion that BNY Mellon acted in a fiduciary capacity when executing

---

[153]

SAC ¶ 34.

[154]

See, e.g., 17 C.F.R. § 240.10b-10 (setting forth different disclosure obligations on broker-dealers who act as principal versus those who act as agent); *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 539–40 (2d Cir. 1999) (concluding that defendant acted as "principal" and not "agent" when it took ownership of financial instrument and sold it from its own account to plaintiff); *Sec. Indus. Ass'n v. Bd. of Governors of Fed. Reserve Sys.*, 716 F.2d 92, 97–98 (2d Cir. 1983) (noting that bank trading for its own account "trades as principal"); *United States v. Blitz*, 533 F.3d 1329, 1334 n.12 (2d Cir. 1976) ("A market maker or trader purchases and sells securities as a principal for his own account.").

standing instructions trades.[155]

The Court thus concludes that the standing instructions trades were "additional services rendered" under the "ancillary services" provision of the MTA. BNY Mellon was entitled to be compensated for those services as determined by arm's-length agreement. There was no fiduciary obligation to provide best execution pricing. This of course is distinct from whether it had a contractual obligation to provide best execution.

### 3.    *Overmastering Influence*

Even where parties engage in a financial transaction on a principal-to-principal, arm's-length basis, a fiduciary relationship still may be created by a sufficient degree of trust reposed by one party in the other in the circumstances.[156]  This corresponds to Pennsylvania's recognition that a confidential relationship may arise, independent of any relationship presumed confidential-at-law, "where there is overmastering influence or . . . weakness, dependence, or trust, justifiably reposed."[157]  Courts have emphasized the "relational focus" of this inquiry, as "what may

---

[155]

    Instead, SEPTA complains only that the reference to "principal basis" was "buried in the FX Policies and Procedures," a document that SEPTA did not sign. DI 41-1 at 18. As discussed below, BNY Mellon may have failed adequately to comply with *disclosure* obligations. But that is a separate issue.

[156]

    *See, e.g.*, *Lehman Bros. Comm. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 151 (S.D.N.Y. 2000).

[157]

    *Basile*, 52 A.3d at 1210 (internal quotation marks omitted).

    Courts should not "ma[k]e too much of the use of the disjunctive in [this] formulation," which is meant just to provide "generalized guidance." *Id.*  Rather, the question is whether "the circumstances make it certain the parties do not deal on equal terms." *Id.* (internal quotation marks omitted).

be couched as 'overmastering' as to one individual will not have the same impact on others."[158]
Mindful that Pennsylvania courts will not find such a relationship in an "arms length business
contract" merely because one party has "superior skill or expertise," what is necessary is a
relationship "marked by such disparity in position that the inferior party places complete trust in the
superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of
power."[159]

        The SAC relies on three main factors in its attempt to plead a confidential
relationship in the FX trading: (1) BNY's allegedly "superior access to confidential information
about prevailing market FX rates at the time SEPTA's FX transactions were actually executed," (2)
its allegedly "superior position over SEPTA and the Class with respect to the execution of FX
transactions," and (3) its "status as fiduciar[y]" under the MTA.[160]

        SEPTA's reliance on alleged confidential information is unavailing.  The SAC does
not allege that BNY Mellon had any information about FX market rates that SEPTA could not
readily have obtained.  Indeed, the SAC directly undermines any such claim when it concedes that
SEPTA or its investment managers always had the option of calling BNY Mellon and engaging in
direct trading in which they could have negotiated their own prices directly.[161]  Moreover, a SEPTA
analysis, included in the SAC, demonstrates that interbank market rates were not secret

---

[158]
        *Id.*

[159]
        *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 23 (Pa. Super. Ct. 2002)

[160]
        SAC ¶ 82.

[161]
        *Id.* ¶ 25.

information.[162]

        SEPTA likewise fails to make any plausible allegation that BNY Mellon held a superior position. SEPTA's assets were controlled by appointed investment managers, sophisticated fiduciaries, themselves charged with duties of care, to make discretionary investment decisions with regard to SEPTA's assets.[163] The Court does not see sufficient allegations of the requisite disparity in position leading SEPTA to "seek no other counsel" when SEPTA here actually sought other counsel and delegated investment authority to such managers.

        This leaves only SEPTA's argument that BNY Mellon's status as fiduciary under the MTA as custodian was sufficient. It was not. Concluding otherwise would do violence to the MTA, which specifically contemplated the possibility that BNY Mellon and SEPTA negotiate, at arm's-length, for the provision of ancillary services.

        *4.    Alleged Misrepresentations and Nondisclosures*

        The foregoing establishes that BNY Mellon, when executing FX trades through the standing instructions program, had no fiduciary obligation to price those trades in SEPTA's best interest.[164] Nonetheless, BNY Mellon, as SEPTA's custodian under the MTA, did owe a duty of

---

[162]

      *Id.* ¶ 46.

[163]

      MTA § 5.2.

[164]

      At times, SEPTA's brief appears to suggest that BNY Mellon would have violated its custodial fiduciary duties insofar as it breached its agreement to provide "best execution" pricing. Even if a fiduciary generally should not breach its contracts with its principal, the Court agrees with BNY Mellon that any such theory would be barred by the "gist of the action" doctrine.

      This doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims." *eToll,* 811 A.2d at 14 (citation omitted). "To be construed as in

44

loyalty.[165]  In describing this duty in the agency context, the Pennsylvania Supreme Court has said

that "in all matters affecting the subject of the agency, the agent must act with the utmost good faith

in furthering and advancing the principal's interests, including a duty to disclose to the principal all

relevant information."[166]  Thus, Pennsylvania courts regularly have upheld the sufficiency of claims

of breach of fiduciary duty grounded in fiduciaries' alleged failures to act candidly with their

principals, i.e., to disclose material information or to speak accurately to their clients regarding the

subjects of their obligations.[167]  Moreover, where Pennsylvania allows a fiduciary to profit from its

position, it nevertheless makes clear that full and frank disclosure of the arrangement is necessary

for the fiduciary to comply with its duties.  For example, in the corporate context, "[a] director or

officer may make a profit out of dealing with the corporation if he first makes a full and complete

disclosure of all the material facts to the corporation and if the shareholders approve the

---

tort, . . . the wrong ascribed to defendant must be the gist of the action, the contract being collateral." *Bash v. Bell Tele. Co.*, 601 A.2d 825, 829 (Pa. Super. Ct. 1992).  But if the only reason that BNY Mellon would have violated its fiduciary duties is that it breached a separate contract with SEPTA, then the contract is hardly collateral.

[165]

*See Anchel v. Shea*, 762 A.2d 346, 357 (Pa. Super. Ct. 2000) ("Our law prescribes that a fiduciary obligation includes both a duty of care and a duty of loyalty."); *see also Vitow v. Robinson*, 823 A.2d 973, 977 (Pa. Super. Ct. 2003) (describing trustee's duty of loyalty to act in interest of beneficiaries as "perhaps the most fundamental duty") (internal quotation marks omitted); *see also* MTA § 2.6 (requiring Master Trustee to hold funds for exclusive benefit of beneficiaries).

[166]

*Basile v. H & R Block, Inc.*, 563 Pa. 359, 368, 761 A.2d 1115, 1120  (2000).

[167]

*See, e.g.*, *Kirscher v. K & L Gates LLP*, 46 A.3d 737, 756 (Pa. Super. Ct. 2012) (sustaining breach of fiduciary duty allegations when, *inter alia*, the fiduciary was alleged to have provided a false and misleading report); *Burton v. Republic Ins. Co.*, 845 A.2d 889, 899 (Pa. Super. Ct. 2004) (holding that fiduciary relationship between insurer and insured creates an obligation to disclose fully the coverage and any requirements under the policy); *In re Shahan*, 429 Pa. Super. 91, 99–100, 631 A.2d 1298, 1303 (Pa. Super. Ct. 1993) (holding that fiduciary breached duties by misrepresenting value of insurance proceeds).

45

transaction."[168]   The requirement of full disclosure is imposed in recognition of the fiduciary obligations owed by a director when functioning in that capacity, notwithstanding that the director acts in the director's personal interests and adversely to those of the corporation where the director deals with the company for his or her own account.

Other jurisdictions also have made the point in similar contexts.  In *Geman v. SEC*,[169] a case that bears a number of similarities with this one, for example, the petitioner held itself out as a fiduciary with regard to advisory and administrative services and promoted its abilities to obtain "best execution" for its clients.[170]   The petitioner later began to act as principal in some of its trades with clients, a fact that it disclosed to its clients and for which it obtained consent, but only after making misleading statements about the reasons for the change.[171]   The Tenth Circuit rejected petitioner's argument that a breach of fiduciary duty claim did not lie because it was not acting in a fiduciary capacity with respect to the principal transactions.[172]   Rather, it concluded that "when a firm has a fiduciary relationship with a customer, it may not execute principal trades with that customer absent full disclosure of its principal capacity, as well as all other information that bears on the desirability of the transaction from the customer's perspective."[173]   The case thus stands for

---

[168]

    *In re Lerch's Estate*, 399 Pa. 59, 72, 159 A.2d 506, 513 (1960).

[169]

    334 F.3d 1183.

[170]

    *Id.* at 1186.

[171]

    *Id.* at 1187.

[172]

    *Id.* at 1189.

[173]

    *Id.* (internal quotation marks omitted; emphasis omitted).

46

the proposition that where a fiduciary seeks to profit by acting in a principal capacity in matters sufficiently related to the subject of its fiduciary duties, the fiduciary may do so only if, at a minimum, it fully and fairly discloses the nature of the relationship and its duties.[174]

While the Court has concluded that BNY Mellon was not acting in its custodial fiduciary capacity in the course of providing standing instruction trades, SEPTA plausibly has alleged that the FX trading relationship was sufficiently related to BNY Mellon's custodial business to trigger this obligation of candor with respect to those trades.[175]  Standing instructions trades were closely related to trade settlement, which the MTA envisioned to be a custodial function.   In addition, there are numerous indications that the program was designed specifically for and marketed towards custodial clients.  The Standing Instructions Web Page stated that "Standing Instructions captures all types of *custody-related* foreign exchange funding needs and automates the currency execution and settlement."[176]  The Daily Schedule Web Page was titled "FX via BNY Mellon Custody."[177]  The FX Policies and Procedures document was titled "FX Program for Trade Requests Processed through BNY Mellon Custody."[178]  Finally, one may infer that the $25 custodial

---

[174]      To the extent that *Geman* went one step further and required disclosure of "all other information that bears on the desirability of the transaction from the customer's perspective," *id.*, that holding appears to have relied on the fiduciary's assumption of "advisory" services, which is not alleged here.

[175]      Put differently, there is a distinction between the capacity in which BNY Mellon was acting while *actually executing* the program, versus the capacity in which BNY Mellon was acting while *marketing* the program and seeking ongoing participation by its custodial clients.

[176]      SAC ¶ 36 (emphasis added).

[177]      DI 41-7 at 2.

[178]      DI 40-8 at 2.

47

fee charged to SEPTA for FX transactions executed with third parties was meant to encourage

SEPTA to trade with BNY Mellon so that BNY Mellon could earn additional trading-related fees.

These strong connections between custodial services and the FX trading program amplified the need

for BNY Mellon to have made full and clear disclosures with respect to its roles as fiduciary and as

principal.[179]

       Here, SEPTA plausibly has alleged both misrepresentations and nondisclosures.

First, SEPTA adequately alleges that BNY Mellon's representation that the standing instruction

trading would provide "FX execution under best execution standards"[180] was materially misleading.

As discussed above, SEPTA may proceed on its claim that BNY Mellon was obligated contractually

to provide best execution pricing on the basis of this representation.  But to the extent that the

evidence ultimately shows that best execution was *not* a part of the parties' contract, SEPTA

alternatively may seek to show that BNY Mellon's statement was a breach of its fiduciary duties.[181]

---

[179]

In *Petty v. Hospital Serv. Ass'n of Ne. Pa.*, 611 Pa. 119,  23 A.3d 1004, 1014 (2011), the
Pennsylvania Supreme Court concluded that insurance policyholders lacked standing to sue
their fiduciary, Blue Cross, for the latter's alleged violation of nonprofit laws in
accumulating excess profits.  The court held, "[w]hile Blue Cross may have a fiduciary duty
to appellants under its contract, that duty does not extend to Blue Cross's business practices,
and thus appellant's breach of fiduciary duty claim cannot stand."  That is not this case.

[180]

SAC ¶ 29.

The SAC alleges also that BNY Mellon represented that its trading was "free of charge."
Neither the SAC nor SEPTA's brief explains how BNY Mellon's conduct involved a
"charge."  Nevertheless, to the extent that SEPTA adequately has alleged that BNY Mellon
made misleading statements about the nature of the program, it may seek to prove such a
claim by reference to the "free of charge" representation as well.

[181]

The Second Circuit has upheld claims of breach of fiduciary duty under analogous
circumstances in the ERISA context.  In *Abbruscato v. Empire Blue Cross and Blue Shield*,
274 F.3d 90 (2d Cir. 2001), plaintiffs contended that representations by Empire were part
of their contract and guaranteed them lifetime benefits.  The court rejected that claim

48

While BNY Mellon contends that the definition on the website obviated any misleading impression, this cannot be determined at this stage.[182]

Similarly, SEPTA may proceed with its claim for breach of fiduciary duty regarding BNY Mellon's disclosures about whether the standing instruction service was part of BNY Mellon's fiduciary responsibilities.  To be sure, BNY Mellon did state that it would be trading "on a principal basis,"[183] and the sophistication of BNY Mellon's audience may be relevant to assessing whether this disclosure was sufficient.  But the Court is not persuaded that this simple reference demonstrates as a matter of law that BNY Mellon provided "the full and complete disclosure of all the material facts" regarding the nature of its relationship that Pennsylvania law requires before a fiduciary seeks to profit from its confidential relationship.[184]  BNY Mellon easily could have stated during the Class Period that the standing instructions service was ancillary to the custodial relationship, that it assumed no fiduciary duties towards SEPTA in that relationship, and that it would not necessarily execute them in SEPTA's best interests.  Indeed, BNY Mellon essentially made all of these

---

because the representations were not part of the contract. Nevertheless, it identified a material issue of fact regarding whether Empire breached fiduciary duties in making representations at odds with the terms of the contract.

[182]

In concluding that there is a plausible claim that the Standing Instruction Page was misleading, the Court relies in part on the contractual gap in the FX Policies and Procedures and the apparent ambiguity of the incorporation language in at least some of the FX Procedure Forms.  If BNY Mellon simply had put forth a single writing that made express that it was free to charge whatever it chose subject to the DSR and the 3% Rule, it would be much less plausible that one could be misled by separate references to best execution.

[183]

SAC ¶ 34.

[184]

*Lerch's Estate*, 399 Pa. at 72, 159 A.2d at 513.

disclosures on May 2, 2011.[185]

The Court expresses no view at this stage whether any of the May 2011 disclosures actually was necessary for BNY Mellon to comply with its fiduciary obligations. Such an inquiry may present factual questions that would benefit from a fuller record. It suffices to note only that the mere reference to "principal basis" in a document incorporated by the FX Procedure Form signed by SEPTA does not foreclose a plausible claim that the disclosures were insufficient.

In sum, BNY Mellon had every right under the MTA to perform additional services for SEPTA in exchange for compensation, and the standing instruction program undoubtedly provided services to SEPTA separate and apart from its custodial duties that were worthy of some compensation. Nevertheless, in marketing its program and thus, seeking to extract additional profit from clients like SEPTA to whom it owed fiduciary duties of loyalty and care, BNY Mellon was obligated to provide the full and fair disclosure of relevant information that the law requires.[186] While BNY Mellon ultimately may show otherwise on summary judgment or at trial, the SAC at

185 SAC ¶¶ 49–52.

186 The Court stresses that there are limits to what information BNY Mellon was obligated to provide. SEPTA suggests that BNY Mellon was obligated to disclose its precise profits and to provide time stamps so that SEPTA could have checked the quality of the execution. The Court disagrees with both contentions. Once BNY Mellon fairly described the program and its non-fiduciary status, BNY Mellon would have been obligated to provide time stamps or an accounting of its profits only insofar as the agreement so specified. *See In re Mexico Money Transfer Litigation*, 267 F.3d 743, 749 (7th Cir. 2001) ("Neiman Marcus does not tell its customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates and incentives it receives to sell cars. This is true in the financial markets no less than the markets for physical goods."). SEPTA has not alleged any industry practice that might have implied a contractual obligation to provide time stamps or reveal profits.

least plausibly alleges that BNY Mellon failed to do so here.[187]

### *D. Unjust Enrichment*

Finally, SEPTA brings a claim for unjust enrichment against all defendants.[188] The Court first addresses the unjust enrichment claims against BNY Mellon and Mellon Bank and then proceeds to the claim against BNY Mellon Corp.

#### *1. Claims Against BNY Mellon and Mellon Bank*

The elements of unjust enrichment under Pennsylvania law are "(1) benefits conferred on defendant by plaintiff, (2) appreciation of such benefits by defendant, (3) acceptance

---

187 The Court notes that the gist of the action doctrine does not bar the claims based on misrepresentations and nondisclosures. BNY Mellon contends that any fiduciary duties arose from the MTA and that the gist of the action is breach of contract because it stems from a breach of the MTA. DI 46 at 10. The argument proves too much. Fiduciary relationships often will be established on the basis of agreements between the fiduciary and the beneficiary. Such agreements may state expressly the duties of care and loyalty that the law imposes on such fiduciaries. But such duties nevertheless are imposed as a matter of law in appropriate circumstances regardless of whether they are restated in such contracts. This is different from saying that the obligations arose only as a matter of mutual agreement. BNY Mellon's position would reduce almost any breach of fiduciary duty claim into a breach of the contract establishing the fiduciary relationship in the first place. That is not Pennsylvania law. *See Bohler-Uddeholm*, 247 F.3d at 105 (recognizing that claim for breach of fiduciary duties imposed on joint venturers was not barred notwithstanding fact that joint venture relationship was created by agreement).

Here, BNY Mellon's duties of full and fair disclosure are imposed under Pennsylvania law on trustees and custodians. The gist of the breach of fiduciary duty claims sounding in lack of candor is in tort, not contract.

188 *See* SAC ¶¶ 87–92.

and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."[189]  It is said to be an "equitable doctrine."[190]  Perhaps somewhat paradoxically, it is said also that "[w]here unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred."[191]

"[T]he doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract."[192]  Thus, "where an express contract already exists to define the parameters of the parties' respective duties, the parties may avail themselves of contract remedies and an equitable remedy for unjust enrichment cannot be deemed to exist."[193]  Under Pennsylvania law, "[i]n order to form a contract, there must be offer, acceptance, and consideration or a mutual meeting of the minds."[194]  "To be enforceable, a contract must be complete.  That is to say, it must represent a meeting of the parties' minds on the essential terms of their agreement."[195]

---

[189]

    *Durst v. Milroy Gen. Contracting, Inc.*, 52 A.3d 357, 360 (Pa. Super. Ct. 2012) (internal quotation marks omitted).

[190]

    *Commonwealth v. Ortho-McNeil-Janssen Pharm., Inc.*, 52 A.3d 498, 512 (Pa. Cmwlth. Ct. 2012) (internal quotation marks omitted).

[191]

    *Durst*, 52 A.3d at 360.

[192]

    *Wilson Area School Dist. v. Skepton*, 586 Pa. 513, 520, 895 A.2d 1250, 1254 (2006).

[193]

    *Lugo v. Farmer's Pride, Inc.*, 967 A.2d 963, 969 (Pa. Super. Ct. 2009).

[194]

    *Ribarchak v. Mun. Auth. of City of Monongahela*, 44 A.3d 706, 708 (Pa. Cmwlth. Ct. 2012).

[195]

    *Ruthrauff, Inc. v. Ravin, Inc.* 914 A.2d 880, 888 (Pa. Super. Ct. 2006) (internal quotation marks omitted); *see Porreco v. Maleno Developers, Inc.*, 761 A.2d 629, 632 (Pa. Cmwlth. Ct. 2000) (assessing whether parties "reached a meeting of the minds as to the material

BNY Mellon offered its standing instruction service to SEPTA, and, by signing the FX Procedure Form, SEPTA agreed to receive that service and follow its procedures.  While there is a considerable dispute about what exactly was agreed in so doing, there undoubtedly was an express contract in this case.  The claim for unjust enrichment therefore will not lie.[196]  Accordingly, the motion to dismiss the unjust enrichment claim as to BNY Mellon and Mellon Bank, N.A., is granted.[197]

### 2.    *Claim Against BNY Mellon Corp.*

The claim against BNY Mellon Corp. presents a different issue.  The SAC does not allege that SEPTA had any relationship whatsoever with BNY Mellon Corp.  Rather, it alleges that "BNY Mellon Corp. is the parent of BNY Mellon," that Mellon Bank, N.A., is "a historical subsidiary of BNY Mellon Corp.," and that "BNY Mellon Corp.'s principal assets and sources of income come from its principal bank subsidiaries—Defendant BNY Mellon and BNY Mellon, N.A."[198]  In its opposition to the motion to dismiss, SEPTA makes clear that it is not seeking to hold

---

terms of the agreement and [whether] the alleged . . . agreement lacks essential terms necessary for the existence of a valid contract").

[196]

SEPTA contends that it is entitled to plead unjust enrichment in the alternative to its breach of contract claim.  That is true but irrelevant. *Id.*; Fed. R. Civ. P. 8(d)(2).  The Court concludes not that SEPTA could not plead unjust enrichment, but that as a matter of substance, the claim is barred by the existence of a contract.

[197]

In dismissing unjust enrichment as an independent cause of action, the Court does not limit any remedies SEPTA may seek regarding its surviving claims of breach of fiduciary duty.

[198]

SAC ¶¶ 13–14.

BNY Mellon Corp. vicariously liable for the allegedly unlawful conduct of subsidiaries BNY Mellon and Mellon Bank, N.A., and it has not attempted to pierce the corporate veil.[199]  It contends only that the allegedly unlawful conduct of the subsidiaries unjustly enriched BNY Mellon Corp., that it would be inequitable for BNY Mellon Corp. to retain any such benefit, and that BNY Mellon Corp. therefore is liable for unjust enrichment.

Pennsylvania law recognizes a "strong presumption against piercing the corporate veil," as the "general rule [is] that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception."[200]  Thus, shareholders, officers, and directors cannot be held liable for corporate acts unless they personally participated in the misfeasance or the plaintiff successfully pierces the corporate veil.[201]

SEPTA's theory would eviscerate this long established respect for the corporate form. Under its view, *whenever* a corporation is liable for some unlawful activity, any parent of that corporation (and, presumably, any other shareholder as well) could be liable on a claim of unjust enrichment.  The Fifth Circuit has rejected a nearly identical claim under Florida and California law, noting the "far-ranging implications such a theory would have on state doctrines of shareholder liability."[202]  While it recognized a possible exception applicable when the subsidiary is liquidated,[203]

---

[199]
   DI 41 at 40.

[200]
   *Allegheny Energy Supply Co., LLC v. Wolf Run Mining Co.*, 53 A.3d 53, 58 n.7 (Pa. Super. Ct. 2012).

[201]
   *Commonwealth ex rel. Corbett v. Snyder*, 977 A.2d 28, 46 (Pa. Cmwlth. Ct. 2009).

[202]
   *United States v. Dean Van Lines, Inc.*, 531 F.2d 289, 293 (5th Cir. 1976); *see also Spires v. Hospital Corp. of America*, 289 F. App'x 269, 273 (10th Cir. 2008) (unpublished

54

this is not such a case.  The SAC does not allege that any subsidiaries have been liquidated.  In the circumstances, the Court concludes that a claim for unjust enrichment will not lie against a parent for the wrongs of its subsidiaries under Pennsylvania law.

> E.    *Statutes of Limitations*

BNY Mellon moves also to dismiss parts of SEPTA's claims as barred by Pennsylvania's statutes of limitations.  "The lapse of a limitations period is an affirmative defense that a defendant must plead and prove, and dismissing claims on statute of limitations grounds at the complaint stage is appropriate only if a complaint *clearly* shows the claim is out of time."[204]

The SAC alleges breaches of contract and fiduciary duty dating as far back as 2000.  The first complaint in this action was filed in March 2011.  Pennsylvania has a four-year statute of

---

disposition) (following *Dean Van Lines* in similar context).

[203]
*Dean Van Lines*, 531 F.2d at 293 ("[O]nly when the corporation is liquidated will the shareholders or the parent corporation be unjustly enriched if they are allowed to retain assets of the corporation free from the debts of the corporation.").

[204]
*SEC v. Gabelli*, 653 F.3d 49, 60 (2d Cir. 2011) (emphasis added; internal quotation marks omitted), *cert. granted on other grounds*, 133 S. Ct. 97 (2012); *see Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008); *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999).

SEPTA's contention that BNY Mellon may not raise a statute of limitations defense in this pre-answer motion to dismiss is easily rejected.  *See Staehr*, 547 F.3d at 425 (permitting such a defense where it "appears on the face of the complaint").

limitations for breach of contract actions[205] and a two-year period for breaches of fiduciary duty.[206] BNY Mellon argues that the contract and breach of fiduciary duty claims, to the extent that they rely on events prior to March 2007 and 2009, respectively, are time-barred.  SEPTA contends that the claims are timely because, under Pennsylvania's "discovery rule" and principles of equitable tolling, the statutes of limitations did not begin to run until the complaints in the Virginia and Florida actions were unsealed in early 2011.[207]

"[T]he general rule [is] that a cause of action accrues, and thus the applicable period begins to run, when an injury is inflicted."[208]  Nevertheless, "the discovery rule may operate to toll the statute of limitations until the plaintiff discovers, or reasonably should discover, that she has been injured and that her injury has been caused by another party's conduct."[209]  The standard to be applied in such cases is reasonable diligence, which asks "not, what did the plaintiff know of the injury done him?  But, what might he have known, by the use of the means of information within his reach, with the vigilance the law requires of him?"[210]  This depends on the facts and thus may

---

[205]

    42 P.S. § 5525(a); *Ario v. Underwriting Members of Lloyd's of London Syndicates 33, 205, and 506*, 996 A.2d 588, 598 (Pa. Cmwlth. Ct. 2010).

[206]

    42 P.S. § 5524(7); *Commonwealth ex rel. Corbett v. Citizens Alliance for Better Neighborhoods, Inc.*, 983 A.2d 1274, 1278 (Pa. Cmwlth. Ct. 2009).

[207]

    DI 41 at 42.

[208]

    *Wilson v. El-Daief*, 600 Pa. 161, 174, 964 A.2d 354, 361 (2009).

[209]

    *Id.* at 174, 964 A.2d at 361–62.

[210]

    *Fine v. Checcio*, 582 Pa. 253, 267, 870 A.2d 850, 858 (2005) (internal quotation marks omitted).

56

be determined on a motion to dismiss only where "reasonable minds would not differ" as to the result.[211]  In the present posture of this case, the Court is not in a position to determine when SEPTA had constructive knowledge of the alleged injury.

SEPTA invokes also the doctrine of fraudulent concealment, which in Pennsylvania may toll the running of statutes of limitations where "through fraud or concealment, [a defendant] causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts."[212] Importantly, the doctrine "does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception."[213] Nevertheless, as with the discovery rule, the statute of limitations "begins to run when the injured party knows or reasonably should know of his injury and its cause," under a standard of reasonable diligence.[214]  Application of the doctrine often presents a jury question.[215]

The Court considers first the breach of contract claims.[216]  The relevant alleged injury

---

[211]

    *Id.*

[212]

    *Id.*

[213]

    *Id.*

[214]

    *Id.* at 272, 870 A.2d at 861.  Courts have recognized that this holding essentially results in the merger of the discovery rule and the fraudulent concealment doctrine.  *See Knopick v. Connelly*, 639 F.3d 600, 607 n.10 (3d Cir. 2011).  After all, in applying the discovery rule on its own, a court surely would need to consider obstacles imposed by defendants in assessing whether the plaintiff could have discovered the injury with reasonable diligence.

[215]

    *Id.* at 271, 870 A.2d at 860.

[216]

    There may be some uncertainty about whether the discovery rule even applies to breach of contract claims under Pennsylvania law.  In *Crouse v. Cyclops Industries*, 560 Pa. 394, 745 A.2d 606 (2000), the Pennsylvania Supreme Court applied the doctrine in the related

was BNY Mellon's alleged failure to provide best execution pricing.  BNY Mellon contends that the SAC's analysis showing that SEPTA's trades generally were executed towards the bottom of the daily interbank range demonstrates that SEPTA should have known that it was not receiving best execution well before the unsealing of complaints against BNY Mellon in early 2011.  Perhaps so. But that cannot be determined at this stage either.

First, defendants themselves argue elsewhere on this motion that even the securities industry understanding of "best execution" would entitle BNY Mellon to a certain markup and spread.[217]  They argue also that interbank rates are available on the wholesale market for large trades, which may suggest that the "best price possible" at any given time for SEPTA's transactions would not necessarily be the interbank rate.[218]  If SEPTA had run the analysis earlier it may have learned that BNY Mellon was a poor provider of liquidity.  But that alone would not necessarily have shown that BNY Mellon was failing to provide best execution.

Further relevant to the inquiry are BNY Mellon's actions in setting the prices as it did.  Even assuming for present purposes that BNY Mellon believed in good faith that it was obliged only to satisfy the DSR and 3% Rule, why did it, as alleged by the SAC, consistently set the prices

---

context of a promissory estoppel action.  But Justice Saylor in a concurring and dissenting opinion noted that while the rule has been adopted in certain discrete categories of contract and quasi-contract, "its use has not been adopted on a wholesale basis in this area, and, notably, other jurisdictions are divided as to its applicability."  *Id.* at 407 n.1, 745 A.2d at 613 n.1.

Defendants have not argued that the discovery rule is inapplicable to breach of contract actions, however, and so the Court will assume that it applies.

[217]

DI 40-1 at 17 n.13.

[218]

*Id.* at 13 n.10.

58

*within* the daily interbank range, but at its lower end?[219]  As BNY Mellon itself argues, under its reading of the contract it had no obligation to price the transactions within the daily interbank range and could have set the prices as much as three percent away from the relevant interbank rate provided only that it did better than the rate on the Daily Schedule Web Page.  The allegations of the SAC arguably permit the inference that BNY Mellon nevertheless consistently priced the transaction within the daily interbank range—against its immediate economic interest—to give clients the impression that the trades were executed at or near prevailing interbank rates, but that the executions unfortunately occurred at times of day when prices were less favorable.  To be sure, BNY Mellon may have been permitted to do this if its reading of the contract bears out, in which case the statute of limitations question would be moot in any event.  But at this stage, the allegations permit the conclusion that BNY Mellon's actions at least constituted "unintentional deception" sufficient to warrant equitable tolling under Pennsylvania law's fraudulent concealment doctrine.[220]

Of course, whether applying the discovery rule or the fraudulent concealment doctrine, SEPTA still was obliged to employ reasonable diligence to discover the injury and its cause.  For SEPTA to assert claims dating back to 2000, the statute of limitations for the breach of contract claims would appear to require seven years' tolling.  Notwithstanding BNY Mellon's pricing methodology and other actions, the record may show that, in all the circumstances, SEPTA had sufficient notice and opportunity to discover its injury in less than this time.  But that is not a

---

[219]

SAC ¶ 40.

[220]

To the extent that SEPTA contends that BNY Mellon concealed the breach by failing to provide time stamps, the Court already has concluded that SEPTA fails to allege a plausible claim that BNY Mellon had any obligation to provide such time stamps.  That said, the fact that the trades did not have time stamps may bear on what SEPTA could have learned through the exercise of reasonable diligence.

question that can be resolved at this point.

    The breach of fiduciary duty claims present somewhat different questions, but the result is the same.  The Court considers first the claim—applicable in the alternative to a breach of contract claim—that BNY Mellon misrepresented that its indirect trading program provided best execution pricing.  Certainly SEPTA might have become aware that this was a misrepresentation of the program by conducting the historical pricing analysis discussed above.  It also might ahve reviewed the contract carefully and inquired further of BNY Mellon to the extent that the terms were not clear.  Similarly, even if it ultimately were shown that BNY Mellon did not fulfill its fiduciary duties by its mere reference to "principal basis," reasonable diligence still might have required that SEPTA take notice of the use of the term "principal" and inquire further of BNY Mellon to ascertain the precise nature of the relationship.  Needless to say, the diligence required for these inquiries would have been substantially less onerous than the pricing analysis.

    On the other hand, as the Third Circuit has held under Pennsylvania law, "where the wrongdoing underlying causes of action has been perpetrated by a fiduciary to the detriment of its principal, this fact militates strongly against summary judgment on the issue of whether the principal . . . exercised reasonable diligence in failing to discover the fiduciary's malfeasance within the applicable statutes of limitations."[221]  The Third Circuit quoted a district court's observation that "'the very position the fiduciary is in prohibits the principal from uncovering the fraud.  Furthermore, the fiduciary, because of his position of trust, would have an affirmative duty to the principal to disclose the fraud.  Absent a disclosure, the fiduciary commits an act of continual

---

[221]     *Burtch v. Ganz (In re Mushroom Transp. Co.*), 382 F.3d 325, 341 (3d Cir. 2004).

covering up of the fraud.'"[222]   Recognizing that "'[t]o require a principal to engage in aggressive oversight of its fiduciary's conduct is to deny the very essence of the fiduciary relationship,'"[223] the Third Circuit concluded that "the existence of a fiduciary relationship is relevant to a discovery rule analysis precisely because it entails such a presumptive level of trust in the fiduciary by the principal that it may take a 'smoking gun' to excite searching inquiry on the principal's part into its fiduciary's behavior."[224]

Thus, while the Court has reservations about whether SEPTA exhibited reasonable diligence as to the breach of fiduciary duty claims, the motion to dismiss on this ground is denied. The existence of the fiduciary relationship emphasizes the likely existence of factual questions regarding what was reasonable diligence in the circumstances.   Mindful that Pennsylvania courts generally consider reasonable diligence a jury question—not one properly resolved on a motion to dismiss—and that Second Circuit law requires the limitations defense to be "clearly" established from the complaint to warrant dismissal on a motion to dismiss, the Court concludes that the defense is not made out at this stage.[225]

---

[222]

Id. (quoting Schwartz v. Perucci, 60 B.R. 397, 403 (E.D. Pa. 1986)).

[223]

Id. (quoting Rubin Quinn Moss Heaney & Patterson, P.C. v. Kennel, 832 F. Supp. 922, 935 (E.D. Pa. 1993)) (emphasis omitted).

[224]

Id. at 343. To be sure, the nature of the fiduciary relationship matters.  This is not a case where an attorney defrauds his client while working on matters entirely entrusted to his care.

[225]

In addition, some of the statute of limitations issues may turn on the degree to which the breaches of duty are best characterized as single breaches early in the Class Period, numerous breaches throughout the Class Period, or a single continuous breach.  This characterization may depend on factual intricacies too early to assess here.

*Conclusion*

For the foregoing reasons, defendants' motion [DI 40] is granted to the extent that Counts II and IV, and Count I except to the extent that it alleges claims for breach of fiduciary duty based on alleged misrepresentations and nondisclosures, are dismissed. The motion is denied in all other respects. Defendants' request to strike references in the SAC to *The Wall Street Journal* is denied as moot.[226]

SO ORDERED.

Dated:        January 23, 2013

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[226]  DI 46 at 19. The Court has not relied on any of these allegations to decide this motion.