KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.
SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215

(202) 326-7900

FACSIMILE:
(202) 326-7999

February 25, 2014

*Via ECF and Hand Delivery*
Hon. James L. Cott, Daniel Patrick Moynihan Courthouse
500 Pearl Street, New York, NY 10007

Re:   *In re Bank of New York Mellon Corporation Foreign Exchange Transactions Litigation*,
No. 12 MD 2335 (LAK); *Louisiana Municipal Police Employees' Retirement System v.
The Bank of New York Mellon Corporation*, No. 11 Civ. 9175 (LAK)

Dear Judge Cott:

Pursuant to Fed. R. Civ. P. 34, this litigation's Pilot Project order, No. 12-md-2335 (Dkt. No. 2), and Judge Kaplan's referral order (Dkt. No. 341),[1] Defendant The Bank of New York Mellon Corporation ("BNYM") partially renews its motion to compel the production of documents responsive to Request Nos. 21, 24-25 & 34 in BNYM's First Set of Document Requests.[2] BNYM certifies that the parties have conferred and are at impasse.

This Court previously denied BNYM's motion to compel compliance with these and other document requests. *See* Dkt. No. 299 ("October 24 Order"), at 5-6. As it later made clear, however, that Order addressed only the "very narrow context . . . . [in which] it was presented." 12/12/2013 Tr. 81:9-12. This motion presents a far different context. It seeks only a narrow subset of the documents that BNYM previously sought; it arises after Plaintiffs abandoned their prior position that a document must reference "BNYM" to be relevant; and it relies on a newly developed record showing that Oregon understood the similarities between BNYM's FX pricing and that offered by its own custody bank, State Street.

Plaintiffs should be required to produce: (1) studies performed by Oregon's consultants analyzing the rates that it obtained on FX transactions executed with State Street; (2) Oregon's contract governing those same transactions; (3) ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and (4) emails pertaining to State Street or "best execution" identified using four discrete search terms proposed by BNYM. *See* Ltr. from A. Shen to L. Posner at 10 (Jan. 15, 2014) (Exh. B). As the record now shows, these documents are relevant to whether Oregon reasonably relied on BNYM's alleged misstatements. Moreover, BNYM's narrowed requests avoid the overbreadth concerns that animated the October 24 Order.

---

[1] BNYM respectfully seeks leave to file this five-page letter, which is consistent with § I(A) of this Court's Individual Practices. This Court previously has recognized that "three-page, single-spaced letters" have been inadequate to address the "complicated issues" presented by this case. 12/12/2013 Tr. 103:4-8.

[2] Plaintiffs are the State of Oregon ("Oregon"), Laborers' Local 235 Benefit Fund, and Pompano Beach General Employees Retirement System (collectively, "Plaintiffs"). BNYM's Requests to each Plaintiff are materially identical. For convenience, BNYM refers here to its Requests to Oregon, which are attached as Exh. A.

1.      Plaintiffs, which seek to represent a class of investors in BNYM common stock, allege that BNYM defrauded investors by misrepresenting that it earned no profit on its standing instruction FX transactions executed with its custody customers.  *See* Dkt. No. 56 ("Compl."), at ¶¶ 89-113.  BNYM intends to prove that Plaintiffs knew (or should have known) otherwise.  But Plaintiffs are withholding critical evidence relevant to that defense – namely, documents showing their understanding that State Street priced standing instruction transactions in a similar manner, and documents reflecting whether Oregon believed those services to be consistent with "best execution."  *See* Ltr. from L. Posner to A. Shen at 4 (Feb. 4, 2014) (Exh. C).

Plaintiffs' understanding of custodial FX transactions – and how such transactions can result in "best execution" – is at the heart of this litigation.  Plaintiffs' core claim is that BNYM deceived investors by describing its standing instruction FX service as consistent with "best execution standards."  Compl. ¶¶ 109-112.  The Complaint alleges that investors must have interpreted that statement through the prism of a "well-defined industry and regulatory definition" of the term "best execution," *id.* ¶ 112, which led them to believe that BNYM's custody customers were receiving the "best available rates" on foreign currency that BNYM itself could obtain from other banks, *id.* ¶ 61.  That alleged misunderstanding, in turn, allegedly "cause[d] Plaintiffs and other members of the Class to purchase BNYM common stock at artificially inflated prices."  *Id.* ¶ 157.

This theory of liability rests on a critical premise:  that Plaintiffs reasonably believed that "customary notions of 'best execution,'" *id.* ¶ 112, when applied to a custodian executing standing instruction FX transactions, require the custodian to price those transactions at its cost.  BNYM intends to show in discovery that Plaintiffs never held – much less relied on – any such belief.[3]  Indeed, it was well-known during the Class Period that standing instruction pricing was less favorable than Plaintiffs now claim to have believed.  *See* Katie Martin, *A Custody Battle in the Currencies Market*, Wall St. J., Nov. 11, 2009, at A24 ("Every professional in the industry knows that the custodial route of doing [foreign exchange] is . . . . like buying your foreign currency at the airport.").  That was for good reason:  standing instruction transactions relieve customers (and their investment managers) of the need to invest in the infrastructure necessary to negotiate individual transactions, and they insulate customers from the operational risks associated with trading currency in emerging markets.[4]  Investors were well aware of this value that standing instruction execution delivered, and no reasonable investor believed that custodians were pricing such transactions at their own cost of funds.  *See* Exh. G (BNYM-WAM0003664, at 64) ███████████████████████████████████████████████████████████████████████████████

---

[3] *See United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438, 477 (S.D.N.Y. 2013) (stating that "the Court is sympathetic to defendants' contentions that the Bank's customers must have known that some spread would be charged," but finding that "the contention presents factual issues not properly decidable" on a motion to dismiss); *Southeastern Pa. Transp. Auth. v. Bank of New York Mellon Corp.*, 921 F. Supp. 2d 56, 77 (S.D.N.Y. 2013) ("*SEPTA*") (noting that BNYM "maybe correct that any best execution obligation would not have required it to provide FX to [customers] at precisely the rates it could obtain in the interbank market").

[4] *See* Exh. D (BONYFXLIT BIP01474, at 74) ████████████████████████████████████████ ████████████████████████████████; Exh. E (GEAM_BNY_0003899, at 99) ████████████ ██████████████; Exh. F (OHIO_0321349, at 56-59) ██████████████████████████████████ ████████████████████████████████████████████████

If Plaintiffs shared that understanding, it would rebut any presumption of reliance and fatally undermine their securities-fraud claim.[5] BNYM therefore is entitled to seek discovery showing Plaintiffs' awareness that: (1) custodial FX transactions by their nature involve pricing that is less favorable than that which banks themselves can obtain on the interbank market; and (2) such pricing, in light of the considerable benefits of custodial FX execution, is consistent with "best execution." Judge Kaplan held that such issues raise "heavily fact-bound question[s]" "best left to a motion for summary judgment after discovery." *SEPTA*, 921 F. Supp. 2d at 77-78 & n.119. Accordingly, documents relevant to those questions are, at the very least, "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

**2.** The documents that BNYM seeks are relevant to those two pivotal issues. Oregon was never BNYM's custody customer and therefore possesses few documents about BNYM's standing instruction service. But it likely executed a substantial volume of standing instruction FX transactions with its own custodian, State Street, at rates similar to those it now claims BNYM applied in secret. *See* Compl. ¶¶ 72-76; Exh. H (ORE-00009454, at 54-56). In fact, Oregon expended considerable effort analyzing those transactions: ████████████ ████████████ Exh. H at 9454, and ████ ████████████ *see* Exh. I (ORE-00009314, at 14); Exh. J (ORE-00009064, at 64). Moreover, the consultant that Oregon hired to negotiate State Street's custody fees generally advised clients that ████████████████ ████████████ Exh. K ████████████ and there is no reason to believe that it failed to communicate the same information to Oregon, *see* Exh. L ████████████. Such evidence is at odds with Oregon's professed belief that custody banks like BNYM offered standing instruction service for free.

Oregon insists that documents concerning State Street are categorically irrelevant because this Court ruled that "'mere existence of a lawsuit against [State Street] is insufficient to justify the production that BNYM seeks here.'" Exh. C at 3 (quoting October 24 Order at 5). But BNYM's motion is not based on the "mere existence of a lawsuit" against State Street; it is based on a documentary record establishing Oregon's understanding that BNYM and State Street priced custody FX transactions in a similar manner. *First*, ████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████ Exh. O (ORE-00009457, at 57); *see also* Exh. K at 5243 (████ ████████████

---

[5] *See GAMCO Investors, Inc. v. Vivendi, S.A.*, 917 F. Supp. 2d 246, 257-58 (S.D.N.Y. 2013) (plaintiff's awareness of "corrective non-public information" "rebut[s] the fraud on the market presumption"); *In re UBS Auction Rate Sec. Litig.*, No. 08-cv-2967, 2010 WL 2541166, at *22-23 (S.D.N.Y. June 10, 2010) (even "general[]" evidence that "did not refer specifically to any of the Defendants" refutes reliance if it shows that plaintiff "should have discovered the truth") (internal quotations omitted); *IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 512 n.131 (S.D.N.Y. 2010) (Kaplan, J.) ("no duty to disclose information to one who reasonably should already be aware of it") (internal quotations omitted); *In re HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447, 459 (N.D. Ala. 2003) ("Plaintiffs' knowledge of material facts that defendants allegedly failed to disclose provides a defense to a cause of action under 10(b)-5.").

[6] *See* Exh. M (ORE-00009459, at 64) ████████████████ *id.* at 60 ████████████████████████ ████████████████████████; Exh. N (ORE-00008026, at 28) ████████████████



). In fact, ▮▮▮ Exh. H at 9454. ▮▮▮ Exh. P (Loomis 0006, at 44).

*Second*, the record confirms that Oregon's understanding of BNYM's FX practices was tethered to the allegations lodged against State Street.[7] ▮▮▮ *See supra* n. 7; *see also*, *e.g.*, Exh. R (ORE-00009329, at 29); Exh. S (ORE-00009333, at 34); Exh. I at 9314. That is unsurprising: BNYM and State Street are the two largest global custodians, and investors tended to view ▮▮▮ Exh. G at 3664. Oregon's investigation of the State Street lawsuit is thus relevant to whether it had, or should have had, knowledge of BNYM's pricing practices. *See id.* ▮▮▮

*Third*, Oregon's FX transactions with State Street will shed light on what it thought BNYM meant when it used the term "best execution." Throughout the Class Period, Oregon instructed its investment managers that ▮▮▮ Exh. T (ORE-00007848, at 48). Yet the evidence also suggests that Oregon knowingly allowed its managers to execute FX trades through State Street's standing instruction program. ▮▮▮ That reflects Oregon's conclusion that State Street's custody FX service, which provided less favorable pricing in exchange for administrative and operational benefits, ▮▮▮ complied with "best price and execution" standards. Such a conclusion strikes at the very core of Oregon's claim (Compl. ¶ 112) that it believed BNYM's similarly priced standing instruction service conflicted with "customary notions of 'best execution.'"

3.  Plaintiffs opposed BNYM's prior motion by arguing that documents were relevant only if they expressly referenced BNYM by name. *See* Dkt. No. 289 at 1-2. After this Court expressed skepticism of that position at the December 12 hearing, Plaintiffs conceded that documents pertaining to custodial FX "industry practices" and the industry understanding of "best execution" should be discoverable. Tr. 82:9-22; *see id.* 86:5-6. Nonetheless, Plaintiffs continue to withhold relevant documents. Although Plaintiffs offered to produce documents pertaining to "general" industry practices, they refuse to produce documents concerning "the specific [FX] practices and specific definitions of 'best execution' employed" by any given industry participant, including State Street. Exh. C at 4.

Plaintiffs' position rests on a false distinction. State Street is one of the world's largest custodians whose standing instruction service Oregon knew mirrored the services offered by other custodians including BNYM, *see supra* p. 3, and Plaintiffs have never explained why State Street's practices do not provide some evidence of "general" industry practice. Moreover, Plaintiffs' focus on *general* practices misses the point. BNYM seeks discovery from Plaintiffs not to illuminate industry practices in the abstract, but rather to establish what *Plaintiffs thought* those practices were. The best (indeed, perhaps the only) source of such evidence will come

---

[7] *See* Exh. H at 9454 ▮▮▮; Exh. Q (ORE-00009068, at 68) ▮▮▮

from Plaintiffs' interactions with the particular industry players, like State Street, on which they relied. *See, e.g., Federal Hous. Fin. Agency v. UBS Americas Inc.*, Nos. 11 Civ. 5201 et al., 2013 WL 3284118, *7-8 (S.D.N.Y. June 28, 2013) ("the size of [an entity's] role in the industry made their procedures relevant in establishing what industry practice was").

In any event, given the parties' disagreement over documents concerning State Street, *see* Exh. B at 10 (Term Nos. 1-2), Plaintiffs have now refused to run *any* additional search terms, including those aimed at the very "industry practices" and "best execution" documents they conceded are relevant, *see id.* (Term Nos. 3-4).[8] BNYM therefore requests that this Court order Plaintiffs to run BNYM's proposed terms, and to produce all responsive documents hitting on those terms – not just those they unilaterally deem relevant to "general" industry practices.

**4.** BNYM's motion is consistent with this Court's October 24 Order. That Order addressed the "very narrow context" in which "it was presented," 12/12/2013 Tr. 81:9-12, and it concluded only that the Court did "not believe additional production is warranted *at this time*," October 24 Order at 5 (emphasis added). Indeed, when this Court issued the October 24 Order, the parties' first production deadline remained several weeks away, and BNYM had been unable to tailor its requests to Plaintiffs' actual documents. *See* Dkt. No. 285 at 2-3. As such, this Court denied (at 5) BNYM's motion based "on the present record" before the Court at that time. Based on the factual record developed since the October 24 Order, *see supra* pp. 3-4, this Court can and should revisit that conclusion. *See Bacon v. Taylor*, 392 F. App'x 30, 34 n.3 (3d Cir. 2010) ("it is common for discovery orders to be revisited by the trial court as discovery proceeds in a case and new evidence is disclosed").[9]

Further, BNYM's renewed motion avoids the concerns about "boundless discovery" that animated (at 5) the October 24 Order. BNYM has identified discrete categories of documents that should be produced, and it has proposed narrow search terms designed to capture responsive documents. *See* Exh. B at 7-8, 10. BNYM requested that Plaintiffs sample those search terms and substantiate any claim of burden with estimated hit counts, *id.* at 8, but Plaintiffs refused. Exh. C at 4. Any claim of undue burden as to BNYM's renewed motion is thus "entitled to no weight whatsoever." *Jackson v. Edwards*, No. 99-cv-0982, 2000 WL 782947, at *3 (S.D.N.Y. June 16, 2000). That is particularly true given Plaintiffs' paltry productions to date: BNYM has produced over 13 million pages of documents, but Plaintiffs collectively have produced about 0.25% (roughly 32,500 pages) of that amount – virtually none of which concerns the FX industry practices at the core of this litigation. Given the vast disparity in the discovery burdens incurred to date, Plaintiffs no longer have any justification for withholding relevant documents.

---

[8] Plaintiffs offered to run two of BNYM's four search terms, but only if BNYM withdrew its request for the State-Street terms and if BNYM agreed that Plaintiffs could withhold any document they deemed irrelevant to "general" industry practices. *See* Exh. C at 3-4. That offer was largely illusory, because Plaintiffs could not explain how they intended to distinguish "generally" relevant documents from those pertaining to a "specific" entity. *See* Ltr. from A. Shen to L. Posner at 3 (Feb. 10, 2014) (Exh. U). Because BNYM did not agree to this arbitrary proposal, Plaintiffs now are refusing to run any new search terms. Ltr. from L. Posner to A. Shen at 3-4 (Feb. 19, 2014) (Exh. V).

[9] *See also, e.g., MSTG, Inc. v. AT&T Mobility LLC*, No. 08-cv-7411, 2011 WL 841437, at *1 (N.D. Ill. Mar. 8, 2011) (reconsidering ruling on motion to compel in light of "new evidence" that "became available after the parties submitted their original briefs"); *Zander v. Craig Hosp.*, 267 F.R.D. 653, 656 (D. Colo. 2010) (reconsidering ruling on motion to compel in light of new documents that were "not previously provided or available"); *Wells Fargo Bank, N.A. v. Konover*, No. 05-cv-1924, 2009 WL 585429, at *2-3 (D. Conn. Mar. 4, 2009) (granting motion for reconsideration in light of "Defendants' new showing," noting that courts enjoy "'greater latitude'" to reconsider "discovery" rulings) (citation omitted); *Haykel v. G.F.L. Furniture Leasing Co.*, 76 F.R.D. 386, 396 (N.D. Ga. 1976) (revisiting motion-to-compel ruling "[i]n light of the more fully developed factual record now before this court").

Dated:  February 25, 2014

Respectfully submitted,
THE BANK OF NEW YORK MELLON
CORPORATION


/s/ Reid M. Figel
Reid M. Figel (RF-8663)
Rebecca A. Beynon (*pro hac vice*)
David L. Schwarz (*pro hac vice*)
Derek T. Ho (DH-0104)
Gregory G. Rapawy (*pro hac vice*)
Andrew C. Shen (AS-7963)
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
rfigel@khhte.com
rbeynon@khhte.com
dschwarz@khhte.com
dho@khhte.com
grapawy@khhte.com
ashen@khhte.com


*Counsel for The Bank of New York Mellon Corporation*