**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| BANK OF NEW YORK MELLON CORP. | )    12 MD 2335 (LAK) |
| FOREX TRANSACTIONS LITIGATION | ) |
| | )    ECF Case |
| | ) |
| This Document Relates to: | ) |
| | ) |
| *Carver v. The Bank of New York Mellon* | )    12 Civ. 9248 (LAK) |
| | ) |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS IN PART**
**THE SECOND AMENDED CLASS ACTION COMPLAINT**

# **TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 4

      A.     BNYM's Core Custodial Services and Foreign Exchange
             Execution Options ................................................................... 4

      B.     The Defined-Benefit Plaintiffs .............................................. 6

            1.     The Owens Corning Plan ........................................... 6

            2.     Jurisdictional Discovery and the Second Amended
                  Complaint ................................................................... 9

      C.     Allegations of the Second Amended Complaint .................... 11

STANDARD OF REVIEW .................................................................................. 12

ARGUMENT ....................................................................................................... 13

      I.     The Court Lacks Subject Matter Jurisdiction over the Defined-Benefit
            Plaintiffs' Claims ................................................................... 13

            A.     The Defined-Benefit Plaintiffs Lack Article III Standing To Seek
                Monetary Relief ...................................................................... 13

                 1.     Participant or Beneficiary Plaintiffs Must Establish
                      Individual Injury for Standing To Seek Monetary Relief ............. 13

                 2.     The Defined-Benefit Plaintiffs Have Not Set Forth
                        Factually Supported Allegations Demonstrating Individual
                        Injury ........................................................................ 16

                 3.     Participant or Beneficiary Plaintiffs Cannot Seek Monetary
                      Relief on the Basis of "Representational Standing" Without
                      Individual Injury ...................................................... 24

             B.     The Defined-Benefit Plaintiffs' Claims for Injunctive Relief Are
                  Moot ........................................................................................ 27

      II.     Plaintiffs Have Not Plausibly Alleged that BNYM Caused the Plans to
            Engage in Transactions Prohibited Under § 406(a) .............. 29

CONCLUSION .................................................................................................... 32

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82
    (2d Cir. 2006)..................................................................................................12

*Armstrong v. Ward*, 529 F.2d 1132 (2d Cir. 1976)..........................................................29

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009) ................................................13

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194 (2d Cir. 1990) ....................12

*Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12 (1st Cir. 1998) ...............................31

*Central States Se. & Southwest Areas Health & Welfare Fund v. Merck-Medco
    Managed Care, L.L.C.*, 433 F.3d 181 (2d Cir. 2005) ...............................14, 15

*Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-
    Medco Managed Care, L.L.C.*, 504 F.3d 229 (2d Cir. 2007) ...............15, 24, 27

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ....................................1, 5

*Checking Account Overdraft Litig., In re*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010) ......14

*City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S. Ct. 1382 (2000) .................................27

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) ...........................................17, 21

*Custer v. Sweeney*, 89 F.3d 1156 (4th Cir. 1996) ..........................................................30

*David v. Alphin*, 704 F.3d 327 (4th Cir. 2013) ...............................................16, 17, 19, 25, 26

*Direxion Shares ETF Trust, In re*, 279 F.R.D. 221 (S.D.N.Y. 2012)............................14

*Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694 (W.D. Mich. 2007) ......................30

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S. Ct. 596 (1990), *holding
    modified on other grounds by City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*,
    541 U.S. 774, 124 S. Ct. 2219 (2004)..............................................................12

*Farm King Supply, Inc. Integrated Profit Sharing Plan & Trust v. Edward D. Jones
    & Co.*, 884 F.2d 288 (7th Cir. 1989)...............................................................30

*Fox v. McCormick,* No. 12-cv-1869 (RMC), 2013 WL 6439128
    (D.D.C. Dec. 9, 2013)................................................................................16, 18

*Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123
(9th Cir. 2006) ............................................................................................. 25, 26

*Harley v. Minnesota Min. & Mfg. Co.*, 284 F.3d 901 (8th Cir. 2002) ............................... 16, 25, 26

*Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013) ........................................................... 25

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 119 S. Ct. 755 (1999) ................................... 7, 18

*Kendall v. Employees Ret. Plan of Avon Prods.*, 561 F.3d 112 (2d Cir. 2009) ................ 14, 15, 17

*L.I. Head Start Child Dev. Servs. v. Economic Oppor. Comm' of Nassau Cnty., Inc.*,
710 F.3d 57 (2d Cir. 2013) .......................................................................... 26, 27

*LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 128 S. Ct. 1020 (2008) ....................... 16, 23

*Lee v. Verizon Commc'ns Inc.*, 954 F. Supp. 2d 486 (N.D. Tex. 2013) ................................. 16, 22

*Lehman Bros. Sec. & ERISA Litig., In re*, 10 CIV. 8631 LAK, 2012 WL 6000575
(S.D.N.Y. Dec. 3, 2012) .............................................................................. 31

*Livent, Inc. Noteholders Sec. Litig., In re*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) ................. 13

*Lockheed Corp. v. Spink*, 517 U.S. 882, 116 S. Ct. 1783 (1996) ..................................... 30

*Lonecke v. Citigroup Pension Plan*, 584 F.3d 457 (2d Cir. 2009) ....................................... 7, 16, 18

*Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598 (6th Cir. 2007) .......................... 25

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130 (1992) ............................... 14

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000) ............................................... 12

*Melnick v. Adelson-Melnick*, 346 F. Supp. 2d 499 (S.D.N.Y. 2004) ................................... 21

*Milgram v. Orthopedic Assocs. Defined Contribution Pension Plan*,
666 F.3d 68 (2d Cir. 2011) .......................................................................... 16

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 130 S. Ct. 2743 (2010) .................... 17

*Mukaddam v. Permanent Mission of Saudi Arabia to the United Nations*,
136 F. Supp. 2d 257 (S.D.N.Y. 2001) ........................................................... 12

*O'Toole v. Arlington Trust Co.*, 681 F.2d 94 (1st Cir. 1982) .......................................... 31

*Palmason v. Weyerhaeuser Co.*, No. C11-0695RSL, 2013 WL 4511361
(W.D. Wash. Aug. 23, 2013) ...................................................................... 23, 24

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013) .......................................1, 9

*Perelman v. Perelman*, 919 F. Supp. 2d 512 (E.D. Pa. 2013) ...................................16, 24

*Poindexter v. EMI Record Grp., Inc.*, No. 11 Civ. 559 LTS JLC, 2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012) ...........................................................................4

*Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of Am., NA*, 907 F. Supp. 2d 536 (S.D.N.Y. 2012).................................................................14

*Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364 (1991)...........................................25

*Qualey v. Jackson*, No. 07-C 2007 WL 1836028 (E.D. Mich. June 25, 2007) ..............30

*Rogers v. Baxter Int'l Inc.*, 710 F. Supp. 2d 722 (N.D. Ill. 2010) .................................30

*Schloegel v. Boswell*, 994 F.2d 266 (5th Cir. 1993) ..............................................30

*Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 96 S. Ct. 1917 (1976) ...............14

*Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan*, 883 F.2d 345 (5th Cir. 1989) ...........................................................................30

*Spencer v. Kemna*, 523 U.S. 1, 118 S. Ct. 978 (1998).................................................12

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269 (2008)................................25, 26

*State St. Bank & Trust Co. Fixed Income Funds Inv. Litig., In re*, 774 F. Supp. 2d 584 (S.D.N.Y. 2011).................................................................13

*Sulton v. Wright*, 265 F. Supp. 2d 292 (S.D.N.Y. 2003) ...........................................4

*TechnoMarine SA v. Jacob Time, Inc.*, No. 12 CIV. 0790 KBF, 2012 WL 2497276 (S.D.N.Y. June 22, 2012)...........................................................................21

*Tullis v. UMB Bank, N.A.*, 640 F. Supp. 2d 974 (N.D. Ohio 2009), *aff'd*, 423 F. App'x 567 (6th Cir. 2011) ...........................................................................30

*United States v. Blackburn*, 461 F.3d 259 (2d Cir. 2006)............................................27

*White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163 (2d Cir. 2007)............27, 29

## STATUTES, REGULATIONS, AND RULES

U.S. Const. art. III ..................................................................1, 2, 13, 14, 15, 16, 18, 23, 24, 25, 26

26 U.S.C. § 162(a)(1) .................................................................................................19

Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*

     29 U.S.C. § 1024(a) ...........................................................................................1, 5

     29 U.S.C. § 1082 .................................................................................................7

     29 U.S.C. § 1083 .......................................................................................7, 18, 23

     29 U.S.C. § 1083(i)(4)(A) ....................................................................................24

     29 U.S.C. § 1102(c)(3) .........................................................................................7

     29 U.S.C. § 1103(a)(2) .........................................................................................7

     29 U.S.C. § 1106(a) ...................................................................................3, 11, 12

     29 U.S.C. § 1106(b) ...........................................................................................11

     29 U.S.C. § 1322 ...............................................................................................19

     29 U.S.C. § 1322b(a) ..........................................................................................19

     29 U.S.C. § 1341(c) ...........................................................................................19

     29 U.S.C. § 1342(a) ...........................................................................................19

     29 U.S.C. § 1344 ...............................................................................................19

     29 U.S.C. § 1344(a)(3) ........................................................................................20

26 C.F.R. § 1.404(a)-1(b) .............................................................................................19

29 C.F.R. § 2520.103-1 .................................................................................................1

Fed. R. Civ. P. 12(b)(1) ............................................................................................1, 12

Fed. R. Civ. P. 12(b)(2) ...............................................................................................12

Fed. R. Civ. P. 12(b)(6) ...................................................................................1, 5, 13, 20

Fed. R. Civ. P. 56 .......................................................................................................12

**OTHER MATERIALS**

General FAQs about PBGC, PBGC.gov, http://www.pbgc.gov/about/faq/pg/general-
faqs-about-pbgc.html ........................................................................................20

Office of the Comptroller of the Currency, Comptroller's Handbook, Custody Services
25 (2002), *available at* http://www.occ.gov/publications/publications-by-
type/comptrollers-handbook/custodyservice.pdf ..............................................8

Restatement (Second) of Trusts § 214 cmt. b (1959) ...................................................25

Defendants The Bank of New York Mellon and BNY Mellon, N.A. (collectively, "BNYM") respectfully submit this memorandum of law in support of their motion to dismiss in part the Second Amended Class Action Complaint ("Second Amended Complaint" or "SAC") pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure.

## INTRODUCTION

This Court lacks jurisdiction over all claims brought by Plaintiffs Carl Carver, Deborah Jean Kenny, and Edward C. Day (the "Defined-Benefit Plaintiffs"). The Defined-Benefit Plaintiffs do not have Article III standing to bring claims for monetary relief. Article III standing requires that ERISA plan participants show personal injury – an alleged loss to the plan that does not affect them personally is not enough. The Defined-Benefit Plaintiffs, in their Second Amended Complaint filed after months of jurisdictional discovery, have failed to establish any cognizable injury to themselves personally. Their claims must be dismissed.

Plaintiffs Carver, Kenny, and Day participate in the Owens Corning Merged Retirement Plan[1] ("Owens Corning Plan"), which is a defined benefit plan. Their benefits are fixed and do not depend on the investment performance of their Plan's assets. Accordingly, a loss to the Plan would not affect them personally absent a set of extremely unlikely circumstances that the Complaint does not plausibly allege will occur. *First*, the loss would have to be so large as to

---

[1] The Owens Corning Plan results from the combination of multiple plans with slightly different terms. *See* Declaration of Jessica C. Collins ("Collins Decl."), Ex. 1, 2011 Form 5500 Schedule SB Attachments (OC000220), at OC000232 (identifying sub-plans comprising the Owens Corning Plan). (Exhibits to the Collins Declaration will be cited as "Ex. __.")

ERISA plans are required to report certain information annually to the Department of Labor ("DOL"), *see* 29 U.S.C. § 1024(a), which is typically reported on a Form 5500, *see* 29 C.F.R. § 2520.103-1; *see also generally Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 720 (2d Cir. 2013) (summarizing disclosure requirements). Owens Corning produced Schedules from several of their Form 5500 filings in jurisdictional discovery. *See, e.g.*, Exs. 1, 2. These filings may be considered for purposes of resolving BNYM's challenge to jurisdiction under Rule 12(b)(1), *see infra* p. 12. In addition, this Court may properly consider the Plans' Form 5500 filings on a motion to dismiss under Rule 12(b)(6) because they are available to Plaintiffs, *see St. Vincent*, 712 F.3d at 720, and are relied on in the Complaint (SAC ¶¶ 2, 84-85), *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

cause the Plan's assets to be insufficient to pay benefits.  *Second*, the Plan's sponsor would have to fail to meet its statutory obligation to make up any shortfall.  *Third*, even if the sponsor were in dire financial straits, its assets would have to be so depleted that termination of the Plan would be the only way for a reorganization in bankruptcy to be successful.  *Fourth*, the Pension Benefit Guaranty Corporation ("PBGC") would have to fail to meet its own statutory duty to protect the benefits.

Not only does the Complaint not allege that these events will occur, but jurisdictional discovery has confirmed that none of these events is likely to occur.  The alleged losses to the Plan are miniscule:  even assuming the truth of Plaintiffs' exaggerated allegations the alleged losses to the Plan still amount to only 0.031% of the Plan's assets.  It is virtually impossible that such infinitesimal losses could cause the plan to become financially insolvent.  That fact alone forecloses any plausible argument that the Defined-Benefit Plaintiffs will suffer any personal economic injury.

In addition, the Owens Corning Plan is essentially fully funded (98.8%), and the Defined-Benefit Plaintiffs have offered no facts that plausibly suggest that the Plan's termination is imminent.  Even in the extremely unlikely event that the Plan were to be terminated, moreover, the Defined-Benefit Plaintiffs' benefits are fully vested.  They thus have priority in the distribution of any plan assets.  Even assuming counter-factually that the alleged losses here could plausibly cause a financial shortfall, such a shortfall is thus unlikely to affect the economic interests of these Plaintiffs.  In short, the Defined-Benefit Plaintiffs lack Article III standing as to their damages claims because they cannot show that the alleged losses to the Plan will cause the Plan to fail, much less that such failure will cause them not to receive benefits due to them under the Plan.

The Defined-Benefit Plaintiffs' claims for injunctive relief are also non-justiciable because they are moot.  BNYM ceased to act as custodian for the Owens Corning Plan in January 2013.  BNYM expects to receive a limited number of residual foreign currency payments for the Plan in the future, but those payments will be in currencies that the Owens Corning Plan has directed BNYM to transfer directly to the successor custodian, without repatriating the currency to U.S. dollars.  BNYM thus does not expect to execute any foreign exchange transaction of any kind with respect to those foreign currency balances.  Moreover, as of February 24, 2014, BNYM ceased to offer the historical standing instruction program that Plaintiffs seek to enjoin in the Second Amended Complaint.  Accordingly, even assuming that BNYM were to execute a foreign exchange transaction with the Plan in the future, such a transaction would be executed pursuant to an entirely different program, with different pricing terms and different disclosures than the historical standing instruction program that Plaintiffs challenge in the Second Amended Complaint.  There thus is no reasonable expectation that Plaintiffs will be subject in the future to the practices alleged in the Second Amended Complaint to violate ERISA.

In addition, Count III of the Second Amended Complaint fails to state a plausible claim for relief as to all Plaintiffs.  To demonstrate a violation of § 406(a) of ERISA, Plaintiffs must show that, as custodian or trustee, BNYM caused the plan to enter into standing instruction transactions.  Plaintiffs' own allegations, however, establish it was not BNYM, but rather the plans' investment managers or fiduciaries who chose to execute transactions through this program.  BNYM did not control those decisions, and instead acted solely at the direction of those investment managers.  Plaintiffs' complaint thus does not plausibly allege – indeed, it negates – the essential element of a § 406(a) claim.

## FACTUAL BACKGROUND

A.   **BNYM's Core Custodial Services and Foreign Exchange Execution Options**

BNYM provides, among other financial services, custodial services to institutional investors.  *See* SAC ¶ 30.  As custodian, BNYM performs largely administrative duties, including holding and safekeeping assets, and settling purchases and sales of securities and currency upon instructions from customers or their investment managers.  *Cf. id.* ¶ 30, 108; Complaint ¶ 25, *Carver v. The Bank of New York Mellon*, No. 12 Civ. 9248 (S.D.N.Y. filed Dec. 19, 2012) ("Compl.").[2]  BNYM's custodial functions do not involve investment discretion.  Its custody customers typically appoint professional investment managers that have fiduciary responsibility for making investment decisions, and in some cases, purchase shares of professionally managed investment funds.  *See id.* ¶¶ 7, 17-19, 93, 97, 100, 102.

Institutional investors, including ERISA plans, sometimes choose to invest in foreign securities or other foreign-denominated assets.  *See* SAC ¶¶ 27-28.  Those plans sometimes choose to engage in FX transactions associated with those foreign investment transactions.  BNYM's custody customers and their investment managers have a range of options for executing FX transactions.  They can opt to execute FX transactions with counterparties other than BNYM.  *See id.* ¶ 37.  Alternatively, BNYM offers various programs for customers and managers who wanted to exchange currencies with BNYM, acting on a principal basis.  *See id.* ¶¶ 43-44.  BNYM's customers have no obligation to use BNYM's FX programs:  whether to

---

[2] The Second Amended Complaint omits the description of the limited administrative role of a custodian, but both the Complaint and the First Amended Class Action Complaint ("Am. Compl."), Dkt. No. 28, remain part of the record of this case, and this Court "may still credit admissions in [the prior complaints] and attached exhibits." *Poindexter v. EMI Record Grp., Inc.*, No. 11 Civ. 559 LTS JLC, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012); *see Sulton v. Wright*, 265 F. Supp. 2d 292, 295 (S.D.N.Y. 2003) ("Admissions in earlier complaints remain binding when a plaintiff files subsequent pleadings.").

trade foreign currency with BNYM, and which method of FX execution to choose, is left entirely to the discretion of customers and their professional investment managers. *See id.* ¶¶ 37, 43-44.

If investment managers or custody customers elect to trade foreign currency with BNYM, they can choose to do so in two primary ways. *First*, they can negotiate foreign currency trades with BNYM's sales desk. *See id.* ¶ 44. The price for each negotiated transaction is agreed between BNYM and the counterparty at the time the transaction is executed. *See id.* ¶¶ 42, 62. *Second*, BNYM's custody customers can, directly or through their investment managers, prospectively instruct BNYM to convert funds to a specified currency – for example, to convert a currency balance in the amount necessary to fund a security purchase or sale – using BNYM's "standing instruction" program.[3] *See* Compl. ¶ 37; SAC ¶ 43. The instruction from the investment manager or customer "[t]ypically" takes the form of a "written standing instruction, *i.e.* a contract, with the plan, or an investment manager for one of the investment funds in which plan assets were invested." Compl. ¶ 37; SAC ¶ 33. The terms of the contracts governing BNYM's standing instruction transactions were generally supplied by its FX Procedures. *See* SAC ¶¶ 33, 47-49.[4] As these Procedures made clear, BNYM only executes standing instruction transactions at the direction of a "fund manager[] [or] other fiduciar[y]." Ex. 12, at 1; *see also*

---

[3] In addition to providing opportunities to participate in negotiated and standing instruction transactions, certain customers have negotiated benchmark agreements with BNYM, pursuant to which BNYM automatically executes certain FX transactions in certain currencies at a rate determined by adding a fixed spread, *e.g.*, 5 basis points, over a benchmark rate, usually a rate reported from an agreed-upon source at a particular time (*e.g.*, 4 p.m. London time) on the day the trade is executed. *See* SAC ¶ 68.

[4] *See also* Ex. 12, FX Program for Trade Requests Processed through BNY Mellon Custody ("FX Procedures"); Ex. 13, Foreign Exchange Policies and Procedures for ERISA Plans ("BNY FX Procedures"). The Court may properly consider these documents on a motion to dismiss under Rule 12(b)(6) because Plaintiffs were aware of the document and relied on it in drafting the Amended Complaint. *See Chambers*, 282 F.3d at 153. ██████████████████████████████████████████████████████████████████████████████████ SAC ¶ 33, quote from the BNY FX Procedures, *id.* ¶ 47, and acknowledge that their "allegations are based on . . . investigations of private whistleblower law firms, . . . International Union of Operating Engineers, and the Stationary Engineers Local 39 Pension Trust Fund," *id.* ¶ 2. The Amended Complaint filed in the *Operating Engineers* action describes BNYM's FX Procedures in detail and attaches as an exhibit a version of the procedures. *See* Am. Class Action Compl. ¶¶ 24-27, 30, Ex. C, in *International Union of Operating Engineers v. The Bank of New York Mellon Corp.*, No. 12-03067 (S.D.N.Y.) (Dkt. No. 73).

Ex. 13, at 3; SAC ¶ 55 (discussing BNYM's receipt of a "standing instruction FX order").

In recent years, BNYM has been developing new and upgraded pricing programs for FX trades executed pursuant to standing instructions. *See* Declaration of John Cipriani ("Cipriani Decl.") at ¶ 2. The principal programs now offered are the Defined Spread Program and an upgraded Session Range Program. *Id.* As of February 24, 2014, unless a customer opts into the Defined Spread Program or another alternative pricing option, any trades that it elects to execute pursuant to standing instructions will be priced pursuant to the Session Range Program. *Id.* at ¶ 4. Pricing in this program is determined by the application of disclosed, fixed percentage Price Collars applied to Session High and Low Rates generally derived from Reuters. *Id.* at ¶ 3 & Ex. B-1, at 3-4, 7-8, 10. Also on February 24, 2014, BNYM ceased offering its historical standing instruction pricing program. *Id.* at ¶ 4.

### B.    The Defined-Benefit Plaintiffs

#### 1.    The Owens Corning Plan

The Defined-Benefit Plaintiffs are participants in the Owens Corning Merged Retirement Plan. *See* SAC ¶ 1. Each has been a plan participant for 30 years or more, *see id.* ¶¶ 14-16, and ███████████████████████████████████████████████████████.[5]

The Owens Corning Plan is a "traditional defined benefit pension plan." *Id.* ¶ 84. Accordingly, the benefits to which the Defined-Benefit Plaintiffs are entitled do not depend on the investment performance of the Plan's assets. *See id.* ¶ 82. As a result, those plaintiffs do not have "a claim to any particular asset that composes a part of the plan's general asset pool."

---

[5] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 440, 119 S. Ct. 755, 761 (1999).  If the Owens

Corning Plan's investments perform poorly, the Plan's sponsor, Owens Corning, "is obligated to

'cover any underfunding as the result of a shortfall that may occur from the plan's investments.'"

*Lonecke v. Citigroup Pension Plan*, 584 F.3d 457, 462 (2d Cir. 2009) (quoting *Hughes Aircraft*,

525 U.S. at 439, 119 S. Ct. at 761).  ERISA prescribes minimum funding requirements for

defined benefit plans, which are designed to ensure that employers cover any shortfall resulting

from a plan's poor investment performance.  *See* 29 U.S.C. §§ 1082-1083.

From the beginning of the class period through 2012, BNYM and its predecessors

provided custody services to the Owens Corning Plan.  *See* SAC ¶ 85.[6]  As permitted by ERISA,

*see* 29 U.S.C. §§ 1102(c)(3), 1103(a)(2), authority to invest the Plan's assets was delegated to a

number of investment managers, including PanAgora Asset Management, Copper Rock, ING

Clarion (now called CBRE Clarion), and T. Rowe Price.  *See* SAC ¶ 7; Compl. ¶¶ 25, 37; Ex. 2,

2011 Form 5500 Schedule C (OC000190), at OC000191-92, OC000195-96.  ███████████████

████████████████████████████████████████████████████████████████████

███████████████████  *See* SAC ¶¶ 87-88.

On October 1, 2012, the Owens Corning Plan informed BNYM that J.P. Morgan Chase

Bank ("J.P. Morgan") would replace BNYM as the Plan's custodian on January 1, 2013.

Guerrieri Decl. at ¶ 2 & Ex. A-1. ████████████████████████████████████████████

████████████████████████████████████████████  *See* Guerrieri Decl. at ¶ 8.

BNYM no longer has custody of any Owens Corning Plan assets.  *See id.* at ¶ 9.

Despite its removal as custodian, BNYM may continue to receive residual foreign

currency payments in the Plan's accounts.  *See id.* at ¶ 5.  In connection with the direction to

---

[6] *Cf.* Declaration of Holly Guerrieri ("Guerrieri Decl.") at ¶ 2 & Ex. A-1 (discussing termination of BNYM
as trustee in January 2013).

transfer assets to J.P. Morgan, the Plan also instructed BNYM *not* to repatriate any residual foreign currency payments into U.S. Dollars and instead to transfer those foreign currency balances directly to J.P. Morgan.  That instruction went into effect on January 14, 2013.  *See id.* at ¶ 5 & Ex. A-2.

The Plan made one exception to that instruction.



At this time – approximately eighteen months after BNYM's removal as custodian – the only foreign currency payments expected to be received in the Plan's accounts are payments associated with foreign tax reclaims.[8]  *See id.* at ¶ 17.  The time that has elapsed since BNYM's termination makes it highly unlikely that other types of foreign currency payments will be made into the Plan's accounts.  *See id.*

---

[7]                                                       *See* Guerrieri Decl. at ¶ 12.

[8] Tax treaties may provide for reduced withholding taxes on dividend and interest payments to nonresident investors.  *See* Office of the Comptroller of the Currency, Comptroller's Handbook, Custody Services 25 (2002), *available at* http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/custodyservice.pdf.  A tax reclaim is a refund of excess withholding tax after a dividend or interest is paid, and generally is obtained by an investor's custodian "fil[ing] a form with a country's tax authority."  *Id.*

███████████████████████████████████████

███████████████████████████████

███████████████████████████ *Id.* at ¶ 22.  Therefore,

pursuant to the Owens Corning Plan's direction, BNYM expects to transfer these amounts to J.P.

Morgan when they are received, and does not expect to repatriate them to U.S. Dollars.  *Id.* at

¶ 23.

### 2.     Jurisdictional Discovery and the Second Amended Complaint

Plaintiffs have filed two prior complaints in this action, each of which BNYM moved to

dismiss for lack of standing.  *See* Dkt. No. 18; Dkt. No. 40.  On June 20, 2013, the Court entered

a Stipulation and Order permitting the parties to propound discovery pertaining to standing and

jurisdictional issues raised in Defendants' Motion to Dismiss the Amended Complaint.  *See* Dkt.

No. 49.  Jurisdictional discovery closed on November 22, 2013.  *See* Collins Decl. at ¶ 2.  During

jurisdictional discovery, the parties served interrogatories and requests for production on one

another, and served six subpoenas on third parties, including the Owens Corning Plan.  *See id.*

Plaintiffs relied on information obtained in jurisdictional discovery in drafting the Second

Amended Complaint.  SAC ¶¶ 2, 87.

Documents produced in jurisdictional discovery confirmed that Owens Corning has met

its obligation to fund the Owens Corning Plan, allowing the Plan to pay benefits as they are due.

As the Second Amended Complaint alleges, the Plan was 98.8% funded in 2012 (the most recent

plan year for which information is available).  SAC ¶ 84 n.7; *see also* Ex. 14, 2012 Form 5500,

at 27; Ex. 3, ██████████████████████████████████.  As

required by ERISA, *see St. Vincent*, 712 F.3d at 720, Plaintiff Kenny received an Annual

Funding Notice disclosing this funding percentage in April 2013.  *See* Ex. 7, 2013 Annual

Funding Notice (BNYM_CARVER_DK0000040), at BNYM_CARVER_DK0000041.  The

cover letter to this Notice reported that "the Plan continues to fully meet its benefit obligations to

participants and beneficiaries."  *Id.* at BNYM_CARVER_DK0000040.  In a "Frequently Asked

Questions" section, the Notice explained the significance of the funding percentage:

> **Q. What does a 98.80 percent funding level mean to me?**
>
> Although calculating a percentage is straight forward, for most individuals, the
> most important measure of a pension plan is whether it is paying its benefit
> obligations to participants and beneficiaries. ***The Owens Corning plan is able to
> pay benefits as they are due.***

*Id.* at BNYM_CARVER_DK0000047 (emphasis added).[9]

The Defined-Benefit Plaintiffs assert that "the Plan has never been one hundred percent

funded," SAC ¶ 84, which is technically (but barely) true given the current 98.8% funding level.

But, critically, they do not allege – and there is no indication – that Owens Corning has ever

failed to meet its funding obligations under ERISA or that the Plan has ever been unable to pay

benefits due to participants.[10]  Further, no facts alleged in the Complaint suggest that Owens

Corning will be unable to meet any future contribution obligations it may have.[11]

Plaintiffs also conducted jurisdictional discovery



---

[9] An Annual Funding Notice from 2009 contains similar language despite a lower funding percentage for
that year.  *See, e.g.*, Ex. 8, 2009 Annual Funding Notice FAQs (BNYM_CARVER_CC0000005), at
BNYM_CARVER_CC0000005 ("The Owens Corning plan has and will continue to pay benefits as they are due.").

[10]

[11] Owens Corning reported pre-tax earnings of $273 million for the year ended December 31, 2013.  *See*
Ex. 15, Owens Corning, 2013 10-K, at 25.  *See id.* at 24 (reporting annual earnings before interest and taxes of $148
million and interest expense of $114 million).  As of January 1, 2012, the Plan had assets with an actuarial value of
$827.7 million and a funding target of $837.7 million.  *See* Ex. 14, 2012 Form 5500, at 26.  Owens Corning has
announced that it plans to contribute $55 million to the Plan in 2014 to meet ERISA's funding requirements.  *See*
Ex. 15, Owens Corning, 2013 10-K, at 34.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

### C.       Allegations of the Second Amended Complaint

In Counts I and II of the Second Amended Complaint, Plaintiffs claim that BNYM acted as a fiduciary when executing FX transactions through the standing instruction program.  *See* SAC ¶¶ 134-147; *cf. id.* ¶¶ 105-112.  Plaintiffs assert that BNYM breached its fiduciary duties of prudence and loyalty in the execution of standing instruction transactions, SAC ¶ 137 (Count I), and that BNYM engaged in transactions prohibited by ERISA, which (unless an exception applies) precludes a fiduciary from "'deal[ing] with the assets of the plan in his own interest or for his own account,'" SAC ¶¶ 142-143 (Count II) (quoting ERISA § 406(b), 29 U.S.C. § 1106(b)).

In the alternative, Plaintiffs plead in Count III that BNYM violated § 406(a) of ERISA, 29 U.S.C. § 1106(a), which prohibits a fiduciary with respect to the plan from causing the plan to engage in certain transactions with a "party in interest."  *Id.* ¶¶ 148-155.  They allege that BNYM "caused the Plans to engage in FX trades with parties in interest with respect to the Plans, namely," BNYM's own "FX trading arm."  *Id.* ¶ 152.  In other words, Plaintiffs' claim is that even if BNYM was not acting as a fiduciary when it engaged in FX transactions with the Plan, it took acts as custodian that caused the Plan to engage in those FX transactions.

The Complaint does not identify any specific acts by which BNYM, as custodian or trustee, purportedly caused the Plans to use its standing instruction program, nor does it identify any specific FX transactions that BNYM allegedly caused.  *See id.* ¶ 108.  Moreover, although

Plaintiffs acknowledge that custodial relationships are controlled by "agreements denominated 'custody agreements,' 'trust agreements,' or the like," they fail to identify any contractual provisions giving BNYM control over whether the Plans or their investment managers use standing instruction transactions or another method of executing FX transactions.  *See id.*[12]

## STANDARD OF REVIEW

Plaintiffs, as the parties seeking the exercise of the Court's jurisdiction, bear the burden to demonstrate that they are "proper part[ies] to invoke judicial resolution of the dispute." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231, 110 S. Ct. 596, 608 (1990), *holding modified on other grounds by City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 124 S. Ct. 2219 (2004).  "[S]tanding cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record," *Spencer v. Kemna*, 523 U.S. 1, 10-11, 118 S. Ct. 978, 985 (1998) (internal quotations omitted).

"[T]o defeat a jurisdiction testing motion" after discovery has been taken, "the plaintiff's *prima facie* showing . . . must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).[13]  This "*prima facie* showing must be factually supported," *id.*, and in resolving a Rule 12(b)(1) motion, the Court may consider materials outside of the pleadings without converting the motion into one for summary judgment under Rule 56.  *See Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 & n.8 (2d Cir. 2006); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

---

[12] Plaintiffs have omitted from the Second Amended Complaint a fourth count, alleged in prior iterations of the Complaint, in which they claim that BNYM was liable *as a party in interest* (rather than as a fiduciary) for transactions prohibited under ERISA § 406(a).  Plaintiffs have therefore abandoned that claim.

[13] "While *Ball* involved a challenge to personal jurisdiction under Rule 12(b)(2), the holding applies to all jurisdiction testing motions, including challenges to subject matter jurisdiction under Rule 12(b)(1)." *Mukaddam v. Permanent Mission of Saudi Arabia to the United Nations*, 136 F. Supp. 2d 257, 260 n.11 (S.D.N.Y. 2001) (Kaplan, J.).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (internal quotations omitted). Where the allegations "are merely consistent with a defendant's liability, [the complaint] stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotations omitted).  "[T]he Court may properly consider documents referenced in or integral to the complaint." *In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011); *see supra* nn.1, 4.  And the Court is not required to "accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001).

## ARGUMENT

**I.    The Court Lacks Subject Matter Jurisdiction over the Defined-Benefit Plaintiffs' Claims**

The Defined-Benefit Plaintiffs lack standing to bring claims for monetary relief, and their claims for injunctive relief are moot.  Therefore, their claims do not present a justiciable "Case" or "Controversy" under Article III of the U.S. Constitution, and must be dismissed.[14]

### A.    The Defined-Benefit Plaintiffs Lack Article III Standing To Seek Monetary Relief

#### 1.    Participant or Beneficiary Plaintiffs Must Establish Individual Injury for Standing To Seek Monetary Relief

"[T]he irreducible constitutional minimum of standing" requires that a plaintiff demonstrate (1) he or she "suffered an 'injury in fact,'" (2) "a causal connection" between the

---

[14] Based on the information produced in jurisdictional discovery, BNYM does not at this time contest the Court's jurisdiction over the claims of the Defined-Contribution Plaintiffs.

injury and the challenged action, and (3) the injury's redressability by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992) (internal

quotations and citations omitted).  Injury in fact "must be concrete and particularized as well as

actual or imminent, not conjectural or hypothetical."  *Kendall v. Employees Ret. Plan of Avon*

*Prods.*, 561 F.3d 112, 118 (2d Cir. 2009) (internal quotations omitted).[15]

     The Second Circuit has twice held that a plan beneficiary who seeks to assert a claim for

monetary relief such as "restitution or disgorgement" under ERISA must demonstrate not merely

a loss to the plan, but an "individual loss" to the beneficiary.  *Central States Se. & Sw. Areas*

*Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 200 (2d Cir.

2005) ("*Central States I*") (internal quotations omitted); *Kendall*, 561 F.3d at 119.  In *Central*

*States I*, a group of four plan beneficiaries asserted claims broadly similar to those here:  claims

that a pharmaceutical benefits manager had breached its fiduciary duties to the plan by acting in

its own (and its corporate parent's) interests; that it had engaged in ERISA-prohibited

transactions; and that it had failed to disclose the costs that its actions imposed on the plan.  *See*

433 F.3d at 187-88.  The court of appeals remanded for an inquiry into whether "any evidence

supports the claim" that the manager had "caused the Individual Plaintiffs – as opposed to the

Plans to which they belong – any injury."  *Id.* at 202 (noting that the beneficiaries could show

---

[15] The Supreme Court has made clear that bringing a suit as a putative class action "adds nothing to the question of standing" of the individual named plaintiffs.  *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 40 n. 20, 96 S. Ct. 1917, 1925 (1976).  At the commencement of an action, "[e]ach named plaintiff in a class action must allege and show that he personally has been injured."  *Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of Am., NA*, 907 F. Supp. 2d 536, 545 (S.D.N.Y. 2012) (internal quotations omitted); *In re Direxion Shares ETF Trust*, 279 F.R.D. 221, 230 (S.D.N.Y. 2012) (internal quotation marks omitted); *see also In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1324 (S.D. Fla. 2010) ("The issue of Article III standing must be resolved for each named plaintiff before issues of class certification and representation are contemplated.").

such injury by proving that they had "pa[id] more for prescription drugs or . . . ha[d] to take different prescription drugs").[16]

In *Kendall*, a plan participant asserted a claim based on an "alleged breach of [a] fiduciary duty . . . to comply with ERISA" and sought relief that was "effectively . . . disgorgement of funds . . . gained by not paying out benefits under a plan that conforms with ERISA." 561 F.3d at 119-20. The court of appeals repeated its holding in *Central States I* that a participant who seeks such monetary remedies must "demonstrate some injury-in-fact to have standing to bring [his or her] claims." *Id.* at 120. In doing so, the court rejected the argument that "either an alleged breach of fiduciary duty to comply with ERISA, or a deprivation of [a participant's] entitlement to that fiduciary duty, in and of themselves constitute[] an injury-in-fact sufficient for constitutional standing." *Id.* at 121. It then held that the participant had failed to establish any such injury in fact because her "claim[] that she would receive more in benefits" if she prevailed was "speculative." *Id.* at 122.

*Central States I* and *Kendall* thus stand for the proposition that a plan participant or beneficiary must establish some personal loss of benefits before seeking monetary relief such as disgorgement or restitution. The Defined-Benefit Plaintiffs' claims for monetary relief, *see* SAC at 42, § IX(c), (d), (e), (f), (h), are subject to this rule.[17]

---

[16] A fifth plaintiff in *Central States I* was a plan *trustee*; the court of appeals held that her standing was also in "considerable question" because she had failed to produce evidence that her plan actually had contracted with the defendant. *See* 433 F.3d at 203. After a remand, the trustee was able to produce such evidence, which cured the standing problem. *See Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241-42 (2d Cir. 2007) ("*Central States II*").

[17] The Second Circuit also held in *Central States I* that a "plan participant may have Article III standing to obtain *injunctive* relief related to ERISA's disclosure and fiduciary duty requirements without a showing of individual harm to the participant." *Central States I*, 433 F.3d at 199 (emphasis added). BNYM's argument that Plaintiffs have failed to allege and cannot show injury in fact is limited to Plaintiffs' claims for monetary relief. The Defined-Benefit Plaintiffs' claims for injunctive relief should be dismissed for the independent reason that they are moot. *See infra* pp. 27-29.

2.      **The Defined-Benefit Plaintiffs Have Not Set Forth Factually Supported Allegations Demonstrating Individual Injury**

The Defined-Benefit Plaintiffs are entitled to "a specified, periodic benefit at retirement," and Owens Corning, the Plan's sponsor, "must cover any shortfall" that will prevent the Plan from paying those Plaintiffs' accrued benefits.  *Milgram v. Orthopedic Assocs. Defined Contribution Pension Plan*, 666 F.3d 68, 76 (2d Cir. 2011); *see also Lonecke*, 584 F.3d at 462. Because ERISA insulates participants' benefits against plan shortfalls, courts have uniformly held that a participant in a defined benefit plan has not alleged a constitutionally sufficient injury merely by asserting a loss to the plan.  *See, e.g., David v. Alphin*, 704 F.3d 327, 336 (4th Cir. 2013); *Harley v. Minnesota Min. & Mfg. Co.*, 284 F.3d 901, 906 (8th Cir. 2002).  Instead, "a beneficiary to a defined benefit pension plan . . . cannot establish standing to sue on behalf of the Plan absent a plausible allegation that the breach of fiduciary duty created or enhanced a risk of default by the entire plan."  *Perelman v. Perelman*, 919 F. Supp. 2d 512, 518-19 (E.D. Pa. 2013).[18]

Even after obtaining jurisdictional discovery, the Defined-Benefit Plaintiffs cannot show that they have sustained an injury sufficient for standing.  They do not attempt to plead *actual injury* – ██████████████████████████████████████████████████████████

████████████████   *See supra* n.10.  Instead, the Defined-Benefit Plaintiffs attempt to plead *imminent* injury by asserting that losses to the Owens Corning Plan "increased the risk that they would receive no or diminished benefits through the Plan."  SAC ¶ 90.  In support of this

---

[18] *See also Fox v. McCormick,* No. 12-cv-1869 (RMC), 2013 WL 6439128, at *7 (D.D.C. Dec. 9, 2013) (designated for publication) ("Without a factual allegation that [the alleged breach] deprived the Central Pension Fund of funds so that the Fund's risk of default has materially increased, [participants] lack Article III standing."). *Lee v. Verizon Commc'ns Inc.*, 954 F. Supp. 2d 486, 498 (N.D. Tex. 2013) (following *Perelman*); *see generally LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 255, 128 S. Ct. 1020, 1025 (2008) ("Misconduct by the administrators of a defined benefit plan will not affect an individual's entitlement to a defined benefit unless it creates or enhances the risk of default by the entire plan.").

allegation, they claim that (a) ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████      *id.* ¶ 87; (b) ███████████████████████████████

████████ *id.* ¶ 88; and (c) "[b]ased on its Form 5500s filed for years 1998 through 2012, . . .

the Plan has never been one hundred percent funded" – specifically, it was 98.8% funded

according to an Actuarial Valuation Report dated September 2012.  *Id.* ¶ 84 & n.7.  These

allegations at best establish only a "conjectural or hypothetical" injury, *Kendall*, 561 F.3d at 118,

which is insufficient to create standing.

      **a.**     The very facts asserted in the Complaint establish that any "risk that [the Defined-

Benefit Plaintiffs will] receive no or diminished benefits through the Plan" is far too small and

remote to qualify as a cognizable injury in fact.  SAC ¶ 90.  To support standing, future harm

"'must be *certainly* impending to constitute injury in fact,'"  and therefore "'[a]llegations of

possible future injury' are not sufficient."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147

(2013) (citations omitted, emphasis in original);[19] *see also David*, 704 F.3d at 338 (rejecting

"risk-based theories of standing" advanced by defined benefit plan participants, in part "because

they rest on a highly speculative foundation lacking any discernible limiting principle").  Here,

even if the alleged misconduct caused a loss to the Owens Corning Plan, there is no "substantial"

risk that the Defined-Benefit Plaintiffs' benefits will not be paid as a result.  *Clapper*, 133 S. Ct.

at 1150 n.5.

---

[19] *Clapper* recognized that a plaintiff could also establish standing "based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm."  133 S. Ct. at 1150 n.5 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153, 130 S. Ct. 2743, 2754-55 (2010)).  The Owens Corning Plaintiffs have failed to allege or show that they have incurred any costs to mitigate the supposedly increased risk of losing their benefits.  Even if they had, they have also failed to establish any "substantial risk" of such a loss. ██████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ SAC ¶ 87.  Plaintiffs have alleged that

BNYM's spread on such trades "may have averaged nearly 60 basis points."  *Id.* ¶ 62.  Although

this figure is vastly inflated, we assume its accuracy for purposes of this motion.  We further

assume, again for this motion only, that this entire amount represents an actionable loss to the

Owens Corning Plan. ████████████████████████████████████████

████████████████████████ The most recently reported market value of the Plan's assets is

$832.7 million.  *See* Ex. 14, 2012 Form 5500, at 26. ████████████████████

████████████████████ On its face, this loss is evidently insufficient to cause a "material[]

increase[]" in the "risk of default" of the entire plan, as required for Article III standing.  *Fox*,

2013 WL 6439128, at *7.

      **b.**      Further, defined benefit plans are structured so that "the employer typically bears

the entire investment risk," *Hughes Aircraft*, 525 U.S. at 439, 119 S. Ct. at 761; and ERISA

contains a number of provisions to safeguard plan participants' benefits even if the plan's

investments perform much more poorly than expected.  Any risk to the Defined-Benefit

Plaintiffs' personal benefits therefore would come only at the end of a "speculative chain of

possibilities," which "require guesswork as to how independent decisionmakers will exercise

their judgment."  *Clapper*, 133 S. Ct. at 1150.

      *First*, any loss to the Plan has no direct impact on the payment of Plaintiffs' benefits.  On

the contrary, the Plan's sponsor, Owens Corning, is obligated to make contributions to the Plan

to cover any shortfall.  *See* 29 U.S.C. § 1083; *Hughes Aircraft*, 525 U.S. at 440, 119 S. Ct. 761;

*Lonecke*, 584 F.3d at 462.  *Second*, even if the Defined-Benefit Plaintiffs could demonstrate that

Owens Corning was at imminent risk of failing to meet its obligations to the Plan as a whole, that

alone would not be enough to show that their personal benefits were at risk.  ERISA is designed to protect a defined benefit plan even when its sponsor is in bankruptcy.  Only if the bankruptcy were so severe that termination of the Owens Corning Plan was necessary to a successful reorganization would termination occur.  *See* 29 U.S.C. § 1341(c) (setting forth the requirements for the "distress termination" of a plan); *id.* § 1342(a) (setting forth the authority of the PBGC to terminate a plan).  *Third*, even plan termination would not necessarily threaten the *named plaintiffs'* benefits.  If a termination were to occur, the PBGC would allocate the Plan's assets pursuant to a priority structure set forth in 29 U.S.C. § 1344.  *Fourth*, even if the Plan's assets were insufficient to cover the Defined-Benefit Plaintiffs' full benefits, the PBGC guarantees participants' vested, non-forfeitable benefits up to a statutory limit.  *See David*, 704 F.3d at 338; *see also* 29 U.S.C. §§ 1322, 1322b(a).

The Defined-Benefit Plaintiffs cannot establish even the first link in this speculative causal chain.  They have set forth no factual basis to conclude that Owens Corning would be unable or unwilling to meet its obligation to make additional contributions for any shortfall.  Owens Corning reported pre-tax income[20] of $273 million in 2013, and projects that it will contribute $55 million to the Plan in 2014, *see supra* n.11 – ████████████████████████ ███████████████████████████████████████████████████████████ The Second Amended Complaint contains no factual allegations that Owens Corning is in such dire financial straits that it is on the cusp of a bankruptcy requiring the termination of the Plan.  Owens Corning's financial performance would, in any event, belie any such allegation.  *See supra* n.11.  And Plaintiffs can offer nothing to suggest that Owens Corning's ability to support

---

[20] Pre-tax income is the relevant measure of an employer's ability to fund an ERISA plan because employer contributions to an ERISA plan are tax deductible.  *See* 26 U.S.C. §§ 162(a)(1), 404(a); 26 C.F.R. § 1.404(a)-1(b).

the Plan would be affected by ████████████████████████████████

████████████████████████

Even in the event of a plan termination, the Defined-Benefit Plaintiffs are unlikely to experience any impact on their benefits.  Among other things, the priority structure to allocate assets of a terminated plan gives priority to those who have retired or qualified for retirement at least three years before termination.  *See* 29 U.S.C. § 1344(a)(3).  Because the Defined-Benefit Plaintiffs have each participated in the Owens Corning Plan for more than thirty years, *see supra* p. 6, their benefits would likely be paid in full.  In addition, ████████████████████████ ██████████████████████████████████████████████████   The Defined-Benefit Plaintiffs do not claim that their accrued benefits exceed the PBGC statutory guarantee limit,[21] or give any reason to think that the PBGC would not make good on that guarantee.

Thus, the Defined-Benefit Plaintiffs could suffer a reduction in benefits only if Owens Corning cannot meet its duty to cover the limited loss asserted, *and* if Owens Corning is in sufficiently poor financial condition to seek reorganization in bankruptcy, *and* if the Plan terminates because Owens Corning is unable to recover financially in bankruptcy proceedings, *and* if their benefits are not protected by ERISA notwithstanding the bankruptcy, *and* if the PBGC is also unable to do its statutory duty to protect them.  Despite obtaining jurisdictional discovery, the Defined-Benefit Plaintiffs have not (and cannot) offer facts establishing that even one of these events will come to pass.  This is the sort of "highly attenuated chain of

---

[21] For example, for plans terminating in 2013, the PBGC's maximum guaranteed benefit for workers who begin receiving payments at age 65 was $4,789.77 per month.  *See* General FAQs about PBGC, PBGC.gov, http://www.pbgc.gov/about/faq/pg/general-faqs-about-pbgc.html.  Plaintiff Day produced a document in jurisdictional discovery indicating that his estimated benefit is $1,191.60 per month assuming he begins retirement at age 65.  *See* Ex. 9, Your Pension Summary Webpage (BNYM_CARVER_ED0000001), at BNYM_CARVER_ED0000001.

possibilities" that the Supreme Court has found "necessarily conjectural" and therefore insufficient for standing. *Clapper*, 133 S. Ct. at 1148-50.

**c.** ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ SAC ¶ 88. Speculative and conclusory allegations of harm, lacking factual support, are insufficient to survive a jurisdiction testing motion after discovery has been taken. *See Melnick v. Adelson-Melnick*, 346 F. Supp. 2d 499, 502 (S.D.N.Y. 2004) (Kaplan, J.). Even under the more lenient 12(b)(6) standard, Plaintiffs' allegation of a fact that "may" exist cannot withstand dismissal. *See, e.g.*, *TechnoMarine SA v. Jacob Time, Inc.*, No. 12 CIV. 0790 KBF, 2012 WL 2497276, at *3 (S.D.N.Y. June 22, 2012).

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████[22] And, in any event, the amounts at issue are *still* too small by at least an order of magnitude to meet the Defined-Benefit Plaintiffs' burden to establish standing. █████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[22] 

████████████████████████████████████████████, and even if we again

apply to that amount Plaintiffs' alleged 60 basis-point spread for standing instruction transactions

(which is vastly inflated), ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████   *See supra* pp. 19-20.  Even with those highly exaggerated numbers, an amount of that

size poses no substantial risk of default to a plan of that size.  When the additional safeguards

provided by ERISA and the PBGC are taken into account, *see supra* pp. 18-20, the chance of any

adverse effect on Plaintiffs' personal benefits becomes vanishingly small.

        **d.**        Plaintiffs' allegation that the Owens Corning Plan "has never been one hundred

percent funded," SAC ¶ 84, does not undermine these conclusions.  As an initial matter, the

Court need not even consider this allegation given that Owens Corning is in a position to cover

any shortfall.  *See Lee*, 954 F. Supp. 2d 498 (declining to address arguments regarding whether a

plan was underfunded because "assuming *arguendo*" a loss to the plan, the plaintiffs "failed to

allege . . . , for example, that Verizon as plan sponsor cannot make the necessary contributions to

the Plan so that reductions are avoided").  The allegation is facially inadequate to demonstrate

standing.

        At any rate, the fact that the Plan was 98.8% funded as of September 2012, SAC ¶ 84 n.7,

undercuts any claim that the Defined Benefit Plaintiffs have suffered injury in fact.  Indeed,

Plaintiffs sought to add a new Defined Benefit Plaintiff, who was a participant in a different plan,

precisely because they recognized that the existing Defined Benefit Plaintiffs could not plausibly

demonstrate standing.  *See* Dkt. No. 83, at 10 (stating that "it will be difficult for the Court to

assess the strength of [Plaintiffs' standing] arguments based on a plan that is 98.8% funded.").

A plan's funding ratio reflects "the actuarial value of the plan's assets" relative to "the present value of the plan's benefit obligations," *Palmason v. Weyerhaeuser Co.*, No. C11-0695RSL, 2013 WL 4511361, at *8 (W.D. Wash. Aug. 23, 2013) – that is, whether the plan's current assets are sufficient to meet its projected obligations, calculated at their present value. Accordingly, the Owens Corning Plan's 98.8% funding ratio establishes that the Plan *already* has assets sufficient to cover 98.8% of benefits due in the future, without considering any additional contributions by Owens Corning.

That the Owens Corning Plan currently has a "modest shortfall" does not mean that Plaintiffs' benefits are in jeopardy. *Id.* at *9. ERISA explicitly allows a defined benefit plan to be underfunded in this sense, so long as the plan complies with minimum funding rules designed to ensure continuing solvency.[23] Owens Corning has already indicated its intention to make future contributions to the Plan, *see supra* n.11, and the Defined-Benefit Plaintiffs have presented no evidence that Owens Corning has not complied with ERISA's funding rules (or will fail to comply in the future). Hence, while the Plan may be 1.2% underfunded, "[t]here is no evidence that such a modest deficit . . . posed any threat to its continued viability or its ability to make payments to plaintiffs." *Palmason*, 2013 WL 4511361, at *9 (finding no Article III standing where participants' plan was 98.5% funded). In the Plan's own words, "[t]he Owens Corning plan is able to pay benefits as they are due." Ex. 7, at BNYM_CARVER_DK0000047.

Plaintiffs fare no better in alleging that the Owens Corning Plan was 80.1% funded at the end of 2011. SAC ¶ 84. Because the Defined-Benefit Plaintiffs rely on the threat of imminent injury, rather than the existence of past injury, to establish standing, it is the plan's *current* funding status, not the its funding status in the past, that is relevant to the standing inquiry. *Cf.*

---

[23] ERISA "require[s] defined benefit plans . . . to satisfy complex minimum funding requirements" to prevent default. *LaRue*, 552 U.S. at 255, 128 S. Ct. at 1025; *see also* 29 U.S.C. § 1083.

*Palmason*, 2013 WL 4511361, at *9 (considering the plan's funding status "at the time this action was filed").  In *Perelman*, the district court found that participants in a defined benefit plan lacked Article III standing to bring claims on the plan's behalf where the plan was 83% funded based on a market value analysis.  *Id.*  Because the plan complied with ERISA's minimum funding requirements, and because, "[m]ore importantly," the plaintiff "[did] not allege that . . . the Plan sponsor . . . [was itself] financially compromised and thus unable to adequately fund the Plan," he had alleged no injury in fact.  *Id.*[24]  Just so here:  the Defined-Benefit Plaintiffs have provided no factually supported allegations that would permit this Court to conclude that the Plan (whether underfunded or not) will fail to pay their benefits.

### 3. Participant or Beneficiary Plaintiffs Cannot Seek Monetary Relief on the Basis of "Representational Standing" Without Individual Injury

The Defined-Benefit Plaintiffs assert that "the Owens Corning Plan suffered financial losses and injury in fact" and "seek recovery *on behalf of the Plan*."  SAC ¶ 89 (emphasis added).  To the extent that Plaintiffs are invoking "representational standing," *Central States II*, 504 F.3d at 243 n.3, whether such standing is available to a plan participant or beneficiary who has not been personally injured by an alleged violation of ERISA is an open question under Second Circuit law.  *See id.* ("express[ing] no opinion" on this issue).  The Fourth, Sixth, Eighth, and Ninth Circuits, however, each have held squarely that a participant or beneficiary who

---

[24] *Perelman* reasoned that conclusory allegations "that the diminution in the value of the Plan assets 'jeopardizes' the Plan's ability to provide continued pension benefits" were "too speculative to provide standing." 919 F. Supp. 2d at 519.  The court noted that a plan "is only considered to be 'in at-risk status for a plan year if' the statutory funding ratio is 'less than 80 percent,'" in which case "it is the obligation of the plan sponsor to make sufficient additional contributions . . . to cure the underfunding."  *Id.* (quoting 29 U.S.C. § 1083(i)(4)(A)).

cannot establish personal injury-in-fact from an alleged ERISA violation also cannot establish standing purely as a representative of his ERISA plan.[25]  Those holdings are correct.

As the Supreme Court has recently emphasized, "[i]t is . . . a 'fundamental restriction on [judicial] authority' that '[i]n the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.' "  *Hollingsworth v. Perry,* 133 S. Ct. 2652, 2663 (2013) (third alteration in original) (quoting *Powers v. Ohio*, 499 U.S. 400, 410, 111 S. Ct. 1364, 1370 (1991)); *see also id.* at 2665 (rejecting the argument that "mere authorization to represent a third party's interests is sufficient to confer Article III standing on private parties with no injury of their own").  Although there are " 'limited exceptions' " to that rule, *id.* at 2663 (quoting *Powers*, 499 U.S. at 410, 111 S. Ct. at 1370), where "history and precedent make clear " that courts should permit one party to vindicate another's injury, *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 271, 128 S. Ct. 2531, 2533 (2008), ERISA beneficiaries and participants do not qualify for any such exception.

As the circuit courts to consider the question have unanimously concluded, there is no historical tradition that supports standing for ERISA beneficiaries or participants to bring suit based on an injury to the plan that has not affected them personally.  *See Harley*, 284 F.3d at 907 ("Under the law of trusts, '[a] particular beneficiary cannot maintain a suit for a breach of trust which does not involve any violation of duty to him.' ") (quoting Restatement (Second) of Trusts

---

[25] *See David*, 704 F.3d at 334-35 (rejecting the argument that plan participants have " ' the same kind of representational standing as a trustee, fiduciary, or assignee' ") ; *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 608-09 (6th Cir. 2007) ("Merely because Plaintiffs claim that they are suing on behalf of their respective ERISA plans does not change the fact that they must also establish individual standing."); *Harley*, 284 F.3d at 906 ("[T]he limits on judicial power imposed by Article III counsel against permitting participants or beneficiaries who have suffered *no* injury in fact from suing to enforce ERISA fiduciary duties on behalf of the Plan."); *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1127 (9th Cir. 2006) (acknowledging that "ERISA plan beneficiaries may bring suits on behalf of the plan in a representative capacity" but holding that they can do so only "so long as [they] otherwise meet the requirements for Article III standing").

§ 214 cmt. b)); *see also Glanton*, 465 F.3d at 1125-26 & n.2 (same); *see also David*, 704 F.3d at 336 (noting the "[a]bsen[ce] . . . [of] any history" that would justify representational standing in "the ERISA context").  Further, unlike a plan trustee or fiduciary, beneficiaries and participants have no fiduciary duty (or any other duty) to their plan or to its other participants.  Accordingly, they have no reason to consider whether litigation is *on balance* in the Plan's interests – a factor that several courts have found weighs against granting them standing.  *See Harley*, 284 F.3d at 907 (noting that the "individual pension rights" which ERISA was meant to protect "would if anything be adversely affected by subjecting the Plan and its fiduciaries to costly litigation brought by parties who have suffered no injury"); *see also David*, 704 F.3d at 336 ("Where there is no actual injury, we see little to be gained from an abstract challenge to alleged fiduciary misconduct at the cost of the plan and those participants who did not bring (and may not approve of) the suit.").

In moving for leave to amend, Plaintiffs cited a footnote in the Second Circuit's decision in *L.I. Head Start Child Development Services v. Economic Opportunity Commission of Nassau County, Inc.*, 710 F.3d 57 (2d Cir. 2013) ("*LIHS*") for the proposition "that an ERISA participant bringing suit on behalf of the plan . . . need not demonstrate individual injury to establish Article III standing."  Reply in Support of their Motion for Leave to File Second Amended Complaint (Dkt. No. 88, at 1 n.2) (citing *LIHS*, 710 F.3d at 67 n.5).  That mischaracterizes *LIHS*.  The court of appeals was not presented with and did not resolve any issue regarding the representational standing of plan *participants*.  Rather, it addressed the very different situation in which one of the named plaintiffs was a "fiduciary of the Plan." *Id.* at 66.  Trustees and other fiduciaries, unlike participants, have representational standing under settled law.  *See, e.g.*, *Sprint*, 554 U.S. at 287, 128 S. Ct. at 2543 ("[t]rustees bring suits to benefit their trusts").  And once the plan

fiduciary's standing was established, that was sufficient for that case to proceed.  *See LIHS*, 710 F.3d at 67 n.5 (concluding that the fiduciary and participants collectively had asserted "injury-in-fact sufficient for constitutional standing"); *Central States II*, 504 F.3d at 243 (declining, after finding that a plan trustee had standing, to consider the standing of plan participants).  But the Second Circuit did not hold – in what would be a conflict with the decisions of the Fourth, Sixth, Eighth, and Ninth Circuits – that the participants would have had standing if they had sued on their own.  *LIHS* thus does not support Plaintiffs' standing in this case.

### B.    The Defined-Benefit Plaintiffs' Claims for Injunctive Relief Are Moot

BNYM is no longer the custodian for the Owens Corning Plan, and it is no longer reasonable to expect the Owens Corning Plan to engage in future standing instruction transactions, as alleged in the Complaint.  As a result, the Defined-Benefit Plaintiffs' claims for injunctive relief are moot, and the Court should dismiss them from the case entirely.

"'In order to satisfy the case-or-controversy requirement, a party must, at all stages of the litigation, have an actual injury which is likely to be redressed by a favorable judicial decision.'" *United States v. Blackburn*, 461 F.3d 259, 261 (2d Cir. 2006) (citation omitted).  "A 'case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'  If 'there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the court to grant any effectual relief whatever to [the] prevailing party.'" *White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 167-68 (2d Cir. 2007) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287, 120 S. Ct. 1382, 1390 (2000)) (alteration in original) (some internal quotations omitted in *White River*)).

The Owens Corning Plan's own actions make it unreasonable to expect that any of the allegedly wrongful conduct alleged in the Second Amended Complaint will be repeated.  The Owens Corning Plan terminated BNYM as its custodian and moved substantially all of its assets

to J.P. Morgan approximately eighteen months ago, in January 2013.  *See* Guerrieri Decl. at ¶ 2 & Ex. A-1.  As a result of that decision, which was taken unilaterally by the Owens Corning Plan, the only foreign currency balances in BNYM's custody in the future will be residual payments made into the Plan's accounts.  But even those balances will not give rise to any new FX transactions between BNYM and the Owens Corning Plan, because the Plan has also directed BNYM to transfer any residual foreign currency payments to J.P. Morgan without repatriating these payments to U.S. Dollars.  *Id.* at ¶ 5 & Ex. A-2.



        And BNYM's records demonstrate that there is no reasonable expectation that this narrow exception will apply to any of the foreign currency payments still expected in the Owens Corning Plan's accounts. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *See* Guerrieri Decl. at ¶¶ 17-22 & Ex. A-5. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *Id.* at ¶¶ 21-22 & Ex. A-3, at 1-3, 13.  There is no basis to conclude that BNYM will be unable to transfer these currencies to J.P. Morgan, consistent with the Owens Corning Plan's direction, and thus no

reason to expect that BNYM will ever engage in an FX transaction with the Owens Corning Plan with respect to any of these foreign currency balances.  *See id.* at ¶¶ 22-23.[26]

Even in the extremely unlikely event that the Plan receives a foreign currency payment other than the outstanding tax reclaims and this payment is denominated in a currency that J.P. is unable to accept, the currency would not be repatriated through the historical standing instruction pricing program that Plaintiffs challenge in the Second Amended Complaint.  That pricing program is no longer offered by BNYM.  *See* Cipriani Decl. at ¶ 4.  Instead, absent the Plan's election of Defined Spread or another alternative pricing program, any FX transaction executed pursuant to the Plan's standing instruction would be executed through the upgraded Session Range Program.  *See id.*  This Program uses new disclosures and a different pricing methodology than the program alleged in the Second Amended Complaint.[27]

Thus, even if BNYM were to execute an FX transaction with the Owens Corning Plan, such a transaction would not be executed under the pricing program that Plaintiffs contend violates ERISA.  These changed circumstances eliminate any "legally cognizable interest" the Defined-Benefit Plaintiffs may have securing injunctive relief, *see White River*, 481 F.3d at 167, and their claims therefore must be dismissed.

## II.     Plaintiffs Have Not Plausibly Alleged that BNYM Caused the Plans to Engage in Transactions Prohibited Under § 406(a)

The choice whether to execute FX transactions through BNYM's standing instruction product was made by independent plan fiduciaries, typically sophisticated investment managers.

---

[26] Such a transaction would occur only if BNYM received a residual currency payment, *and* J.P. Morgan could not accept this currency, *and* the Plan directed the repatriation of the currency into U.S. dollars.  But "'such speculative contingencies afford no basis'" for the Defined-Benefit Plaintiffs to proceed with their claims. *Armstrong v. Ward*, 529 F.2d 1132, 1136 (2d Cir. 1976).

[27] *Compare* SAC ¶ 55 (alleging that BNYM "informed clients that [it] would execute the trade using best execution practices during the next available trading window," but instead "unilaterally decided, or exercised discretion, to determine how much 'spread' they would pay themselves on the transaction."), *with* Cipriani Decl. at ¶ 3 & Ex. B-1 (describing pricing under the Session Range Program using disclosed, fixed percentage Price Collars).

*See supra* pp. 4-6.  Count III alleges that BNYM (as custodian or trustee) "caused" these transactions to occur.  BNYM's narrow duties as custodian or trustee do not support an inference of causation, and Plaintiffs fail to state a plausible claim.

"[T]o sustain an alleged transgression of § 406(a), a plaintiff must show that a fiduciary caused the plan to engage in the allegedly unlawful transaction."  *Lockheed Corp. v. Spink*, 517 U.S. 882, 888-89, 116 S. Ct. 1783, 1788-89 (1996).  Absent "that showing, there can be no violation . . . to warrant relief under the enforcement provisions."  *Id.*  A fiduciary causes a transaction only if it "exercise[s] discretionary authority or control over the . . . decision" to engage in the transaction.  *Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 352-53 (5th Cir. 1989) (explaining that a "jury[ ] finding that . . . defendants did not exercise" such authority "is also a finding that they did not 'cause' the plan to enter into such a transaction").  This causal requirement is not met where a custodian or trustee "allow[s] . . . transactions to occur" by "follow[ing] . . . investment directives . . . prohibited under ERISA," *Tullis v. UMB Bank, N.A.*, 640 F. Supp. 2d 974, 980-81 (N.D. Ohio 2009), *aff'd*, 423 F. App'x 567 (6th Cir. 2011).[28]  Further, even recommending or encouraging the purchase of a product does not constitute control over the decision to purchase it.[29]

---

[28] *See also Rogers v. Baxter Int'l Inc.*, 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010) (determining that where fiduciaries properly "obey[ed] the investment instructions of participants," they were "not liable for any resulting losses which were caused by participants', not the fiduciaries', decisions"); *Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694, 711 (W.D. Mich. 2007) (finding no proof of causation by a broker with custody of plan assets that "process[ed] checks in circumstances that were, at most, arguably suspicious"); *Qualey v. Jackson*, No. 07-CV-10910-DT, 2007 WL 1836028, at *5 (E.D. Mich. June 25, 2007) (holding that where a merger required shareholder approval, it would be the shareholders, not the directors who voted in favor of the merger, "who will 'cause' " the resulting conversion of shares).

[29] *See Custer v. Sweeney*, 89 F.3d 1156, 1163 (4th Cir. 1996) (concluding that an attorney's "non-binding recommendations" to the board of trustees did not establish control over plan assets, even if he "control[ed] information relevant to the propriety" of investment decisions); *Schloegel v. Boswell*, 994 F.2d 266, 271 (5th Cir. 1993) ("Mere influence over the trustee's investment decisions, however, is not effective control over plan assets."); *Farm King Supply, Inc. Integrated Profit Sharing Plan & Trust v. Edward D. Jones & Co.*, 884 F.2d 288, 292 (7th Cir. 1989) (distinguishing, for purpose of determining whether a party is a fiduciary, between "the authority to exercise control unilaterally over a portion of a plan's assets" and "merely . . . propos[ing] investments").

With respect to BNYM's custodial role, Plaintiffs allege in conclusory fashion that "[t]o the extent [BNYM] exercise[s] any authority or control respecting management or disposition of the Plans' assets or exercise[s] any discretionary authority or discretionary control respecting management of the Plans or the Plans' assets in conducting foreign exchange transactions, [it] act[s] in a fiduciary capacity." SAC ¶ 108.  A custodian or directed trustee, however, does not have discretionary authority or control over a customer's decision to engage in FX transactions.  As Plaintiffs have acknowledged, *see id.* ¶ 108; Compl. ¶ 24, a custody bank's core functions are typically "mechanical administrative responsibilities (such as retaining the assets and keeping a record of their value)," *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 20 (1st Cir. 1998), and do not extend to "discretionary, advisory activities," *O'Toole v. Arlington Trust Co.*, 681 F.2d 94, 96 (1st Cir. 1982).  Thus, this Court has explained that "the fiduciary duties of a directed trustee are 'extremely narrow,'" with no obligation "to duplicate or second-guess the work of the plan fiduciaries that have discretionary authority." *In re Lehman Bros. Sec. & ERISA Litig.*, 10 CIV. 8631 LAK, 2012 WL 6000575, at *2 (S.D.N.Y. Dec. 3, 2012).

Nothing alleged in the Second Amended Complaint suggests that BNYM had atypical custody relationships with the Plans at issue in this action that might have granted BNYM discretionary authority or control.  Plaintiffs, despite acknowledging that custody contracts control the terms of these relationships, *see* ¶ 108, have not identified or appended any contractual terms authorizing BNYM to choose between the various options for executing FX transactions.  Moreover, although they claim that standing instruction transactions were not executed at "arm's length," Plaintiffs do not deny (and cannot dispute) that the Plans could decline to enter into standing instruction transactions on any given day or to cease them at any

time.[30]

As the Second Amended Complaint makes clear, the standing instruction program is only one of several options available to managers for FX transactions, *see* SAC ¶¶ 37, 43-44. Moreover, it is solely in the manager's (or independent fiduciary's) discretion to issue a "standing instruction FX order," *id.* ¶ 55. BNYM does not, in its custodial capacity, "cause" a transaction by complying with the direction of the fiduciary vested with investment authority over plan assets. Because Plaintiffs fail to allege plausibly that BNYM exercised control over the Plans' discretionary choices to engage in standing instruction transactions, Count III should be dismissed.[31]

## CONCLUSION

For the foregoing reasons, BNYM's motion to dismiss in part should be granted.

---

[30] *See* Ex. 12, FX Procedures, at 2 (explaining consequences of a manager's instruction "that it does not want BNYM to effect an FX transaction in accordance with these Procedures"); Ex. 13, BNY FX Procedures, at 3 ("[Standing] instructions shall continue in force until terminated by either BNY or the fiduciary without penalty upon up to 10 days prior notice").

[31] In its previous motions to dismiss Plaintiffs' original Complaint and First Amended Complaint, BNYM also contended that Plaintiffs had not plausibly alleged that BNYM was acting in a fiduciary capacity under ERISA when it executed standing instruction transactions with the Plans. *See* Dkt. No. 19, at 21-28; Dkt. No. 41, at 23-30. BNYM continues to deny that it was acting in any such capacity. Nevertheless, in view of the substantial time that has passed since those motions, and the progress of discovery in the case as a whole, BNYM now believes that it would be more appropriate and efficient to assert this argument at summary judgment or at trial on the merits, so that the Court will have the benefit of a fuller factual record in deciding it.

32

Dated:  July 14, 2014

Respectfully submitted,

THE BANK OF NEW YORK MELLON

BNY MELLON, N.A.

Reid M. Figel (RF-8663)
Rebecca A. Beynon (*pro hac vice*)
David L. Schwarz (*pro hac vice*)
Derek T. Ho (DH-0104)
Gregory G. Rapawy (*pro hac vice*)
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
rfigel@khhte.com
rbeynon@khhte.com
dschwarz@khhte.com
dho@khhte.com
grapawy@khhte.com

*Counsel for The Bank of New York Mellon and BNY Mellon, N.A.*

33