UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| BANK OF NEW YORK MELLON CORP. | ) | 12 MD 2335 (LAK) |
| FOREX TRANSACTIONS LITIGATION | ) | |
| | ) | ECF Case |
| This Document Relates to: | ) | |
| | ) | |
| *Carver v. The Bank of New York Mellon* | ) | 12 CV 9248 (LAK) |
| | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS IN PART
THE SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................... 1

II.   BACKGROUND ....................................................................................... 2

III.  ARGUMENT ............................................................................................ 4

    A.    OC Plan Participants Have Article III Standing to Seek Relief on
        Behalf of the OC Plan for Injuries to the Plan, Regardless of
        Whether They Suffered an Individual Economic Injury ..................................... 4

        1.    Statutes May Confer Constitutional Standing .......................................... 4

        2.    ERISA's Remedial Scheme Provides that Participants May
            Bring Actions on Behalf of their Plans to obtain Relief for
            their Plans ........................................................................................ 5

        3.    ERISA's Remedial Scheme Confers Article III Standing ...................... 6

        4.    The OC Plan Has Suffered an Injury-in-Fact ......................................... 8

        5.    The Second Circuit Holds that ERISA Plaintiffs Have
            Representational Article III Standing; Defendants'
            Arguments to the Contrary Misread the Cases ....................................... 9

            a.    The Second Circuit Rejected BNYM's Argument in
                *L. I. Head Start* (2013) ............................................................. 9

            b.    The Second Circuit Refused to Adopt BNYM's
                Argument in both *Central States I (2005)* and *II
                (2007)* ....................................................................................... 10

            c.    The Second Circuit Has Rejected BNYM's
                 Argument that ERISA Plan Participants Lack
                 Standing to Seek Relief on Behalf of an *Overfunded
                 Plan* ......................................................................................... 13

            d.    Other Second Circuit Precedents ............................................... 15

        6.    The Law of Trusts, Which Informs ERISA, Confirms That
            Trust Beneficiaries Have, and Historically Had, Standing to
            Sue When a Trust Corpus Suffers a Loss Without a
            Showing of Individual Financial Loss ..................................................... 16

B.   The OC Plaintiffs Have Suffered an Individual Injury-in-Fact ........................ 20

    1.   The Increased Risk of Non-Payment of Benefits from the Underfunded OC Plan Easily Meets the "Identifiable Trifle" Standard for Injury-in-Fact ....................................................... 20

    2.   The Second Circuit Has Rejected BNYM's Argument that Potential Mitigation from Collateral Sources Defeats Injury-in-Fact ..................................................................... 21

    3.   The Invasion of the OC Plaintiffs' Legally Protected Interest in the Trust Corpus and their Entitlement to Sound Fiduciary Practices in Governing their Plan Also Satisfy the Requirement of Individual Injury-in-Fact ............................................. 23

C.   The *Harley* Line of Cases Upon Which Defendants Rely is Irrelevant Because it Conflicts with Second Circuit Law; the *Harley* Rule Has Also Been Widely Criticized as Unworkable ...................... 25

    1.   *Harley* and its Progeny are Distinguishable and in Any Event Conflict with Second Circuit Law ................................ 25

    2.   *Harley* Has Been Widely Criticized as Wrong on the Law and for Creating an Unworkable Rule ................................... 26

D.   The OC Plaintiffs' Claim for Injunctive Relief is Not Moot ........................... 29

E.   Count III States a Claim under Fed. R. Civ. P. 12(b)(6) .................................. 31

IV.   CONCLUSION ........................................................................ 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agway, Inc., Emps.' 401(k) Thrift Inv. Plan v. Magnuson*,
    No. 03-cv-1060, 2006 WL 2934391 (N.D.N.Y. Oct. 12, 2006) ............................................ 33

*Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*,
    861 F.2d 1406 (9th Cir. 1988) ............................................................................................. 24

*Anderson News v. Am. Media*,
    680 F.3d 162 (2d Cir. 2012) ................................................................................................. 31

*Ass'n of Data Processing Serv. Orgs. v. Camp*,
    397 U.S. 150, 90 S.Ct. 827 (1970) ...................................................................................... 16

*In re Bear Stearns Sec., Derivative, and ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ................................................................................ 33

*Bendauod v. Hodgson*,
    578 F. Supp. 2d 257 (D. Mass. 2008) ................................................................................ 24

*Blair v. Comm'r of Internal Revenue*,
    300 U.S. 5, 57 S.Ct. 330 (1937) .......................................................................................... 18

*Braden v. Wal-Mart Stores*,
    588 F.3d 585 (8th Cir. 2009) ................................................................................................. 2

*Cent. States SE and SW Areas Health and Welfare Fund v. Merck-Medco*
    *Managed Care, L.L.C.*,
    433 F.3d 18 ......................................................................................................... 7, 10, 11

*Cent. States SE and SW Areas Health and Welfare Fund v. Merck-Medco*
    *Managed Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007) ...................................................................................... 7, 11, 13

*Chao v. Merino*,
    452 F.3d 174 (2d Cir. 2006) ....................................................................................... 21, 22

*Chater v. Carter*,
    238 U.S. 572, 35 S.Ct. 859 (1915) ..................................................................................... 18

*Chevron Corp. v. Donzinger*,
    No. 11-cv-0691 LAK, 2014 WL 1663119 (S.D.N.Y April 25, 2014) ............................ 28, 29

*Cigna Corp. v. Amara,*
    ___U.S.____, 131 S.Ct. 1866 (2011) ............................................................................... 7, 8

*Coan v. Kaufman,*
    457 F.3d 250 (2d Cir. 2006) ................................................................................. 6, 8, 17

*Comer v. Cisneros,*
    37 F.3d 775 (2d Cir. 1994) ............................................................................................ 30

*Constellation Energy v. FERC,*
    457 F.3d 14 (D.C. Cir. 2006) ........................................................................................ 21

*David v. Alphin,*
    704 F.3d 327 (4th Cir. 2013) .................................................................................. 25, 27

*DeRosa v. U.S. Dept. of Housing and Urban Development,*
    787 F.2d 840 (2d Cir. 1986) ......................................................................................... 20

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.,*
    191 F.3d 198 (2d Cir. 1999) ......................................................................................... 31

*Faber v. Metropolitan Life Ins.,*
    648 F.3d 98 ..................................................................................................................... 23

*Fin. Insts. Ret. Fund v. Office of Thrift Supervision,*
    964 F.2d 142 (2d Cir. 1992) ........................................................................ 6, 13, 14, 15

*Firefighters Local Union No. 1784 v. Stotts,*
    467 U.S. 561, 104 S.Ct. 2567 (1984) ........................................................................... 30

*Firestone Tire and Rubber v. Bruch,*
    489 U.S. 101, 109 S.Ct. 948 (1989) ............................................................................. 17

*Flanigan v. General Elec. Co.,*
    242 F.3d 78 (2d Cir. 2001) ........................................................................................... 15

*Freund v. Marshall & Ilsley Bank,*
    485 F. Supp. 629 (W.D. Wis. 1979) ............................................................................. 24

*Harley v. Minnesota Mining & Mfg. Co.,*
    284 F.3d 901 (8th Cir. 2002) ......................................................................... 2, 23, 25, 26

*Harley v. Zoesch,*
    413 F.3d 866 (8th Cir. 2005) ........................................................................................ 27

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363, 102 S.Ct. 1114 (1982) ............................................................................. 5

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432, 119 S.Ct. 755 (1999) ...........................................................................15

*in Chao v. Hall Holding Co.*,
  285 F.3d 415 (6th Cir. 2002) .....................................................................................24

*Kendall v. Emps. Ret. Plan of Avon Products*,
  561 F.3d 112 (2d Cir. 2009) ...................................................................................9, 15

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
  __U.S.__, 132 S. Ct. 2277 (2012) .............................................................................30

*L.I. Head Start Child Dev. Serv. v. Econ. Opp. Comm'n of Nassau Cty.*,
  710 F.3d 57 (2d Cir. 2013) .........................................................................1, 6, 9, 10

*LaScala v. Scrufari*,
  479 F.3d 213 (2d Cir. 2007) ............................................................................2, 3, 23, 24

*LeBlanc v. Cahill*,
  153 F.3d 134 (4th Cir. Va. 1998) ...............................................................................31

*Lockheed Corp. v. Spink*,
  517 U.S. 882, 116 S.Ct. 1783 (1996) .........................................................................23

*Los Angeles Cnty. v. Davis*,
  440 U.S. 625, 99 S.Ct. 1379 (1979) .....................................................................29, 30

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555, 112 S.Ct. 2130 (1002) ...........................................................................5

*Mass. Mut. Life Ins. Co. v. Russell*,
  473 U.S. 134, 105 S.Ct. 3085 (1985) ......................................................................6, 11

*In re Medco Health Solutions, Inc. Pharmacy Benefits Mgmt. Litig.*,
  No. 03-md-1508 CLB slip op. (S.D.N.Y. Aug. 11, 2006) .......................................11, 12, 26

*Merriam v. Demoulas*,
  No. 11-cv-10577, 2013 WL 2422789 (D. Mass. June 3, 2013)..............................................23

*Michoud v. Girod*,
  45 U.S. 503 (1846) .....................................................................................................19

*In re MTBE Products Liab. Litig.*,
  725 F.3d 65 (2d Cir. 2013) ........................................................................................20

*Natural Res. Defense Council v. U.S. Food and Drug Admin.*,
  710 F.3d 71 (2d Cir. 2013) ........................................................................................20

*Pressroom Unions Printers - League Income Security Fund v. Continental Assurance Co.*,
   700 F.2d 889 (2d Cir. 1983) ............................................................................. 8

*Quint v. Freda*,
   No. 98-civ-4285 DLC, 1999 WL 65045 (S.D.N.Y. Feb. 10, 1999) ....................................... 31

*Scanlan v. Eisenberg*,
   669 F.3d 838 (7th Cir. 2012) ................................................................... 17, 18, 24

*Sprint v. APCC Servs.*,
   554 U.S. 269, 128 S. Ct. 2531 (2008) ............................................................... 16

*In re State St. Bank & Trust Co. ERISA Litig.*,
   579 F. Supp. 2d 512 (S.D.N.Y. 2008) ........................................................... 22, 23

*Tullis v. UMB Bank*,
   640 F. Supp. 2d 974 (N.D. Ohio 2009) ............................................................. 33

*United States v. SCRAP*,
   412 U.S. 669, 93 S.Ct. 2405 (1973) ............................................................... 2, 20

*Vermont Agency of Natural Res. v. United States*,
   529 U.S. 765, 120 S.Ct. 1858 (2000) ............................................................... 16

*Warth v. Seldin*,
   422 U.S. 490, 95 S.Ct. 2197 (1975) ............................................................... 5, 23

*Wilmington Shipping Co. v. New England Life Ins. Co.*,
   496 F.3d 326 (4th Cir. 2007) ..................................................................... 19

## Statutes

29 U.S.C. § 1083 ............................................................................. 28

29 U.S.C. § 1104 ............................................................................. 24

29 U.S.C. § 1106 ..................................................................... 23, 24, 31

29 U.S.C. § 1106(a) .......................................................................... 32

29 U.S.C. § 1106(a)(1) ....................................................................... 33

29 U.S.C. § 1106(b) .......................................................................... 32

29 U.S.C. § 1132(a) ......................................................................... 2, 6

29 U.S.C. § 1132(a)(2) ....................................................................... 25

ERISA § 3(40), 29 U.S.C. § 1002(40) ..................................................................14

ERISA § 204(b)(i)(B), 29 U.S.C. § 1054(b)(i)(B)..............................................15

ERISA § 204(b)(1)(H)(i), 29 U.S.C. § 1054(b)(1)(H)(i) .....................................15

ERISA § 204(g), 29 U.S.C. § 1054(g) ................................................................15

ERISA § 204(h), 29 U.S.C. § 1054(h) ................................................................15

ERISA § 403(a), 29 U.S.C. § 1103(a)..................................................................18

ERISA § 404 .................................................................................................15, 24

ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1)..........................................................18

ERISA § 406(a)(1) ...............................................................................................33

ERISA §§ 406(a), (b) ..........................................................................................31

ERISA § 409, 29 U.S.C. § 1109 ...........................................................................6

ERISA § 409(a), 29 U.S.C. § 1109(a)...................................................................6

ERISA § 502(a) .....................................................................................................7

ERISA § 502(a)(2).............................................................................................6, 11

ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2)....................................................8, 16

ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)....................................................8, 31

Fair Housing Act § 804(d).....................................................................................5

Moving Ahead for Progress in the 21st Century Act ("Map-21")........................28

## Other Authorities

26 C.F.R. § 1.411(a)..............................................................................................15

29 C.F.R. § 1.411(b)..............................................................................................15

Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 885 (1983) ...........................5, 7

Black's Law Dictionary 1162 (7th ed. 1999)........................................................24

*Brief Amici Curiae of Trust Law and ERISA Law Professors In Support of Respondent*, *First Am. Fin. Corp. v. Edwards*, No. 10-708 (Oct. 18, 2011)...........20

*Brief for Defendants-Appellants, L.I. Head Start*, No. 12-2082-cv, 2012 WL 4202693 (2d Cir. Sept. 5, 2012)................................................................9

*Brief for Plaintiffs-Appellees, L.I. Head Start*, No. 12-2082-cv, 2012 WL 5462769 (2d Cir. Nov. 2, 2012) ..............................................................10

*Brief of Reporter and Advisers to Restatement (Third) of Restitution and Unjust Enrichment, As Amici Curiae In Support of Respondent, First Am. Fin. Corp. v. Edwards*, No. 10-708 (Oct. 18, 2011) ...............................................20

Fed. R. Civ. P. 12(b)(1) ............................................................................1, 30

Fed. R. Civ. P. 12(b)(6) ..................................................................................31

Fed. R. Civ. P. 23.1 .........................................................................................6

IRS, *MAP-21: New Funding Rules for Single-Employer Defined Benefit Plans*, http://www.irs.gov/Retirement-Plans/MAP-21-New-Funding-Rules-for-Single-Employer-Defined-Benefit-Plans (Interest rate relief provided by MAP-21 is reduced each year through 2016) .......................................28

Mark L. Ascher, *et al.*, *Scott and Ascher on Trusts* § 17.2 (5th ed. 2010)...................................19

Melanie B. Leslie, *In Defense of the No Further Inquiry Rule: A Response to Professor John Langbein*, 47 Wm. & Mary L. Rev. 541 (2005)...........................18

*Pension Benefit Guarantee Corporation amicus brief* in *David v. Alphin*, No. 11-2181 (4th Cir. Feb. 28, 2013) ..................................................26

*Reply Brief of Defendants-Appellants, L.I. Head Start*, No. 12-2082-cv, 2012 WL 6053206 (2d Cir. Nov. 29, 2012) ........................................10

*Restatement (Second) of Trusts* § 280 cmt. h (1959) .............................7, 8

*Restatement (Third) of Trusts* § 78 cmt. b (2007)...................................19

*U.S. Dept. of Labor amicus brief* in *David v. Alphin*, No. 11-2181 (4th Cir. Feb. 28, 2013)........................................................................26

## I.      INTRODUCTION

Defendants' ("BNYM") have moved under Fed. R. Civ. P. 12(b)(1) to dismiss all claims in Plaintiffs' Second Amended Complaint ("SAC") brought by three of the six named Plaintiffs ("the OC Plaintiffs"), who are participants in the Owens Corning Merged Retirement Plan ("OC Plan") for lack of standing and, with respect to injunctive relief, mootness.  They have also moved to dismiss *Count III* for failure to state a claim as to all Plaintiffs.

With respect to their standing argument, the first 23 pages of BNYM's brief are baseless. They rely upon a proposition rejected by the Second Circuit:  that to have constitutional standing participants in ERISA-governed defined benefit plans who sue on behalf of the plan, for injury to the plan, must demonstrate, in addition to harm to the plan, an individual economic injury to themselves.[1] On page 24, Defendants finally begin to grapple with the actual issue – a plaintiff's Article III standing when he sues for monetary relief on behalf of a plan rather than for himself. Defendants' argument fails because of what the Second Circuit, and other courts within the circuit, have unequivocally stated:

> We also reject the Administrators' argument that LIHS and the Class lack constitutional standing because they have not suffered an injury-in-fact. As discussed, LIHS and the Class have asserted their claims in a derivative capacity, to recover for injuries to the Plan caused by the Administrators' breach of their fiduciary duties. This is injury-in-fact sufficient for constitutional standing.

*L.I. Head Start Child Dev. Serv. v. Econ. Opp. Comm'n of Nassau Cty. ("L.I. Head Start")*, 710 F.3d 57, 67 n.5 (2d Cir. 2013) (citation omitted).  It is Plaintiffs' position that this case, without more, requires the denial of Defendants' Rule 12(b)(1) motion, Plaintiffs nevertheless present additional arguments in an abundance of caution.

---

[1] All citations to BNYM's brief, noted as "BNYM Br.", are to the unredacted version of Defendants' Memorandum in Support of the instant partial motion to dismiss, filed under seal (Dkt. 109). (Docket numbers herein refer to the docket in this case, rather than the combined MDL docket).

Assuming *arguendo* that, contrary to Second Circuit law, individual economic harm were required for standing in such circumstances, Defendants' argument is still fatally flawed. First, their argument that a $256,200 loss to Plaintiffs' underfunded plan is too small for standing purposes ignores the settled principle that an "identifiable trifle" is sufficient injury-in-fact for constitutional standing.[2]   Second, Defendants ignore Second Circuit law holding that standing is not defeated by collateral sources, such as the PBGC or the plan sponsor, that may mitigate an injury-in-fact. Third, Plaintiffs also have an injury-in-fact, independent of an economic loss, by virtue of BNYM's invasion of their protected statutory interest in a plan governed by ERISA fiduciary principles and prohibited transaction rules. Finally, Defendants' reliance upon a line of cases deriving from *Harley v. Minnesota Mining & Mfg. Co*., 284 F.3d 901 (8th Cir. 2002), is misplaced not only because these cases conflict with the Second Circuit law, but also because, unlike the underfunded Owens Corning Plan at issue here, they involved *overfunded* plans.

Finally, Defendants' mootness and failure to state a claim arguments fail for the reasons discussed below.

## II.    BACKGROUND

This is an ERISA civil enforcement action brought pursuant to 29 U.S.C. § 1132(a) to remedy BNYM's fiduciary breaches and prohibited transactions stemming from their FX trading scheme.  (SAC ¶3).[3]  "Congress intended that private individuals would play an important role in enforcing ERISA's fiduciary duties…." *Braden v. Wal-Mart Stores*, 588 F.3d 585, 598 (8th Cir. 2009).  "The fiduciary obligations of the trustees to the participants and beneficiaries of [an ERISA] plan are those of trustees of an express trust—the highest known to the law." *LaScala v.*

---

[2] *United States v. SCRAP*, 412 U.S. 669, 689 n.14, 93 S.Ct. 2405, 2417 n.14 (1973).
[3] "SAC" refers to the unredacted Second Amended Complaint (Dkt. 102).

*Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 (1982)).

The named Plaintiffs include three participants in the OC Plan, Carl Carver, Deborah Jean Kenny, and Edward C. Day.  (SAC ¶¶14-16). The OC Plan is a defined benefit plan, *i.e.* a traditional pension plan designed to pay a fixed amount of benefits in retirement. (SAC ¶¶82, 84). The remaining three Plaintiffs, whose standing BNYM does not contest, are participants in two defined contribution plans, the Eastman Kodak Employees' Savings and Investment Plan, and the Verizon Savings and Security Plan for Mid-Atlantic Associates.  *Id.*

Pursuant to ERISA, this suit is brought in a representative capacity by these Plaintiffs "on behalf of the ERISA employee benefit plans in which [they] are participants," and as a class action on behalf of participants, beneficiaries, and named fiduciaries of similarly situated ERISA plans. (SAC ¶¶ 1, 3, 84). It is brought to recover losses to these plans incurred through BNYM's FX trading scheme and to require disgorgement of profits earned through the scheme. *See* SAC Prayer for Relief (seeking "an order compelling Defendants to restore all losses caused to the Plans (or that will be caused to the Plans after the filing of this Complaint), including lost investment returns on money that would have been invested but for Defendants' illegal conduct").

Plaintiffs assert three claims on behalf of their plans seeking to recoup the losses they suffered through BNYM's FX trading scheme. *Count I* alleges BNYM's Standing Instruction FX ("SI FX") trading scheme breached its ERISA fiduciary duties to the Plans. C*ount II* alleges BNYM enriched itself at the expense of the Plans by engaging in self-dealing transactions, specifically prohibited by ERISA, in the course of executing SI FX transactions for the Plans. *Count III* alleges, in the alternative to *Count II*, that BNYM in its role as trustee engaged in

transactions specifically prohibited by ERISA by causing the Plans, principally through its SI FX trading scheme, to exchange property (plan assets) with a party-in-interest to the Plans, namely the FX trading arm of BNYM itself.

BNYM served as trustee and custodian of the OC Plan. (SAC ¶85). BNYM also provided custodial foreign exchange "standing instruction" trading services (referred to as "SI FX") to the OC Plan.  (SAC ¶86). For purposes of their motion, BNYM has admitted the accuracy of Plaintiffs' allegation that during the class period, BNYM executed 3706 SI FX transactions with OC Plan assets with a total volume of at least $42.7 million. (SAC ¶ 87); BNYM Br. at 18. BNYM has similarly admitted to a loss to the OC Plan from these transactions of $256,200. BNYM Br. at 18. Plaintiffs allege that the OC Plan's losses may be even higher. (SAC ¶ 88).

BNYM does not dispute, for purposes of this motion, the sufficiency of Plaintiffs' allegations that it was acting as an ERISA fiduciary for the named Plaintiffs' plans, including when it was engaged in SI FX. BNYM Br. at 32 n.31.

## III.    ARGUMENT

### A.    OC Plan Participants Have Article III Standing to Seek Relief on Behalf of the OC Plan for Injuries to the Plan, Regardless of Whether They Suffered an Individual Economic Injury

The Second Circuit has held that when ERISA plan participants bring suit on behalf of their ERISA plan, for losses to the plan, they have constitutional standing because an injury to the plan satisfies Article III's injury-in-fact requirement.  This follows from ERISA's remedial purpose and long established principles by which statutes create rights sufficient for constitutional standing.

### 1.    Statutes May Confer Constitutional Standing

It is well established that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing…."

~ 4 ~

*Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205 (1975) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3, 93 S.Ct. 1146, 1148 n.3 (1973)).[4] "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Lujan v. Defenders of Wildlife*, 504 U. S. 555, 580, 112 S.Ct. 2130, 2136 (1992) (Kennedy, J., concurring in part and concurring in judgment). In doing so, Congress must "identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit." *Id.* In other words, a statute identifying a wrong and designating a class of persons to seek relief for that wrong satisfies Article III's standing requirement. Justice Scalia has explained that the "existence [of Article III standing] in a given case is largely within the control of Congress" because a plaintiff's ability to establish a cognizable "injury" will "depend[] upon whether the legislature has given [him] *personally* a right to be free of [the challenged] action" or instead has left "enforcement" of the relevant prohibition "exclusively to public authorities." Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 885 (1983) (emphasis in original).

## 2. ERISA's Remedial Scheme Provides that Participants May Bring Actions on Behalf of their Plans to obtain Relief for their Plans

ERISA provides, in pertinent part, that a civil action may be brought:

(2) by the Secretary, or by a *participant*, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a *participant*, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to

---

[4] *See also Havens Realty Corp. v. Coleman,* 455 U.S. 363, 373-74, 102 S.Ct. 1114 (1982) (holding that a violation § 804(d) of the Fair Housing Act is itself an injury-in-fact, because someone "who has been the object of a misrepresentation made unlawful under § 804(d) has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions"); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578, 112 S.Ct. 2130, 2145 (1002) ("Nothing in this contradicts the principle that the injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing") (internal quotation marks and alterations omitted).

> obtain other appropriate equitable relief (i) to redress such violations or (ii) to
> enforce any provisions of this subchapter or the terms of the plan;

ERISA § 502(a), 29 U.S.C. § 1132(a) (emphasis added).

The "relief under section 1109" referred to in § 502(a)(2) is the right to sue on behalf of a plan "for *any losses to the plan* resulting from each such [fiduciary] breach, and to *restore to such plan* any profits of such fiduciary which have been made through *use of assets of the plan* by the fiduciary*.*" ERISA § 409, 29 U.S.C. § 1109 (emphasis added).[5] As the Supreme Court has held, "Congress did not intend [ERISA § 409] . . . to authorize any relief except for the plan itself." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 144, 105 S.Ct. 3085, 3091 (1985). Thus, any suit properly brought under ERISA § 502(a)(2) is brought in a representative capacity on behalf of the plan, regardless of whether the person suing has suffered an injury distinct from the injury to the plan itself.[6]

### 3.      ERISA's Remedial Scheme Confers Article III Standing

When Congress enacted ERISA's remedial scheme for breaches of fiduciary duty that cause losses to a Plan, it created specific rights and authorized specific categories of persons to enforce those rights. *Fin. Insts. Ret. Fund v. Office of Thrift Supervision*, 964 F.2d 142, 147 (2d

---

[5] ERISA § 409 provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

ERISA § 409(a), 29 U.S.C. § 1109(a).

[6] The Supreme Court refers to suits "brought in a representative capacity on behalf of the plan," *Russell*, 473 U.S. at 142 n.9, 105 S.Ct. at 3090 n.9, rather than "derivative suits" subject to Fed. R. Civ. P. 23.1. Likewise, the Second Circuit has held that ERISA participant suits under § 502(a)(2) are representational rather than derivative. *Coan v. Kaufman*, 457 F.3d 250, 258 (2d Cir. 2006) ("Because ERISA plans cannot bring suit against fiduciaries on the plans' own behalf under section 502, the lawsuits of individual participants are not derivative…"). In practice, however, the terms "representational" and "derivative" often are used interchangeably in this context. *E.g.*, *L.I. Head Start*, 710 F.3d at 65-67.

Cir. 1992) (Congress altered "[t]he prudential contours of the standing doctrine" when it passed

ERISA § 502(a), effectively "'grant[ing] an express right of action to persons who otherwise

would be barred by prudential standing rules . . .'") (quoting *Warth*, 422 U.S. at 501, 95 S.Ct. at

2206). More recently, the Supreme Court noted that "actual harm" caused by a breach of

fiduciary duty may come from "the loss of a right protected by ERISA or its trust-law

antecedents." *Cigna Corp. v. Amara*, ___U.S.____, 131 S.Ct. 1866, 1881 (2011). Justice Scalia

has long espoused the view that a plaintiff will "always" have standing when he is "the very

object of a law's requirement or prohibition." Scalia, *supra* at 894.

BNYM admits that a plan trustee (or other plan fiduciary) has Article III standing to

bring claims on behalf of a plan. BNYM Br. at 26 ("[t]rustees and other fiduciaries…have

representational standing under settled law"), 27. Indeed, in *Cent. States SE and SW Areas

Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C. ("Central States II")*, 504

F.3d 229, 235 (2d Cir. 2007), plan trustees brought suit on behalf of their respective plans, and

the trustees of the "Blumenthal Plan" had undisputed Article III standing to do so. The Second

Circuit recognized the standing of another trustee—Ms. Janazzo, on behalf of the "County Line

Plan"—because "her Plan has standing." *Id.* at 242. "Janazzo's Plan was involved in a

contractual relationship with [defendant] Medco so as to give her [Ms. Janazzo] standing." *Id.* at

243.[7]

A trustee suit is the paradigmatic example of a representative or derivative claim even

though a trustee has no personal interest in the trust corpus: the trustee seeks to recover on behalf

of another. *Restatement (Second) of Trusts* § 280 cmt. h (1959) ("The trustee can maintain such

---

[7] *See also Cent. States SE and SW Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.
("Central States I")*, 433 F.3d 181, 197 (2d Cir. 2005), (remanding for further factual development because trustee
Janazzo "could not demonstrate that *her Plan incurred the requisite injury-in-fact*….") (emphasis added).

actions at law or suits in equity or other proceedings against a third person as he could maintain if he held the trust property free of trust."). *Id.* cmt. h ("Whatever money or other property is recovered by the trustee in the action he holds subject to the trust."). Congress was aware of trustees' standing to sue at common law in enacting ERISA and Congress stated that courts should look to the common law of trusts in developing and applying ERISA's fiduciary provisions. *Coan v. Kaufman*, 457 F.3d 250, 260 (2d Cir. 2006). Trust beneficiaries could also sue at common law for harm to the trust. *See* Section III.A.6, *infra*. Under ERISA, therefore, a trustee and a participant have the same standing to assert claims on behalf of a Plan is the same. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) ("by the Secretary, or by a participant, beneficiary or fiduciary"), and ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) ("by a participant, beneficiary, or fiduciary").

**4.    The OC Plan Has Suffered an Injury-in-Fact**

For purposes of this motion, it is undisputed that the real party-in-interest — the OC Plan — suffered an injury-in-fact. *See* BNYM Br. at 18 (BNYM executed $42.7 million of standing instruction transactions with the OC Plan during the class period, which for purposes of this motion admittedly caused "a total loss to the Plan of $256,000"); *see also* SAC ¶¶ 87-89.

Plans do not have a right to sue in their own names to recover for breaches of fiduciary duty because ERISA limits the right to pursue such claims to "the Secretary [of Labor], or . . . a participant, beneficiary or fiduciary." ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). *Pressroom Unions Printers - League Income Security Fund v. Continental Assurance Co.*, 700 F.2d 889 (2d Cir. 1983); *see also Coan v. Kaufman* 457 F.3d 250, 258 (2d Cir. 2006) ("ERISA plans cannot bring suit against fiduciaries on the plans' own behalf under section 502 . . ."). Where an injury-in-fact exists, a remedy also must exist. *Amara*, ___U.S. ___, 131 S. Ct. at 1879 (relying on the trust law maxim that "[e]quity suffers not a right to be without a remedy" to hold that a violation

of ERISA must have a remedy). That the Defendants have *admitted* injury to the OC Plan for purposes of this motion establishes that the Plan suffered an injury-in-fact. Plaintiffs Carver, Kenny, and Day have express authority to assert a claim for these injuries on behalf of the Plan.

> **5.    The Second Circuit Holds that ERISA Plaintiffs Have Representational Article III Standing; Defendants' Arguments to the Contrary Misread the Cases**

BNYM argues that various Second Circuit cases support their no-standing argument.  All these arguments misread the cases or fail for other reasons, as discussed below.

> **a.    The Second Circuit Rejected BNYM's Argument in *L. I. Head Start* (2013)**

The Second Circuit expressly rejected BNYM's no standing argument in *L. I. Head Start,* 710 F.3d 57. In that case, L.I. Head Start ("LIHS"), an employer formerly contributing to a defined benefit plan, sued the plan's administrators. *Id.* at 63. A plan participant also sued as "representative of a class of LIHS employees who were plan participants." *Id.* at 61. The district court held that both the Class and LIHS (in its capacity as a former plan fiduciary) had standing to sue under ERISA. The Second Circuit affirmed, specifically stating that loss to the plan was sufficient injury-in-fact to satisfy Article III standing for the Class of participants:

> We also reject the Administrators' argument that LIHS and the Class lack constitutional standing because they have not suffered an injury-in-fact. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (constitutional standing requires injury-in-fact, causation, and redressability). As discussed, LIHS and the Class have asserted their claims in a derivative capacity, to recover for injuries to the Plan caused by the Administrators' breach of their fiduciary duties. *This is injury-in-fact sufficient for constitutional standing.*

*Id*. at 67 n.5 (emphasis added). This holding was not a throw-away line. The issue of Article III standing was briefed extensively. *See Brief for Defendants-Appellants, L.I. Head Start*, No. 12-2082-cv, 2012 WL 4202693, at *26-33 (2d Cir. Sept. 5, 2012) (relying primarily on *Central States I* and *Kendall v. Emps. Ret. Plan of Avon Products,* 561 F.3d 112 (2d Cir. 2009), as

BNYM does here); *Brief for Plaintiffs-Appellees*, *L.I. Head Start*, No. 12-2082-cv, 2012 WL 5462769, at *15-22 (2d Cir. Nov. 2, 2012); and *Reply Brief of Defendants-Appellants*, *L.I. Head Start*, No. 12-2082-cv, 2012 WL 6053206, at *3-14 (2d Cir. Nov. 29, 2012) (relying on *Harley* and its progeny, as BNYM does here).

BNYM argues that "[t]he court of appeals was not presented with and did not resolve any issue regarding the representational standing of plan *participants*. Rather, it addressed the very different situation in which one of the named plaintiffs was a 'fiduciary of the plan.'" BNYM Br. at 26 (emphasis by BNYM). This argument misstates the holding in *L.I. Head Start*. The Second Circuit explicitly affirmed the Article III standing of both "LIHS *and the Class*" in *L.I. Head Start*, 701 F.3d at 67 n.5 (emphasis added). The Court analyzed and affirmed the standing of plan participants, *id*. at 65-66, separately from the standing of LIHS, *id*. at 66-67. It found both LIHS and the plan participants in the Class had Article III standing. BNYM's attempt to distinguish *L.I. Head Start* ignores the plain language of the Court's opinion.

### b.   The Second Circuit Refused to Adopt BNYM's Argument in both *Central States I (2005)* and *II (2007)*

The Second Circuit also addressed Article III standing for plan participants in a line of cases involving The Central States Southeast and Southwest Areas Health and Welfare Fund ("Central States Plan"). BNYM incorrectly asserts that a 2005 decision, *Central States I*, 433 F.3d 181 (2d Cir. 2005) ("*Central States I*"), "[holds] that a plan beneficiary who seeks to assert a claim for monetary relief such as 'restitution or disgorgement' under ERISA must demonstrate not merely a loss to the plan, but also an 'individual loss' to the beneficiary." BNYM Br. at 14. But the *Central States I* Court neither addressed nor resolved this issue as the Second Circuit itself made clear in its subsequent decision in that case in 2007:

> In addition to arguing that they have incurred individualized injury, the plan participants and beneficiaries on remand and in this round of briefing urge that (1)

~ 10 ~

they have representational standing under the doctrine enunciated in *Vermont Agency of Natural Res. v. United States*, 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000), and (2) they have standing to assert the vindication of the intangible right to the honest services of fiduciaries guaranteed to them by ERISA. *Because these theories were not argued to us in an intelligible fashion prior to our original [2005] decision, that decision should not be read as rejecting them.* Because addressing these difficult issues is not necessary to our resolution of the standing issue in this case, we express no opinion on them. Instead, we leave their resolution to a future panel.

*Central States II,* 504 F.3d at 243 n.3 (emphasis added).[8]

In *Central States I*, representational ERISA standing for purposes of Article III was "not argued to [the Second Circuit] in an intelligible fashion," so the Second Circuit did not rule on that legal theory. Instead, the Court remanded with instructions to consider and rule on Article III standing. *Central States I*, 433 F.3d at 203. Upon remand, District Court Judge Brieant considered exhaustive briefing on Article III standing and additional factual submissions. Four plan participants asserted standing to seek relief on behalf of their ERISA plan. *In re Medco Health Solutions, Inc. Pharmacy Benefits Mgmt. Litig. ("Central States 1.5")*, No. 03-md-1508 CLB, slip op. at 3 n.3 (S.D.N.Y. Aug. 11, 2006), (Copley Decl., Ex. 1). Two participants demonstrated a direct personal impact based on purchase of a more expensive drug or a different generic drug. *Id.* at 16-18. The other two participants did not show any personal impact, but the district court held that they had "representational standing under the ERISA statute, which also satisfies Article III standing in the factual context of this case." *Id.* at 18.

Initially, Judge Brieant looked to Supreme Court precedent:

The Court in [*Mass. Mut.l Life Ins. Co. v.*] *Russell* [473 U.S. 134 (1985)] also assumed Article III standing when it held that '[t]here can be no disagreement with the Court of Appeals' conclusion that § 502(a)(2) authorizes a beneficiary to bring an action against a fiduciary who has violated § 409 and that any restoration

---

[8] Indeed, BNYM admits that its version of the *Central States I* holding is inaccurate when it states that participants' representational standing is "an open question under Second Circuit law." BNYM Br. at 24. Even this statement, however, is wrong because the Second Circuit resolved the issue in 2013 in *L.I. Head Start*.

> of profits inures to the plan . . . . While not expressly mentioned in the opinion, we may not lightly conclude that all nine Justices overlooked the hot issue of Constitutional standing.

*Id*. at 19. He also considered the power of Congress to create legal rights, the invasion of which creates standing, and the abundant precedent for recognition of derivative claims regardless of personal harm or lack thereof:

> Congress also authorized Plan beneficiaries to sue derivatively in the right of their Plans for all relief permitted by the statute, including disgorgement. *See* 29 U.S.C. § 1132(a). Notwithstanding the requirement of injury to establish constitutional standing, there is a long unquestioned history of practice in the federal district courts where a Plaintiff may sue derivatively in the right of another who was in fact injured. A voluntary organization has standing to sue in the right of its members whose rights have been adversely affected by governmental action or inaction. *Sierra Club v. Morton*, 405 U.S. 727 (1972); *Andrus v. Sierra Club*, 442 U.S. 347, 353 (1979); *Schweiker v. Gray Panthers*, 453 U.S. 34, 40 (1981). An ordinary citizen sues in the name of the United States as a *qui tam* relator for injury to the United States. *See Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 787 (2000) ("We hold that a private individual has standing to bring suit in federal court on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-3733"). Shareholders of a corporation sue defalcating officers and directors derivatively in the right of the injured corporation. Persons having remote or contingent interests in a trust sue trustees derivatively for injury to the trust *res*. A guardian sues in the right of his ward and the parent or foster parent in the right of his child. *Smith v. Organization of Foster Families*, 431 U.S. 816, 840-42 (1977). This is a result of a juridical relationship which gives standing without any requirement of the derivative plaintiff to show actual personal harm. Just as the common law and equity grant standing to the parent, the guardian and the *cestuis qui trustent*, the statute in this case grants standing to the plan beneficiary to sue for disgorgement by wrongdoers to the Plan, and to the extent that the Eight Circuit's decision in *Harley* is read to hold by implication such provision in the statute to be unconstitutional or void, it is respectfully submitted that *Harley* is wrong, inapplicable or distinguishable on its facts.

*Id*. at 20-21.

Based on this careful analysis, the district court held: "It is also the view of this Court under *Russell* and the ERISA statute, that all of the individual plaintiffs have representational standing in the right of their plains [sic], which have Article III standing. *See Central States*, *supra* at 203." *Id*. at 22 (referring to *Central States I*).

~ 12 ~

The case returned to the Second Circuit, which noted that only one class representative was needed to establish standing. *Central States II*, 504 F.3d at 241. Because the Second Circuit affirmed the district court's ruling that one plaintiff had standing, it did not address the standing of the others. *Id.* at 243. Thus, although Judge Brieant found that participants had representational standing sufficient to satisfy Article III in the district court, the Second Circuit again, "express[ed] no opinion on" the question of a participant's representational standing to pursue a claim on behalf of an ERISA plan, although it emphasized that its rulings "should not be read as rejecting them." *Id.* at 243 n.3.

Contrary to BNYM's argument, *Central States I* and *II* do not hold or even suggest the Second Circuit's creation of an "individual loss" requirement to assert a representative or derivative claim for injury to a Plan under ERISA. Indeed, the only judicial analysis of the issue—*Central States 1.5*, undisturbed by *Central States II*—resoundingly rejects the restrictive view espoused by BNYM in this action.

> **c.    The Second Circuit Has Rejected BNYM's Argument that ERISA Plan Participants Lack Standing to Seek Relief on Behalf of an *Overfunded* Plan**

BNYM's argument is predicated on the unestablished assertion that the OC Plan is a well-funded, defined benefit plan and there is no immediate threat that the OC Plan will fail to pay future benefits. BNYM Br. at 10. Even if this were established, it does not mean, however, as BNYM argues, that participants lack standing to sue faithless fiduciaries on behalf of the Plan for losses suffered by the Plan. The Second Circuit long ago considered and rejected BNYM's argument.

*Fin. Insts. Ret. Fund v. Office of Thrift Supervision* ("*FIRF*"), 964 F.2d 142, 147 (2d Cir. 1992), which BNYM ignores, involved a group of twelve Federal Home Loan Banks ("Banks")

who created a multiple-employer pension plan—a defined benefit plan similar to the OC Plan.[9] The plan received the Banks' contributions and held them in a trust (called the Financial Institutions Retirement Fund (the "FIRF Fund") for the benefit of the plan's participants and beneficiaries. Upon retirement, qualified participants (or beneficiaries) were entitled to receive predetermined pension payments from the FIRF Fund. *Id.* at 144. The Savings & Loan Crisis of the 1980's led Congress to overhaul regulation of the industry. Among other changes, Congress stripped the Banks of their supervisory and examination functions, vested those functions in the Office of Thrift Supervision ("OTS"), and mandated that some 2,500 of the Bank's employees involved in regulatory activities be transferred to OTS.  The transfer made them federal employees. The OTS then became responsible for making ongoing retirement contributions to the Fund on for the benefit of the transferred employees. *Id.* At the time of transition, the Fund had a $21 million surplus. The Banks argued they were entitled to the surplus rather than the FIRF Fund or the OTS. *Id*. at 146.

The issue on appeal was whether the FIRF Fund's participants had standing to counterclaim against the Banks for breach of fiduciary duty for improperly claiming the surplus) *Id*. The district court ruled that the participants lacked standing because "injuries cognizable under ERISA must entail at least some risk to plan assets," and there was no imminent risk to an over-funded plan. *Id*. (paraphrasing the district court's holding). The participants appealed. The Second Circuit specifically rejected this limited view of ERISA participant standing: "We think the statute casts a wider net." *Id*. at 147.

ERISA's remedial scheme "essentially empowers beneficiaries to bring a civil action to redress *any* violation of the statute's fiduciary requirements." *Id.* at 148 (original emphasis). In

---

[9] Defined at ERISA § 3(40), 29 U.S.C. § 1002(40).

*FIRF*, the plan participants had standing to sue because they alleged violation of fiduciary duty and conflict of interest regarding the Plan's surplus, whether or not those breaches of duty had any effect on the payment of future plan benefits.[10] *Id.* at 149 ("These facts . . . sufficiently allege violations of ERISA section 404 to establish that the plan participants have been injured within the meaning of the statute and therefore also within the meaning of Article III."). Just as the plan participants in *FIRF* had standing to assert injury to their *overfunded* plan and satisfied the injury-in-fact requirement, the OC Plan participants now before the Court have standing to assert injury to their *underfunded* plan. In any event, it is irrelevant whether loss occasioned by the breach of fiduciary duty is likely to affect the payment of future plan benefits.

### d.  Other Second Circuit Precedents

BNYM asserts that *Kendall*, 561 F.3d 112, stands for the proposition that a plan beneficiary "must demonstrate not merely a loss to the plan, but an 'individual loss' to the beneficiary." BNYM Br. at 14 (string cite including *Kendall*). *Kendall* does not stand for that proposition, however, because *in Kendall* there was no alleged loss to the Plan and the claims were not brought in a representative capacity. The *Kendall* plaintiff argued that the Plan failed to comply with several ERISA requirements,[11] and asked that the plan be reformed to correct these alleged violations. *Kendall*, 561 F.3d at 114. Under the reformed plan, the plaintiff argued that the plan would be required to pay more benefits to participants. *Id.* at 116. Because she sought

---

[10] *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 441, 119 S.Ct. 755, 762 (1999), and *Flanigan v. General Elec. Co.*, 242 F.3d 78 (2d Cir. 2001), are not to the contrary. In both cases, plaintiffs did not have a legitimate claim to the plan surplus, but that did not vitiate their standing to assert claims. Moreover, Plaintiffs here are suing to recover a loss to the Plan, not to claim a surplus.

[11] The alleged violations concerned ERISA § 204(b)(i)(B), 29 U.S.C. § 1054(b)(i)(B) (the rule of 85); 29 C.F.R. § 1.411(b)-1(b)(2)(ii)(F) (offset affecting base for benefit computation); ERISA § 204(b)(1)(H)(i), 29 U.S.C. § 1054(b)(1)(H)(i) (age trigger affecting accrued benefits); 26 C.F.R. § 1.411(a)-7(c)(5) (method of annualizing partial payment); ERISA § 204(g), 29 U.S.C. § 1054(g) (incorrect effective date); and ERISA § 204(h), 29 U.S.C. § 1054(h) (failure to provide proper notice prior to effective date).

relief in her personal capacity as a participant, not in a representative capacity on behalf of the plan under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), *Kendall* does not involve the representational standing issues addressed in *L.I. Head Start*, *Central States*, and *FIRF*, discussed above.

### 6.   The Law of Trusts, Which Informs ERISA, Confirms That Trust Beneficiaries Have, and Historically Had, Standing to Sue When a Trust Corpus Suffers a Loss Without a Showing of Individual Financial Loss

The Supreme Court has "often said that history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Sprint v. APCC Servs.*, 554 U.S. 269, 274, 128 S. Ct. 2531, 2535 (2008). In *Sprint*, the Court looked to the long history of assignees bringing suit and held that an assignee has standing to pursue the assignor's claims for money owed. Similarly, in *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 120 S.Ct. 1858 (2000), the Court examined the history of *qui tam* actions to determine whether a relator had standing. *Id.* at 774 ("That history is particularly relevant to the constitutional standing inquiry since, as we have said elsewhere, Article III's restriction of the judicial power to 'Cases' and 'Controversies' is properly understood to mean 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.'") (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 1016 (1998)).[12]

BNYM contends that history does not support representational standing for ERISA plan participants.  BNYM Br. at 25.  However, BNYM ignores the strong connection between ERISA and the law of trusts.  ERISA "abounds with the language and terminology of trust law. ERISA's legislative history confirms that the Act's fiduciary responsibility provisions codify and make

---

[12] *See also Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 151-52, 90 S.Ct. 827, 829 (1970) ("[I]n terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution") (quoting *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953 (1968)).

applicable to ERISA fiduciaries certain principles developed in the evolution of the law of trusts." *Firestone Tire and Rubber v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 954 (1989) (internal quotation marks, citations, and alterations omitted).  Hence, "the common law of trusts…'offers a starting point for analysis of ERISA unless it is inconsistent with the language of the statute, its structure, or its purposes.'"  *Coan,* 457 F.3d at 260 (quoting *Harris Trust and Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238, 250, 120 S.Ct. 2180, 2189 (2000)).

A recent case applied the law of trusts in a situation analogous to that of the instant case, and analyzed relevant historical precedents.  *Scanlan v. Eisenberg*, 669 F.3d 838 (7th Cir. 2012). *Scanlan* involved a suit brought by the beneficiary of a discretionary trust alleging the trustee's breach of the fiduciary duties of loyalty and prudence in making an imprudent investment which resulted in a loss of millions of dollars to the trust.  It was undisputed, however, that the remaining assets in the trust, consisting of over $800 million, were easily sufficient to pay the beneficiary what she was entitled to receive from the trust.  As a result, the district court raised the issue of Article III standing and dismissed the case *sua sponte*, concluding that the beneficiary lacked injury-in-fact because she failed to allege "facts showing a likelihood that the corpus of the trusts would ever be insufficient to pay all of her discretionary distributions to which [she] might become entitled during her lifetime." *Id.* at 841.

The Seventh Circuit reversed. After performing a careful and exhaustive analysis of trust law, the Court found that "beneficiaries—including discretionary beneficiaries—have 'long been permitted to bring' suits to redress a trustee's breach of trust*." Id.* at 845 (quoting *Sprint,* 554 U.S. at 275, 128 S.Ct. 2536, 2541).  More specifically, the Court found the beneficiary satisfied the injury-in-fact requirement because she had (and beneficiaries historically had) the requisite stake in her suit, *i.e.* preservation of a "legally protected [equitable] interest in [the] Trusts'

corpus and in the proper administration of that corpus." *Id.* at 846. The Court also noted that requiring more would allow a trustee to breach its fiduciary duty to a trust with impunity:

> [T]he requirement that a beneficiary of a discretionary trust must plead facts indicating that the diminution in the trust assets had, or will ever have, a probable adverse impact on discretionary distributions is too demanding…. [U]nder that reasoning, a trustee could mismanage a trust with impunity, substantially reducing the assets over time, so long as there were enough assets left in the corpus to fund a future distribution.

*Id.* at 847.

The application of *Scanlan* and its historical trust law precedent in the ERISA context is straightforward. The trust law roots of ERISA are revealed throughout the statute, including in the fundamental principle that assets of an ERISA plan are held in a trust by one or more trustees as fiduciaries,[13] and that a fiduciary shall discharge his duties with respect to a plan solely in the interest of participants and beneficiaries.[14] One reason ERISA mandates the trust arrangement for pension plans is to ensure that participants and beneficiaries can enforce the duties owed to them and the plan by fiduciaries. *See* Melanie B. Leslie, *In Defense of the No Further Inquiry Rule: A Response to Professor John Langbein*, 47 Wm. & Mary L. Rev. 541, 559 (2005). In a trust arrangement, legal title to the trust property is vested in the fiduciaries, but equitable title is vested in the participants and beneficiaries. *Chater v. Carter*, 238 U.S. 572, 583-84, 35 S.Ct. 859, 863 (1915). Indeed, a beneficiary's equitable interest in trust property is well-established. *Blair v. Comm'r of Internal Revenue*, 300 U.S. 5, 13, 57 S.Ct. 330, 333 (1937) ("The will creating the trust entitled the petitioner during his life to the net income of the property held in trust. He thus became the owner of an equitable interest in the corpus of the property"). As a result of this equitable interest in the plan's corpus, an ERISA plan participant has standing to

---

[13] ERISA § 403(a), 29 U.S.C. § 1103(a).
[14] ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

sue to remedy her injury for a breach of fiduciary duty (based on her individual equitable interest) at the same time that she seeks to remedy the loss to the plan as a whole. *See, e.g., Wilmington Shipping Co. v. New England Life Ins. Co.*, 496 F.3d 326, 335 (4th Cir. 2007) (plaintiff's "injury is no less concrete because the benefit to him . . . would derive from the restored financial health of the Plan").

Furthermore, for centuries, under the "no-further-inquiry" rule, trust law has recognized that a beneficiary has standing to sue its trustee for self-dealing or a breach of loyalty even if that beneficiary does not allege that the breach has caused any tangible harm to either the trust or its beneficiaries. Mark L. Ascher, *et al.*, *Scott and Ascher on Trusts* § 17.2 (5th ed. 2010) ("[A] trustee who has violated the duty of loyalty is liable without further inquiry into whether the breach has resulted in any actual benefit to the trustee . . . [or] whether the breach has caused any actual harm to either the trust or its beneficiaries"). Under this rule, all a beneficiary needs to establish is that the trustee engaged in self-dealing or acted under a conflict of interest–nothing more is necessary for liability to attach. *See Restatement (Third) of Trusts* § 78 cmt. b (2007) (stating that under the no-further-inquiry rule "it is immaterial that the trustee may be able to show that the action in question was taken in good faith, that the terms of the transaction were fair, and that no profit resulted to the trustee"). Similarly, over 150 years ago the Supreme Court recognized that when a trustee sells a part of the trust corpus and "becomes himself interested in the purchase," a trust beneficiary had a cause of action on the theory that a transaction was void, without "any further inquiry" into the nature of the sale or the fairness of the price. *Michoud v. Girod*, 45 U.S. 503, 553, 557 (1846). Legal scholars agree that these principles of law and equity

support the right of ERISA participants and beneficiaries to seek relief on behalf of their plans regardless of personal economic harm.[15]

## B.      The OC Plaintiffs Have Suffered an Individual Injury-in-Fact

As noted above, in the Second Circuit an ERISA plaintiff bringing suit on behalf of his plan for harm to the plan need not demonstrate an individual injury-in-fact to establish Article III standing.  Nevertheless, the OC Plaintiffs meet the individual injury-in fact requirement BNYM asserts here on two independent grounds:  the increased risk of non-payment of benefits resulting from BNYM's breaches, and invasion of their legally protected interests by BNYM's fiduciary breaches.

### 1.      The Increased Risk of Non-Payment of Benefits from the Underfunded OC Plan Easily Meets the "Identifiable Trifle" Standard for Injury-in-Fact

In this Circuit it is settled that "the injury-in-fact necessary for standing need not be large; an identifiable trifle will suffice." *In re MTBE Products Liab. Litig.*, 725 F.3d 65 (2d Cir. 2013) (quoting *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002)); *see also United States v. SCRAP*, 412 U.S. 669, 689 n.14, 93 S.Ct. 2405, 2417 n.14 (1973) ("[A]n identifiable trifle is enough for standing"). "Even a small financial loss is an injury for purposes of Article III standing." *Natural Res. Defense Council v. U.S. Food and Drug Admin.*, 710 F.3d 71 (2d Cir. 2013).  Furthermore, injury-in-fact sufficient for standing may be found if the plaintiff incurs a risk of possible future financial harm.  *See, e.g.*, *DeRosa v. U.S. Dept. of Housing and Urban Development*, 787 F.2d 840, 842 n. 2 (2d Cir. 1986) (low income city residents satisfied Article III injury-in-fact requirement to sue regarding public-private hotel construction project where

---

[15] *See Brief of Reporter and Advisers to Restatement (Third) of Restitution and Unjust Enrichment, As Amici Curiae In Support of Respondent, First Am. Fin. Corp. v. Edwards*, No. 10-708 (Oct. 18, 2011) (Copley Decl., Ex. 2); *Brief Amici Curiae of Trust Law and ERISA Law Professors In Support of Respondent, First Am. Fin. Corp. v. Edwards*, No. 10-708 (U.S. Oct. 18, 2011) (Copley Decl., Ex. 3). The *Edwards* writ of certiorari was dismissed as improvidently granted. *Edwards*, ___U.S.___, 132 S.Ct. 2536 (2012).

city used as collateral for loan for the project federal funds that would otherwise be intended for housing rehabilitation, thus placing the availability of those funds for rehabilitation at risk); *Constellation Energy v. FERC*, 457 F.3d 14, 20 (D.C. Cir. 2006) ("the increased risk of non-recovery inherent in the reduction of collateral securing a debt of uncertain amount is sufficient to support its [Article III] standing").

In accordance with these principles, the Defendants' admitted $256,200 loss to the OC Plaintiffs' underfunded plan, and the attendant and increased risk that Plaintiffs may not receive some or all of their pension benefits is sufficient injury-in-fact for standing. BNYM's complaints that both the amount and the risk are small ignore the law of standing.[16]

### 2. The Second Circuit Has Rejected BNYM's Argument that Potential Mitigation from Collateral Sources Defeats Injury-in-Fact

BNYM labors to explain that any losses suffered by the OC Plan are harmless because Owens Corning will likely contribute additional money to the Plan, Owens Corning is liable to cover any future shortfalls, a Bankruptcy Court would favor the Plan in the event of bankruptcy, and the Pension Benefit Guaranty Corporation ("PBGC") is available as an insurer of last resort. BNYM Br. at 2, 16-24. BNYM, however, ignores the fact that the Second Circuit has already considered and rejected the argument that collateral sources of recovery (here, the plan's sponsor and/or the PBGC) eliminate injury-in-fact when an ERISA defined benefit plan suffers damages resulting from breach of fiduciary duty.

In *Chao v. Merino*, 452 F.3d 174 (2d Cir. 2006), a fiduciary caused an ERISA defined benefit plan to lose approximately $200,000, but argued that her breach caused the plan no *real* losses because the claims of all plan beneficiaries were paid thanks to voluntary additional

---

[16] While the loss to the OC Plan is Defendants' $256,200 loss estimate and returns, the total amount at issue on the OC Plaintiffs' claim includes the possibility of pre-judgment interest and disgorgement of any profits earned.

contributions by employers, and thanks to a cash infusion from another plan with which it later

merged. The Second Circuit noted: "We have several difficulties with this argument." *Id*. at 184.

First, the Court rejected the idea that collateral sources of recovery eliminated the fact of injury

or absolved the wrongdoer of liability:

> As the district court reasoned, [the fiduciary] "should not be permitted to escape
> liability because [her] victims may have made double contributions to make up
> for some of the losses [she] caused…. The underlying purposes of ERISA would
> not be furthered by awarding an errant fiduciary credit for [double] contributions
> made by an employer or others concerned about continuing health care coverage
> for employees."

*Id*. at 184-85 (quoting district court opinion).

Next, the Second Circuit rejected the fiduciary's argument that there was no injury-in-

fact because "all claimants were paid" by the plan. It was immaterial whether plan *participants*

and *beneficiaries* received benefits because ERISA focuses on "losses *to the plan*." *Id*. at 185

(emphasis by the Court). The statute renders incidental any losses that might be suffered by

participants and beneficiaries:

> Although the ultimate goal of ERISA § 409(a) is "the restoration of the trust
> beneficiaries to the position they would have occupied but for the breach of trust,"
> *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir.1985) ("*Bierwirth II*"), the
> express language of that section makes the breaching fiduciary liable not directly
> for losses to beneficiaries, but for "losses *to the plan*," 29 U.S.C. § 1109(a).

*Id.* (emphasis added).

The Second's Circuit's holding in *Merino* is consistent with other notable authorities

applying the "collateral source rule" to injuries suffered by ERISA plans. *See In re State St. Bank*

*& Trust Co. ERISA Litig*., 579 F. Supp. 2d 512, 517-18 (S.D.N.Y. 2008) (applying the collateral

source rule, "which permits a plaintiff to recover damages from a tortfeasor though the plaintiff

has already received compensation for its injuries from a third-party" in an ERISA defined

benefit case because, in part, "the collateral source rule here is also consistent with 'ERISA's

essentially remedial purpose of protecting beneficiaries of pension plans.'") (quoting in part *Salovaara v. Eckert*, 222 F.3d 19, 31 (2d Cir. 2000));[17] *Merriam v. Demoulas*, No. 11-cv-10577, 2013 WL 2422789 (D. Mass. June 3, 2013) (following *State Street Bank and Trust Co. ERISA Litig.*, 579 F. Supp. 2d 512 (S.D.N.Y. 2008).

### 3. The Invasion of the OC Plaintiffs' Legally Protected Interest in the Trust Corpus and their Entitlement to Sound Fiduciary Practices in Governing their Plan Also Satisfy the Requirement of Individual Injury-in-Fact

It is well established that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing...." *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206 (quoting *Linda R.S.*, 410 U.S. at 617 n.3, 93 S.Ct. at 1148 n.3). The OC Plaintiffs satisfy Article III's injury-in-fact requirement on an individual basis for this reason as well.

First, with respect to Counts II and III, Plaintiffs have alleged violations of ERISA's prohibited transaction provisions, 29 U.S.C. § 1106. It is well settled that these are *per se* violations. *Lockheed Corp. v. Spink*, 517 U.S. 882, 888, 116 S.Ct. 1783, 1788 (1996) (purpose of §1106 is to "categorically bar" transactions "likely" to injure the plan). Accordingly, injury to the plan (let alone to an individual participant) is not even an element of a cause of action of these provisions. *See, e.g., Faber v. Metropolitan Life Ins.*, 648 F.3d 98, 107 n. 4 ("the district court erred in suggesting that [Plaintiffs' § 1106 claim] required an allegation of injury to the Plans.... [I]njury to the plan is not an element of a prohibited transaction claim under § 1106(b)(1)..."); *LaScala*, 479 F.3d at 221-222 (district court erred in dismissing §1106 claim

---

[17] The *State Street* court distinguished *Harley v. Minnesota Mining & Mfg. Co.*, 284 F.3d 901 (8th Cir. 2002), as a case in which the employer was the defendant fiduciary and *the defendant employer* made voluntary contributions to the plan. *State Street*, 579 F. Supp. at 518 n.2. Here, as in *State Street*, the collateral source rule applies because contributions to an ERISA plan by the sponsoring employer (*i.e.*, Owens Corning) do not eliminate the injury caused by a third party fiduciary (*i.e.*, BNYM).

simply because there was no loss to the plan; defendants violated ERISA if they engaged in a prohibited transaction regardless of whether there was a loss).[18]

Second, with respect to Count I, in which Plaintiffs allege a breach of the fiduciary duties spelled out in ERISA § 404, 29 U.S.C. § 1104, the OC Plaintiffs have also suffered an injury-in-fact through the alleged violation of those duties irrespective of any loss to themselves or the plan. *See LaScala*, 479 F.3d at 221 ("The fact that the [ERISA pension funds] may not have suffered any loss as a result of [the plan manager's self-dealing] may bear on the question of damages, but has no bearing on whether [he] breached his fiduciary duties in the first place"– accordingly "the district court erred as a matter of law in holding that [the defendant fiduciary] did not breach his [ERISA] fiduciary duties"); *Bendauod v. Hodgson*, 578 F. Supp. 2d 257, 264 (D. Mass. 2008) ("ERISA creates an actionable statutory entitlement to prudent, loyal management of funds in each participant"); *see also Scanlan*, 669 F.3d at 846 (in trust law context, court held that plaintiff had "legally protected interest…in the proper administration of [the trust]," the invasion of which is alone sufficient injury-in-fact for Article III standing purposes).

---

[18] The legislative history of ERISA also makes clear that injury is not an element of such violations. Early draft versions of ERISA contained language requiring a showing of harm to establish such violations. *Freund v. Marshall & Ilsley Bank*, 485 F. Supp. 629, 637 (W.D. Wis. 1979). But Congress eliminated that language requiring a showing of harm in what became 29 U.S.C. § 1106 when ERISA was enacted in 1974, and as such the "Congressional intent is clear that, absent a statutory or administrative exemption, plan fiduciaries were forbidden to cause a plan to engage in such a transaction regardless of whether any harm actually resulted from such transaction." *Id.* Such a *per se* violation is a violation "of, in, or by itself; standing alone, without reference to additional facts." Black's Law Dictionary 1162 (7th ed. 1999), *quoted in Chao v. Hall Holding Co.*, 285 F.3d 415, 442 n.12 (6th Cir. 2002). *See Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1407 (9th Cir. 1988) (where ERISA fiduciary profited from self-dealing with plan assets, only means to deny fiduciary his ill-gotten profits was to distribute the ill-gotten profits to Plan participants and beneficiaries "even after they received their actuarially vested plan benefits").

**C.** **The *Harley* Line of Cases Upon Which Defendants Rely is Irrelevant Because it Conflicts with Second Circuit Law; the *Harley* Rule Has Also Been Widely Criticized as Unworkable**

      **1.** ***Harley* and its Progeny are Distinguishable and in Any Event Conflict with Second Circuit Law**

BNYM relies heavily upon *Harley v. Minnesota Mining & Mfg. Co.*, 284 F.3d 901 (8th Cir. 2002), and *David v. Alphin*, 704 F.3d 327 (4th Cir. 2013), which followed *Harley*.  These are the only Courts of Appeals that have held, in the defined benefit plan context, that ERISA participants must demonstrate individual harm when bringing suit on behalf of the plan, to remedy harm to the plan.

BNYM ignores the fact that both these cases are clearly distinguishable.  Unlike the instant case, both cases involved *overfunded* defined benefit plans.  *See Harley*, 284 F.3d at 907 ("Here, the ongoing Plan had a substantial surplus before and after the alleged breach"); *David*, 704 F.3d at 330 (the "parties agree that the Pension Plan was overfunded" when the action was filed).  Furthermore, both courts examined and answered the question of whether participants had standing to bring suit where the Plan was *overfunded*.  *See Harley*, 284 F.3d at 908 ("absence of adequate surplus is an element of plaintiffs' standing under § 1132(a)(2)—proof they are suing to redress a loss to the Plan that is an actual injury *to themselves*"); *David*, 704 F.3d at 333 ("The core question here is whether participants have suffered an injury that supports Article III standing…where the plan is overfunded").  Neither court considered standing in the context of either an adequately funded plan or an *underfunded* plan.  Here, BNYM concedes that the OC Plan was *underfunded* when the suit was filed.[19]  This is an obvious and significant difference between the instant case and both *Harley* and *David*.  Indeed, if a plan's funding level

---

[19] *See*, *infra*, note 22.

were relevant to participant standing, then the OC Plan's underfunding should support Article III standing; otherwise, what would be the point of discussing funding levels at all?

Furthermore, both *Harley* and *David* conflict with Second Circuit Law, under which participants need not demonstrate individual economic harm to bring suit on behalf of their plan for a plan loss. Moreover, both cases accept the notion that collateral sources mitigating harm may eliminate injury-in-fact that might otherwise provide the basis for standing. As discussed above, the Second Circuit rejects that approach.

### 2. *Harley* Has Been Widely Criticized as Wrong on the Law and for Creating an Unworkable Rule

*Harley* was a 2-1 decision over a vigorous dissent by Circuit Judge Bye. Judge Bye would have held, as the Second Circuit has held, that plaintiffs "satisfy the case-or-controversy requirements of Article III by standing in the shoes of a party that clearly has standing—the Plan itself." *Harley*, 284 F.2d at 910 (Bye, Circuit Judge, dissenting). The criticism did not end there. Both the U.S. Department of Labor—the agency with governmental responsibility for enforcing ERISA fiduciary standards—and the Pension Benefit Guaranty Corporation—which insures the benefits of terminated defined benefit plans that cannot pay certain promised benefits—filed amicus briefs in *David v. Alphin* making clear their opposition to the *Harley* rule and belief that it was wrong on the law. *U.S. Dept. of Labor* and *Pension Benefit Guarantee Corporation amicus briefs* in *David v. Alphin*, No. 11-2181 (4th Cir. Feb. 28, 2013) (Copley Decl., Exs. 4 & 5). And *Harley* has been criticized within this Circuit. *See Central States 1.5*, slip op. at 20-21 (Copley Decl., Ex.1) ("[I]t is respectfully submitted that *Harley* is wrong, inapplicable or distinguishable on its facts").

The *Harley* approach of making participant standing depend upon a defined benefit plan's funding level has also been criticized as unworkable and arbitrary. Circuit Judge Bye explained

in a subsequent opinion that a defined benefit plan's ability to recover losses should not depend

on the vagaries of the stock market:

> Under the approach adopted in *Harley*…a plan participant's standing to bring
> suit…on behalf of a defined benefit plan may depend on nothing more than how
> the stock market is performing.  When the market is doing well…a defined
> benefit plan is more likely to have a surplus, and thus a plan participant will lack
> standing to bring a lawsuit on behalf of the plan.  When the market is performing
> poorly, plan participants are more likely to have standing to recoup a loss to a
> defined benefit plan because the plan is more likely to be underfunded.
>
> I do not see the sense in tying a plan participant's standing…to the stock market's
> performance.  A defined plan's ability to recover losses caused by a fiduciary's
> breach should not depend upon the vagaries of the stock market…. *The question*
> *of standing for bringing such a suit should be tied to whether the plan had a loss,*
> *period, not on whether the plan participants arguably suffered a loss at any*
> *particular snapshot in time,*[20] *based on fluctuations in the stock market.*

*Harley v. Zoesch*, 413 F.3d 866, 872-73 (8th Cir. 2005) (emphasis added) (Bye, Circuit Judge,

concurring); *see also* PBGC Amicus Brief in *David v. Alphin*, at p. 10 (Copley Decl., Ex.5)

("The funding level in an ongoing defined benefit plan continually changes, and depends on

asset performance, actuarial assumptions, and related factors").

    To decide standing, *Harley* requires a determination of whether a plan, at some point in

the future, might be able to pay vested and accrued benefits.  But given the mercurial nature of

plan funding levels, this reduces participant standing to a mathematical guessing game in which

random factors play key roles.  The instant case is a example of this phenomenon.  In 2010 and

2011, the OC Plan's actuarial asset value and actuarial funding percentage held relatively

constant: in 2010, at about 80% funded, the Plan had a funding shortfall of $187 million and a

"funding target attainment percentage" of 80%; in 2011, the Plan had a funding shortfall of $193

---

[20] A "snapshot in time" is a reference to the fact that an actuarial valuation of a defined benefit plan, which
determines its funding status, is made as of a specific date; *i.e.*, it is a snapshot in time that says nothing about how
well funded the plan was at any previous point in time or how well funded it will be in the future.

million and a funding target attainment percentage of 80.01%.[21] BNYM argues that the OC Plan was 98.8% funded,[22] *i.e.* 1.2% underfunded, in 2012, but that figure largely results from a change in an actuarial assumption.[23] Using the same assumption for the future rate of return as it used in 2010 and 2011, the Plan had a 2012 funding shortfall of $159 million and a funding target attainment percentage of 83.86%. The reason BNYM can claim a 98.8% funding level for 2012 is that Congress passed a special bill[24] allowing pension plans to assume higher rates of return when calculating funding for calendar years 2012 through 2016.[25] For 2012, this change allowed the OC Plan's actuaries to *increase* the projected value of Plan assets by $56 million and *decrease* the projected value of Plan liabilities by $129 million. This served to *decrease* the company's minimum required contribution from $42 million in 2011 to $17 million in 2012.[26] Based on a consistently applied future rate of return, the real-world funding status of the OC Plan did not significantly improve from 2011 to 2012.[27] But for the new accounting rule, the Plan was

---

[21] *See* Collins Decl. Ex. 7 at p. 5 (Dkt. 110-7).

[22] Based on the OC Plan's 2011 Form 5500, Plaintiffs correctly alleged the OC Plan's target attainment percentage was 80.1% in the Amended Complaint filed March 26, 2013. *See* Amended Class Action Complaint, Dkt. 28. The OC Plan did not disclose the change in its funding status for the 2012 calendar year based on the newly enacted MAP-21, 29 U.S.C. § 1083, until issuing the Annual Funding Notice dated April 2013. *See* Collins Decl., Ex. 7. Standing is determined at the time the initial complaint is filed. *Chevron Corp. v. Donziger*, No. 11-cv-0691 LAK, 2014 WL 1663119 (S.D.N.Y April 25, 2014). At the time Plaintiffs filed their Class Action Complaint (Dkt. 1), on December 19, 2012, the OC Plan's publicly disclosed funding level was 80.1%. Defendants now rely on the retroactive recalculation of the Plan's 2012 funding status, which was not disclosed until four months after Plaintiffs filed the Class Action Complaint. Plaintiffs argue the OC Plan's funding status is irrelevant to Article III standing. If the court were to decide otherwise, however, under Second Circuit law, the Plan's funding status at the time the Class Action complaint was filed controls.

[23] Collins Decl., Ex. 7 at p. 4.

[24] *See* The Pension Funding Stabilization provisions of the Moving Ahead for Progress in the 21st Century Act ("MAP-21"), a highway and transportation funding bill, enacted July 6, 2012, and codified at 29 U.S.C. § 1083.

[25] Collins Decl., Ex. 7 at p. 4; *see* IRS, *MAP-21: New Funding Rules for Single-Employer Defined Benefit Plans*, http://www.irs.gov/Retirement-Plans/MAP-21-New-Funding-Rules-for-Single-Employer-Defined-Benefit-Plans (Interest rate relief provided by MAP-21 is reduced each year through 2016).

[26] Collins Decl., Ex. 7 at p. 5.

[27] *Id.*

just as underfunded in 2012 as it was in 2011 and 2010. This underscores the weakness of the *Harley* premise: Article III standing, a fundamental constitutional principle, should not ebb and flow with the vagaries of complex and shifting funding measurements for defined benefit plans.

**D.     The OC Plaintiffs' Claim for Injunctive Relief is Not Moot**

BNYM asserts that the OC Plaintiffs' claim for injunctive relief is moot because they have largely stopped providing custodial services to the OC Plan and because BNYM no longer follows the SI FX procedures at issue in Plaintiffs' Second Amended Complaint.  As a result, BNYM argues, injunctive relief against Defendants cannot provide a remedy to the OC Plan going forward.  BNYM Br. at 27-29.  This argument fails, however, because BNYM has not satisfied the Second Circuit standard for a finding of mootness.

As a threshold matter, Plaintiffs have standing to seek injunctive relief because BNYM served as the OC Plan's custodian when Plaintiffs filed their first Complaint on December 19, 2012.  *Chevron Corp v. Donziger*, No. 11-cv-0691 LAK, 2014 WL 1663119, at *9 (S.D.N.Y. April 25, 2014). The question Defendants raise is whether one or both of two alleged events has mooted the Named Plaintiffs' claim for injunctive relief.

"The burden of demonstrating mootness 'is a heavy one.'" *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383 (1979) (quoting in part *United States v. W.T. Grant Co*., 345 U.S. 629, 632–33, 73 S.Ct. 894, 897 (1953)). To demonstrate mootness, the moving party must show:

> (1) it can be said with assurance that "there is no reasonable expectation . . ." that the alleged violation will recur, . . . and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

*Id*. (citations omitted).  BNYM has not proven either element as to either alleged event.

With respect to BNYM's claim that BNYM is no longer the OC Plan's custodian, BNYM goes to great lengths to show that it no longer conducts SI FX transactions for the OC Plan even though clearly portions of the relationship remain in place. BNYM Br. 27-29.  This is not an argument that BNYM's alleged violations will not recur. It is only an argument that BNYM is not conducting SI FX for the OC Plan at present. BNYM fails to address the second factor in its entirety. On this record, there is no basis for a finding of mootness.

Even if BNYM's argument were to gain some traction, BNYM still would not be entitled to dismissal of the Named Plaintiffs claims for injunctive relief because this is a class action.  *See Comer v. Cisneros,* 37 F.3d 775, 799 (2d Cir. 1994) ("Where the claims of the name plaintiffs become moot prior to class certification, there are several ways in which mootness is not had. First, an intervenor might have stepped in…. Second, under the appropriate circumstances, class certification may relate back to the filing of the complaint"). This is an issue of class certification, not an issue of standing or mootness that can be decided under Rule 12(b)(1).

Defendants' second argument, that BNYM no longer follows the SI FX procedures at issue in the Second Amended Complaints, is equally unavailing. A defendant's voluntary decision to cease its illegal conduct does not necessarily render a case moot. *See Los Angeles Cty.*, 440 U.S. at 631, 99 S.Ct. at 1383 (citing *W.T. Grant*, 345 U.S. at 632, 73 S.Ct. at 897). If the plaintiff has an ongoing interest in the outcome of the litigation, his or her claim is not moot. *Knox v. Serv. Emps. Int'l Union, Local 1000*, __U.S.__, 132 S. Ct. 2277, 2287 (2012) ("[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot") (internal quotation marks omitted). The party seeking to have the case declared moot bears the burden of proof. *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 569-70, 104 S.Ct. 2567, 2583 (1984).

Again, BNYM has not shown that the alleged violations will not recur *or* that the effects of the alleged violation have been completely and irrevocably eradicated. BNYM continues to offer SI FX services, and there is a scant factual record regarding whether its present practices continue to violate ERISA as Plaintiffs allege. Even if BNYM's changes have been salutary, they are purely voluntary and can be revised at any moment. *See, e.g.*, *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999). There are no grounds on which to dismiss the OC Plaintiffs' claims for injunctive relief as moot.

## E.    Count III States a Claim under Fed. R. Civ. P. 12(b)(6)

BNYM argues for the first time in this, their third motion to dismiss, that Count III fails to state a claim for relief under Fed. R. Civ. P. 12(b)(6).[28]  BNYM Br. at 29-32. Contrary to BNYM, Count III does state a claim.[29]  Of course, this determination is made pursuant to the liberal pleading standards of the federal rules. *See, e.g.*, *Anderson News v. Am. Media*, 680 F.3d 162, 185 (2d Cir. 2012) ("a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely" (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 1965 (2007)).

Count III "is pled in the alternative to Count II." (SAC ¶149). Both Counts allege violations of what are referred to, in the language of ERISA, as "prohibited transaction" rules. These rules are in addition to, and independent of, ERISA's general fiduciary duties, which are

---

[28]  *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Class Action Complaint (Dkt. 19), filed Feb. 14, 2013; Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Class Action Complaint (Dkt. 41), filed May 7, 2013.

[29]  Defendants wrongly assert Plaintiffs have "abandoned" their claim that Defendants, through their FX scheme, are liable as nonfiduciary parties in interest participating in prohibited transactions in violation of 29 U.S.C. §1106. BNYM Br. at 12, n.12. The SAC clearly was brought pursuant to, *inter alia*, ERISA § 502(a)(3) which extends to nonfiduciary party in interest claims. (SAC ¶¶ 3, 11). *LeBlanc v. Cahill*, 153 F.3d 134, 152 (4th Cir. Va. 1998); *Quint v. Freda*, No. 98-civ-4285 DLC, 1999 WL 65045, 7-8 (S.D.N.Y. Feb. 10, 1999) (recognizing nonfiduciary party in interest liability under ERISA §§ 406(a), (b)). The nonfiduciary party in interest liability remains pled. (SAC ¶¶ 151, 153-155).

the basis for the cause of action alleged in Count I.  Count II alleges BNYM violated ERISA's

prohibited transaction rules against fiduciary self-dealing under 29 U.S.C. § 1106(b). Count III

alleges BNYM violated a different set of prohibited transaction rules, specifically those

preventing a fiduciary from causing a plan to engage in transactions with entities with whom the

plan may have a conflict of interest, or, in the language of ERISA, a "party in interest" with

respect to the plan. 29 U.S.C. § 1106(a).  Count III alleges:

> Defendants...in their role as custodian/trustee caused the Plans to engage in FX
> trades with parties in interest with respect to the Plans, namely, the FX trading
> arm of Defendants themselves.  These trades constituted an exchange of property
> between the Plans and parties in interest, and are thus prohibited by ERISA.

(SAC ¶152).

Plaintiffs include Count III out of an abundance of caution.  Plaintiffs have alleged and

strongly believe that BNYM was an ERISA fiduciary when conducting SI FX for the Plaintiffs'

plans, and Defendants are no longer challenging the sufficiency of those allegations. [30]  Count II

correctly alleges BNYM's prohibited transaction violation if they are found to be an ERISA

fiduciary for those purposes.  Count III is brought in the alternative in the event the Court finds

BNYM was not an ERISA fiduciary when executing SI FX.  Count III thus alleges BNYM

violated ERISA's prohibited transaction provisions not when executing SI FX, but by causing, in

its fiduciary role as plan trustee/custodian, the plans to engage in SI FX with a party in interest to

the plans.

BNYM does not dispute that Count II states a claim, but contends that in Count III

Plaintiffs have insufficiently alleged that BNYM, in its role as trustee, "caused" the plans to

---

[30] In the instant motion, BNYM abandoned the argument asserted in its previous motions to dismiss that Plaintiffs
insufficiently allege that BNYM was an ERISA fiduciary when conducting SI FX.  BNYM Br. at 32 n.31.
However, BNYM continues to deny that it was acting as an ERISA fiduciary in executing SI FX for the Plaintiffs'
plans, and claims it may revisit the issue at summary judgment or trial.  *Id.*

engage in prohibited transactions with parties-in-interest.  They argue that as trustee/custodian BNYM was simply following the instructions of other plan fiduciaries.  BNYM Br. at 31-32. BNYM's argument fails for several reasons.

First, BNYM misreads the standard for alleging causation.  The cases on which BNYM principally relies clearly make no holding as to what must be pled, because they were decided after trial or on summary judgment and in fact dependent contexts.  *See* BNYM Br. at 30 (citing *Sommers Drug Stores v. Corrigan*, 883 F.2d 345 (5th Cir. 1989) (decided after trial); *Tullis v. UMB Bank*, 640 F. Supp. 2d 974 (N.D. Ohio 2009) (decided on summary judgment).  The requirements for *pleading* causation under the notice pleading standard applicable here are considerably more liberal.  *See, e.g., In re Bear Stearns Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 488 (S.D.N.Y. 2011) (for notice pleading purposes, in pleading loss causation, a "complaint need only provide the defendant with some indication of the loss and the causal connection that the plaintiff has in mind" (internal quotation marks omitted)); *Agway, Inc., Emps.' 401(k) Thrift Inv. Plan v. Magnuson*, No. 03-cv-1060, 2006 WL 2934391 at *23 (N.D.N.Y. Oct. 12, 2006) (causation for purposes of ERISA § 406(a)(1) [29 U.S.C. § 1106(a)(1)] is sufficiently alleged by stating "that the defendants 'engaged,' 'authorized' and 'participated' in" the relevant transactions).

Second, Plaintiffs sufficiently allege causation.  ERISA's prohibited transaction provision simply says that the fiduciary must "cause" the transactions to occur; it does not require a particular type of cause or specify that it must be the sole cause.  29 U.S.C. § 1106(a)(1) (a "fiduciary with respect to a plan shall not cause the plan to engage in a transaction…"). Plaintiffs allege BNYM was required to "hold Plan assets in trust for the exclusive benefit of Plan participants and beneficiaries." (SAC ¶32).  They also allege Defendants "provided FX

services to the Plans as part of Defendants' custodial services." (SAC ¶33). These suggest that to facilitate any SI FX transaction in its role as trustee/custodian, BNYM would first have to release plan funds from its custody. BNYM's protest that BNYM, as trustee/custodian, was simply following instructions from other plan fiduciaries ignores the fact that BNYM as trustee/custodian facilitated these transactions when it knew, and other plan fiduciaries and investment managers did not, that BNYM's FX division was taking unauthorized and excessive charges when processing SI FX. (SAC ¶¶63-64). Hence, only BNYM, and not other fiduciaries, knew the transactions were improper.[31] In these circumstances, this sufficiently alleges that BNYM as trustee/custodian caused the alleged prohibited transactions to occur. To the extent BNYM wishes to contest the truth of these allegations, the appropriate time is at summary judgment or trial, rather than the pleading stage.

## IV.   CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss in Part Plaintiffs' Second Amended Complaint.

---

[31] *See* DOL Field Assistance Bulletin (FAB) 2004-03 ("Under section 403(a)(1), a directed trustee may not follow a direction the trustee knows or should know is contrary to ERISA. For example, the directed trustee cannot follow a direction that the directed trustee knows or should know would require the trustee to engage in a transaction prohibited under section 406 …").

Dated:  August 18, 2014                    Respectfully submitted,

                                           BEINS, AXELROD, P.C.
                                           KELLER ROHRBACK L.L.P.
                                           MCTIGUE LAW LLP

                                           ___/s/David S. Preminger_____
                                           David S. Preminger (DP 1057)
                                           KELLER ROHRBACK L.L.P.
                                           1440 Avenue of the Americas
                                           New York, NY 10036
                                           Telephone: (646) 380-66908
                                           Facsimile: (646) 380-6692
                                           dpreminger@kellerrohrback.com

                                           Lynn Lincoln Sarko (*pro hac vice*)
                                           Derek W. Loeser (*pro hac vice*)
                                           T. David Copley (*pro hac vice*)
                                           Margaret E. Wetherald (*pro hac vice*)
                                           KELLER ROHRBACK, L.L.P.
                                           1201 3rd Avenue, Suite 3200
                                           Seattle, WA 98101
                                           Telephone: 206-623-1900
                                           Facsimile: 206-623-8986
                                           lsarko@kellerrohrback.com
                                           dloeser@kellerrohrback.com
                                           dcopley@kellerrohrback.com
                                           mwetherald@kellerrohrback

                                           J. Brian McTigue (*pro hac vice*)
                                           James A. Moore (*pro hac vice*)
                                           MCTIGUE LAW LLP
                                           4530 Wisconsin Ave. NW, Suite 400
                                           Washington, DC 20016
                                           Telephone: (202) 364-6900
                                           Facsimile:  (202) 364-9960
                                           bmctigue@mctiguelaw.com
                                           jmoore@mctiguelaw.com

Jonathan G. Axelrod
(New York Bar Number: 2012029)
Regina M. Markey *(pro hac vice)*
Beins, Axelrod, P.C.
1625 Mass. Ave. NW
Washington, DC 20036
Telephone: (202) 328-7222
jaxelrod@beinsaxelrod.com
rmarkey@beinsaxelrod.com

*Counsel for Plaintiffs*