**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: | No: 12-md-2335-LAK |
| BANK OF NEW YORK MELLON CORP.<br>FOREX TRANSACTIONS LITIGATION | **JURY TRIAL DEMANDED** |
| This Document Relates to: | No. 14-cv-05496-LAK |
| *Fletcher v. The Bank of New York Mellon* | |

**AMENDED CLASS ACTION COMPLAINT**

**[REDACTED VERSION TO BE FILED PUBLICLY]**

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ........................................................................ 1

II.     JURISDICTION AND VENUE ................................................................... 4

III.    PARTIES ..................................................................................................... 4

        A.      Plaintiff ........................................................................................... 4

        B.      Defendants ...................................................................................... 5

IV.     DEFENDANTS' UNLAWFUL SCHEME TO ACQUIRE WINDFALL
        PROFITS ON FX TRANSACTIONS AT THE EXPENSE OF ERISA
        EMPLOYEE BENEFIT PLANS AND THEIR PARTICIPANTS ................ 6

        A.      Defendants Provided Trustee and Custodial Services to the Plans .... 6

        B.      How FX Trading Works ................................................................... 9

        C.      The Nature of the FX Services Defendants Provided to Clients ....... 10

        D.      How Defendants' Unlawful FX Scheme Worked ............................ 13

        E.      Customers Received More Favorable FX Prices When Defendants
                Negotiated Comparable Arm's-Length FX Transactions ................. 16

        F.      Defendants' Scheme Included the Failure to Follow the Standard
                Industry Practice of Netting Transactions ....................................... 17

        G.      Defendants' Unlawful FX Scheme at Mellon, Bank of New York,
                and BNY Mellon .............................................................................. 17

        H.      Defendants' Unlawful FX Scheme is Revealed ............................... 18

V.      FACTUAL BACKGROUND OF THE ERISA  PLANS AND
        PLAINTIFF'S CLAIMS .............................................................................. 19

        A.      The Central States Plan and FX ...................................................... 19

        B.      Defendants' Fiduciary Status .......................................................... 22

VI.     PLAINTIFF IS ENTITLED TO ERISA'S FRAUD OR CONCEALMENT
        LIMITATIONS PERIOD ............................................................................ 25

    A.    Defendants' Concealment of the FX Scheme from Mr. Fletcher and the ERISA Plans ........................................................................ 25

    B.    Defendants' Internal Communications Reflect Defendants' Active Concealment of the FX Scheme from the ERISA Plans .................................... 27

VII.    CLASS ALLEGATIONS .................................................................... 32

VIII.    CLAIMS FOR RELIEF .................................................................... 35

IX.    PRAYER FOR RELIEF .................................................................... 40

1.      Plaintiff Landol D. Fletcher brings this action against the Bank of New York Mellon and BNY Mellon, National Association for the benefit of the ERISA[1] employee benefit plan in which he is a participant — the Central States, Southeast and Southwest Areas Pension Plan ("Central States Plan"). He also brings this action as a class action on behalf of a class (the "Class") of participants, beneficiaries, and named fiduciaries of the Central States Plan and all other similarly-situated ERISA employee benefit plans (collectively the "Plans").

2.      These allegations are based on (i) investigations of private whistleblower law firms, the Commonwealth of Virginia, the Commonwealth of Massachusetts, the State of New York, the State of Florida, the International Union of Operating Engineers, and the Stationary Engineers Local 39 Pension Trust Fund; (ii) counsel's investigation which included reviewing: Internal Revenue Service Forms 5500 filed with the U.S. Department of Labor ("DOL"), filings with the U.S. Securities and Exchange Commission, and other publicly available documents. The allegations are based upon personal knowledge as to Plaintiff and his own acts, and upon information and belief and the investigation of counsel as to all other matters.

## I.      NATURE OF THE ACTION

3.      This is a civil enforcement action brought pursuant to ERISA, 29 U.S.C. § 1132(a)(2) and (a)(3), to recover losses and obtain equitable relief to remedy Defendants' fiduciary breaches including their transactions prohibited by ERISA. It is brought for the benefit of the named Plaintiff's ERISA plan and as a class action on behalf of the participants, beneficiaries, and named fiduciaries of that plan and all other similarly situated plans.

---

[1] The Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, et seq.

4.      Defendants' ERISA fiduciary duties, the "highest known to the law,"[2] required them to act prudently and solely in the interest of the Plans' participants and beneficiaries.

5.      Rather than fulfilling these duties, the Defendants enriched themselves at the expense of the retirement security of Plaintiff and the Class.

6.      Defendants appropriated excessive, unauthorized, and undisclosed markups in the course of executing non-negotiated foreign exchange ("FX") transactions with the Plans' assets. Defendants' breach of their fiduciary duty increased their revenues and profits by millions of dollars annually at the expense of Plaintiff and the Class. Defendants' parent company, BNY Mellon Corporation, stated in its 2008 annual report that "foreign exchange and other trading activities revenue totaled a record $1.5 billion in 2008 compared with $786 million in 2007." This was despite the fact that 2008 was one of the worst years of the recent financial crisis.

7.      Defendants charged excessive rates and markups on non-negotiated FX transactions including what are known as "standing instruction" transactions,[3] via the pricing scheme described herein. When Defendants reported transactions to the Plans (or the managers of investment funds in which the Plans invested), they did not report the FX market rate at the time the Plan's FX order was received and at the time Defendants "covered" the transaction in the Interbank FX market. Instead, Defendants selected a price for their own benefit. For a purchase of foreign currency, they selected a rate at or near the highest rate at which the particular currency had traded during the day. For a sale of foreign currency, they selected a rate

---

[2] *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

[3] Unless the context indicates otherwise, in this complaint the phrase "standing instruction" FX transaction should be interpreted broadly to refer to virtually any FX transaction other than one in which the parties negotiate a price in real time on a transaction by transaction basis.

at or near the lowest rate at which the currency traded. This scheme increased Defendants' profits at the expense of their ERISA clients without their consent.

8.     Defendants' "spread" on FX currency transactions with the Plans was as much as 20 times greater than what was charged (and disclosed) for Defendants' spreads on the same currency pair for comparable negotiated FX transactions.

9.     The *Wall Street Journal* examined one trade of 8.1 million euros for dollars made by Bank of New York Mellon for a large pension fund. The trader reported to the pension fund that the euro rate was $1.3610. On that day, however, euro/dollar trades occurred between $1.3704 and $1.3604. Had the trade settled at the higher end of the range of the day, $1.3704, the pension fund would have gotten an extra $76,012. The *Wall Street Journal* analyzed over 9,400 trades processed over a decade and found that 58% of the currency trades were within the 10% of the day's range least favorable to the client. Carrick Mollenkamp & Tom McGinty, *Inside a Battle Over Forex*, Wall St. J., May 23, 2011.

10.     Defendants generally kept their fictitious prices within the "range of the day," a stratagem which helped prevent discovery of their acts. Defendants further concealed their breach of duty from their clients by failing to disclose the actual time of the transaction, or the interbank rates for the purchase or sale of the currency pair. Since currency prices change throughout the day, and Defendants never disclosed when a given FX transaction occurred, clients could not discover Defendants' improper practices and breaches of fiduciary duty. Defendants' actions ensured that the customers would not discover that the rates reported to them included the excessive, unauthorized markups. Meanwhile, Defendants reaped windfall profits by selecting the worst rate, from the customer's perspective, and using a rate that was

advantageous to Defendants. Defendants concealed their FX Scheme and their ERISA violations from the Plans.

## II.      JURISDICTION AND VENUE

11.      ERISA provides for exclusive federal jurisdiction over ERISA breach of fiduciary duty claims. 29 U.S.C. § 1132(e)(1). The Plans are "employee benefit plans" within the meaning of ERISA, 29 U.S.C. § 1002(3), and Plaintiff is a plan participant within the meaning of ERISA, 29 U.S.C. § 1002(7). Plan participants are authorized to bring actions such as this to obtain appropriate relief for their plans. 29 U.S.C. § 1132(a)(2) and (3).

12.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and ERISA, 29 U.S.C. § 1132(e)(1).

13.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and ERISA, 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which relief is sought occurred in this district and the Defendants reside and may be found in this district.

## III.      PARTIES

A.      **Plaintiff**

14.      Plaintiff **Landol D. Fletcher** is a participant in the Central States Plan, an ERISA-covered plan. Mr. Fletcher began participating in the Plan in approximately 1980. Mr. Fletcher resides in Buford, South Carolina.

15.      The **Plaintiff Class** is limited to participants, beneficiaries, or named fiduciaries of ERISA-covered employee benefit plans custodied by Defendants. ERISA is the exclusive governing law for private sector employee benefit plans sponsored by employers, plans sponsored by labor unions, and plans sponsored by both labor unions and employers. 29 U.S.C. § 1003(a).

**B.      Defendants**

16.      Non-defendant **The Bank of New York Mellon Corporation** ("**BNY Mellon Corp.**") is the parent of Defendants The Bank of New York Mellon and BNY Mellon, N.A., which are its two principal subsidiaries and sources of income. BNY Mellon Corp. is a Delaware corporation with headquarters at One Wall Street, New York, New York, 10286. BNY Mellon Corp. is the product of the July 1, 2007 merger (the "Merger") of The Bank of New York Company, Inc. and Mellon Financial Corporation ("Mellon"). Its website claims it had $27.9 trillion under custody or administration on September 30, 2012.

17.      Defendant **The Bank of New York Mellon** ("**BNY Mellon**"), a New York state-chartered bank, is one of two principal bank subsidiaries of BNY Mellon Corp. It was formerly named "The Bank of New York". There is substantial overlap between BNY Mellon Corp. and BNY Mellon's leadership. For instance, the BNY Mellon Corp. 2010 10-K reported that every current executive officer of BNY Mellon Corp. also served as an officer of BNY Mellon. According to the BNY Mellon Corp. 2010 10-K, BNY Mellon "houses [BNY Mellon Corp.'s] institutional businesses, including Asset Servicing, Issuer Services, Treasury Services, Broker-Dealer and Advisor Services, and the bank-advised business of Asset Management."

18.      Defendant **BNY Mellon, National Association** ("**BNY Mellon, N.A.**") is a nationally-chartered bank that was formerly named Mellon Bank, N.A. BNY Mellon Corp. describes BNY Mellon, N.A. as one of its two principal subsidiaries. BNY Mellon, N.A. is based in Pittsburgh, Pennsylvania.

19.      Defendants **Does 1-20** are entities or individuals whose identities are not currently known to Plaintiff but (i) are affiliates or employees of BNY Mellon Corp. or its affiliates, and (ii) that either provided FX services to the Plans pursuant to the FX scheme described below during the relevant period or are successors in interest to entities that provided such services.

20.     Unless otherwise specified or indicated by context, the term "Defendants" includes the above-named Defendants and their predecessors in interest, including pre-Merger predecessors in interest.

21.     Defendants possess information regarding which particular entities affiliated with BNY Mellon Corp. were responsible for which conduct with respect to the class. Plaintiff expects to refine the complaint allegations in this respect subsequent to discovery.

## IV.     DEFENDANTS' UNLAWFUL SCHEME TO ACQUIRE WINDFALL PROFITS ON FX TRANSACTIONS AT THE EXPENSE OF ERISA EMPLOYEE BENEFIT PLANS AND THEIR PARTICIPANTS

### A.     Defendants Provided Trustee and Custodial Services to the Plans

22.      In recent years, ERISA employee benefit plans and other institutional investors have found it increasingly necessary to enter overseas securities markets and expand the global scope of their investment portfolios. These investments may offer increased diversification and greater returns than domestic investments alone.

23.     Institutional investors that buy and sell foreign securities must trade currency because purchases, sales, dividends, and interest payments are all transacted in the currency of the nation in which the relevant securities exchange sits. Just as euros, yuan, or yen are needed to buy a cup of coffee in Berlin, Beijing, or Tokyo, those same currencies are needed to buy securities in Germany, China or Japan.

24.     Accordingly, custodial banks, including Defendants, typically offer their clients FX services to facilitate purchases and sales of foreign securities, as well as the repatriation of interest, dividends, and other income or payments that result from these investments.

25.     Defendants, either by themselves or through their subsidiaries and affiliates, provided trustee and custodial services during the class period to a variety of institutional investors throughout the world, including the Plans.

6

26.     Defendants' trustee and custodial services are generally set forth in a formal agreement. Sometimes, these agreements are denominated "trust agreements" and other times they are denominated "custody agreements." The language varies slightly depending on the time and the entity, subsidiary or affiliate entering into the agreement, but there is generally no significant difference in the scope of duties required of Defendants as trustees/custodians for purposes relevant to this action.

27.     Defendants' trust/custody agreements provide, among other things, that Defendant will hold Plan assets in trust for the exclusive benefit of Plan participants and beneficiaries.

28.     Defendants provided FX services to the Plans as part of Defendants' custodial services. Often, but not always, Defendants had Plan customers sign various forms indicating whether the Plan wanted Defendants to execute FX Transactions on a standing instruction basis or a transaction by transaction basis. On information and belief, Defendants used several versions of these forms at the same time and over time. Defendants assert that these forms were contracts which incorporated the terms of Defendants' foreign exchange policies and/or procedures.

29.     Under Defendants' custodial agreements with the Plans and/or pursuant to additional alleged contracts specific to FX custodial services, Defendants conducted their FX scheme as alleged herein without full and open disclosure to the Plans. Defendants set their own fee or compensation for conducting FX Transactions. Defendants' fee or compensation for conducting FX Transactions was variable depending entirely on factors within Defendants' authority and control, such as time of the trade during the day and the rate of exchange.

30. ███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████

31.     After an ERISA customer signed up for trust/custody services (including FX services), Defendants sent the new customer a "welcome package" that represented FX standing instruction services as "free of charge," that "[t]he terms of FX Transactions with any Plan shall not be less favorable to the Plan than terms offered ... to unrelated parties in a comparable arm's length transaction," that FX transactions would be bundled "to achieve better rates for the benefit of clients," and "[o]ur FX trading staff provides foreign exchange at very competitive rates."

32.     Custodial customers were encouraged to conduct FX transactions through Defendants. Defendants charged a $25 fee per transaction for FX transactions executed with third parties, which encouraged the Plans to conduct FX transaction with Defendants, so Defendants could earn additional FX-related profits.

33. ████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████



34. ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

35. ████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

**B.     How FX Trading Works**

36.     The values of different currencies "float" against each other. That is, they vary based on factors ranging from supply and demand to political and economic trends. While the price of coffee at a Berlin cafe might be €2 all week long, it might cost $2.50 on Monday morning and $2.72 by Friday.

37.     FX trading occurs on a nearly 24-hour cycle, five-and-a half days a week. The official FX trading day begins at 7:00 a.m. New Zealand time and ends at 5:00 p.m. New York City time.

38.     For each currency pair bought and sold during the course of the FX trading day, there will necessarily be a high trade and a low trade. This information is tracked by proprietary services, such as the company WM/Reuters.

39.     If, during one trading day, the lowest trade was $1.25 to buy €1.00, and the highest rate trade was $1.35 to buy €1.00, the range of the day would be $1.25-$1.35.

## C.     The Nature of the FX Services Defendants Provided to Clients

40.     Ordinarily, absent some exemption, it would be illegal for Defendants to engage in FX transactions with their ERISA customers. In the terminology of ERISA, Defendants are "parties in interest" to FX transactions.

41.     Defendants provided "indirect" or "standing instruction" FX services to the Plans. For example, if a Plan needed to purchase or sell a foreign security, Defendants would exchange plan assets in dollars for the relevant foreign currency prior to the purchase or sale. In this type of transaction, the Plans relied upon Defendants to use best execution practices and pay the Plans fair value for the foreign currency bought and sold. There is no arm's-length negotiation of the FX transaction price between the ERISA plan and the Defendants.

42.     Defendants also offer "direct" or "negotiated" FX transactions. In such an FX trade, an investor communicates directly with an FX trader. The FX trader quotes a rate for a proposed transaction, which is accepted, rejected or countered—in other words, actively negotiated. If a deal is reached, the trader executes the FX trade at the agreed-upon price.

43.     Non-negotiated and standing instruction trades are intended to benefit the Plans and Defendants' other clients because, among other things, the clients save the expense and time of negotiating the most competitive exchange rate. Defendants touted these indirect transactions as being done pursuant to best execution standards as well as being free of charge.

44.     The duty of best execution requires that a broker-dealer seek to obtain for its customers the most favorable terms reasonably available under the circumstances. At a minimum, therefore, best execution standards require that Defendants execute trades on terms that are no less favorable than those offered to unrelated parties in a comparable arm's-length transaction.

45.     Defendants established policies and procedures for the execution of FX transactions on behalf of ERISA customers. Under these policies and procedures, Defendants are prohibited from engaging in FX transactions in any instance in which the Defendant has discretionary authority or control with respect to the investment of a Plan's assets, or when it renders investment advice with respect to a Plan's assets. The Defendants' policies and procedures guarantee that "the terms of FX transactions with any Plan shall not be less favorable to the Plan" than terms offered by Defendants to unrelated parties in a comparable arm's length FX transaction.

46.     For range of the day standing instruction FX transactions, the Defendants' policies and procedures called for Defendants to set rates for FX automatic income item conversion transactions based on the range of buy/sell rates in effect at specific times of day, and to bundle such transactions to achieve better rates for the benefit of the Plans. These policies and procedures permitted Defendants discretion to set rates, which Defendants used to the disadvantage of the Plans, e.g. by setting rates that were greater than rates that would have been agreed to at arm' s-length for comparable transactions.

47.     For range of the day standing instruction FX transactions, the Defendants' policies and procedures called for Defendants to set rates for FX purchase/sale transactions based on the range of buy/sell rates in effect at specific times of day. These policies and procedures

permitted Defendants discretion to set rates, which Defendants used to the disadvantage of the Plans, e.g. by setting rates that were greater than rates that would have been agreed to at arm's-length for comparable transactions.

48. ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

49. ████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████

50. Plaintiff is informed and believes that Defendant BNY Mellon revised its FX policies and procedures when its improper FX trading practices were discovered and the first FX-related lawsuit was filed against it.

51. At all times, regardless of any self-serving language in documents drafted by Defendants, Defendants were required to comply with the general fiduciary liability provisions of ERISA § 404, 29 U.S.C. § 1104, which require, among other things, that a fiduciary discharge

12

his duties with respect to a Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. Furthermore, Defendants at all times were required to act prudently and consistent with their duty of loyalty to the Plans and the Plans' participants and beneficiaries.

52.     To the extent Defendants or any of their predecessors in interest purport to disclaim liability for breach of fiduciary duty, ERISA provides that any such agreement or instrument is void as against public policy. 29 U.S.C. § 1110.

**D.     How Defendants' Unlawful FX Scheme Worked**

53.     Defendants' FX scheme concerned indirect, non-negotiated FX transactions, and was designed to reap tens if not hundreds of millions of dollars in profits while minimizing the risks of detection by their custodial clients.

54.     FX transactions between banks are executed at an interbank rate, which is a benchmark rate that tracks how much one currency is worth in terms of another. These interbank rates fluctuate throughout each day.

55.     Upon receiving a standing instruction FX order, Defendants informed clients that they would execute the trade using best execution practices during the next available trading window.  That is not what they did. Instead, they executed the transaction at their convenience, charged the Plans a price unrelated to the actual transaction price, the "cover" price, or to the interbank market rate, and unilaterally decided, or exercised discretion, to determine how much "spread" they would pay themselves on the transaction.

56.     Defendants charged the Plans FX prices that were generally within the range of the day of prices at which the currency pair traded, and provided Defendants with an excess margin on the transaction.

57.     Defendants considered standing instruction FX trades to be the most profitable form of business because "it offers the traders a free intra-day option to time its currency execution in the marketplace knowing it does not have to get back to the customer immediately with the deal price. Business of this type allows us to take advantage of increased market volatility and wide intra-day trading ranges." Email from Jorge Rodriguez to Richard Mahoney, Feb. 1, 2008 Re: "the negative impact of e-commerce."

58.     By generally keeping the price charged to the Plans within the range of the day, Defendants ensured that their customers would not discover that the FX transactions were not being provided as disclosed.

59.     Defendants touted their pricing structure to clients by stating, "We price at the high and low of the day." According to internal emails, the truth was, "It's the high and low of the day, depending on which one is against you." Email from David Green to James McAuliffe, July 26, 2010, "Re: Follow-up Strategy Session - Standing Instruction Business."

60.     When volatility in FX prices increased, such as during the 2008 financial crisis, this could greatly expand the range of the day, giving Defendants the opportunity to set their fictitious prices much higher (or lower), thus increasing their profits even more during periods of market volatility. Defendants' FX revenues from standing instruction trades during periods of high volatility in fact increased by tens of millions of dollars. (BNY Mellon Corp.'s 2008 annual report noted that record FX revenues in part "reflect[] the benefit of increased market volatility.")

61.     Defendants' FX scheme for implementing standing instruction orders required that Defendants exercise discretion in fulfilling their custodial duties. For standing instruction trades, Defendants exercised discretion as to the time of day that the trades were executed, as

well as the amount of any markup or markdown charged to the client. In relevant part, Defendants controlled and set the markups and markdowns and determined: whether they would fall within the range of the day for the currency pair; whether to net trades for buys and sells across clients; the spread for those netted trades; whether to minimize markups where Defendants utilized subcustodians for certain currency pairs; and whether to provide discounts for clients with larger accounts for the same or similarly-sized trades of the same currency pairs.

62.     For best execution on a *negotiated arm's-length FX trade*, a client might ordinarily be charged a **2 to 3 basis point markup**. ("Basis points" are one one-hundredth of a percentage point, i.e. there are 100 basis points in one percent). In contrast, analysis of Defendants' transactions after the FX scheme was disclosed revealed that for *standing instruction trades* some of the Plans have reported that the charge Defendants recouped with their FX scheme could be almost 40 times that—**113 basis points**—and may have averaged nearly 60 basis points per transaction.

63.     Perpetuation of Defendants' scheme and its attendant high-marginal revenue on non-negotiated and standing instruction trades required withholding from clients critical information about the manner in which the trades were executed and priced.

64.     ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

65.     ███████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

66.     BNY Mellon Corp.'s first-quarter 2012 report filed with the SEC admits that standing instruction trading is the most profitable form of FX trading for Defendants. It stated that "A shift by custody clients from the standing instruction program to other trading options . . . may negatively impact our foreign exchange revenue."

67.     The same report also said 46% of all BNY Mellon Corp.'s revenue from foreign exchange trading results from standing instruction trades.

68.     ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

**E.     Customers Received More Favorable FX Prices When Defendants Negotiated Comparable Arm's-Length FX Transactions**

69.     In some instances, with *other* custodial customers, Defendants engaged in arm's-length negotiations with their clients regarding fees for standing instruction trades. When Defendants actually negotiated FX fees, they provided competitive pricing. For example, the negotiated FX trading price might be a few basis points above (or below) the interbank rate. One customer, Blackrock, Inc., was offered standing instruction trades at 1.5 basis points above/below a benchmark price. In some instances, customers were allowed to negotiate their FX prices directly with Defendants' traders, while otherwise keeping their trades within the "standing instructions" channel. These "opt-out" situations resulted in the customers receiving

the benefits of lower, arm's-length negotiated prices for FX transactions compared to the fictitious rates the Defendants charged the Plans.

70.     Instead of providing FX trades to the Plans at the favorable price levels noted above, Defendants conducted the FX manipulations described in the Complaint.

71.     Defendants earned less from FX transactions with negotiated prices, but they offered preferential pricing to some customers to placate them, lessening the likelihood that Defendants' wrongful conduct would be revealed.

**F.     Defendants' Scheme Included the Failure to Follow the Standard Industry Practice of Netting Transactions**

72.     It is standard practice in the FX industry to "net" client trades. That is, when clients give both buy and sell orders for the same currency on a given day, the FX service provider will, when possible, net the orders and only execute a single buy or sell order for the net amount. This saves clients money because only one transaction need be executed rather than two.

73.     Defendants represented that they would follow the practice of netting when providing FX services to clients.

74.     Defendants frequently did not net client trades. Instead, when clients or their investment managers submitted both buy and sell orders, they were executed separately and Defendants applied a markup to both transactions.

**G.     Defendants' Unlawful FX Scheme at Mellon, Bank of New York, and BNY Mellon**

75.     As noted above, on July 1, 2007 the Bank of New York Company, Inc. and Mellon Financial Corporation merged to form BNY Mellon Corp. Substantially the same FX trading scheme was employed by affiliates of all three entities during the class period, i.e. both before and after the Merger.

76.     BNY Mellon Corp.'s global FX operations are currently managed from New York. However, even after the Merger, the separate FX departments that existed before the Merger were maintained. Those custodial clients that previously hired affiliates of the old Bank of New York to be their custodian still had their trades executed by the legacy Bank of New York FX desk in New York, and those clients that previously hired affiliates of Pittsburgh-based Mellon to be their custodian still have their trades executed by the legacy Mellon FX desk in Pittsburgh.

77.     Since the Merger, at the conclusion of each trading day, a "Reconciliation" call is made between the New York and Pittsburgh Transaction Desks. The Pittsburgh Transaction Desk (i.e. legacy Mellon) calls the New York Transaction Desk (i.e. legacy Bank of New York), so that they can verify they have selected the same high and low ranges for each currency pair. The telephone calls are made on a private, direct line and may be excepted from the customary policy of recording transactional conversations.

78.     The "Reconciliation" call is made so that any discrepancies between each Transaction Desk's prices can be avoided and discovery of Defendants' pricing scheme made less likely.

**H.     Defendants' Unlawful FX Scheme is Revealed**

79.     On information and belief, Defendants' unlawful FX practices began prior to the commencement of the Class Period. Those practices have only recently come to light, and are now the subject of lawsuits by whistleblowers, state attorneys general, the U.S. Department of

Justice, and some private plaintiffs.[4] Until approximately 2011, Defendants' lack of disclosure and lack of transparency concealed the wrongful conduct from Plaintiff and the Class.

## V.   FACTUAL BACKGROUND OF THE ERISA PLANS AND PLAINTIFF'S CLAIMS

### A.   The Central States Plan and FX

80.     There are two types of ERISA-covered retirement plans—defined benefit plans and defined contribution plans. Defined benefit plans are traditional pension plans in which the amount of benefit a participant receives is fixed; defined contribution plans are plans such as 401(k) plans in which participants contribute a portion of their earnings to an account, invest it, and then receive the proceeds upon retirement. Both types of retirement plans have, especially over the last decade, found it necessary and prudent to expand their investments to include foreign securities. Accordingly, defined benefit plans have expanded foreign holdings, and defined contribution plans frequently include at least one, if not several, foreign investment options.

81.     ERISA-covered plans regularly purchase and sell foreign securities in order to increase diversification and take advantage of opportunities for higher returns. ERISA plans that invest in foreign securities receive principal, dividends, and interest that are paid in foreign currencies, or participate in other investments that require the exchange of foreign currency into and from U.S. Dollars, either directly or through participation in Separately Managed Accounts

---

[4] The lawsuits referenced are: *Commonwealth of Virginia, ex. rel. FX Analytics v. The Bank of New York Mellon Corp.*, No.CL-2009-15377 (Va. Cir. unsealed Jan. 21, 2011); *State of Florida, ex. rel. FX Analytics v. The Bank of New York Mellon Corp.*, No. 2009-ca-4140 (Fla. Cir. unsealed Feb. 7, 2011); *People of the State of New York, et al., v. The Bank of New York Mellon Corporation*, Index No. 09/114735 (N.Y. Sup. Ct.); *Bank of New York Mellon Corp. False Claims Act Foreign Exchange Litigation v. BNY Mellon*, No. 3:11-cv-05683-WHA (filed in various California counties; removed to N.D. Cal. on Nov. 28, 2011); *United States v. BNY Mellon Corp.*, No. 1:11-cv-06969-LAK (S.D.N.Y.); *Int'l Union of Operating Engineers v. The Bank of New York Mellon Corp. et al.*, No. 3:11-cv-03620 (N. D. Cal.).

or Collective Investment Funds.[5] As a result, the purchase and sale of currencies incidental to a foreign securities transaction is vital to a plan's participation in the international securities markets and to the acquisition, holding, and disposition of foreign securities.

82. The Central States Plan in which Plaintiff Fletcher participates is an "employee pension benefit plan" under ERISA, 29 U.S.C. § 1002(2)(A). It is also a traditional defined benefit pension plan. The Plan's assets are held under the custody of the Defendants. Some assets of the Plan are managed by Mellon Capital Management Corporation, which is described in the Central States Plan's 5500s filed with the U.S. Department of Labor as an affiliate of Defendants, the Plan's custodian, "and therefore qualifies] as [a] part[y]-in-interest."

83. The Central States Plan is underfunded. The Plan's actuary has certified the Plan's funding status as "critical" (also called the "red zone") for plan years 2008, 2009, 2010, 2011, and 2012. "Critical" is the worst plan status possible under the Pension Protection Act of 2006. As required by law, the Plan Trustees adopted a rehabilitation plan in 2008. While the Plan expects to forestall its possible insolvency until 2021 or later, there is no reasonable prospect that current benefits will be fully funded. The Plan states that its "rehabilitation plan . . . is expected to last indefinitely." In other words, the Plan does not ever expect to fully fund its liabilities.

84. In 2005, the Plan sought IRS relief in the form of a request for 10-year amortization of the Plan's unfunded liabilities. In 2008, the Plan was unable to meet its amortization schedule, so it sought further relief from its minimum funding percentage requirement. The IRS never granted or denied the request to decrease minimum funding

---

[5] "Separately Managed Account" refers to a professionally managed investment account offered by, e.g., a broker-dealer typically for a single high net worth individual or entity in which the entity directly owns the securities in the account. "Collective Investment Funds" refers to investment vehicles, other than mutual funds governed by the Investment Company Act of 1940, that are offered for investment to more than one large institutional investor. Such funds are typically offered by banks.

requirements. The Plan again failed to meet its amortization schedule in the Plan year ending December 31, 2011, but the Plan did not seek or receive further relief from the IRS.

85.     The 2011 annual report filed on Form 5500 with the U.S. Department of Labor indicates that the Plan had 58.9% of the assets necessary to pay projected benefits. According to the Plan's 2012 Annual Funding Notice, its "funding percentage" in 2012 dropped to **53.9%.** Based on its Form 5500s filed for years 1998 through 2012, the Plan has never been fully funded.

86.     In view of the Plan's significant underfunding, the Plan's Trustees froze or reduced certain benefits including reducing the benefit accrual rate from 2% of contributions to 1% of contributions; freezing certain early retirement benefits at their year-end 2003 levels; and eliminating retirement benefits for all employees who would seek to retire before age 57, these included benefits for which Plaintiff Fletcher had been eligible.

87.     During the Class Period, Defendants or one of their predecessors in interest served as the Central States Plan's custodian.

88.     The Central States Plan held foreign investments during the Class Period, and on information and belief, Defendants and their predecessors in interest executed non-negotiated and standing instruction FX trades for the Plan, the Plan's accounts and/or Collective Investment Funds and Separately Managed Accounts in which the Plan invested. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████

89.     ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████    ████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

90.     As a direct consequence of the misconduct alleged herein, the Central States Plan suffered financial losses and injury in fact for which Mr. Fletcher seeks recovery on behalf of the Plan.

91.     As a result of these financial losses suffered by the Central States Plan, Plaintiff Fletcher suffered injury in fact.

**B.     Defendants' Fiduciary Status**

92.     Every ERISA plan must have one or more named fiduciaries to administer and manage the plan. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries,



but also any other person who in fact performs fiduciary functions. Specifically, under ERISA a person is a fiduciary "to the extent ... he *exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets.*" 29 U.S.C. § 1002(21)(A)(i) (emphasis added). Thus, an entity is an ERISA fiduciary if it exercises discretionary authority or control in managing the plan, or, if it exercises any authority or control (discretionary or not) respecting management or disposition of plan assets. Under ERISA, one can be a fiduciary whether or not one would qualify as an agent under the common law.

93.     An ERISA fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of providing benefits to participants and beneficiaries and … defraying the reasonable expenses of … administering the plan ...." ERISA, 29 U.S.C. § 1104(a)(1)(A)(i), (ii). In common parlance, ERISA fiduciaries owe the duty of loyalty.

94.     Defendants and their predecessors in interest are/were fiduciaries under ERISA to the extent they exercise any authority or control respecting management or disposition of the Plans' assets. In addition, Defendants and their predecessors in interest are/were fiduciaries under ERISA to the extent they exercise any discretionary authority or discretionary control respecting management of the Plans or the Plans' assets.

95.     Pursuant to agreements denominated "custody agreements," "trust agreements," or the like, Defendants provided custodial services to the Plans. As custodian, Defendants held the Plans' assets in trust and performed administrative duties. One of the custodial services Defendants offered was handling FX trades (generally repatriating dividends earned on non-US investments). To the extent Defendants exercise any authority or control respecting management

23

or disposition of the Plans' assets or exercise any discretionary authority or discretionary control respecting management of the Plans or the Plans' assets in conducting foreign exchange transactions, they act in a fiduciary capacity and must satisfy ERISA's fiduciary conduct requirements when doing so.

96.     Here, Defendants and their predecessors in interest exercised discretionary authority and control over plan assets and management because, through the FX scheme described above, they determine the FX rates the Plans pay when they improperly mark-up or mark-down the rates for the FX transactions. In effect, the Defendants negotiate with themselves to determine the fee they receive for the FX services they provide to the Plans. BNYM set its own fee or compensation for conducting FX transactions, i.e. Defendants' fee or compensation for conducting FX transactions was variable depending entirely on factors within Defendants' control, which Defendants manipulated to increase their own fee or compensation.

97.     Defendants did not disclose the FX scheme as alleged herein to the Plans. As a result, any agreements between Defendants and the Plans regarding FX services were not arm's length transactions.

98.     In addition, Defendants and their predecessors in interest are/were fiduciaries under ERISA to the extent they helped the Plans manage FX transactions for a fee or other compensation, direct or indirect, with respect to any moneys or other property of each plan, or had any authority or responsibility to do so. In a non-negotiated and standing instruction FX transaction, Defendants have authority and responsibility to execute the FX transactions with respect to moneys or other property of the Plans, and they receive a fee or other compensation, direct or indirect, for doing so.

99. In addition, Defendants and their predecessors in interest are/were fiduciaries under ERISA to the extent they have any discretionary authority or discretionary responsibility in the administration of such Plans, including their discretionary authority or discretionary responsibility regarding the execution of FX transactions on behalf of the Plans.

## VI. PLAINTIFF IS ENTITLED TO ERISA'S FRAUD OR CONCEALMENT LIMITATIONS PERIOD

### A. Defendants' Concealment of the FX Scheme from Mr. Fletcher and the ERISA Plans

100. ERISA's statute of limitations provision for fiduciary breach claims provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation." 29 U.S.C. § 1113.

101. Defendants' FX Scheme, as described above, constitutes intentional concealment sufficient for ERISA's fraud or concealment limitations period. Mr. Fletcher was not aware of this scheme prior to 2012. Particular instances or evidence of concealment, or Defendants' intentional policy of concealment, include those cited above and below.

102. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

103. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

104. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

105. ████████████████████████████████████████

████████████████████████████████████████████

106. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

107.     To conceal its actions and reap secret profits at its custodial clients' expense during the Class Period, Defendants' account statements generally reported FX conversion rates that fell within (or close to) the high and low range for each day's FX rates but failed to provide time stamped execution prices. The combination effectively precluded custodial clients from discovering that Defendants actively concealed from the Plans the time of day they planned to transact range of the day standing instruction FX transactions for the Plans for sales and purchases-related FX. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

108.     Defendants failed to disclose and actively concealed their markups and markdowns in the pricing of standing instruction FX transactions. ████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

**B.**     **Defendants' Internal Communications Reflect Defendants' Active Concealment of the FX Scheme from the ERISA Plans**

109.     Defendants engaged in acts to hinder the discovery of their FX Scheme and the

resultant breach of fiduciary duty and violations of prohibited transaction rules.

110.     ████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████

        ███████████████████████████████████████
        ███████████████████████████████████

        █████████████████████████████████
        ███████████████████████████████████████
        █████████████████████████████████████████
        ████████████████████████████████████

111.     ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

112.     ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

    ████████████████████████████████████████████

    ████████████████████████████████████████

113.     ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

114.     Defendants actively concealed the availability of benchmark standing instruction

FX pricing. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

    ████████████████████████████████████████████

    ████████████████████████████████████████████

    ████████████████████████████████████████████

    ████████████████████████████████████████████





115.

116.

117.

118.

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

    ███████████████████████████████████████████
    █████████████████████████

119.   ███████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████████████

120.   ███████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████

121.   ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████



122.

123.

124.

125.



126.     Plaintiff expects to uncover further evidence of Defendants' concealment as discovery proceeds.

## VII.     CLASS ALLEGATIONS

127.     **Class Definition**. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) on behalf of the following class:

> All participants, beneficiaries, and named fiduciaries of ERISA Plans for which Defendants (or their affiliates or predecessors in interest) (i) served as trustee or custodian of assets (including serving as trustee or custodian for Collective Investment Funds or Separately Managed Accounts in which the plans invested) and (ii) provided foreign currency exchange transactional services (including foreign currency transactional services provided to Collective Investment Funds or Separately Managed Accounts that held the Plans' assets), at any time from January 12, 1999 to the present. (Excluded from the class are any officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of the Defendants or any of their respective predecessors in interest or any entity in which any Defendant or any of their respective predecessors in interest have a controlling interest.)

Class treatment is appropriate in this case because it would promote judicial economy by adjudicating Plaintiff's ERISA fiduciary breach and prohibited transaction claims with respect to all Class members.

128.    **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiff believes that hundreds of ERISA plans with thousands of participants[8] throughout the country sustained losses because of Defendants' unlawful FX scheme. Defendants have approximately $28 trillion in assets under custody, and claim to be the largest provider of investment services to U.S. public and private pension funds. These assets could all be exposed to Defendants' improper pricing scheme.

129.    **Commonality**. The claims of Plaintiff and all Class members originate from the same misconduct, breaches of duties, and violations of ERISA perpetrated by Defendants with regard to their FX trading scheme. The questions of law and fact common to the Class include, but are not limited to:

a.      Whether Defendants breached their fiduciary duties of prudence and loyalty to Class members by using an FX trading scheme to improperly mark-up or mark-down FX transactions for Plaintiff and the Class;

b.      Whether Defendants' self-dealing FX transactions constituted transactions prohibited by ERISA;

c.      Whether Defendants are ERISA fiduciaries;

d.      Whether Defendants' fiduciary breaches caused losses to Plaintiff and the Class; and

e.      Whether Defendants' prohibited transactions caused losses to Plaintiff and the Class.

---

[8] In 2011, the Central States Plan had over 400,000 participants.

130.   **Typicality**. Plaintiff's claims for the benefit of his Plan are not only typical of, but the same as, claims for the benefit of other Plans. Individual cases would require each Class member to prove the same claims based upon the same conduct of the Defendants, using the same legal theories, and would be seeking the same relief.

131.   **Adequacy**. Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has no interests antagonistic to, or in conflict with, those of the Class. Plaintiff will vigorously protect the interests of absent Class members.

132.   Plaintiff has retained counsel who are competent and have extensive experience in class action and ERISA litigation. Plaintiff's counsel includes the firms of Beins, Axelrod, P.C., Keller Rohrback L.L.P., and McTigue Law LLP.

133.   **Rule 23(b)(1)(A) & (B) Requirements**. Class action status is warranted under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecution of separate actions by Class members would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by Class members would create a risk of adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

134.   **Rule 23(b)(2) Requirements**. Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole. No plan-by-plan inquiry would be required to determine whether Defendants' breached their fiduciary duties.

135.    **Rule 23(b)(3) Requirements**. In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VIII.   CLAIMS FOR RELIEF

### COUNT I

### Breach of Duties of Prudence and Loyalty
### (Violation of ERISA, 29 U.S.C. § 1104 by All Defendants)

136.    All previous averments are incorporated herein.

137.    At all relevant times, the Defendants were fiduciaries of the Plans within the meaning of ERISA, 29 U.S.C. § 1002(21)(A).

138.    Defendants exercised discretionary authority or control with respect to management of the Plans or exercised authority or control with respect to management or disposition of the Plans' assets when they determined what time of day to execute non-negotiated and standing instruction trades and when they determined the excessive and unauthorized mark-up or mark-down on the FX rates the Plans would be required to pay for the trades and thereby determined the amount of their compensation. Defendants exercised discretion in setting the FX rates when they altered the mark-up and mark-down amounts based upon such factors as the volatility of the market, the range of the day for the currency pair, whether or not a sub-custodian was required for the currency pair, whether to net markups, and whether to provide discounts to certain clients for comparably-sized trades.

139.    Defendants breached their ERISA fiduciary duties of prudence and loyalty, 29 U.S.C. § 1104(a)(1)(A), (B), when executing non-negotiated and standing instruction FX trades for the Plans and/or with the Plans' assets by, inter alia:

a. Charging the Plans (or the Collective Investment Funds or Separately Managed Accounts in which the Plans invested) improper rates for FX transactions that resulted in excessive and windfall profits for Defendants;

b. Charging the Plans (or the Collective Investment Funds or Separately Managed Accounts in which the Plans invested) improper rates for FX transactions that were far in excess of what fully informed parties agree to for comparable transactions in an arm' s-length bargain;

c. Failing to disclose to the Plans, their fiduciaries, or participants that Defendants were engaging in FX transactions for the Plans, setting their own compensation for said transactions, and charging the Plans much higher rates than what parties agree to when bargaining at arm' s-length;

d. Failing to disclose to the Plans, their fiduciaries, or participants that Defendants intended to act exclusively for their own benefit and as principal dealers when conducting FX transactions;

e. Failing to provide full and frank disclosure to the Plans, their fiduciaries, or participants of the FX trading rates and arrangements for non-negotiated trades as compared to negotiated trades;

f. Failing to provide the Plans, their fiduciaries, or participants with information disclosing the actual periodic and daily FX currency pair ranges that would enable them to determine the reasonableness of Defendants' FX transaction charges;

g. Failing to disclose to, and concealing from the Plans, their fiduciaries, or participants information showing the markups and markdowns charged for

FX trading, that other clients were charged far less for the same services, and that other FX traders charged far less for the same service in comparable arm's- length transactions; and

h.   Appropriating the Plans' assets for Defendants' own benefit, and reducing the Plans' assets and the retirement savings of their participants by tens, if not hundreds, of millions of dollars.

140.   Defendants committed these breaches during each FX transaction involving assets of the Plans.

141.   As a direct and proximate result of these breaches of fiduciary duty, the Plans and their participants suffered tens, if not hundreds, of millions of dollars of losses. Moreover, for the defined benefit plans in the Class, these losses increased the risk of non-payment of future benefits to participants.

142.   Pursuant to ERISA, the Defendants are liable to restore all losses suffered by the Plans caused by the Defendants' breaches of fiduciary duty.

## COUNT II

**Engaging in Self-Interested Prohibited Transactions with Plan Assets**
**(Violation of ERISA, 29 U.S.C. § 1106(b) by All Defendants)**

143.   All previous averments are incorporated herein.

144.   ERISA prohibits fiduciaries from engaging in certain transactions and imposes strict liability for any losses that result. Specifically, "a fiduciary with respect to a plan shall not . . . deal with the assets of the plan in his own interest or for his own account. . . ." 29 U.S.C. § 1106(b).

145.   The Defendants, all fiduciaries of the Plans, committed prohibited transactions in that they dealt with the Plans' assets for their own interests and for their own accounts in

executing standing instruction or non-negotiated trades on behalf of the Plans. In addition, they appropriated from the Plans' assets millions of dollars in fees for improperly marked-up and marked-down non-negotiated FX transactions based on fictitious rates, enriching themselves at the expense of the Plans and their participants.

146.    As a direct and proximate result of these prohibited transactions, the Plans, directly or indirectly, paid millions of dollars in transaction fees that were prohibited by ERISA and suffered millions of dollars in losses.

147.    Notably, the terms of the transactions were less favorable to the Plans than terms generally available in comparable arm's-length FX transactions between unrelated parties, and the terms of the transactions were less favorable to the Plans than the terms afforded by Defendants in comparable arm's-length FX transactions involving unrelated parties. As discussed above, Defendants negotiated much lower pricing for FX trades for certain clients when those clients sought greater transparency in the FX transactions.

148.    As a direct and proximate result of these prohibited transactions, the Plans and their participants suffered tens, if not hundreds, of millions of dollars of losses. Moreover, for the defined benefit plans in the Class, these losses increased the risk of non-payment of future benefits to participants.

149.    Pursuant to ERISA, Defendants must disgorge all fees paid them for the Plans' FX transactions, restore all losses suffered by the Plans from the prohibited transactions, and disgorge all profits earned on the fees paid by the Plans to Defendants.

## COUNT III

### Causing the Plans to Engage in Party in Interest Prohibited Transactions
### (Violation of ERISA, 29 U.S.C. § 1106(a) by All Defendants)

150.    All previous averments are incorporated herein.

151.    This claim is pled in the alternative to Count II.

152.    ERISA prohibits fiduciaries from causing a plan to engage in certain transactions with parties in interest with respect to a plan, specifically:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect -
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest; [or],
>
> * * * *
>
> (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan[.]

29 U.S.C. § 1106(a)(1).

153.    Defendants, as trustees and custodians of the Plans, are parties in interest with respect to the Plans. 29 U.S.C. § 1002(14)(A) (a party in interest with respect to a plan includes "any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian)").

154.    The Defendants, through their FX scheme, in their role as custodian/trustee caused the Plans to engage in FX trades with parties in interest with respect to the Plans, namely, the FX trading arm of Defendants themselves. These trades constituted an exchange of property between the Plans and parties in interest, and are thus prohibited by ERISA.

155.    On information and belief, Defendants' actions also caused the Plans to transfer plan assets to a party in interest with respect to the Plans, namely the FX trading arm of Defendants themselves, for the benefit of the party in interest. Specifically, Defendants facilitated the transfer of Plan assets in one currency to themselves, and used those assets for their benefit by taking excessive FX trading markups or markdowns in the course of exchanging them for a different currency.

156.     As a direct and proximate result of these prohibited transactions, the Plans and their participants suffered tens, if not hundreds, of millions of dollars of losses. Moreover, for the defined benefit plans in the Class, these losses increased the risk of non-payment of future benefits to participants.

157.     Pursuant to ERISA, Defendants must disgorge all fees paid them for the Plans' FX transactions, restore all losses suffered by the Plans from the prohibited transactions, and disgorge all profits earned on the fees paid by the Plans to Defendants.

## JURY DEMAND

158.     Plaintiff demands a trial by a jury of six (6) persons as to all claims triable by jury.

## IX.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a.       Declare that the Defendants breached their fiduciary duties under ERISA;

b.       Declare that the Defendants have violated ERISA's prohibited transactions provisions;

c.       Issue an order compelling a proper accounting of the FX transactions in which the Plans have engaged;

d.       Issue an order compelling Defendants to restore all losses caused to the Plans (or that will be caused to the Plans after the filing of this Complaint), including lost investment returns on money that would have been invested but for Defendants' illegal conduct;

e.      Issue an order compelling the Defendants to disgorge all fees paid to or incurred by the Plans (or that will be paid or incurred by the Plans after the filing of this Complaint), including any profits thereon;

f.      Order surcharge, equitable restitution, and other appropriate equitable monetary relief against the Defendants;

g.      Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to select or serve as custodian or trustee to the Plans;

h.      Order that this action be certified as a class action and that a constructive trust be established for distribution to the extent required by law;

i.      Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

j.      Award Plaintiff attorneys' fees and costs pursuant to ERISA, 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

k.      Award such other and further relief as the Court deems equitable and just.

Respectfully submitted,

BEINS, AXELROD, P.C.
KELLER ROHRBACK L.L.P.
MCTIGUE LAW LLP

Dated:      Seattle, Washington
            September 25, 2014

By: *Margaret E. Wetherald*

Lynn Lincoln Sarko *pro hac vice*
Derek W. Loeser *pro hac vice*
T. David Copley *pro hac vice mtn filed*
Margaret E. Wetherald *pro hac vice*
KELLER ROHRBACK L.L.P.
1201 3rd Avenue, Suite 3200
Seattle, WA 98101
Telephone: 206-623-1900
Facsimile: 206-623-8986
lsarko@kellerrohrback.com
dloeser@kellerrohrback.com
dcopley@kellerrohrback.com
mwetherald@kellerrohrback.com

David S. Preminger (DP 1057)
KELLER ROHRBACK L.L.P.
1140 Avenue of the Americas, Ninth Floor
New York, NY  10036
Telephone: (646) 380-6690
Facsimile: (646) 380-6692
dpreminger@kellerrohrback.com

J. Brian McTigue *pro hac vice mtn to be filed*
James A. Moore *pro hac vice*
MCTIGUE LAW LLP
4530 Wisconsin Ave, NW, Suite 300
Washington, DC 20016
Telephone (202) 364-6900
Facsimile: (202) 364-9960
bmctigue@mctiguelaw.com
jmoore@mctiguelaw.com

Jonathan G. Axelrod
(New York Bar Number: 2012029)
Regina M. Markey *pro hac vice mtn to be filed*
BEINS, AXELROD, P.C.
1625 Mass. Ave. NW
Washington, DC 20036
Telephone:  (202) 328-7222
jaxelrod@beinsaxelrod.com
rmarkey@beinsaxelrod.com

***Attorneys for Plaintiff***